## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

**STEVEN LONG** § <br>
§ <br>
**V.** §     **NO. 3:12-CV-839-P** <br>
§ <br>
**RICK THALER,** § <br>
**DIRECTOR** §

## PETITIONER, STEVEN LONG'S
## PETITION  FOR WRIT OF HABEAS CORPUS

Scott Smith <br>
State Bar Number 18688900 <br>
120 South Crockett Street <br>
P.O. Box 354 <br>
Sherman, Texas 75091-0354 <br>
e-mail: smithlaw@airmail.net <br>
Facsimile (903) 870-1446 <br>
Telephone (903) 868-8686

ATTORNEY FOR STEVEN LONG, PETITIONER

February 27, 2013

TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.    The Guilt/Innocence Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

             1.    The Night Before the Murder . . . . . . . . . . . . . . . . . . . . . . 5
             2.    The Search and Discovery . . . . . . . . . . . . . . . . . . . . . 6
             3.    The Subsequent Statements . . . . . . . . . . . . . . . . . 8
             4.    The Physical Evidence . . . . . . . . . . . . . . . . . . . . . 10
             5.    Mr. Long's Intoxication . . . . . . . . . . . . . . . . . . . . 12
             6.    Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       B.    Punishment Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

             1.    The Drive-By . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
             2.    Prison Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
             3.    Jail Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
             4.    Family History . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                   i      Aunt Dorothy . . . . . . . . . . . . . . . . . . . . . . . . . 18
                   ii     Sister Cindy . . . . . . . . . . . . . . . . . . . . . . . . . 22
                   iii.   Mother Judy . . . . . . . . . . . . . . . . . . . . . . . . 23
                   iv.    Mr. Long's Ex-Wife . . . . . . . . . . . . . . . . . . . 25

             5.    Anger Towards Women . . . . . . . . . . . . . . . . . . . . . 27
             6.    Mr. Long's Post-Arrest Statements . . . . . . . . . . . . 28
             7.    Kelly Goodness – Mitigation . . . . . . . . . . . . . . . . . 28

       C.    State Post-Conviction Hearing . . . . . . . . . . . . . . . . . . . . . . . 31

             1.    Dr. Daneen Milam . . . . . . . . . . . . . . . . . . . . . . . . . 31
             2.    Dr. Randall Price . . . . . . . . . . . . . . . . . . . . . . . . . 37
             3.    Toni Knox . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
             4.    Kelly Goodness . . . . . . . . . . . . . . . . . . . . . . . . . . 40
             5.    Paul Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
             6.    Dr. Laura Lacritz . . . . . . . . . . . . . . . . . . . . . . . . . 42
             7.    Request for Additional Time . . . . . . . . . . . . . . . . . 45

i

V.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Claim 1

      Mr. Long's Sixth Amendment right to counsel was violated when he
      received ineffective assistance of counsel as a result of his legal team's
      failure to adequately investigate and present mitigation evidence.  . . . . . . 46

      A.    The Legal Standard – Ineffective Assistance of
            Counsel and Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

            1.    Deficient Performance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
            2.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      B.    Mr. Long's legal team failed to adequately investigate
            and present mitigation evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . 52

            1.    General Lack of Thorough Mitigation Investigation . . . . . . . 52
            2.    Confusion Concerning the Mitigation Expert's Role . . . . . . . 53
            3.    Poor Presentation of Mitigation in Punishment Phase . . . . . . 56
            4.    Failure to Investigate Mr. Long's Brain
                  Damage, Mental Retardation and Post-
                  Traumatic Stress Disorder  . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Claim 2

      Mr. Long's Sixth Amendment right to counsel was violated when his
      legal team failed to adequately investigate and present evidence that he
      is mentally retarded and thus ineligible to receive the death penalty.  . . . . 70

Claim 3

      Mr. Long is mentally retarded and thus ineligible to receive the death
      penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      A.    Execution of the Mentally Retarded is Cruel and Unusual. . . . . . . . 70

      B.    Mr. Long is Mentally Retarded – Intelligence Testing. . . . . . . . . . 74

      C.    Effort Assessment; Malingering.  . . . . . . . . . . . . . . . . . . . . . . . . . . 75

            1.    Evidence Presented to the State Court. . . . . . . . . . . . . . . . . . 75

i.      Present Measures of Effort Do Not Work with MR
        Population. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
ii.     Consistency Means Accuracy. . . . . . . . . . . . . . . . . . . 78

        a.      Dr. Daneen Milam. . . . . . . . . . . . . . . . . 79
        b.      Dr. Randall Price. . . . . . . . . . . . . . . . . . 79
        c.      Dr. Laura Lacritz. . . . . . . . . . . . . . . . . . 80

iii.    Advanced Clinical Solutions (ACS). . . . . . . . . . . . . . 81

2.      There has been a Paradigm Shift in how psychologists Assess
        "Effort" with a Mentally Retarded Population.. . . . . . . . . . . . 83

D.      Adaptive Deficits.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

E.      Onset Prior to Age 18.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

F.      Failure to Raise and Present Mental Retardation Was Ineffective.  . 92

1.      No Procedural Bar. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
2.      Ineffective Assistance by Mr. Long's Counsel. . . . . . . . . . . 96

G.      Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Claim 4

        The failure of the Texas death penalty statute to inform jurors that  the
        effect of the  jury's failure to reach a unanimous verdict on any issue at
        the punishment phase of the trial would result in a life sentence violated
        Mr. Long's rights against cruel and unusual punishment and to due
        process of law under the 8th and 14th Amendments to the United States
        Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Claim 5

        Mr. Long's Eighth and Fourteenth Amendment rights were violated
        because the Texas death penalty statute impermissibly placed the burden
        of proving the mitigation issue on Mr. Long, rather than requiring the
        State to prove the absence of mitigating factors beyond a reasonable
        doubt.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Claim 6

        Mr. Long's right to Due Process of Law and his Eighth Amendment

right to be free from cruel and unusual punishment were violated by the failure to define the term "probability.". . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Claim 7

The State's failure to provide meaningful appellate review of the insufficient evidence to support the jury's verdict with regard to mitigating evidence violates the Eighth Amendment's prohibition against cruel and unusual punishment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

VI.    CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

APPENDIX OF EXHIBITS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

COMES NOW, Steven Long, currently confined on death row in the Texas Department of Criminal Justice, Institutional Division, who petitions this Honorable Court, pursuant to 28 U.S.C. sec. 2254, *et seq.*, to issue a writ of habeas corpus ordering that his sentence of death be vacated.  In support whereof, Mr. Long would show this Court as follows:

## I.

## **INTRODUCTION**

At the essence of Mr. Long's complaints is that he is a mentally retarded individual, who is therefore ineligible for the death penalty, and that his lawyers woefully failed to investigate and bring this evidence, and other mitigating evidence, before the jury.[1]

The state courts were presented with evidence that Mr. Long had been given four different intelligence tests administered by three different doctors at different intervals.  The marquee of all the test scores was their amazing consistency – 62, 63, 64 and 63 – all well below the normal cutoff for a diagnosis for mental retardation. Mr. Long has once again been tested with the gold standard, WAIS IV, and is continuing to test at a level consistent with mental retardation.  He consistently scores

---

[1]    In 2006, the American Association on Mental Retardation ("AAMR") changed its name to the American Association on Intellectual and Developmental Disabilities.  "Intellectual disability," rather than "mental retardation," is now the preferred terminology.  *See World's Oldest Organization on Intellectual Disability Has a Progressive New Name*, Am. Ass'n on Intellectual & Developmental Disabilities (Nov. 2, 2006), *available at* http://www.aamr.org/content_1314.cfm.  Also, recently enacted federal legislation known as Rosa's Law, Pub. L. No. 111-256, 124 Stat. 2643 (2010), mandates the use of the term "intellectual disability" in place of "mental retardation" in all federal enactments and regulations. Nonetheless, throughout this petition, the old terminology will be employed because the relevant legal sources use the terms "mental retardation" and "mentally retarded."

in this range because he is, in fact, mentally retarded and thus ineligible to be executed under prevailing 8th Amendment law.

Despite the very reasonable probability that the jury could have determined that Mr. Long was mentally retarded at trial, his defense team failed to even present the evidence or issue to the jury, clearly an ineffective representation. This application does not challenge Mr. Long's guilt.

## II.

## PROCEDURAL HISTORY

Mr. Long was indicted by a Dallas County Grand Jury for the offense of capital murder, alleged to have occurred on May 21, 2005. Mr. Long was convicted and sentenced to death on October 13, 2006.

An automatic appeal followed, and on April 8, 2009, the the Texas Court of Criminal Appeals affirmed the conviction and death sentence in an unpublished opinion.[2] A petition for rehearing was filed and denied on July 1, 2009.

State post-conviction proceedings were initiated while his direct appeal was pending. An evidentiary hearing was conducted and relief was denied on March 7, 2012.[3]

---

[2] *Long v. State*, 2009 Tex. Crim. App. Unpub. LEXIS 250 (Tex. Crim. App., AP-75,539, Apr. 8, 2009).

[3] *Ex parte Steven Long*, 2012 Tex. Crim. App. Unpub. LEXIS 201 (Tex. Crim. App., WR-76,324-01, Mar. 7, 2012).

2

# III.

## STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  Under AEDPA, a federal court may not grant habeas relief after an adjudication on the merits in a state court proceeding unless the adjudication of the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)

Section 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to exceptions in Section 2254(d)(1) and (d)(2).[4]  These two exceptions – the an "unreasonable application" prong and a "contrary to" prong – are overlapping but distinct exceptions.[5]

The Supreme Court has "made clear that the 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of petitioner's case."[6] "In other words, a federal court may grant relief when a state court has misapplied a governing legal

---

[4]    *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

[5]    *See, Terry Williams v. Taylor*, 529 U.S. 362, 404 (2000).

[6]    *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)(quotations omitted).

3

principle to a set of facts different from those of the case in which the principle was announced." *Id.* However, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable – a substantially higher threshold."[7]   Under § 2254(d)(2), "a federal habeas court must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[8]  "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' § 2254(e)(1)." *Id.* at 338–39.

Finally, where the state court did not decide the case on the merits, despite being offered an opportunity to do so, the AEDPA is inapplicable, and a *de novo* standard is appropriate.[9]

## IV.

## STATEMENT OF FACTS

Mr. Long was charged in a single, one-count indictment with capital murder of the decedent in this case, Kaitlyn Smith.  TEX. PENAL CODE § 19.03.  The offense was alleged to have occurred in the late evening of May 20, 2005, or early morning of May 21, 2005.  On his plea of not guilty, a jury was empaneled and the following evidence

---

[7]     *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[8]     *Rice v. Collins*, 546 U.S. 333, 338 (2006).

[9]     28 U.S.C. § 2254(d)*; Reed v. Quarterman*, 555 F.3d 364, 369-70 (5th Cir. 2009): *Rosales v. Dretke*, 444 F.3d 703, 707 (5th Cir. 2006).

4

adduced.[10]

A.    **The Guilt/Innocence Phase**

1.    **The Night Before the Murder**

Kenneth Edwards, the common law husband of Savannah Poynter's mother, Deborah Poynter, lived with Deborah and Savannah in Unit 33 of the trailer park north of Dallas.  (RR 26:62-63)  The Grants, Kaitlyn's parents, lived in a trailer across the street from Mr. Edwards.  (RR 26:65)  Savannah and Kaitlyn were friends.  (RR 27:55)  Shelley Grant knew Mr. Long and his children from the neighborhood because Mr. Long's mother lived across the street.  (RR 27:78-79)  Mr. Long had been a babysitter for neighborhood children.  (RR 27:68)

Mr. Edwards and Ms. Poynter met Mr. Long when he moved into the trailer park.  Edwards sold Mr. Long a pit bull that Mr. Long named "Pretty Boy."  (RR 26:63, 64; 27:55)  Edwards was disabled, which permitted him to remain at home and frequently "hang out" with Mr. Long playing chess and horseshoes.  (RR 26:64)

On May 15, 2005, Mr. Long moved out of his mother's trailer because of problems the two were having.  (RR 26:102)  Poynter and Edwards permitted Mr. Long to live in their trailer.  (RR 27:56)  Mr. Long was unemployed, and Poynter was trying to help him find a job.  (RR 27:57)

On May 20, 2005, Shelley Grant hosted a party.  Savannah and three of her friends went to a skating rink in the early evening, but returned home around 10:30

---

[10]    The Reporter's Record from the trial shall be referred to as "RR".  The Clerk's Record shall from the state court shall be referred to as "CR".  The record from the State post-conviction proceedings shall be referred to as "SH".  See, RR 26:12, 18.

p.m. (RR 27:57)  Kaitlyn and Savannah's friends planned to spend the evening at Savannah's home.  (RR 26:68)  Kailtyn's parents let her go to Edwards' home, and Savannah began playing with Kaitlyn once she arrived home.  (RR 27:58, 59)  Kaitlyn obtained permission to stay with Savannah.  (RR 27:60)  Prior to May 20, 2005, Kaitlyn had never spent the night with Savannah.  (RR 27:77, 78)

At the party, everyone was drinking beer and watching the basketball game. (RR 26:66)  Mr. Long was at the party, laughing, joking and cutting up.  (RR 26:67) Edwards went to bed between 1:00 a.m. and 2:00 a.m., while his wife stayed up with the Grants.  (RR 26:97; 27:61, 71)  Poynter had five or six beers between 10:30 p.m., when she brought the children home from the skating rink, and when she went to bed around 3 a.m.  (RR 27:59)  Edwards recalled that the girls were in Savannah's bedroom, playing with dolls.  (RR 26:69)  Edwards' room was on the opposite end of the trailer from Savannah's room.  (RR 26:69, 70)  Mr. Long's bedroom was adjacent to Savannah's.  (RR 26:72)  Edwards said that the acoustics in the trailer were such that he could not hear Savannah when she was in her room.  (RR 26:100)  Poynter recalled that, just before going to bed, she saw Mr. Long and he appeared to be "regular." (RR 27:62)  She did not recall hearing any noises that evening.  (RR 27:67)

## 2.     The Search and Discovery

At 10:00 a.m. the following day, May 21, Edwards and Poynter were awakened by the sound of the clothes dryer.  (RR 26:70; 27:63, 64)  Both Edwards and Poynter showered and then went into the living room where each saw Mr. Long.  (RR 26:71; 27:65)  When Poynter went to check on the girls, she found that Kaitlyn was missing.

(RR 26:73, 27:65)  When Mr. Long heard this, he left fairly quickly, but returned a short time later and said that he had found some glasses in the grass.  The glasses were Kaitlyn's.  (RR 26:73; 27:65-66)

Edwards went to Kaitlyn's home to return the glasses, only to find that she was not there either.  (RR 26:74)  When her husband showed her the glasses, Mrs. Grant knew immediately that something was wrong.  (RR 27:80)  At that point, everyone began searching for Kaitlyn, including Mr. Long.  (RR 26:74-75)  Mr. Long attempted to get Edwards to search out by a pond in a wooded area behind the trailer park.  (RR 26:76)

Jack Holder, the grandfather of Kaitlyn Smith, received an emergency telephone call around 10:00 a.m. that his granddaughter was missing.  (RR 26:39, 40, 42, 43)  He immediately drove over to his daughter's home and began assisting in the search.  (RR 26:43, 44)  He noticed that the skirt around the base of Unit 24 had been pulled open.  (RR 26:45)  Holder crawled through the opening to search under the trailer, where he saw a bulky object that he first thought was a roll of tar-paper.  (RR 26:46)  As he approached, he discovered that it was his granddaughter and that she was dead.  He crawled out of the opening and notified the police.  (RR 26:48)  When Kaitlyn's body was found, Mr. Long fell to his knees, crying, "No, No, No!"  (RR 30:27, 28)

Officers Ochoa and Epple responded to the trailer park call around 1:00 p.m. on May 21, 2005.  (RR 26:59)  Epple crawled under the trailer to locate Kaitlyn's body.  (RR 26:107).  The skirt panels of the trailer were fingerprinted and Mr. Long's

7

bloody fingerprint was found on one of the skirts.  (RR 26:115)  Photographs of the crime scene were taken.  (RR 26:108)  Epple took photographs of the crime scene and photographed the mattress from Mr. Long's room, but did not check the underside at that time.  (RR 26:115, 120)  He also seized a metal cord found near the body, and the cord was submitted for DNA testing.  (RR 26:111, 122)  Blood also was found on the dryer and a detergent bottle nearby.  (RR 27:64)

### 3.    The Subsequent Statements

John Davison, the lead detective, testified that he arrived at the crime scene around 1:35 p.m. on May 21, 2005, where he met Mr. Long.  (RR 26:150-52)  Ultimately, Mr. Long consented to provide a buccal swab for DNA testing at the station, and Officer Ochoa collected a buccal swab from Mr. Long.  (RR 26:60, 153)  Shortly thereafter, Mr. Long became a suspect and was "Mirandized."  (RR 26:154, 155)

Officer Davison questioned Mr. Long from 7:00 p.m. to 11:45 p.m. with intermittent breaks.  (RR 26:156, 157)  That evening, Mr. Long was provided a meal and the right to use the restroom.  (RR 26:157)  Davison believed Mr. Long was not under the influence of alcohol or drugs, and observed that he had no trouble communicating, although Mr. Long was often agitated and sometimes cried uncontrollably during the interview, so much so that Detective Sanders had to rub Mr. Long's back to calm him down.  (RR 26:160, 162-63)  Davison even admitted to having prayed with Mr. Long.  (RR 26:165)  Davison encouraged Mr. Long to make a statement by suggesting that, "It must have been something bad inside that [Long]

8

was not responsible for." (RR 26:168)   Davison recalled that the only two incriminating statements made by Mr. Long were to the effect of, "Pretty Boy, why did you do that to her?" (RR 26:177)   The interview was not recorded because, at the time of the interview, the police department did not have the capacity to make recordings. (RR 26:170)

Paul Ellzey, a Dallas homicide detective, was brought into the case around 1:00 a.m. on May 22, 2005. (RR 26:182)   He agreed to attempt to obtain a statement from Mr. Long. (RR 26:183)   Ellzey purposely limited the amount of information given to him prior to the interview to avoid tainting the investigation. (RR 26:184)   Ellzey recalled that Mr. Long was sober and lucid. (RR 26:185)   Ellzey "Mirandized" Mr. Long and then took a statement dictated by Mr. Long. (RR 26:186)   Mr. Long cried during the interview. (RR 26:205)   The statement was introduced into evidence as Exhibit 114. (RR. 26:189)

In the statement, Mr. Long admitted that he had been drinking and watching the Dallas Mavericks game and was pretty drunk.   After 4:00 a.m., he saw Kaitlyn enter the bathroom.   According to Mr. Long, "Pretty Boy" grabbed her, choked her with a cord, and hit her with his fist.   Mr. Long went out and smoked a cigarette.   "Pretty Boy" put her in a trash bag and put her under that house. (RR 26:191)   "Pretty Boy" took a shower, washed the blanket, and flipped the mattress over. (RR 26:191)

According to Ellzey, a suspect in the investigation of a heinous offense often speaks in the third-person as Mr. Long did in this case. (RR 26:200-02)   Ellzey remembered that Mr. Long insisted on adding the final sentence that, "Pretty Boy is

9

an evil mother fucker." (RR 26:207-09)

After Ellzey obtained a written confession from Mr. Long, Davison formally charged Mr. Long with capital murder. (RR 26:160) On re-direct examination, Ellzey testified that, after the interview, the police returned to the trailer, flipped the mattress over, and found blood on the mattress as described in Mr. Long's written statement. (RR 26:216)

### 4.   The Physical Evidence

Joani McClain, a Deputy Chief Medical Examiner for Dallas County, performed the autopsy on Kaitlyn Smith. (RR 26:125-27) She noted bite marks on Kaitlyn's face and buttocks, with bruising on the scalp and the lips. (RR 26:127, 132, 133) She also noted strangulation injuries. (RR 26:130) The strangulation marks were very deep and would have required extensive force. (RR 26:132) The bruising on the chest, arm, hands, and legs were consistent with injuries sustained by someone trying to fend off an attack. (RR 26:133) There were extensive blunt force injuries to Kaitlyn's pelvic region, of greater magnitude than any the medical examiner had ever seen before. (RR 26:135) It was the medical examiner's opinion that Kaitlyn died from strangulation by use of a cord. (RR 26:137) However, the exact instrument could not be determined. (RR 26:137-38) In her opinion, had Kaitlyn not been strangled, she would have died from the injuries to her pelvic region. The medical examiner was also certain that there had been penetration of her anus and vagina. (RR 26:138) The defense asked no questions of the medical examiner. (RR 26:149)

Detective Ken Sanders of the Dallas Police Department testified that he

10

returned to the trailer around 4:00 a.m. on May 22, 2005, flipped the mattress over and found wet blood stains. (RR 26:218, 219) It appeared that someone had attempted to clean the blood stains. (RR 26:220)

Dr. Robert Williams, a dentist, had worked at the Dallas County Medical Examiner's office since 1990 as a forensic odontologist. (RR 27:8-9) In that capacity, he had helped to identify numerous bodies by bite-mark comparisons. (RR 27:10, 11) On May 27, 2005, he took impressions from Mr. Long. (RR 27:14, 15) He then conducted comparisons with the bite marks found on Kaitlyn's body. (RR 27:16, 17) Mr. Long's bite was distinctive because he is missing a front central tooth and has four artificial teeth. (RR 27:20) Williams looked at three bite marks – two on the buttocks and one on the right cheek. (RR 27:24-26) Although he could not match two of the bite marks, the bite mark on the right cheek was positively Mr. Long's. (RR 27:27; 28:34, 35) Tara Johnson, a forensic biologist from SWIFS, performed a DNA analysis on several items. (RR 27:38-41) Comparisons were made to two of the bite marks on Kaitlyn's body. (RR 27: 41) Mr. Long's DNA was identified in two of the bite marks on Kaitlyn's body. (RR 27:43) She also compared the blood found on the trailer skirt and identified that blood as coming from Kaitlyn. (RR 27:45, 46) Finally, she compared the blood from the mattress stains and found that it matched Kaitlyn's, as well. (RR 27:48-50)

### 5.   Mr. Long's Intoxication

Much of the examination at the guilt/innocence phase and the defense case focused on Mr. Long's intoxication the evening of May 20.  Edwards recalled Mr. Long drinking beer as well as a mixed drink.  (RR 26:90)  Edwards did not feel that Mr. Long was intoxicated, but recalled Mr. Long complaining of a hangover.  (RR 26:92, 101)   Likewise, Poynter remembered Mr. Long leaving with two girls sometime during the evening.  (RR 27:70)  When Mr. Long returned, she did not notice any difference in his demeanor.  (RR 27:70)  Mrs. Grant said that Mr. Long appeared to be normal.  (RR 27:79)

Edwards did not recall anyone consuming drugs, although he had seen Mr. Long smoke marijuana with a girl named "Crystal" on a previous occasion. Edwards admitted that he had taken Mr. Long to purchase some marijuana earlier that evening. (RR 26:94, 95)  Edwards denied ever seeing Mr. Long use methamphetamine.  (RR 26:95)

Edwards remembered that Crystal and a girl named "Saprina" left with Mr. Long at some point during the evening, possibly around 11:00 p.m.  (RR 26:93-94) Mr. Long was acting differently after returning with the girls.  (RR 26:95, 96)  He seemed a little more excited, giddy and happy, but not intoxicated.  (RR 26:96)

 Saprina Lara, a 19-year-old, testified that she had known Mr. Long for about two years.  (RR 27:84-85)  Around 8:00 p.m. or 9:00 p.m., Lara and Crystal McEvoy went to visit Mr. Long and smoked methamphetamine and marijuana.  (RR 27:88, 89) They consumed these drugs in Mr. Long's room in the trailer.  (RR 27:88, 89)  They

left around 11:30 p.m.  (RR 27:90)  Mr. Long was drinking rum as well.  (RR 27:90)

Lara eventually went to sleep on the floor of a mutual friend's house.  (RR 27:93)

Lara testified that methamphetamine made people paranoid.  (RR 27:87)

In rebuttal, the State called Crystal McEvoy, another teenager.  (RR 27:97)  She

testified that she had been contacted as a witness a few hours before testifying in

Court.  (RR 27:98)  She remembered seeing Lara and Mr. Long on the day of the

murder.  (RR 27:99)  She recalled wanting to party with some methamphetamine.

(RR 27:99)  They went to the trailer where Mr. Long was around 8:30 p.m. or 9:00

p.m.; however, Mr. Long did not have any drugs.  (RR 27:101)  They attempted to

smoke residue in a glass pipe.  (RR 27:101, 102)  They did step outside of the trailer

and smoked one marijuana joint with Mr. Long before leaving.  (RR 27:102)  She

recalled that Mr. Long was a little bit drunk.  (RR 27:103)  She recalled that, just

before leaving, she saw the girls returning from the skating rink.  (RR 27:105)

Kimberly Lara, Saprina's mother, testified that after midnight on May 21, 2005,

she went to the trailer where Mr. Long was looking for her daughter.  (RR 27:106-07)

Mr. Long got into the passenger side of the car and asked her if she wanted to spend

the night.  (RR 27:108)  He had been drinking.  (RR 27:108)  She did not recall him

acting crazy.  (RR 27:109)  She acknowledged that Mr. Long was drunk.  (RR 27:111)

She also acknowledged that Saprina, her daughter, had told her that they had smoked

methamphetamine.  (RR 27:111, 112)

### 6.   Verdict

Outside of the jury's presence, Mr. Long declined to testify.  (RR 27:114-18)
The defense argued that the medical examiner's testimony was ambiguous concerning
the cause of death.  (RR 28:27-30)  The jury sent out a note regarding the medical
examiner's report.  In response and over defense's objection, the judge sent Exhibit
74, the Autopsy Report, back to the jury.  (RR 28:39, 40)  The jury returned a verdict
of guilty.  (RR 28:40, 41)

### B.   Punishment Phase

Although there were relatively few contested issues concerning guilt, each side
produced a variety of evidence relevant to sentencing issues. These are grouped as
prior convictions for a drive-by shooting; prison conduct; jail conduct; family history;
assaultive conduct and mitigation expert testimony.

### 1.   The Drive-By

Michael Garcia testified that in 1991 he committed a drive-by shooting with
Mr. Long and received a probated sentence. (RR 29:82) On May 1, 1991, Garcia saw
Mr. Long and asked him to drive to the beer store.  (RR 29:85)  Mr. Long said,
"Okay," but told Garcia to bring his gun.  (RR 29:86)  Mr. Long alleged that a street
gang called the "East Side Locos" were after him.  (RR 29:86)  They drove to a nearby
apartment complex in Mesquite, Texas, where Garcia shot at a group of people from
the car.  (RR 29:88)  On the way home, Mr. Long asked Garcia to give him Garcia's
gun.  (RR 29:89)  The police tracked Mr. Long down through the license plate on the
vehicle.  (RR 29:90).  On cross-examination, Garcia admitted that he knew Mr. Long

had turned him in for the shooting.  (RR 29:94, 95)  When Garcia was in prison, he met Mr. Long at one of the units.  (RR 29:91)  Garcia denied threatening Mr. Long at that time on account of the incident.  (RR 29:97)  The State introduced Mr. Long's probation file and his conviction record for the drive-by shooting.  (RR 29:101)

### 2.  **Prison Conduct**

Howard O'Connor, an employee of Texas Department of Criminal Justice, testified that he worked at the French Robertson Unit in Abilene, Texas.  (RR 29:103-04)  On January 27, 1997, he received word that some of the inmates were going to retaliate against the guards because a guard had seriously injured an inmate the day before.  (RR 29:108, 110-12)  Most of the inmates were in the recreational yard, but a few were getting haircuts in one of the buildings.  (RR 29:113-15)  Around 7:00 p.m. a number of inmates rushed the door to the building where the haircuts were being given.  (RR 29:116, 117)  The inmates jumped the desk and began assaulting the officers.  (RR 29:118)  Mr. Long was among the twenty-five inmates in the charge.  O'Connor could not say if Long specifically assaulted him.  (RR 29:118-20)  The inmates were apparently intent upon getting Officer Gonzales, whom they held responsible for the previous day's injury.  (RR 29:121, 122)  Eventually, security gassed the inmates in order to restore order.  (RR 29:122, 123)

On cross-examination, O'Connor admitted that, of all the people present, he was the only person to say that Mr. Long was involved.  (RR 29:130)  Further, he only mentioned Mr. Long as being one of the persons to enter the building.  (RR 29:132)  O'Connor could not recall Mr. Long ever getting written up for any violent activity.

(RR 29:136)  After this incident occurred, Mr. Long was placed in administrative segregation in the Robertson Unit and, while under that security, was still written up for illegally obtaining tobacco.  (RR 29:150, 151)  The State introduced Exhibit 149, two volumes of prison records concerning the riot in which Mr. Long allegedly participated.

The State also introduced Mr. Long's medical and disciplinary records (RR 29:158, 159)  Among the disciplinary problems noted were soliciting contraband from an officer, failing to work, failing to obey an order, and seven incidents of masturbating before female guards.  (RR 29:160-61)  Finally, he was disciplined for tampering with his restraints.  (RR 29:164)

Robert Romero, Jr., a prison guard, testified that on May 30, 2002, at the Montford Unit, a psychiatric facility, he was working with inmates arriving on the transport vans.  (RR 29:165, 166)  When he noticed Mr. Long in the van, he saw that Mr. Long had removed some of his restraints.  (RR 29:171)  Romero had never seen an inmate out of restraints before and found the incident disturbing.  (RR 29:172)  He did acknowledge that Mr. Long was compliant and caused no trouble.  (RR 29:173)

On cross-examination, Romero admitted that guards receive special instructions concerning inmates known to be violent.  Mr. Long was not one of those inmates.  (RR 29:178, 179)  Romero had no idea why or how long Mr. Long had been out of the restraints.  (RR 29:180, 181)  He conceded that it was possible that the locks had simply malfunctioned.  (RR 29:181)  Romero further acknowledged that he was at the Montford Unit for seven months and was aware of no other incidents.  (RR 29:192,

193)

Manuel Gonzales was another guard who helped transfer Mr. Long to the Montford Unit.  He tested the restraints on Mr. Long before the trip started.  (RR 29:198) The locks were working at that time.  (RR 29:199) He could not explain how Mr. Long got out of the locks.  Mr. Long was strip-searched and no key was located. He also acknowledged that Mr. Long was a good inmate in dealing with him.  (RR 29:202, 203)

Anthony Hogan met Mr. Long in prison.  (RR 30:211-12)  The prison was full of gangs.  (RR 30:213)  He thought Mr. Long was a "prison girl,"  meaning he was gay and weak.  (RR 30:215-16)  He protected Mr. Long in return for sex.  (RR 30:220)  Mr. Long became a female impersonator and Hogan would fight Mr. Long's fights for him.  (RR 30:221-23)  Hogan confessed that he was able to obtain drugs, even in prison, and that prisons employ female guards.  (RR 30:235-36)

### 3.    Jail Conduct

Virginia Jennings, a Dallas Sheriff's Office jail guard, testified that on July 15, 2005, at 7:20 p.m., Mr. Long masturbated in front of her.  (RR 29:230, 231)  She felt he was trying to scare or intimidate her.  (RR 29:232, 233)  When she had other officers escort him away, he laughed about it.  (RR 29:234)  She recorded at the time that Mr. Long had a "mean spirit," although she did not recall any other problems with Mr. Long.  (RR 29:235, 237-38)

Kacey Robinson, an inmate at the Wilmer Drug Treatment Center, testified that she was brought to court from the jail on August 22, 2005.  (RR 29:239)  While in the

holding cell, she saw Mr. Long masturbating.  (RR 29:240)  She could even see a tattoo on his back that said, "Breana."  (RR 29:241)  She recalled Mr. Long yelling at her, "Hey, look at this, little mama."  (RR 29:243)  In return for her report, the District Attorney placed her in the drug treatment program.  (RR 29:244, 245)

### 4.   Family History

Mr. Long's history primarily came from four family members: his mother, sister, aunt and ex-wife.

### i.   Aunt Dorothy

Dorothy Hutson is Mr. Long's aunt, the sister of his mother, Judy.  (RR 30:29-30)  Both girls were raised at Buckner Baptist Children's Home after their father sexually abused them.  (RR 30:30)  They were molested for several years before reporting it to their step-mother. (RR 30:31, 32) Their father was convicted and spent 25 years in the penitentiary.  (RR 30:33)  Their stepmother could not support them, and they were sent to Buckner Baptist Children's Home.  (RR 30:34)  In the orphanage, Dorothy was separated from her sister.  (RR 30:35)  They did not have a sponsor, so they were not allowed to leave the home.  (RR 30:35, 36)  Because they had accused their father of incest, their family shunned them.  (RR 30:36)  The family wanted to blame the incest on their brother, but the girls refused.  (RR 30:37)  They tried to run away several times, but they were caught.  (RR 30:38)  On cross-examination, Dorothy said that she had been able to overcome her childhood.  (RR 30:76)

Judy got married immediately after leaving the orphanage.   She was

promiscuous.  (RR 30:40).  Ronny Long, the father of her daughter, left them when Long was young.  (RR 30:43)  He was caught having affairs and they got divorced. Judy never had any friends in her life.  (RR 30:44, 45)  She drank a lot and got into bar fights.  (RR 30:40)  She spent some time at Terrell State Hospital.  (RR 30:41) She had to give her first son up for adoption.  (RR 30:42)  She tried to commit suicide on several occasions by jumping from moving cars.  (RR 30:42)

Mr. Long's father is Steve Ramon.  (RR 30:45)  Dorothy only met him once. (RR 30:45)  Dorothy was financially supporting Judy when Mr. Long was born.  (RR 30:46)  Judy admitted leaving the children in the car while going drinking at bars. (RR 30:96)  Dorothy did not want to make her sister look bad.  (RR 30:98)  She felt that her sister did the best she could with the children.  (RR 30:98)

When Mr. Long was young, Judy got a job at Sea Blue Corporation and became a workaholic.  (RR 30:47)  According to Dorothy, once Judy began working, she did well with the children.  (RR 30:47)  When the company moved to St. Louis, Missouri, Judy would travel back and forth.  (RR 30:48)  The family moved around quite a bit. (RR 30:49)  After Judy's father got out of prison for sexually abusing her, she and the children moved in with him.  (RR 30:49)

Dorothy did not recall Judy having drugs or alcohol in her home.  (RR 30:51) Dorothy admitted Judy was not affectionate towards her children and that Mr. Long never had a role model.  (RR 30:66)  Dorothy recalled taking Mr. Long to movies and roller-skating.  (RR 30:55)  His sister Cindy raised Mr. Long when Judy worked full time, although Cindy herself is emotionally unstable.  (RR 30:100)

As a practical matter, Cindy was responsible for raising Mr. Long from the age of 10. (RR 30:53) She became pregnant at age 14, and began using drugs. (RR 30:53) After she became pregnant, Mr. Long was left by himself. (RR 30:54) He became involved in the drive-by shooting at age 17. (RR 30:55) Mr. Long's mother did not know how to discipline him, and the household was filled with arguing and cussing. (RR 30:56) Dorothy, however, did not see Judy physically abuse Mr. Long. (RR 30:81) When Mr. Long was 15 years old, his mother took him to Parkland to see a psychiatrist. (RR 30:83)

Dorothy visited Mr. Long in prison on several occasions, and she took Mr. Long's children to visit him in prison, as well. (RR 30:57-58, 65) She was also aware that Mr. Long was in a mental facility in the prison for several months. (RR 30:63) Mr. Long learned to read and write while in prison. (RR 30:83) By the time Mr. Long was released from prison, he was 25 years old, had lost his teeth and was on anti-depressants. (RR 30:58, 66) According to Dorothy, prison made Mr. Long much more angry and belligerent. (RR 30:67)

When Mr. Long was released from prison, he went to live with his mother, his sister and her husband. While Mr. Long was in prison, his sister and her children became heavily involved in drugs. (RR 30:60) His mother helped him get a car and a job, but they fought constantly. (RR 30:67, 68)

At one point, Dorothy had given Judy a key to her house to avoid Mr. Long because Judy was afraid of him. (RR 30:84) Mr. Long had pulled a knife on Judy once. (RR 30:67, 68) Although she knew that Mr. Long could not hold a job, she did

20

not know why.  (RR 30:64)  Mr. Long, his sister and his nephew had heavy drug problems at the time.  (RR 30:69)  Mr. Long became jealous that his mother, Judy, was allowing his nephew, Sam, to live with them.  (RR 30:70)  Judy kicked Mr. Long out of the home for using drugs and alcohol.  Mr. Long then went to live with his cousin, who was also using drugs.  (RR 30:71)  Dorothy thought Mr. Long was scary when drunk.  (RR 30:71)   Mr. Long never bonded with his son, but did to some extent with his daughter.  (RR 30:65)

Dorothy did not see Mr. Long for almost a month before Kaitlyn's death.  (RR 30:73)  Mr. Long called her after the offense and told her what happened.  (RR 30:74)  On May 21, 2005, Mr. Long called her and told her that they had found a dead girl, and she knew immediately that Mr. Long was responsible for it.  (RR 30:93)  Dorothy thought Mr. Long had emotional problems, but was not crazy.  (RR 30:93)  She never knew him to have an alter-ego.  (RR 30:93)  Mr. Long told Dorothy that all he remembers about the murder was seeing red.  (RR 30:94)

Dorothy did not know much about Mr. Long's criminal history.  (RR 30:85-88)  She knew that Mr. Long abused his wife, Olga, physically.  (RR 30:57)  Dorothy witnessed Mr. Long once holding his daughter in an inappropriate manner in the swimming pool.  (RR 30:90)  At another time, Judy found Mr. Long and his daughter in the bedroom.  (RR 30:91)  Mr. Long typically called all women "bitches."  (RR 30:91)

### ii.   **Sister Cindy**

Cindy Blakenship, Mr. Long's sister, did not want to testify.  (RR 30:102-03).
She recalled her mother leaving her and Mr. Long in the car when she went drinking.
(RR 30:104)  She had to take care of Mr. Long because her mother worked all of the
time and her father was never around.  (RR 30:105)  She and Mr. Long did not do well
in school.  (RR 30:106)  She began drinking and using drugs at age 12.  (RR 30:107)
Her mother bought beer for Cindy and her friends when she was in the seventh grade.
(RR 30:107)  She and Mr. Long both had ADD and were put on medication.  (RR
30:107, 108)  She was responsible for feeding and taking care of Mr. Long.  (RR
30:108)  She moved out of the house at the age of 15 and lived with her boyfriend.
(RR 30:110)  Mr. Long never had any friends growing up.  (RR 30:111)  They would
get spanked for making "F's" in school.  (RR 30:111)  She recalled that when she
argued with her brother, her mother would threaten to take her to an orphanage.  (RR
30:133)  While she was left alone with Mr. Long, she and her friends would smoke
marijuana and get drunk.  (RR 30:134) After she moved out, Mr. Long began to run
with a gang.  (RR 30:112)

For several years, Cindy did not keep in touch with Mr. Long because she was
using drugs.  (RR 30:113) According to Olga González, Mr. Long also had a volatile
relationship with his sister.  Nevertheless, she visited Mr. Long in prison.  (RR
30:114)   When Mr. Long was released from prison, he started using
methamphetamine, crack and marijuana.  (RR 30:116)  She used to do drugs with Mr.
Long and his girlfriend, Mindy.  (RR 30:118)  She and Mr. Long moved in with his

22

grandfather.  (RR 30:119, 120)  She knew Mr. Long was kicked out of his mother's trailer for refusing to work.  (RR 30:120)  She went to visit Mr. Long on May 21, 2005, but saw all of the news crews and found out he was in jail.  (RR 30:121)

### iii.   **Mother Judy**

Judy Long, Mr. Long's mother, was molested as a child at age four or five by her father.  (RR 30:140)  Her mother died when she was four years old and, as a result of her father's imprisonment, Judy became a ward of the State. (RR 30:140)  Judy was angry as a child, and as she grew older she drank and fought a great deal, and eventually tried to commit suicide several times.  (RR 30:141-43)  At 18 she was committed to a mental institution.  (RR 30:143)

Judy put up her first child for adoption.  (RR 30:142)  That child was the result of meeting a man at a nightclub.  (RR 30:142)  She was married to Ronnie Long, the father of her second child, Cindy, for 11 years.  (RR 30:144) Mr. Long was born in 1971.  His father was Steven Ramon, a man she had met at a bar while still married to Ronnie Long.  (RR 30:139)  Ronnie did not help in raising either of the children. (RR 30:144)  At one point, Steven Ramon asked to raise Mr. Long, but she refused the help, despite the fact that she was not really "together," and was not in a position to raise children on her own.  (RR 30:147)

Judy moved in with her father after he got out of prison for molesting her as a child.  (RR 30:157)  She moved out again after her father, incredibly, tried to have sex with her again.  (RR 30:158)

She turned her life around at age 26.  (RR 30:197)  Thereafter, she worked 40

to 50 hours a week.  (RR 30:150)  The children had to take care of themselves from that point.  (RR 30:150)  She admitted never taking the children to church.  (RR 30:188)  She was not aware that her daughter used marijuana until age 15.  (RR 30:154)  She allowed the children to drink at age 14.  (RR 30:155)  She admitted to having thought often of putting the children in an orphanage because of her residual anger.  (RR 30:159)

Even in kindergarten, Mr. Long's teacher said he exhibited unusual anger.  (RR 30:152)  Mr. Long was in special education; he did not successfully complete the fourth grade, and never went past the eighth grade, despite being "socially promoted." (RR 30:49,151-53)

After his sister Cindy moved out, Mr. Long's life started to take a downward spiral.  (RR 30:159)  He was arrested for shoplifting and suffered from anxiety attacks.  (RR 30:160)  He joined a street gang called "Beastie Boys."  When Mr. Long misbehaved at school, his mother would whip him.  (RR 30:190)  His mother tried to get him to see a psychologist, but he refused.  (RR 30:162)

The State admitted records of Parkland Hospital as Exhibit 135.  (RR 29:8) One page of the exhibit referred to Mr. Long as a 15-year-old with homicidal and suicidal tendencies.  Mr. Long would not attend school, and had a heavy drug abuse problem, with drugs including marijuana, heroin, barbiturates, speed, tobacco and alcohol, according to the Parkland records.  (RR 29:8, 9)  Judy remembered that the psychologist said that Mr. Long was going to hurt or kill someone one day.  (RR 30:194)

24

Olga González, Mr. Long's ex-wife, knew that Mr. Long did not have a close relationship with his mother. (RR 29:43) Olga knew Mr. Long's mother as a caring person. (RR 29:51) She was also very hard-working, and, although Mr. Long argued with her, she did not turn her back on him. (RR 29:52,55)

After Mr. Long got out of prison, he was a violent drunk. (RR 30:174) Mr. Long pulled a knife on his mother once. (RR 30:175)

Sam, Mr. Long's nephew, and Mr. Long fought all of the time. (RR 30:177) His mother asked Mr. Long to leave her home on May 21, 2005, after he threatened to beat up Sam. (RR 30:176, 180, 181). Mr. Long was angry that Sam was allowed to stay in the trailer and he was not. (RR 30:183)

### iv.    Mr. Long's Ex-Wife

Olga González was the mother of two of Mr. Long's children, Breana, age 14, and Christopher, age 12. She and Mr. Long had a common law marriage in the early 1990's. (RR 29:11) Cindy, Mr. Long's sister, thought Mr. Long had a good relationship with Olga at first, but the marriage worsened after they started having children. (RR 30:112)

Mr. Long drank a lot and would become more physically abusive when drunk. (RR 29:32) He also used cocaine. (RR 29:33) Mr. Long was jealous, and would get angry over various things, for example, the meals she cooked. (RR 29:14) When he got angry, he would slap or hit her in the face. (RR 29:14) She also testified that if she would not agree to have sex, he would beat her. (RR. 29:23) Mr. Long did not like the children crying and would get angry with Olga if they did, to the point of

punching holes in the wall.  (RR 29:24, 25)  One time he became angry with her about her clothing and began hitting her while she was sitting in her car.  (RR 29:16)  He hit her so hard that she had a miscarriage.  (RR 29:18, 19)  Afterwards, Mr. Long apologized.  (RR 29:19, 20)  Even after that, he would grab her by her neck or punch her in the face and became very verbally abusive.  (RR 29:20, 21).  After these episodes, he would always apologize.  (RR 29:21, 22)  She recalled that when she was pregnant with Christopher, Mr. Long threatened her with a knife.  (RR 29:26, 27)

According to González, even Mr. Long's mother was concerned for Olga's safety.  (RR 29:21, 22)  Judy was aware of Mr. Long's abuse toward his wife.  She saw bruises on Olga from Mr. Long hitting her.  (RR 30:164)  Olga was afraid to call the police on him.  (RR 29:24, 25)  Shortly after Christopher was born in 1994, Olga left Mr. Long.  (RR 29:27)

Mr. Long was placed on probation for attempted murder involving a fight with Olga.  (RR 29:28)  The probation was revoked and he was sent to the penitentiary in 2002.  After he was released from the penitentiary, Olga refused to tell him how to contact her.  (RR 29:29)  The physical and mental abuse caused González to have nightmares.  (RR 29:35)

Although Mr. Long had several jobs, he was not capable of retaining them for very long.  He was often fired for failing to show up for work.  (RR 29:31)  González felt that he could have kept a job if he had wanted to do so, but felt that Mr. Long was lazy.  (RR 29:39, 54)

All in all, González felt that Mr. Long was a normal person.  (RR 29:40)  She

26

did not consider Mr. Long to be mentally unstable or crazy.  She never heard him refer to himself in the third-person. (RR 29:33, 34)

### 5.   <u>Anger Towards Women</u>

Melanie Gorham testified that she lived in Farmersville, Texas in 2003.  Her two children became friends with Mr. Long's niece and nephew.  (RR 29:207)  She met Mr. Long through his sister, Cindy.  She had a short relationship with Mr. Long and thought he was a nice guy.  (RR 29:208)  However, she said that Mr. Long became increasingly abusive in their sex life.  (RR 29:209)  Oftentimes, he would use other objects or engage in anal sex against her wishes.  (RR 29:209)  One time he sexually assaulted her with a shampoo bottle.  She acknowledged that alcohol would make him angry.  (RR 29:211)  Still he would become physically abusive if she would not give him money.  (RR 29:212)  Toward the end of their relationship, she stated that Mr. Long drugged her and took her to Oklahoma, where he and another friend named "Jerry" had sex with her.  (RR 29:213, 214)  The next morning she went to see a doctor because she was bleeding anally.  (RR 29:214)  She did not recall any evidence of Mr. Long having a split personality or hearing voices.  (RR 29:214, 215)

 She recalled that Mr. Long used drugs and would become angry when he did so.  (RR 29:216)  She also recalled that Mr. Long did not get along well with his family.  (RR 29:217)  She stayed in the relationship only because she was afraid to leave him.  (RR 29:220)

Amber Holmes, an 18-year-old, met Mr. Long at a Waffle House in Mesquite, Texas.  (RR 29:223)  Although she had a sexual relationship with Long, she only did

so because she was pressured into it.  (RR 29:225)  She recalled being forced into having oral and vaginal sex with him against her will.  On one occasion, the intercourse caused her to bleed.  (RR 29:226)  As a result of their relationship, she lost interest in having sex.  *Id*.

### 6.      **Mr. Long's Post-Arrest Statements**

The defense called Kenneth Edwards.  He received telephone calls from Mr. Long while he was in jail.  (RR 30:18)  One of the telephone calls was taped.   (RR 30:19)  The tape was played for the jury.  (RR 30:22)  On the tape, Mr. Long indicated that he was drunk that night.  (RR 30:22)

### 7.      **Kelly Goodness – Mitigation**

The defense called Dr. Kelly Goodness to testify in mitigation.  Goodness testified that she reviewed Mr. Long's prison records, psychological records, criminal justice records, family records, and interviewed several family members.  (RR 31:15-17)  Based on that, her opinion was that Mr. Long lacked any true capacity to relate to other people.  (RR 31:20)

According to Goodness, Mr. Long is filled with self-loathing, is chronically angry and does not see other people as having value.  (RR 31:21)  He also exhibits anger toward women.  (RR 31:21)  He perpetually feels disrespected and experiences frustration and rage as a result.  (RR 31:22)  He lacks normal inhibitions and is highly impulsive.  (RR 31:23)  Goodness could not tell if Mr. Long has an organic brain problem or brain injury, but his mother's intelligence is much lower than average and he did not score well on his neuro-psychological testing.  (RR 31:25)  Some of Mr.

28

Long's problems may be related to chronic alcohol and substance abuse.  (RR 31:26)

She also noted that Mr. Long comes from an incredibly dysfunctional family. (RR 31:27)  His biological father had multiple convictions for sex crimes, and he had never met his biological father prior to trial.  (RR 31:27)  His grandfather was convicted of raping his daughters.  (RR 31:28)  He grew up in an anti-social environment without a male role model.  (RR 31:32)  Mr. Long discovered that he had a half-brother when they were placed together as roommates in prison and figured out that they were related.  (RR 31:28)  His mother has a long criminal history of assaults and bar fights.  (RR 31:29)  Like Mr. Long, his mother has a detachment disorder and cannot relate to other people.  (RR 31:42)  Although his mother was a hard worker, she has no parenting skills.  (RR 31:44, 45)  She is an angry, depressed, miserable person.  (RR 31:45)  In sum, every single member of Long's family has a history of sexual misconduct.  (RR 31:29)  His entire family is so dysfunctional that they were not fully aware of their problems.  (RR 31:33, 34)  His mother, for example, did not see anything wrong with going to bars and looking for fights while leaving Mr. Long in the car.  (RR 31:34)

When Mr. Long was small, his sister provided him with drugs and alcohol.  Mr. Long had never had a close friend his entire life.  (RR 31:36)  His brother-in-law was a gang member.  (RR 31:30)  She stated it is possible that he has a genetic propensity to abuse substances.  (RR 31:31)  Mr. Long has used a wide variety of drugs, including paint for sniffing.  (RR 31:31)

According to Goodness, prison worsens his condition because it places him in

29

an environment with others suffering with similar problems.  (RR 31:33)  Because violence was sexualized for him at an early age, he views it as an erotic experience.  (RR 31:38)  Mr. Long's severe lack of nurturing as a child quite possibly stunted his brain functioning.  (RR 31:41)

In Goodness' opinion, except for the masturbation episodes in the penitentiary, Mr. Long did not have a lot of disciplinary problems.  (RR 31:47)  Goodness acknowledged that Mr. Long had a wife and two children and chose not to be in the relationship.  (RR 31:49)  Mr. Long lacked the psychological tools needed for a successful relationship.  (RR 31:77)  She also acknowledged that Mr. Long viewed women as objects.  (RR 31:49, 50)  She reported that when she was interviewing Mr. Long in jail, he masturbated in front of her.  (RR 31:51)  She agreed that Mr. Long was manipulative and untruthful.  (RR 31:53)

Goodness explained that a psychopath is someone who consistently violates the rules without remorse.  (RR 31:69)  Because Mr. Long associated with street gangs, he qualified as a danger.  (RR 31:70, 71)  Also the violent nature in which the death occurred indicated a risk of violence.  (RR 31:72, 73)  Ultimately, Goodness did not disagree with the statement, "Steven Long is an evil mother fucker."  (RR 31:75)

Mr. Long's prison records indicate several attempted suicides, several trips to the psychiatric ward, and medications for emotional problems.  (RR 31:79)  Most of the assaultive and anger problems with women did not occur in the penitentiary.  (RR 31:82, 83)  Mr. Long was able to adjust his behavior in prison.  (RR 31:85)

### C.   <u>State Post-Conviction Proceedings</u>

Mr. Long presented three claims to the state court in his post-conviction proceedings. He claimed his lawyers were constitutionally ineffective for failing to investigate mitigating evidence and evidence that he was in fact mentally retarded, and a third claim presenting the issue that regardless of whether his lawyers were ineffective, he is in fact mentally retarded and ineligible to receive the death penalty. He was afforded an evidentiary hearing at which four psychologists, a mitigation specialist and his primary trial lawyer all testified.

### 1.   Dr. Daneen Milam

Dr. Milam is a licensed psychologist in private practice in San Antonio appointed to assist state post-conviction counsel with a neuropsychological assessment of Mr. Long. (SH2:3,6) Well credentialed, she was recognized by the States's expert, Dr. Randall Price as a qualified expert with a good reputation among the field. (SH 2:117) In her career she has administered over 5,000 intelligence tests. (SH 2:20)

When conducting a neuropsychological assessment, Dr. Milam administers an intelligence test "one hundred percent of the time." (SH 2:6) She was also aware that Mr. Long had previously been administered the WAIS-III[11], which she described as the "gold standard" in the industry. (SH 2:7) Dr. Laura Lacritz had administered the WAIS-III about fifteen months earlier.[12] Protocol dictates that an individual should

---

[11]     The acronym refers to the Weschler Adult Intelligence Scale. (SH2:7)

[12]     SH 2:8. The Neuropsychological Evaluation of Mr. Long by Dr. Lacritz, from 2006, was presented to the state court as Exhibit 12 in Exhibit 1, and admitted as Exhibit 4 in the state habeas evidentiary hearing. It is found at Petitioner's Exhibit 1, at pages 197-199, and separately as Petitioner's Exhibit 3.

not have the test re-administered within six months, to avoid the "practice effect", which means that a person will improve each time a test is re-administered. (SH 2:8)

Dr. Milam administered every subtest that was available for the WAIS-III (ten are required and there are fourteen in all), so that she could also compare her data with that of Dr. Lacritz's earlier data. (SH 2:9) She also administered the Holstead-Reitan Battery, which is a standard test looking to reveal brain damage. (SH 2:10) Dr. Milam described brain damage as anything that goes wrong with the brain, which can be often limited to a single area of the brain, such as an aneurism, tumor or closed head injury. (SH 2:10) The Holstead-Reitan Battery for Mr. Long revealed very minor brain damage, so "there was a fairly low probability that he had brain damage per se. (SH2:11) She spent ten hours with Mr. Long. (SH 2:67)

Dr. Milam discussed that effort tests are to be used when a person does poorly on a neuropsychological evaluation. (SH 2:13) They are intended to answer whether the person did poorly because they were brain damaged or malingering. Long was making effort on the Holstead-Reitan Battery because he was passing the imbedded items. (SH 2:12-13) As she stated it, "And of course he was making effort because he was passing it." (SH 2:13)

Mr. Long scored a full scale intelligence (FSIQ) of 63 on the testing performed by Dr. Milam on November 19, 2007.[13] The best indicator of a person's intelligence is the overall full scale IQ. (SH 2:15) His score with Dr. Lacritz was a FSIQ of 62. (SH 2:17) Dr. Milam was additionally aware of a group administered prison

---

[13]     SH 2:15. Dr. Milam's Declaration and report was submitted to the state habeas court as Exhibit VI. It is submitted herewith as Petitioner's Exhibit 2.

intelligence test in 1995 and scored a 97, but expressed concern because those tests are not closely monitored.  (SH 2:17-18) She has seen wide variability between the group testing and properly administered tests. (SH 2:18) With respect to the prison test score she stated, "No, he just could not have [that high of an IQ]."  (SH 2:18) Finally, Dr. Milam was aware of the results of testing administered by the state's expert, Dr. Randall Price in August of 2009, wherein Mr. Long scored a 63 on a WAIS-IV, the most recent form of the WAIS series.  (SH 2:20)

With respect to the similarity of Mr. Long's scores on the three WAIS administrations, she testified:

> I would have to either give absolute maximum effort every time, and then I should get a score very similar across time, or I would have to basically refuse to take the test and get all zeros.  But unless you're giving your maximum effort and zero effort, it's not – it is not possible.

(SH 2:21) Given the standard of error of three points either way, the likelihood of being within the spread is pretty high when maximum effort is being used.  (SH 2:22) She further testified that while it is theoretically possible to guess one's way to a 63, it was "absolutely not" the case with Mr. Long.   (SH 2:25)

As an example of why he was giving his best effort and not "malingering" she noted that on her administration and that of Dr. Lacritz fifteen months earlier, Mr. Long subtracted incorrectly in his head the same way.  (SH 2:30)  She commented that when someone tries to give a false answer, they usually say "I don't know," and just try not to answer the question.  (SH2:30)

Dr. Milam was also aware that the State's expert, Dr. Price had also administered the Reynolds Intellectual Adult Scale ("RAIS") intelligence test, with

33

totally different types of questions from the WAIS.[14]  The RAIS will produce a reliable IQ score.  (SH 2:36)  On the RAIS Mr. Long scored a 62 or 63, in the same range as his WAIS tests.  (SH2:35)  Dr. Milan remarked:

> I was basically amazed, amazed at how consistent they were.  I had never seen this before.  I've given a lot of tests for a lot of years. . . .  To get the same score across three different administrations of the Weschler series, and one administration of a totally different test by three different examiners over a three-year period is absolutely not possible to be anything other than an accurate score.

(SH 2:33, 36).

Dr. Milam also testified regarding the inexactitude of existing measures of effort with respect to a mentally retarded population.  One such measure is the Text of Memory Malingering, or "TOMM", which was designed to see if someone is faking a loss of memory, but which is no longer the standard for a mentally retarded population:

> The literature is very, very consistent now that you should not use any of these effort tests for the mentally retarded.  They were never designed for that, and they are making inappropriately high false positives at the rate of one to three.

(SH 2:40, 41) She indicated the same problems existed with the Rey 15-item measure.  (SH 2:40) A third measure, the Dot Counting Test is also contraindicated  for use in determining feigned mental retardation, with a seventy percent failure rate.  (SH 2:32)

As Dr. Milam described it, researchers went to homes where people were already classified as mentally retarded and not involved in any litigation – and got false positives.  They kept getting high false positives in a mentally retarded population with no reason to

---

[14]     SH 2:34.  The 2009 report of Dr. Price was admitted as Exhibit 3 in the state habeas evidentiary hearing.  It is submitted herewith as Petitioner's Exhibit 4.

34

malinger. (SH 2:42)

Dr. Milam's opinions were fortified by the findings in a treatise, ASSESSMENT OF FEIGNED CONGNITIVE IMPAIRMENT, A NEUROLOGICAL PERSPECTIVE edited by Dr. Kyle Brauer Boone.[15]  This treatise was a compilation of work by all of the leaders in the field who develop measures and research malingering.[16]  The treatise states that subjects with mental retardation are typically excluded from effort test validation samples, and the standard effort tests may not be appropriate for this population.  The empirical literature is limited, but suggests great caution as the likelihood of false positives is probably quite high.  Borderline or mentally retarded individuals can fail an average of one in four even when putting forth full effort.  (SH 2:45; DX 7)

Finally, Dr. Milam described a relatively new instrument in testing effort in the context of IQ tests:

> It's called Advanced Clinical Solutions.  It is the Weschler series' attempts to address the concerns that have been coming out in the last two or three years about effort tests, so they developed a test that was basically a direct measure of whether an IQ is being malingered rather than inferring it through memory skills.

(SH 2:48) It is a computer algorithm that is normed for different populations.  (SH 2:49) It does not diagnose mental retardation, but rather examines whether a person

---

[15]     Kyle Brauer Boone, Ph.D. is a Professor-in-Residence in the Department of Psychiatry and Biobehavioral Sciences at the David Geffen School of Medicine, University of California, Los Angeles, and Director of Neuropsychology Services and Training in the Deparment of Psychology at Harbor-UCLA Medical Center in Torrance California.  She has published over 100 peer-reviewed articles in professional journals in the area of neuropsychological assessment.

[16]     SH 2:44.  The chapter of this book devoted to identification of feigned mental retardation was admitted as Defendant's Exhibit 7 in the state habeas proceedings, and is submitted herewith as Petitioner's Exhibit 5.

is malingering.  (SH 2:73)  Dr. Milam performed the requisite testing on Mr. Long based upon the test administered by Dr. Price and determined: "[I]t came out clean as a whistle.  He was not malingering."  (SH 2:50, 53-54; DX 5)

Dr. Milam found that Mr. Long was able to read at a sixth or seventh grade level, and described that a person with mental retardation can read, but cannot think abstractly.  (SH 2:56, 57) She summarized her testimony regarding his testing as follows:

> Q.    ... What is your professional opinion that Mr. Long's IQ score is, what's the bottom line of the IQ score?
>
> .    .    .
>
> A.    He cannot score the same score over and over if he wasn't – if it wasn't a true score.
>
> Q.    And you think his true score is what?
>
> A.    Sixty-two or 63.

(SAH 2:57).[17]

With respect to Mr. Long's adaptive deficits, Dr. Milam noted that Mr. Long failed first grade, failed the fifth grade twice, never passed a grade past fourth grade, would indicate his academic performance was an adaptive skill deficit.  (SH 2:59-60) Further, he never lived independently, had trouble with maintaining jobs, and has always been supported by others.  (SH 2:60) She noted adaptive deficits in school, work and social.  (SH 2:66).  "He has not been successful in any area of his life."  (SH 2:66) Dr. Milam testified that Mr. Long was absolutely mentally retarded.  (SH 2:83)

---

[17]    Dr. Milam repeated this, emphatically, at least twice in cross and re-direct examination.  (SH 2:111, 113).

## 2.   **Dr. Randall Price**

Dr. Randall Price is a clinical and forensic pathologist who was called by the State.  (SH 2:114) He recognized Drs. Milam and Lacritz as qualified experts with good reputations in the field.  (SH 2:117-118) Dr. Price administered a WAIS-IV and the Reynolds Intellectual Assessment Scale to Mr. Long over a period of six hours, and Mr. Long's full scale IQ was 64.  (SH 2:117-19; PX 4)

Dr. Price administered three effort tests, the Rey 15-Item test, the Dot Counting Test, and the Test of Memory Malingering.  (SH 2:119).  He acknowledged that use of these tests in a mentally retarded setting is an "emerging field," but in applying them found that they indicated a lack of optimal effort which renders Mr. Longs scores as suspect.  (SH 2:119-120) Dr. Price stated that, even though these tests were not designed for this context, the standard is to give some kind of effort test.  (SH 2:120) However, in 2003 Dr. Price co-authored an article in the Journal of Forensic Neuropsychology questioning these tools.[18]

Dr. Price was familiar with Dr. Boone's treatise, and had read it.  (SH 2:150; DX 7)  He took no issue with the conclusion in the treatise, at page 337, "that "Great caution should be used in effort test interpretation as the likelihood of false positive error is probably quite high."  (SH 2:150-51; PX 5)

With respect to the ACS test, Dr. Price stated that he was "quite interested" in it, but "I don't own it yet, I haven't given it yet, I don't understand the analysis of it

---

[18]     Niland, J., Price, J., *Applications of Neuropsychology in Capital Felony (Death Penalty) Defense*, JOURNAL OF FORENSIC NEUROPSYCHOLOGY, Vol 3(4) 2003), page 113.  This article was admitted in the state habeas evidentiary hearing as Exhibit 5, and is submitted here as Petitioner's Exhibit 6.

at this time." (SH 2:125) He did not understand how to interpret the ACS, and had never tried to understand it. (SH 2:160) However, he could not explain the consistency of Mr. Long's scores:

> I agree that . . . it would be extremely difficult for a person to intentionally have a plan to score a 63 or 64 over that kind of time frame by memorizing the items. I couldn't do it; I wouldn't expect it to happen.

(SH 2:126) He agreed that he could not intentionally score a lower than his own IQ on three tests across time. (SH 2:144) To Dr. Price, the only way to get completely consistent score is to make no effort, and that is not what happened with Mr. Long. (SH 2:145) If maximum effort was given, it would be within the margin of error (3 to 5 points on either side. (SH 2:145) After agreeing that there was a "shocking amount of consistency" in the test scores, DR. Price testified:

> I just don't see how he could intentionally get that score. . . . I think it would be extraordinarily difficult  for anybody to intentionally get the same IQ score over all those administrations, absolutely.

(SH 2:146-47)

With respect to Mr. Long's educational history, Dr. Price testified that as a third grader he was testing as a second grader, and remained a year or so behind his peers, until he reached the fifth grade when he drops off substantially. (SH 2:129-130) Dr. Price stated "That would be – that would constitute an adaptive behavior problem, or a deficit that he did not achieve in school." (SH 2:132)

### 3.   **Toni Knox**

Toni Knox is a clinical social worker and mitigation specialist who testified for Mr. Long. (SH 2:183) She had been working in capital mitigation since 2003, and had

been involved in 30-35 cases.  Ms. Knox prepared a thorough and exhaustive mitigation report.[19] She did not believe that the mitigation presentation was done well for Mr. Long's trial.  (SH 2:204)  In particular, with Mr. Long's school records, she did not understand why it was not developed further.  (SH 2:205)

With respect to Mr. Long's education she advise the Court that Mr. Long repeated first grade. (SH 2:185).  He did not perform well in the second grade, even though he was a year older because he repeated first grade.  (SH 2:185)  In third grade he was performing at a second grade level, but he was almost ten years old. (SH 2:192).  This fourth grade report card reflected that he is did very poorly, scoring F's and D's.  (SH 2:186)  He repeated fourth grade. (SH 2:195)  In 1980, there was an ARD "which means special education" meeting for special education, but no records to verify what happened. "Special education under consideration, required parents' consent to pursue." (SH 2:186) Mr. Long repeated fifth grade two times.  By the second pass at fifth grade he was failing everything but P.E.  (SH 2:187) Although he was almost fourteen years old, he was testing at the fourth grade level.  (SH 2:192)  His grades in elementary school were not attributable to absences, as he only missed fifth grade eight days.  (SH 2:189)

Mr. Long never held a job longer than a few weeks or months.  "I mean, as you can see, McDonald's, Lather and Lube, Granit Roofing, Williams Concrete, VIP Movers.  I mean, it goes on and on on.  But it never lasts more than a couple of weeks."  (SH 2:196) He did hold a job for almost a year upon release from prison, but it was a situation where his mother was his boss.  (SH 2:196)

### 4. __Kelly Goodness__

---

[19]     Presented to the state habeas court as Exhibit I, and here as Petitioner's Exhibit 1.

The State called Kelly Goodness, who testified regarding her qualifications as a clinical psychologist.  (SH 3:2-3) She was asked by Mr. Long's trial lawyers to assist in their mitigation investigation, initially as a consulting psychologist who was initially not expected to testify.  (SH 3:6) Subsequently, counsel determined that she should testify to bring to the jury how Mr. Long came to have such antisocial proclivities and some of his background information.  (SH 3:6) She did not believe that Mr. Long met the criteria for mental retardation because he had been tested in prison in the average range, which she thought was an overstatement.  (SH 3:9) Additionally, although she did not do any reading tests, it was her informal assessment that his reading and writing was higher than an IQ in the sixties would indicate, and his speech and vocabulary were broader than would be indicated by testing.  (SH 3:11-12) Dr. Goodness noted that in the testing done by Dr. Lacritz, Mr. Long failed the three measures of effort.  (SH 3:13) Again, her assessment of Mr. Long in her interviews was that he was not forthright and was exaggerating his symptoms.  (SH 3:14) Although she later testified that she never spoke with Dr. Jay Crowder, she told the court that Dr. Crowder, who was engaged to do brain scans of Mr. Long to rule-out brain pathology, also felt that Mr. Long was malingering.  (SH 3:14, 26, 45) Although qualified to administer IQ tests, she assessed that Mr. Long had an IQ of 84 or 84 based upon how he *appeared* to function during interviews.  (SH 3:32-33) She stated that it was a part of a normal clinical practice to estimate a person's IQ.  (SH 3:34)

Dr. Goodness acknowledged that the creator of the TOMM said it should not be used

40

in evaluation in malingering in a mentally retarded population. (SH 3:42) She does not use the Dot Counting Test, and knew nothing about it. (SH 3:43) Although she presented as an expert on malingering, she was not familiar with the chapter in Boone's treatise, Petitioner's Exhibit 5, that deals exclusively with the question of and studies relating to assessing malingering and mental retardation. (SH 3:44) She was familiar with Dr. Randall Price's writings relating to lowering the cutoff score when using the Rey 15 Item test with a mental retardation population. (SH 3:44; PX 6, p. 113) Finally, she said she was familiar with 2006 study by Hurley and Teal showing 41% of mentally retarded subjects with no incentive for malingering showed on the standard cutoff for TOMM that they were malingering. "That's why we would never use just one piece of data as evidence of anything." (SH 3:56)

Dr. Goodness agreed that Mr. Long reads and writes at the "6[th], 7[th], 8th" grade level. (SH 3:38)

### 5. Paul Johnson

The State called Mr. Long's lead trial attorney, Paul Johnson. Mr. Johnson testified that he had been handing death penalty cases since the early '90's and had handled about six through verdict. (SH 3:59-60) He told the court that Kelly Goodness, Jay Crowder and Laura Lacritz all believed Mr. Long was malingering. (SH 3:62) He testified that until Dr. Lacritz "came back with her neuropsych testing, I had no indication" that Mr. Long was retarded. (SH 3:67) Dr. Lacritz told him that she could not say that Mr. Long was mentally retarded because she was troubled by the failure of assessment on the effort test. (SH 3:67) He agreed that in her report,

41

(PX 3) Dr. Lacritz said that her effort tests were not definitive, but claimed that she was definitive in her oral reports to him.  (SH 3:68)

He understood that one of the State's themes in the case was that "Pretty Boy was an evil motherfucker", and that it was anticipated that Dr. Goodness would be asked about it.  (SH 3:69) He resisted, but finally agreed that he was aware that Dr. Goodness would agree on the stand to that characterization of Mr. Long. (SH 3:70)

### 6.   Dr. Laura Lacritz

Dr. Laura Lacritz was the final witness. She is a board certified neuropsychologist employed a the University of Texas Southwestern Medical Center. (SH 4:2-3)  She stated that she had probably administered thousands of IQ tests in the course of her career and was initially asked to assess Mr. Long's overall cognitive functioning.  (SH 4:3-4) She administered the WAIS-III, the most widely used instrument and the "gold standard" and several other tests, and determined that there were global cognitive deficits that were longstanding.  (SH 4:5-6)  "[B]asically he was impaired on all the tests that I gave him."  (SH 4:6)  Mr. Long's full scale IQ on the WAIS-III was 62.  (SH 4:6; PX 3) With the standard of error, his range was 59 to 67. (SH 4:34)

She administered three effort tests, which she described as tests that look like real cognitive measures but that are thought to be easy enough that even individuals with real brain damage can still perform well enough so that scores below certain cutoffs provide an "indication, possible indication of suboptimal efforts."  (SH 4:8) Dr. Lacritz testified that these effort tests were not designed for a mentally retarded

42

population.  (SH 4:8) Although Dr. Lacritz had not read Dr. Boone's treatise, was familiar with the false positive studies relating to the TOMM, Rey-15 and Dot Counting tests with respect to a mentally retarded population, she did recognize Dr. Boone as respected in the field.  (SH 4:60, 61)

Dr. Lacritz felt that, as an expert in the field, one can get a general feel for what is thought to be a person's IQ, but it is difficult to determine with accuracy.  (SH 4:12).  She also agreed that a mentally retarded person can present as if they are not mentally retarded.  (SH 4:12)  "That's why we do testing." (SH 4:12) Presentation does not trump the testing.  (SH 4:13)

Dr. Lacrtiz stated that a person with a very low IQ, but because he came from a very difficult home environment and very poor educational opportunities, would not be disqualified from a diagnosis of mental retardation. (SH 4:15) Although education deficits can be an adaptive deficit, she was not provided any of Mr. Long's school records.  (SH 3:25, 28)  In fact, she did not evaluate Mr. Long for adaptive behavior. (SH 4:45) She asked for school records, any information about his previous IQ score, and records relating to his mother's IQ score of 59, but was not provided that information.  (SH 4:45) Kelly Goodness was not providing her with additional information (SH 4:48), and she only had one phone conversation with Mr. Long's counsel, Paul Johnson (SH 4:46).  Dr. Lacritz did not remember a conversation where she "emphatically" told him that Steven Long was not mentally retarded.  (SH 4:47).  To the contrary, as she described it, "I was not asked to assess [mental retardation] and so I didn't make – get all the information to make a determination with that."  (SH

43

4:47)

With respect to the consistency of Mr. Long's IQ scores, she was made aware of that information, and felt "it would be very difficult to get consistent scores over three different testing periods, particularly if it was not an accurate reflection of one's ability." (SH 4:10)  With respect to Mr. Long's 62 and 63 and 63 on the Reynolds IQ test – she felt it would be very difficult to intentionally achieve those scores.  (SH 4:10) To Dr. Lacritz the consistency supports the reliability of Mr. Long's scores. (SH 4:11) She told the state habeas court that she now believes, being aware of the other scores, that her score was accurate.  (SH 4:14) That Mr. Long was scoring 62 and 63 on the tests over a period of years is "a pretty strong reflection of an accurate score."  (SH 4:56).

She told the state habeas court that she now believes, being aware of the other scores, that her score was accurate.  (SH 4:14)  That Mr. Long was scoring 62 and 63 on the tests over a period of years is "a pretty strong reflection of an accurate score." (SH 4:56)  Finally, when asked about her opinion of Mr. Long's scores, she told the court, "I would say it's below 70."

## 7.   Request for Additional Time

Neither Dr. Price, nor Dr. Lacritz were familiar with the ACS, as it was a relatively new component of the Weschler series at the time of the State habeas proceedings in January of 2010.  It was obvious that the State questioned this test, and at the conclusion of the hearing Mr. Long's counsel requested additional time for evaluation of the new instrument and re-testing of Mr. Long:

So I'm requesting that the Court delay making any findings in this case and for us to reopen this matter once we have more information on this ACS testing and possibly even readminister this with a valid WAIS-IV with this new testing have the most sophisticated information available to the Court to make this extremely important decision.

(SH 4:69)   The State "vehemently objected" and the request was not granted. (SH 4:69-70)

# V.

# CLAIMS FOR RELIEF

## Claim 1

**Mr. Long's Sixth Amendment right to counsel was violated when he received ineffective assistance of counsel as a result of his legal team's failure to adequately investigate and present mitigation evidence.[20]**

## A.   The Legal Standard – Ineffective Assistance of Counsel and Mitigation

Under the standards recognized by the court in *Strickland v. Washington*, 466 U.S. 668 (1984), Mr. Long received ineffective assistance of counsel as a result of his legal team's failure to adequately investigate and present mitigation evidence as required by *Wiggins v Smith*, 539 U.S. 510 (2003) and *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003).

The Sixth Amendment guarantees a criminal defendant a right to counsel.  The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel."[21]   An ineffective assistance claim has two well-known components:  A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668 at 687 (1984).

---

[20]   This was presented to the State Court as Issue 1 in Mr. Long's Application for Writ of Habeas Corpus.  Although the trial court recommended that the ineffective assistance issues were procedurally barred, FFCL 1-3, the Court of Criminal Appeals specifically rejected those findings.  *Ex parte Steven Long*, 2012 Tex. Crim. App. Unpub. LEXIS 201.

[21]   *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970).

### 1. <u>Deficient Performance</u>

To establish deficient performance, it must be demonstrated that counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. 510.

The concept of mitigation has been evolving rapidly over the past years. Prevailing norms of practice, such as those reflected in the American Bar Association standards, are guides to determining what conduct is reasonable.[22]

In 2000, The Supreme Court in *Williams v. Taylor* established that the defense counsel had a duty to present evidence that a defendant would not pose a danger if kept in a structured environment and evidence that a defendant was "borderline mentally retarded." In 2003, the Supreme Court in *Wiggins* established that the defense counsel had a duty to investigate mitigating circumstances in a defendant's background. In 2005, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court indicated that the defense counsel has a duty to the client to investigate all available mitigation evidence, even if the client claims to have had a "normal" childhood.

In fact, the ABA Guidelines were revised in 2003 to reflect the changing rulings regarding mitigation in capital defense.[23] These ABA Guidelines have been accepted

---

[22]     *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 395 (2000).

[23]     A copy of ABA Guideline 10.7 – Investigations, was submitted to the State habeas court as Exhibit III, as is submitted herewith as Petitioner's Exhibit "7".

as the standard for mitigation investigations in capital cases.[24]   The Revised Guidelines state that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11).

The previous Guidelines, adopted in 1989, similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence."   (1989 Guideline 11.4.1.)   The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation."   (1989 Guideline 11.4.1.(7))   The 1989 ABA Guidelines were recognized by the U.S. Supreme Court in *Wiggins* as "well-defined norms."[25]   "The new ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence."[26]

The 2003 Revised ABA Guidelines also provide that "counsel at every stage have an obligation to conduct thorough and independent investigations relating to issues of both guilt and penalty."   (2003 Guideline 10.7(A))   Investigations of mitigating evidence necessarily include considering:

---

[24]     *Rompilla*,  545 U.S. 374; *Wiggins*, 539 U.S. 510.

[25]     *Wiggins*, 539 U.S. at 524.

[26]     *Hamblin v. Mitchell*, 354 F.3d 482 at 487 (6th Cir. 2003).

48

witnesses familiar with and evidence relating to the client's life and development, *from conception to the time of sentencing*, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death.

Expert and lay witnesses along with supporting documentation (e.g. school records, military records) to provide medical, psychological, sociological, cultural, or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s)...

(2003 Guideline 10.11(F)(1)-(2))(emphasis added).

The State Bar of Texas Guidelines and Standards for Texas Capital Counsel, which closely mirror the ABA Guidelines, provide that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."[27]  Investigation at the penalty phase should include:

(i.) Development of character witnesses and family background evidence, and where applicable, relevant records and witnesses from additional sources, including military, school, hospital, past employment, etc., to corroborate the mitigating theory;

(ii.) Development of expert witnesses on mental health issues, if any;

(iii.) Development of rebuttal witnesses for State's extraneous evidence, if any.[28]

The standard for ineffectiveness claims established in *Strickland* applies to claims where trial counsel fails to discover mitigating evidence at the sentencing

---

[27]     State Bar of Texas Guidelines and Standards for Texas Capital Counsel 11.1(A), p. 15 (April 21, 2006).

[28]     *Id*. at 11.1(A)(3)(b)(i.)-(iii).  While these guidelines were not in effect at the time of pre-trial investigation of the case, their adoption is so close to the time so as to evidence the prevailing norms of practice at the trial.  In any event, the Supreme Court has judged lawyers by ABA standards that were adopted after the trial.  *See Rompilla*, 545 U.S. 376 fn. 7.

phase of trial.  In such cases, the inquiry into whether counsel was "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" turns not on the single issue of whether counsel should have presented a mitigation case, but whether the investigation supporting counsel's decision not to introduce mitigating evidence is *itself reasonable*.[29]

## 2.   Prejudice

A showing of prejudice requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, that is a trial whose result is reliable. *Strickland*, 466 U.S. at 687.  Prejudice is assessed by re-weighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings.[30]  Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.  *Strickland*, 466 U.S. at 694.

"'Counsel's performance is considered deficient if it falls below an objective standard of reasonableness as measured by professional norms.'"[31]  This Court "must determine whether there is a gap between what counsel actually did and what a reasonable attorney would have done under the circumstances."  *Id*.

To establish prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

---

[29]     *Wiggins*, 539 U.S. at 523.

[30]     *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000).

[31]     *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002)(en banc)(quoting *Strickland*).

would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome.[32]  The relevant query is whether one juror's mind might have been changed had counsel performed adequately.[33]  As recently re-affirmed by the 10th Circuit:

> If "there is a reasonable probability that at least one juror would have struck a different balance," that "at least one juror would have refused to impose the death penalty," prejudice is shown.[34]

The prejudice inquiry for an ineffective assistance of counsel claim is not outcome determinative.  The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case.  *Strickland*, 466 U.S. at 693-94.  Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, ***even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome***."  *Id*. (emphasis supplied).  Thus, the "reasonable probability" standard – a probability sufficient to undermine confidence in the outcome – is a less onerous burden than even the preponderance of the evidence standard.[35]

---

[32]     *Id*. at 391; *See also Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000).

[33]     *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

[34]     *Hooks v. Workman*, 689 F.3d 1148, 1202 (10th Cir. 2012)(citations omitted).

[35]     In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit observed that the prejudice prong imposes "a lower burden of proof than the preponderance standard." *Id*. at 595.  Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id*.  *See also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n. 18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of evidence").

The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 405-06, expressly noting that a state court's use of a preponderance-of-the-evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court. *Id.* at 405-06.

### B.   Mr. Long's legal team failed to adequately investigate and present mitigation evidence

Mr. Long's legal team failed to adequately investigate and present mitigation evidence. Specifically, the facts and circumstances surrounding Mr. Long's trial and the pre-trial investigation show the following:

1.   The legal team failed to thoroughly investigate his mitigation evidence.

2.   There was significant confusion concerning the role of the mitigation specialist.

3.   The mitigation in the punishment phase was not effectively presented.

4.   There were areas of critical importance that were identified in the investigation phase, but there was no follow-up investigation to clarify. In particular, it was noted that Mr. Long had an I.Q. score of 63 but an assumption was made that this score was the result of malingering. There was no attempt to follow up with further neuropsychological testing in order for a clear understanding of the degree of impairment so that an informed strategic decision could be made whether to present this evidence of mental retardation.[36]

### 1.   General Lack of Thorough Mitigation Investigation

Mr. Long's defense team retained Dr. Kelly Goodness as a mitigation specialist for trial. Toni Knox, LSCW was as the mitigation specialist for the state habeas corpus proceedings. Ms. Knox reviewed the mitigation investigation by Dr.

---

[36]      In Claims 2 and 3, Mr. Long contends that he is mentally retarded as a bar to the imposition of the death penalty, and that his trial attorneys were ineffective for failing to present evidence that he was mentally retarded.

Goodness, conducted a mitigation investigation. As Toni Knox's investigation reveals, Dr. Goodness failed to perform the functions of the mitigation investigator in accordance with the standard accepted and practices in the field.[37] Ms. Knox found:

> One of the major purposes of mitigation and the goal of mitagation presentation is to humanize the client. I interviewed two of the jurors who decided to impose the death penalty about their views of the case. Both made clear that they felt Dr. Goodness was an effective advocate for death rather than life.[38]

In addition to her declaration, Toni Knox prepared a psychological history of Mr. Long, a complete genogram and time line.[39] The information that Dr. Goodness did obtain was not processed into a formal psycho-social history. According to the ABA Guidelines, a complete psychosocial history for a capital case should include a genogram that can be presented to the jury and a time line of the defendant and his family. This is important because many psychological disorders can be traced through family history and is necessary for a complete mitigation investigation.

### 2.   Confusion Concerning the Mitigation Expert's Role

Psychologist Kelly Goodness served on Mr. Long's defense team as both as a mitigation specialist and a consulting psychological expert. Acting as a consulting psychologist, Dr. Goodness administered and evaluated various psychological tests to Mr. Long. As the mitigation specialist, Dr. Goodness also conducted a mitigation

---

[37]     The Declaration of Toni Knox, LCSW, titled: "Assessment of Mitigation Investigation and Presentation" (hereinafter referred to as "Knox Declaration") was submitted to the state habeas court as Exhibit I, and is submitted herewith as Petitioner's Exhibit 1.

[38]     Knox Declaration, p. 7. The juror interviews were submitted to the state habeas court as items 2 and 3 of the Knox Declaration. PX1, pp. 99-103.

[39]     This was submitted to the state habeas court as Attachments A-C to the Knox Declaration. PX 1, pp. 58-95.

investigation on Mr. Long's behalf.

In addition, combining the responsibilities of the mitigation specialist and consulting psychologist, both of whom are recommended by the ABA Guidelines, created problems in presenting the mitigation information to the jury.

The ABA guidelines recommend that a Mitigation Specialist be a part of the defense team. She was asked by Mr. Long's trial lawyers to assist in their mitigation investigation, initially as a consulting psychologist who was initially not expected to testify. (SH 3:6) She reviewed records, "evaluated" Mr. Long, and subsequently testified as an expert. She was also used in the capacity of a mental health consulting expert. Dr. Goodness' training is in psychology, and the majority of her experience is in the forensic arena. It does not appear that she has had adequate training in the area of mitigation.[40] From the continuing education courses listed by Dr. Goodness,

---

[40]     The following is a list of continuing education activities that were listed on Dr. Goodness' Curriculum Vitae at the time of trial:

- Workshop on Child Custody Problems and Post Custody Issues (2005)
- Treatment, Ethical Issues, Hope for Change in Problematic Sexual Behavior (2005)
- Postpartum Disorders:  Treatment and Social/Legal Implications (2005)
- Methodological and Ethical Issues in Evaluation of Trial Competency:  A Case Study Approach (2005)
- Threat Assessment:  A Practical Approach to prevent Targeted Violence (2005)
- Compulsive Sexual Behavior and the Internet (2005)
- Conducting Forensic Evaluations in Capital Cases (2005)
- The Insanity Defense in Texas (2005)
- The Expert Witness:  Impartiality and Advocacy in Mental Health Testimony (2004)
- Expert Mental Health Testimony (2004)
- The Therapeutic Contract (2004)
- A Practical Guide to Risk Assessment (2004)
- Ethics and the Business of Forensic Practice (2004)
- Practical Legal Research Techniques for Forensic Psychologists (2004)
- Professional Ethics and Family Law:  Lawyers and Mental Health Professionals (2004)
- Trial Competency Exams and the New Texas Statutes (2004)
- Evaluating Competency to Stand Trial (2003)
- Psychological Evaluations at Capital Sentencing (2003)

she is well versed in forensic psychology and evaluations, but there is little mention

of any "mitigation investigation" training.

Guideline 8.1, Training, in the new proposed guidelines, states:

All capital defense team members should attend and successfully complete, at least once every year, a specialized training program that focuses on the defense of death penalty cases offered by an organization with substantial experience and expertise in the defense of persons facing execution and committed to the national standard of practice embodied in these supplemental Guidelines and the ABA Guidelines as a whole.[41]

In tracking Dr. Goodness' continuing education courses she has listed since 1997,

there is no specific mention of mitigation training.   Dr. Goodness' web site indicates her

areas of expertise as:

Our work in criminal forensic cases varies widely, but may include the assessment of such issues as, Competence to Stand Trial, Mental Status at the Time of the Offense, the defendant's dangerousness, or specific diagnostic questions related to the defendant or his behavior during the offense.[42]

The majority of Dr. Goodness' experience appears to be related to these various

assessments and evaluations, which is very different from the tasks required of a

mitigation specialist.

Additionally, we may be asked to conduct an investigation that will assist a

---

- Advanced Forensic Psychology Practice:  Issues and Applications (2003)
- Forensic Update Training (2002)
- Recent Developments in the Admissibility of Psychological Evidence (2002)
- Expert Witness Liability, Immunity and Ethics (2002)
    Preparing for the Diplomate Exam in Forensic Psychology (2002)

[41]      Submitted to the state habeas court as Exhibit 4 – Proposed Supplemental Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, May 13, 2007, Pg 5.  It is submitted herewith at Petitioner's Exhibit 1, starting pages 109.

[42]      Submitted to the state habeas court as Exhibit 6 – Dr. Kelly Goodness Website – Practice Overview.  It is submitted herewith at Petitioner's Exhibit 1, starting pages 126.

prosecutor in recognizing psycholegal factors relevant to sentencing or a defense attorney in presenting a mitigation defense in a capital death trial.

*Id.* Although this statement vaguely alludes to a "mitigation investigation," this indicates that Dr. Goodness would serve more in an advisory capacity, suggesting a separate mitigation specialist should be retained.   Dr. Goodness furnished a two-page summary of her credentials as they pertained to Mr. Long's case, but there was no specific mention of performance of a mitigation investigation.[43]   Indeed, there was no person specifically delegated to the role of a  mitigation specialist and the tasks associated with that role – collecting records, interviewing and maintaining a relationship with Mr. Long, and interviewing family history witnesses (family and friends).

### 3.   Poor Presentation of Mitigation in Punishment Phase

Q:     Are you here to disagree that Steven Long is an "evil mother-fucker?"

A:     I'm not here to disagree with that.

(RR. 31:75)  In a death penalty trial, in which the defendant has been convicted of a terrible homicide, it might not be too surprising if the State's future dangerousness "expert" characterized the defendant as an "evil mother-fucker," especially when the defendant allegedly self-described himself in this manner in his confession.  However, in this case, it was not the State's expert who described the defendant in this manner, but Mr. Long's own mitigation expert.  Counsel understood that one of the State's themes in the case was that "Pretty Boy was an evil motherfucker", and that he even anticipated that Dr. Goodness would be asked about it and in fact agree with it.  (SH

---

[43]     Submitted to the state habeas court as Exhibit 7 – Dr. Kelly Goodness Credentials – Prepared for Mr. Johnson in Steven Long's Case.  It is submitted herewith at Petitioner's Exhibit 1, starting pages 128.

3:69-70)  During closing argument Mr. Johnson, Mr. Long's trial attorney, also referred to Mr. Long as a "monster" and called him "evil," further dehumanizing Mr. Long.  (RR. 32:59, 61)

Although generally the desire of the defense team to see the case from the jury's perspective is understandable, most death penalty-trials – and Mr. Long's trial was no different – are essentially struggles between two opposing views of human behavior. The State tends to see the defendant as being entirely possessed of a free will, independent of genetic and environmental influences, so that his commission of a shocking crime is the result of the defendant's choice of evil over good.  The defense, on the other hand, sees the defendant and his crime as the tragic product of genetic and environmental influences.  In Mr. Long's case, the defense team's admission that Mr. Long was "evil," rather than a tragic individual to be pitied, sealed his fate and constituted an abrogation of their role.  As one expert in mitigation explained:

> Mitigation does not require a diagnosis.  The expert who assists a capital defense team is not there for either the traditional forensic purpose (assessing competency and/or responsibility) or for the routine goals of a clinician (diagnosis in order to prescribe treatment).  If the expert testifies, it may simply be to help jurors appreciate the world as the client experiences it.[44]

Expressing a belief that many experts in the field of capital representation hold, Stephen Bright, a defense attorney, who is considered one of the country's leading experts in the field of capital litigation writes:

> It is the lawyer's job to "**humanize the client**" for the jury because ultimately death penalty cases rely "far more on human compassion than

---

[44]     Stetler, Russell, *Mental Disabilities and Mitigation, Training Events – Winning Strategies*, Philadelphia, Sept. 16, 2005

the technicalities of the law.  It's very hard to kill someone you know. You are asking the jury to make a premeditated decision to kill someone. A lot of times our client is guilty.  But there are different levels of culpability.  Who was this person?  There is always a story.  No one wakes up and decides to be a bad person.[45]

Throughout the trial Mr. Long's defense attorneys and expert witness contributed to his dehumanization in front of the jury.  Dr. Goodness suggested that once she began testifying she no longer had a duty of loyalty to the client although she had been "appointed by the court to assist in Mr. Long's defense."

> Depending on what I'm asked to do in a case, if I'm asked to evaluate and investigate the Defendant and his background for purposes of presenting his life history or presenting information about who he is in court, I may not be the one that testifies.  I may do much of the same work that I did in this case.  I present that to the Defense Attorneys and then they may choose to bring out whatever they feel is most important for the jury to know through other experts or through lay witnesses or however that information needs to come out.

> On occasion, they choose for me to testify, and when I'm asked to testify, then it my opinion and my professional ethics that my duty changes from the Defense Counsel to the jury then because my job now is to assist you in understanding who this individual is and how he came to be the person who is charged with a **heinous** offense.

(RR. 31:16)(emphasis added).

Dr. Goodness testified as though she had been hired by the court to "evaluate" the client and report her findings, when in fact she had been hired by the defense to investigate and help develop a mitigation presentation for Mr. Long.  If Dr. Goodness was retained to simply evaluate Mr. Long rather than act as a mitigation specialist, then Mr. Long had, in fact, no mitigation specialist at all.

---

[45]    Submitted to the state habeas court as Exhibit 8 – Schaeffer-Duffy, Claire, *Death Penalty Lawyers Defend Rights of Politically Invisible*, <u>National Catholic Reporter</u>, Oct. 5, 2001. It is submitted here as Petitioner's Exhibit 1, at page 131.

In her testimony Dr. Goodness repeatedly referred to Mr. Long as "this individual" and conveyed to the jury that she did not think of Mr. Long as a human being.

> I'm not holding out that **this individual** has a hole in his brain or anything like that.  I'm not saying that whether it was because he was born that way or through a collection of genetics and his experiences, whether that has been chemical exposure or through head injuries or whatever the total cause was, **this individual** has less horsepower, if you will, in terms of intelligence and in terms of inhibition.

(RR. 31:23)

Dr. Goodness often referred to Mr. Long's "pathologies," which has a negative sound to a lay-person such as a juror.  The purpose of the mitigation expert's witness should have been to explain in detail how all the risk factors that were present in Mr. Long's life may have contributed to his mental deficits and make him less culpable.  Instead, in many instances, Dr. Goodness attempted to minimize the important issues relating to mitigation.  For example, she testified, "I am not saying he has a hole in his head," instead of relating to the jury that Mr. Long had some brain damage and noting how that might have impacted Mr. Long's behavior.  This important factor – Mr. Long's brain damage – rather than being presented as something that may have explained Mr. Long's behavior, was minimized in importance.

Dr. Goodness also brought up her perception of an episode where Mr. Long had shown no inhibitions with her.  This information **had not** been introduced by the State, and Dr. Goodness opened the door for further testimony along this line, which was extremely harmful to Mr. Long.

Mr. Johnson:  Okay, the next one is the ability to inhibit his responses

59

decreases when social controls are absent.  What are you referring to with that?

Dr. Goodness:  Mr. Long has the ability to inhibit his impulses and thoughts at some level.  Although I'm telling you that his ability is less than a normal person's, he still has some ability.  His ability increases as he has social controls.  For example, being in the courtroom and having the Judge or other authority figures here, he's going to be less likely to do anything that is inappropriate such as masturbate.  **My own experience with him, he has shown this inhibition when I have been in the room but when a man walks into the room, he stops.**

I'm not sure how many of the episodes have been described before the jury, but in general, **an individual** in **Mr. Long's** situation, who is openly masturbating, it takes quite a bit to get over your inhibitions if you're a **normal** person, to be able to just come out and do that in front of other people or to want to do that, especially when you're charged with a **heinous offense** and your life is on the line.

(RR. 31:21-24)(emphasis added)

Dr. Goodness made little attempt to explain the consequences of sexual abuse when describing Mr. Long's mother.  It was important to explain her behavior to the jury, but Dr. Goodness should have explained how his mother's behavior may have resulted from her sexual abuse by her father, particularly her anger and violence.

Mr. Johnson: How about the mother or the impact of the sexual abuse upon her and her general criminality at a younger age?  Do you associate that with aggression and fighting that's been described here to the jury?

Dr. Goodness:  Yes, certainly she doesn't – she was not charged with a great number of offenses, but this is an individual that would go to some of the worse bars that you can go to looking for fights.  She had a need to physically fight other people and she went to where she could do that.  So definitely plenty of aggression and violence on her part.

(RR. 31:29)  The purpose of disclosing information about the family is to illustrate how it has affected Mr. Long.  There was no reference to how the aggression and violence has been directed at Mr. Long and the possible effect on him.  Mr. Long's

60

defense attorney, and Dr. Goodness used several opportunities to illustrate to the jury how Mr. Long is not "human.":

> Mr. Johnson: Doctor, have you – I thought it was kind of unusual in our work on this case that through all the people that we spoke with together, and I know to some without me, but it is unusual to be able to find an individual, 35-year-old man, who cannot report or cannot be reported that had ever really had a close friend?
>
> Dr. Goodness: It is unusual in the human spectrum, yes.

(RR. 31:36) Without further explanation of why Mr. Long was unable to form friendships related to his possible attachment disorder, he is again portrayed as being less than human.

### 4.   Failure to Investigate Mr. Long's Brain Damage, Mental Retardation and Post-Traumatic Stress Disorder

The most egregious error made by Dr. Goodness during the mitigation investigation was her failure to fully investigate the nature and extent of Mr. Long's brain damage, mental retardation and post-traumatic stress disorder.  As part of her mitigation investigation, Dr. Goodness retained Dr. Laura Lacritz to conduct neuropsychological testing of Mr. Long that Ms. Goodness herself was not qualified to administer.  Curiously, she, rather than the defense attorneys at trial, interacted with Dr. Lacritz.  Dr. Lacritz stated she was uncomfortable with the manner in which Dr. Goodness interacted with her, and that she felt manipulated.  (PX 1, p. 195)  Dr. Lacritz further advised the habeas team that she never spoke with Mr. Long's trial team (PX 1, p. 195), but testified that she only had one phone conversation with Mr. Long's counsel, Paul Johnson.  (SH 4:46) Although education deficits can be an adaptive deficit, she was not provided any of Mr. Long's school records.  (SH 3:25,

61

28)  In fact, she did not evaluate Mr. Long for adaptive behavior.  (SH 4:45)  She asked for school records, any information about his previous IQ score, and records relating to his mother's IQ score of 59, but was not provided that information.  (SH 4:45) Dr. Lacritz testified that Kelly Goodness was not providing her with additional information (SH 4:48)

In addition, when Dr. Lacritz performed the testing, she was not provided a complete social history that would have better enabled her to interpret the data from her testing.

Dr. Lacrtiz administered several neuropsychological and cognitive tests to Mr. Long.  Based on the results of the tests,  Dr. Lacritz diagnosed Mr. Long as having "extremely low intellectual abilities, obtaining a Verbal IQ score of 66 and Performance IQ of 64, for a full scale IQ of 62 (bottom 1%)"  (PX 3)  Dr. Lacritz did note that Mr. Long performed sub-optimally on tests of motivation and effort, and some variability was noted across testing sessions.  *Id.*  She concluded certain performances *may* reflect an underestimate of his true abilities.

Dr. Goodness responded to this information with the conclusion that these low-test results were entirely the result of malingering.  She informed the defense lawyers that, in her professional opinion, Mr. Long was not mentally retarded.  She asserted that Mr. Long does not "present" like a person with such a low IQ as 62.[46]  Without being specific, she contended, "Mr. Long's performance on a variety of [tests] shows that he is not being currently forthright in his efforts and is attempting to manipulate

---

[46]     See, the letter from Dr. Goodness, dated August 23, 2006, submitted to the state habeas court as exhibit IV.

the findings."   Without any supporting basis, she also simply concluded Long's "adaptive functioning is not so low that he could at all qualify for a mental retardation diagnosis . . ." *Id.*

It should have been apparent to Dr. Goodness that, because of the importance of the potential ramifications of brain damage found in a defendant in a criminal case in which the State is seeking the death penalty, and because of her limited scope of expertise in the area of neurology, further investigation of this issue was required. Even more importantly, further investigation would have revealed that Mr. Long is, in fact, mentally retarded, and thus ineligible to receive the death penalty.

Dr. Daneen Milam, a board-certified diplomat in clinical neuropsychology was appointed by the state habeas court to evaluate Mr. Long in order to assist counsel in preparing this petition pursuant to TEX. CODE CRIM. P., § 11.071.   Dr. Milam conducted a clinical interview of Mr. Long; spent ten hours conducting neuropsychological testing; reviewed the trial record; reviewed Mr. Long's previous psychological reports, and reviewed the results of Toni Knox's mitigation investigation.   Dr. Milam concludes that Mr. Long is brain damaged, suffers from mental retardation, and, additionally, suffers from post-traumatic stress syndrome. (PX )

After Dr. Milam conducted her neuropsychological testing, she made a comparison of the answers that Mr. Long gave when Dr. Lacrtiz tested him on August 1, 2006 and his answers on the identical test given on November 23, 2007.   According to Dr. Milam, Mr. Long's answers were remarkably similar, and he generally made the

same mistakes.  As Dr. Milam notes, "It would be very difficult for a high functioning individual to maintain [this level of consistency] with a sixteen month lag time between test and restest.  There is simply no possibility that a low functioning individual could maintain [this level of consistency] with no knowledge that retest was going to be taken."  Petitioner's Exhibit 2, ¶ 6.

The neuropsychological evaluation conducted by Dr. Milam contained a total of 56 subtests.  Mr. Long's performance on these tests remained substantially the same, although there was a small improvement that Dr. Milam believes is likely due to practice effect.  Although Mr. Long may have exaggerated his memory deficits on the malingering screening test performed by Dr. Lacrtiz, Dr. Lacrtiz's test results nevertheless suggested that he both suffered from brain damage and mental retardation.

Dr. Milam also noted the importance of the fact that vital information pertaining to Mr. Long was kept from Dr. Lacritz and prevented Dr. Lacritz from properly assessing the significance of Mr. Long's neuropsychological test results.  (PX 2, ¶ 9)  Dr. Lacritz was unaware that Mr. Long's mother had tested as having an IQ score of 59 when she was child in a local orphanage.  *Id.*  Current evidence suggests that 80% to 85% of intellectual potential is genetic.  *Id.*  Dr. Milan stated:

> Given the fact that Judy scored in the mentally retarded range, and there is a strong genetic predisposition to mental health issues, that should have been a signal to anyone evaluating his records that this was an issue requiring further investigation.

*Id.*  In addition, had Dr. Lacritz known about the evidence that suggests Mr. Long suffers from post-traumatic stress syndrome, she might have attributed his artificially

low performance on a memory/malingering evaluation part of the test to a "panic attack" [exaggerated arousal response] rather than an intentional attempt to skew the results. *Id.* In addition, much of Mr. Long's family suffers from some mental illness or another, which also may have partially explained his what otherwise appeared to be malingering. *Id.*

In making the decision to "write off" Mr. Long's mentally retarded performance on Dr. Lacritz's test, Dr. Goodness placed a great deal of stock on the fact that Mr. Long received a score of 97 on an IQ test to determine his potential for earning a G.E.D.. These in-prison tests are performed in a group setting and are subject to rampant cheating, and Dr. Lacritz questioned the validty of that score. (PX 1, p. 195). According to Mr. Long, he hired an inmate to help him with the test in order to get into the G.E.D. program that, in turn, could result in his receiving vocational training. (SH 4:10) Even the state's expert, Dr. Paul Johnson only considered this score to be an "estimate", and "we don't use group IQ tests, we use them for screening instruments. The are not as accurate as individually administered IQ tests." (SH 2:171)[47]

Although Dr. Goodness refered to the neuropsychological testing in her testimony, she minimized the results of the tests. Later in the closing, Mr. Johnson referred to Dr. Goodness' testifying about "frontal lobe" damage, but Dr. Goodness did not testify in a way that might have benefit to Mr. Long. Surprisingly, Dr. Goodness minimized the important points related to possible brain damage and below-

---

[47]    Notably, Mr. Long's  scores from school indicate he had some type of learning disability or low IQ, which did not support the IQ score of 97 as tested in the prison.

normal intelligence:

> Mr. Johnson:  Could you tell the Jury -- and if you've already done so, let me know, but as far as the pathology, you said that you're not here trying to tell the jury that there is an actual brain injury or brain problem that is the direct cause, although there has been some pathology noted, is that correct?

> Dr. Goodness:  That's correct.

> Mr. Johnson:  And could you tell the jury what you relied upon for making this particular statement?

> Dr. Goodness:  One is my own interviews and assessment of Mr. Long and his functioning, as I observed him.  Also a neuropsychologist did quite a bit of testing with him for the purposes of this trial and I looked at her report and information as well.

(RR. 31:24-25)

From Mr. Johnson's remark in his closing statement, it is clear that he was

aware of some frontal lobe damage, which is critical to impulse control, but Dr.

Goodness furnished little information to the jury:

> Two year old babies, as Dr. Goodness told you, reaches and is denied that love, that nurturing, that each of you, I submit, has had, it doesn't just make you a little different.  It actually causes brain damage, actual damage, and she told you here that she wasn't coming in claiming that this man was damaged, some massive brain trauma, but she told you that he's been tested by experts and they have noted frontal lobe damage.

(RR. 31:58)

According to Dr. Milam, her testing reveals that Mr. Long "presented with a

clear pattern of organic brain impairment."  (PX 2, ¶ 23)  He exhibits:

> [A]cross most instruments, an inablity to control or inhibit impulsive responses along with disturbances of muscular control which are highly suggestive of deficits in the central nervous system, called constructional dyspraxia.    He exhibited verbal attention deficits, impulsivity, organizational deficits and the partial loss of ability to perform coordinated acts.  The results tended to indicate frontal and temporal

66

> lobe dysfunction that is exhibited in poor planning and organizational skills which have a significant impact on a person's ability to benefit from feedback and alter behavior.

*Id.* Mr. Long reports that he was hit by a car as a child; hit in the head by a pull-down bar in prison, leaving a permanent scar; and had suffered head trauma from several "bar fights," including one occasion when he was knocked unconscious from being struck by a beer bottle.  His prison records indicate that he has often complained of headaches.  (PX 2 ¶ 14)  These anecdotes, in conjunction with the test results of two neuro-psychologists showing that Mr. Long does indeed suffer from diffuse brain damage, make evident the reality that Mr. Long does, in effect, have a "hole in his head."

A predominant feature of brain injury is lack of inhibition.  Brain-damaged individuals frequently have emotional outbursts and engage in inappropriate behavior. Contrary to Dr. Goodness' testimony at trial, Mr. Long's brain damage may explain why Mr. Long lacks normal inhibitions and masturbates in front of females.  The evidence that Mr. Long did this, rather than having been a source of revulsion to the jurors, could have been compelling evidence of his brain damage.

In addition, it is well known that substance abuse often exaggerates the effects of brain damage.  (PX 2 ¶ 13)  "[Mr. Long] has mild generalized neuro-cognitive deficits which are probably long standing and have been compounded by the effects of polysubstance abuse . . . ."  *Id.*  Notably, many of Mr. Long's bad acts occurred under the influence of alcohol.  At no time did Dr. Goodness explain to the jury the results of the interaction of alcohol and brain damage in order to lessen Mr. Long's

culpability for the harm he inflicted on others.

As discussed in greater detail in the claim that Mr. Long received ineffective assistance of counsel due to his trial team's failure to present a mental retardation case, Dr. Milam also concludes that Mr. Long is, in fact, mentally retarded. She believes he has an IQ well below 70, several deficits in adaptive living, and the onset of this impairment occurred before he was 18.

Dr. Milam also opines that Mr. Long suffers from Post Traumatic Stress Disorder [PTSD]. This disorder is a "biological and chemical malfunction" and not the result of a lack of will power. (PX 2 ¶ 26) PTSD impairs one's ability to function in social settings, and causes occupational instability, sleep irregularities, feelings of detachment, and estrangement from others. PTSD arises when an individual suffers from a traumatic event. Some of the most common traumatic events associated with men who suffer from PTSD are rape and childhood neglect. Notably, strong evidence exists that Mr. Long suffered from extreme neglect as a child, and was raped while in prison. Given Mr. Long's difficulties in social relations and the evidence of the trauma that he had suffered, Dr. Goodness abdicated her role as an expert witness for Mr. Long by failing to diagnose him with PTSD and by failing to explain the role of that disorder in relation to his criminal behavior.

In summary, this case differs little from *Hooks v. Workman*, recently out of the 10th Circuit:

> Based on these principles, we find that counsel's performance during the sentencing phase was woefully inadequate. Not only did he mount "an extraordinarily limited case in mitigation," , but his own statements and the statements of his testifying expert served to villify Mr. Hooks in the

eyes of the jury. These failures raise a reasonable probability "that at least one juror would have empathized with Mr. [Hooks]" and chosen life over death.[48]

Mr. Long's defense presented incomplete family-history evidence, and the mental-health evidence that was presented was inadequate, unsympathetic, and even counterproductive at times. This evidence was reasonably available to counsel and highly relevant to the question of moral culpability. Its absence left the jury with a pitifully incomplete picture of Mr. Long. As the Supreme Court has found, the failure to investigate and develop this kind of evidence at sentencing constitutes deficient performance.

---

[48]      *Hooks*, 689 F.3d at 1202.

## Claim 2

**Mr. Long's Sixth Amendment right to counsel was violated when his legal team failed to adequately investigate and present evidence that he is mentally retarded and thus ineligible to receive the death penalty.[49]**

## Claim 3

**Mr. Long is mentally retarded and thus ineligible to receive the death penalty.[50]**

### A.    Execution of the Mentally Retarded is Cruel and Unusual

In *Atkins v. Virginia*, 536 U.S. 304, at 321 (2002), the Supreme Court held that "death is not a suitable punishment for a mentally retarded criminal." It based this holding on its conclusion that the Eighth Amendment's meaning is to be drawn "from the evolving standards of decency that mark the progress of a maturing society." *Id.* at 311-12.

In *Atkins*, the Supreme Court early in its opinion set forth in full the generally accepted clinical definitions of mental retardation:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992).

---

[49]    This was presented to the State Court as Issue 2 in Mr. Long's Application for Writ of Habeas Corpus.

[50]    This was presented to the State Court as Issue 3 in Mr. Long's Application for Writ of Habeas Corpus.

> The American Psychiatric Association's [(APA)] definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.*, at 42-43.

*Atkins*, 536 U.S. at 308 n.3.[51]  The Courts in the state of Texas cite the very same references and rely upon the same three fundamental factors to define mental retardation.[52]

Under these definitions, "significantly subaverage general intellectual functioning" has been defined as the individual's having an IQ of about 70 or below, which is approximately two standard deviations below the mean.[53]  While a full-scale IQ score of 70 or below is generally acknowledged as the defining point for subaverage intellectual functioning, there can be measurement error of approximately

---

[51]     As noted above in footnote 1, the AAMR is now called the American Association on Intellectual and Developmental Disabilities.  For consistency, the acronym "AAMR" will be used herein to refer to the manual of the American Association on Mental Retardation.  "DSM-IV" shall refer to the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 2000).

[52]     *Ex parte Briseno*, 135 S.W.3d 1, at 7 (Tex. Crim. App. 2004)(citing DSM-IV and AAMR.  See also, *Hearn v. Thaler*, 669 F.3d 265, 268 (5th Cir. 2012).

[53]     *Briseno*, 135 S.W.3d at 7 n.24 (citing DSM-IV and AAMD); *Hearn*, 669 F.3d at 229.

five points in either direction when assessing IQ, depending on the testing instrument.[54] "It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."[55] It is known that there are more than 1,000 different known organic causes of mental retardation.[56]

In the decade or so since *Atkins* announced its watershed rule, state and federal courts have become well-acquainted with what it means for a person to be "mentally retarded", and have learned formerly-foreign neuropsychological terminology, such as "practice effect", effort testing, and the "Flynn effect"[57], as they related to intelligence testing and the attempts to forensically determine whether an inmate is mentally retarded.  We know that people with mental retardation are complex human beings who likely have certain gifts as well as limitations.   As stated in the first page of the AAMR, "Within an individual's limitations often coexist with strengths."

The AAMR Manual describes four categories of risk factors that may interact to cause mental retardation.  The four categories of risk factors are: (1) biomedical:

---

[54]     *Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex. Crim. App. 2010); *see also Atkins*, 536 U.S. at 309 n.5; *Hearn*, 669 F.3d at 269.

[55]     *Ex Parte Hearn*, 310 S.W.3d at 428, citing COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000)

[56]     Boone, PX 5, at page 316.

[57]     The Flynn Effect is a phenomenon named for James R. Flynn, who discovered that the population's mean IQ score rises over time, by approximately 0.3 points per year.  Under his theory, if an individual's test score is measured against a mean of a population sample from prior years, then his score will be inflated in varying degrees (depending on how long ago the sample was first employed) and will not provide an accurate picture of his IQ. *See, e.g., Walton v. Johnson*, 440 F.3d 160, 177 n.22 (4th Cir. 2006) (en banc)

factors that relate to biological processes, such as genetic disorders or nutrition; (2) social: factors that relate to social and family interaction, such as stimulation and adult responsiveness; (3) behavioral: factors that relate to potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse; and (4) educational: factors that relate to the availability of educational supports that promote mental development and the development of adaptive skills.  AAMR at 126.  The AAMR Manual emphasizes that "the impairment of functioning that is present when an individual meets the criteria for a diagnosis of mental retardation usually reflects the presence of several risk factors that interact over time."  *Id*.  Similarly, the DSM-IV, at pages 45 and 46, notes that heredity and environmental influences such as "deprivation of nurturance and of social, linguistic, and other stimulation" as predisposing factors.

There are, in fact, degrees of severity of retardation.  The "mild" category is roughly equivalent to what was formerly termed "educable", and consists of about 85% of those who are characterized as mentally retarded.[58]  The "mild" group are often not distinguishable from children without mental retardation until a later age. *Id*.  By their late teens, they can develop academic skills up to approximately the sixth grade.  *Id*.  During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.  *Id*.

---

[58]      DSM-IV, at pages 42-43.

### B.   Mr. Long is Mentally Retarded – Intelligence Testing

Mr. Long is mentally retarded and thus ineligible for the death penalty.  Mr. Long claims that he is entitled to relief under both 28 U.S.C. § 2254(d)(1) and 28 U.S.C. § 2254(d)(2).  He asserts that the state court's adjudication resulted in a decision contrary to and involving an unreasonable application of clearly established federal law under *Atkins* and was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

The state habeas court afforded him an evidentiary hearing, at which evidence was presented concerning four different formal test scores given by three different doctors.  The marquee of all the test scores was their amazing consistency – 62, 63, 64 and 63 – all well below the normal cutoff for a diagnosis for mental retardation.[59]  Mr. Long has been subsequently tested again, using the universally acknowledged "gold standard", Weschler Adult Intelligence Scale - IV ("WAIS"), and scored a full scale IQ of 55, well within the same range of mental retardation.[60]

The question in the state proceedings then became one of whether Mr. Long was giving his best effort (colloquially, pejoratively and sometimes simplisticly termed "malingering") on the tests and whether the scores were an accurate representation of his intelligence.  The State habeas court found that Mr. Long was "malingering", and that as such it invalidated his test scores.  The State court findings

---

[59]    The state habeas court did correctly find that Mr. Long scored a full-scale IQ of 64 on the evaluation by Dr. Price, a full-scale IQ of 63 on the evaluation by Dr. Milam, and a full-scale IQ of 62 on the evaluation by Dr. Lacritz.  SH FFCL 154-156.

[60]    *See*, the Declaration of Daneen Milam, Ph.D., submitted herewith as Petitioner's Exhibit 10.

in this regard were an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d)(2).

As stated above, the WAIS is universally acknowledged as the "gold standard" in intelligence testing, and at time of the state habeas hearing it has been administered to Mr. Long on three separate occasions by three separate respected psychologists. (SH 2:7, 4:6).  A WAIS III  was administered by Dr. Laura Lacritz on August 1, 2006, and Mr. Long scored a full scale IQ of 62.  (SH 2:17-18; PX 3).  Over a year later, on November 28, 2007, Dr. Daneen Milam administered a third WAIS III, and Mr. Long scored a full scale IQ of 63.  (SH 2:15; PX 2).  Finally, in August of 2009, Dr. Randall Price on behalf of the State, administered a WAIS-IV, and then a totally different test, the Reynolds Intellectual Assessment Scale.  Mr. Long scored a full scale IQ of 64 on the WAIS-IV, and a 63 on the Reynolds Assessment Scale.  (SH 2:20-21, 119; PX 4)

C. **Effort/Malingering**

1. **Evidence Presented to the State Court**

i. **Present Measures of Effort Do Not Work with MR Population**

Dr. Milam testified regarding the instruments available to test whether best effort is given.  With respect to *brain damage*, but not mental retardation, there are separate tests which are designed to assess whether someone is malingering brain damage: the TOMM, the Rey-15 Item test, and the Validity Indicator Profile.  (SH 2:14, 39)  There is no separate test to assess effort with respect to intelligence testing. (SH 2:14) With respect to the three referenced tests, she testified:

The literature is very, very consistent now that you should not use any

> of these effort tests for the mentally retarded.  They were never designed
> for that, and make for inappropriately high false positives at the rate of
> one to three.

(SH 2:40; see also 2:42)  She testified that when these instruments are applied to the

mentally retarded the cutoff scores are causing people to be described as malingering.

(SH 2:40-41)   Dr. Lacritz also testified that these effort tests were not designed for

a mentally retarded population.  (SH 4:8)

Dr. Kyle Boone[61] produced a treatise in 2007 which addressed testing effort.

Bone, K., ASSESSMENT OF FEIGNED COGNITIVE IMPAIRMENT, A NEUROLOGICAL

PERSPECTIVE (The Guiliford Press 2007).  Chapter 14 on "Identification of Feigned

Mental Retardation" was admitted in the state habeas hearing.[62]  Dr. Milam directly

referred to this treatise when testifying.  (SH 1:44)  Dr. Lacritz was aware of Dr.

Boone's treatise and recognized Dr. Boone as respected in the field.  (SH 5:60)  Dr.

Price was aware of this treatise and had read it.  (SH 3:150)  Not surprisingly, Dr.

Goodness was not familiar with Dr. Boone's treatise.  (SH 4:44)

The State's expert, Dr. Price used the TOMM, the Dot Counting Test and the

Rey-15 Item Test to erroneously conclude that Mr. Long was malingering.  (SH 2:47)

Oddly, however, in 2003, Dr. Price co-authored an article in the Journal of Forensic

Neuropsychology questioning these tools:

---

[61]     In addition to editing ASSESSMENT OF FEIGNED COGNITIVE IMPAIRMENT, Dr.
Boone has also coauthored HANDBOOK OF NORMATIVE DATA FOR NEUROPSYCHOLOGICAL
ASSESSMENT.  Dr. Boone has also published the Dot Counting Test.  Boone, K., ASSESSMENT
OF FEIGNED COGNITIVE IMPAIRMENT, A NEUROLOGICAL PERSPECTIVE (The Guiliford Press
2007), at page vii.

[62]     SH 5:66-67.  It was admitted as Exhibit 7, and is submitted herewith as
Petitioner's Exhibit 5.

In spite of the psycho-metric sophistication of the maligering measures presented [the TOMM, Rey's 15 Item and Dot Counting Tests], their use is to detect malingering brain injury or even a specific aspect of neuropsychological functioning such as memory. **None were designed to detect malingering mental retardation**. . . .  The Test of Memory Malingering (TOMM) is frequently used in conjunction with an *Atkins* evaluation even though it was developed as a measure of malingered memory – not intelligence – and was not normed on individuals with mental retardation.[63]

Dr. Price's article further suggests that "School files must be reviewed, and the presence of special education evaluations with ultimate eligibility determination for mental retardation is the evidence to be most relied upon. *Id.*, p. 114.[64]

The TOMM, or Test of Memory Malingering is no longer the standard of care with respect to measuring malingering on IQ tests. (SH 2:40).  It was specifically designed to determine if someone was faking a loss of memory.  (SH 2:41)

The Dot Counting Test is contra-indicated to determine feigning with a mentally retarded individual.  (SH 2:43)  It's use led to 11 false positives out of 24 in one study, or a seventy-percent failure rate.  (SH2:43)  Dr. Milam noted that Mr. Long made a good faith effort:

---

[63]     PX 6, at page 113. Emphasis added.

[64]     *Id.*, at p. 114.  The very instruments Dr. Price profiled in his article were measures he used to determine Mr. Long was not mentally retarded, despite his own testing which indicated an overall intellectual ability in the mild mentally retarded range.  Due to the scores on short paper and pencil tasks and Mr. Long's verbal statements that he had read many books, Dr. Price came to believe Mr. Long was malingering his intellectual disability and never addressed the flaws in his own instruments, while minimizing the high standards of validity of the ACS.  This rush to judgment allowed him to accept Mr. Long's statement as true that he read many books in the Grisham series without giving Mr. Long a measure of reading comprehension.  Had he given such an instrument, he would have found that Mr. Long could phonically sound out words but cannot read for meaning.  On a formal reading comprehension task, Mr. Long was found to be reading at the beginning third grade level which was commensurate with his measures of intellectual potential.  See, Declaration of Daneen Milam, PX 10, at ¶ 11.

At the time of this evaluation Steven was making a good faith effort, as validated by internal measures built into the Halstead-Reitan Battery. An item by item review of prior responses versus current responses on his measures of intelligence, along with his consistent pattern of responses across instruments was used as a measure of sustained effort.

To assess malingering an item by item analysis was undertaken between the measure of intelligence potential given by Dr. Luara Lacritz on August 1, 2006 and the identical instrument given by this examiner on November 28th, 2007 (Weschler Adult Intelligence Scale, Third Edition). Mr. Longs answers were remarkably similar and even more important, his mistakes remained basically the same across math and block design subtests. It would be very difficult for a high functioning individual to maintain set with a sixteen month lag time between test and retest. There is simply **no possibility** that a low functioning individual could maintain a set with no knowledge that a retest was going to be undertaken.

(SH Applicant Ex. VI, ¶ 5-6; SH 2:14-15; SH FFCL 197)(emphasis added)

## ii.     Consistency Means Accuracy

The consistency of the scores across the spectrum of time stumped all of the doctors. The only reasonable conclusion they could all reach was that consistency could only be the result of maximum effort. This frankly should be of little surprise, since the WAIS-III manual reports that people with mental retardation achieve low scores "with minimal variability." AAMR, p. 62. So too, Dr. Price noted that score *discrepancies* were the markers for malingering: "Psychometric inconsistency is the hallmark of malingering."[65] Dr. Price wrote that factors to look for in assessing malingering include score discrepancies on different IQ and achievement tests as well as adaptive behavior assessments. *Id.*

## a.     Dr. Daneen Milam

---

[65]     PX 6, at page 114.

Dr. Milam was recognized by the States's expert, Dr. Randall Price as a qualified expert with a good reputation among the field.  (SH 2:117) As to the remarkably consistent scores, Dr. Milam testified:

> I would have to either give absolute maximum effort every time, and then I should get a score very similar across time, or I would have to basically refuse to take the test and get all zeros.  But unless you're giving your maximum effort and zero effort, it's not – it is not possible.

(SH 2:21)  She further testified that while it is theoretically possible to guess one's way to a 63, it was "absolutely not" the case with Mr. Long.  (SH 2:25).  Dr. Milam continued:

> I was basically amazed, amazed at how consistent they were.  I had never seen this before.  I've given a lot of tests for a lot of years. . . .  To get the same score across three different administrations of the Weschler series, and one administration of a totally different test by three different examiners over a three-year period is absolutely not possible to be anything other than an accurate score.

(SH 2:33, 36).  In her opinion absolutely no one could successfully fake the same test scores across various tests over a period of several years; it was simply not possible. (SH 2:111, 113)

### b.    Dr. Randall Price

To Dr. Price scores in the 60's across the board could not be completely explained and agreed that there was a shocking amount of consistency with the scores. (SH 2:126, 146).  He personally could not intentionally score lower than his own IQ on three tests across time.  (SH 2:144).  He, like Dr. Milam, agreed that the only way to get completely consistent scores would be to make no effort, which he agreed was not the case with Mr. Long.  (SH 2:145).  If he gave maximum effort, he would expect

the scores to be within the margin of error which was three to five points on either

side. (SH 2:145).  In his words,

> I just don't see how he could intentionally get that score."  "I think it
> would be extraordinarily difficult  for anybody to intentionally get the
> same IQ score over all those administrations, absolutely.

(SH 2:146).  Further:

> I agree that . . . it would be extremely difficult for a person to
> intentionally have a plan to score a 63 or 64 over that kind of time frame
> by memorizing the items.  I couldn't do it; I wouldn't expect it to
> happen.

(SH 2:126)

### c.   Dr. Laura Lacritz

Dr. Lacritz administered the first WAIS to Mr. Long, and obviously did not

have the benefit of the subsequent testing by Drs. Milam and Price when she initially

administered the WAIS III.  In light of the consistency of the subsequent scores she

stated that her score of 63 was accurate and reliable.  (SH 4:11, 14).  Scoring 62 or 63

on the tests over a period of several years is "a pretty strong reflection of an accurate

score." (SH 4:56)  She told the state habeas court: "It would be very difficult to get

consistent scores over three different testing periods, particularly if it was not an

accurate reflection of one's ability." (SH 4:10)  Further, given Mr. Long's 62 and 63

and 63 on the Reynolds IQ test, she agreed it would be very difficult to intentionally

achieve those scores. (SH 4:10).  Dr. Lacritz concluded by opining about his IQ score,

"I would say it's below 70." (SH 4:59)

80

### iii.    Advanced Clinical Solutions (ACS)

After acknowledging the limitations in historical effort tests with respect to a mentally retarded population, Dr. Milam described for the state habeas court the relatively new ACS test:

> It's called Advanced Clinical Solutions.  It is the Weschler series' attempts to address the concerns that have been coming out in the last two or three years about effort tests, so they developed a test that was basically a direct measure of whether an IQ is being malingered rather than inferring it through memory skills.

(SH 2:48)   This computer algorithm, which is normed for different populations, . examines whether a person is malingering.  (SH 2:49,73)  Dr. Milam performed the requisite testing on Mr. Long based upon the test administered by Dr. Price and determined: "[I]t came out clean as a whistle.  He was not malingering."  (SH 2:50, 53-54; DX 5; SH FFCL 208, 220)

With respect to the ACS test, Dr. Price stated that he was "quite interested" in it, but "I don't own it yet, I haven't given it yet, I don't understand the analysis of it at this time."  (SH 2:125)  He did not understand how to interpret the ACS, and had never tried to understand it.  (SH 2:160)

Neither Dr. Price, nor Dr. Lacritz were familiar with the ACS, as it was a relatively new component of the Weschler series at the time of the State habeas proceedings in January of 2010.  The State habeas court found that the ACS test was too new and untried to be reliable.  (SH FFCL 222)        It was obvious that the State questioned this test, and at the conclusion of the hearing Mr. Long's counsel requested additional time for evaluation of the new instrument and re-testing of Mr. Long:

> So I'm requesting that the Court delay making any findings in this case and for us to reopen this matter once we have more information on this ACS testing and possibly even readminister this with a valid WAIS-IV with this new testing have the most sophisticated information available to the Court to make this extremely important decision.

(SH 4:69.  The State "vehemently objected" and the request was not granted. (SH 4:69-70)

Having rejected Mr. Long's request, AEDPA deference is not owed to the finding of malingering.  See, *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002)("Having refused [petitioner] an evidentiary hearing on the matter, the state cannot argue now that the normal AEDPA deference is owed the factual determinations of the [state] courts."); *Hurles v. Ryan*, 650 F.3d 1301, 1311 (9th Cir. 2011); *Brumfield v. Cain*, 854 F.Supp.2d 366, 378-79 (M.D. La 2012)(state habeas court's denial of funding to develop Atkins claim constitutes an unreasonable application of clearly established federal due process law.)

Dr. Milam was recently re-engaged to administer the WAIS-IV to Mr. Long and to ascertain whether Mr. Long could be diagnosed as mentally retarded with a high level of certainty and it whether it was possible to rule out malingering with a high level of certainty?  Dr. Milam noted that the ACS had been designed to address the inadequacies of former measures of malingering.  PX 10 ¶ 5.  Further, she said that since the ACS had only been on the market for a matter of weeks at the time of his state habeas hearing, a request for a measure by measure examination of his performance on these scales in 2008 to be compared to his performance in 2013 was critical to ensure a fair and honest appraisal of Mr. Long's true level of functioning

as well as to address the issue of whether he was or was not malingering to avoid execution. *Id.* She concluded that he was not malingering, and is in fact mentally retarded:[66]

> To answer both of these questions a comparison was undertaken by evaluating Mr. Long's current level of mental retardation, also called intellectual disability, and a current measure of malingering and then comparing these scores with obtained scores from prior evaluations. Both the current measures of intelligence and the 2008 scores are based upon normative samples developed by the Wechsler Adult Intelligence Scales-Fourth Edition.
>
> The malingering indices are both based upon the Advanced Clinical Solutions, using the normative data of mental retarded individuals along with an item by item comparison of past performances and current performance.
>
> This ipsative comparison, comparing Mr. Long's present performance and Mr. Long's prior performance would be difficult if not impossible to malinger and is a strong indicator of his honesty and effort in his evaluation of mental retardation.

*Id.*

## 2.    There has been a Paradigm Shift in how psychologists Assess "Effort" with a Mentally Retarded Population.

Over the last four years research in the area of malingering has become quite pronounced as a result of the inadequacy of comparing the mentally retarded to base rates achieved by other populations such as those with traumatic brain injury and the emotionally impaired. *Id.* There has been, in fact, a paradigm shift in how neuropsychologists approach effort testing with a mentally retarded population. A bit of a historical perspective might be of assistance.

---

[66]    PX 10.

Neuropsychological and Psychological testing has been around for sixty years; mostly developed during World War II. (*Id.*, ¶ 7) The Weschler series of instruments are the primary tools used to measure intelligence. *Id.* At first most clinicians believed that by giving a long battery most people were truthful and trying their best. (*Id.*, ¶ 9) In the 60's and 70's it became obvious that at least a third were not doing their best when some kind of outcome was wanted (i.e, individuals learned to perform poorly to get disability and perform well to obtain some job or service). *Id.* Thus there was a significant need for instruments to determine true brain damage from malingering. *Id.* In the 70's and 80's tests were designed to "catch" these individuals who were making "suboptimal" effort. These tests, collectively, are called effort tests.

By 2000 several effort tests were available to detect potential malingers. For the most part, the efforts tests would report sensitivity rates (i.e., does it measure what it proposes to measure and identifies individual with that trait).[67] "Base rates" were developed for a wide variety of subgroups. Cut off scores were developed by disorder, by age, by education, and most often brain injury. When the cut-off score

---

[67]   *Id.*, ¶ 10. "Sensitivity" looks at the frequency or rate of occurrence of a finding among patients with a given condition. For example, with a pregnancy test, if 100 women who think they are pregnant take the test and the findings are accurate for 99, the test is sensitive to pregnancy. However, if 25 women were told they were pregnant and they were not, then the test produces a lot of false positives.

"Base rates" means how common something is in a given population. For example, one living in upper class suburbia may have never heard a gunshot in the neighborhood. In much rougher neighborhoods, there may be two or three a night. Different ethnic groups, different cultures, different ages have different base rates for some quality or attribute. In other words, the "base rate" refers to the frequency with which something happens in a given population.

for any given population of people is compared against a random sample of normal people false positives and false negatives often occur.  Another problem is the cut-off score makes the clinician more confident of his diagnosis and he or she tends to look for confirming evidence at the expense of ignoring disconfirming evidence.  This is called "confirmation bias."  During this time, it was believed that the mentally retarded would perform like the brain damaged, and when the individuals with mental retardation were evaluated, the cut-off scores for the brain damaged samples were used.  Very few studies of individuals with low scores on measures of potential were undertaken at all.  *Id.*  The mentally retarded subset of the population was rarely tested while large groups of people with traumatic brain injury filled the scientific literature. *Id.*

From 2003 to 2006, as more and more inmates on death rows across the country were evaluated for intellectual disabilities, some within the neuropsychological community began to report that the mentally retarded tended to score like the malingering with approximately the same cut off scores, thus producing an unacceptable rate of false positives.  (*Id.*, ¶ 11; PX 5)  One of these reporters was Dr. Price.  (*Id.*, *see also* PX 6)  In other words, the community was learning that the mentally retarded scored just about like malingers.

By 2008, the standard of care had evolved to a commonly held belief that many instruments used to measure effort were at risk of false identification of mentally retarded individuals.  (*Id.*, ¶ 12)  It was commonly held to be true that many mentally retarded individuals were being falsely accused of not putting forth maximum effort

when they had honestly tried their best.  It was not that the intellectually disabled could not be evaluated for suboptimal effort but they needed:  (1) adequate norming samples of mentally challenged people to be compared against; (2) cut off scores that reflected the performance of peers of same level potential; and (3) at least three different types of instruments, such as forced choice and embedded designs.[68]  *Id.*  At this time, due to the high number of false positives on standard malingering instruments, the Social Security Service DDS has formally discouraged the use of formal measures of effort to determine eligibility.  *Id.*

The WAIS-IV was published in 2008 and dramatically departed from earlier versions that were reported as Verbal IQ, Performance IQ and Full Scale IQ.  (*Id.*, ¶ 7)  There are now ten core subtests and five supplemental subtests and measures of intellectual potential are reported as indices.  The structure of the Wechsler Series have been the subject of numerous studies.  The new WAIS-IV was standardized on 2200 people and the newest version of the Wechsler Memory Scale was revised and updated at the same time on the same sample of individuals who comprise the standard sample.  *Id.* Research indicates that the WAIS-IV with its new configuration of four index scores, along with special scores to identify malingering or suboptimal effort, is a more appropriate and better test than the previous editions and a much more reliable measure of validity.  *Id.*

---

[68]     A forced choice format seeks an answer by "true"/"false", or "yes"/"no". Generally, a sample of random individuals were given the test with no directions and answered randomly.  In a forced choice format the sample generally got 50% right just by chance.  If the individual got less than 50% correct they were generally trying to answer wrong and were called malingerers.

86

So too, the ACS was introduced in 2009 by the Weschler group. (*Id.*, ¶ 13) The WMS-IV is a battery of subtests that are frequently administered in a comprehensive measure of memory. The WMS-IV contributes three scores to the ACS while the WAIS-IV contributes one test and a new forced choice test completes the five subtest battery. Since the ACS is a subtest of the WAIS-IV and WMS-IV, it has an overall norming sample of 2,200 individuals. *Id.* Using the special scales on the ACS, the base rate is compared against 67 mentally retarded men and women who had previously been diagnosed with an intellectual disability at a MHMR center with no incentive for malingering. This allows the examinee to be compared to individuals with the same ability level, called adjusted scores. The ACS reflects the new, proper way of thinking about malingering with respect to testing the mentally retarded.

### D.    **Adaptive Deficits.**

The AAMR Manual requires, for a diagnosis of mental retardation, that there also be "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical skills." AAMR, at 1. "Significance" can be established by the limitations in one of the three domains. AAMR, at 74, 77-78. The AAMR provides examples of "representative skills" in each of the three domains. Representative **conceptual skills** are "language, reading and writing, money concepts, and self-direction." *Id.* at 82. Representative **social skills** are "interpersonal, responsibility, self-esteem, gullibility, naiveté, follows rules, obeys laws, avoids victimization." *Id.* Representative **practical skills** are "activities of daily living, instrumental activities of daily living, occupational skills, and maintains safe environments." *Id.* The DSM-

IV definition requires that there be "significant limitations" in at least two of the following eleven domains:

- communication
- self-care
- home living
- social/interpersonal skills
- use of community resources
- self-direction
- health
- safety
- functional academics
- leisure
- work

DSM-IV-TR, at 41.[69]

The Supreme Court in *Atkins* itself, acknowledged the principal that the adaptive functioning component of mental retardation is complex. Not simply complex, but determining deficits in adaptive behavior (the second element) is highly subjective as well.[70]

The AAMR sets forth three adaptive-behavior areas applicable to determining mental retardation: conceptual skills, social skills, and practical skills. AAMR, at 73.

---

[69] The AAMR and DSM-IV adaptive behavior domains are consistent with each other. Prior to the present edition of the 2002 AAMR Manual, the 1992 AAMR Manual (9th ed.1992) utilized a description of adaptive behavior domains similar to the description of the eleven domains still utilized by the APA in the DSM-IV. The only differences were the APA domain "social/interpersonal skills" was called "social skills" in the 1992 AAMR Manual; the APA domain "use of community resources" was called "community use" in the 1992 AAMR Manual; and the two APA domains, "health" and "safety" were combined into a single "health and safety" domain in the 1992 AAMR Manual. *See* AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (9th ed. 1992). Although the 2002 AAMR Manual shifted from a focus upon ten domains to three broader domains of adaptive behavior, each of the ten 1992 skill areas fits neatly within at least one 2002 AAMR Manual domain. AAMR, Table 5.2. Thus, the current AAMR and APA domains are likewise compatible.

[70] *Briseno*, 135 S.W.3d at 8.

Conceptual skills include skills related to language, reading and writing, money concepts, and self-direction. *Id.* at 82. Social skills include skills related to interpersonal relationships, responsibility, self-esteem, gullibility, naivete, following rules, obeying laws, and avoiding victimization. *Id.* Practical skills include skills related to personal daily living activities such as eating, dressing, mobility, and toileting; instrumental daily living activities such as preparing meals, taking medications, using the telephone, managing money, using transportation, and housekeeping activities; occupational skills; and maintaining a safe environment. *Id.*

According to the AAMR, limitations in adaptive behavior can and should be determined by using standardized tests that are normed on the general population, which includes people with and without mental retardation. *Id.* at 83. A "significant" limitation is established by a score of two standard deviations below the mean in one of the three adaptive-behavior skill areas. *Id.* at 78.

There are many respected standardized measures that are commonly used, including the Vineland Adaptive Behavior Scales, the AAMR Adaptive Behavior Scales (ABS), the Scales of Independent Behavior, the Comprehensive Test of Adaptive Behavior-Revised, and the Adaptive Behavior Assessment System. *Id.* at 88-90. Typically, these measures require the clinician to interview a parent, teacher, or direct-service provider of the individual being assessed. *Id.* at 85. The interviewees should be well-acquainted with the individual's behavior over an extended period of time and in multiple settings. *Id.* Observations, interviews, and other assessment methods that gather information about adaptive behavior may

89

complement standardized measures but ordinarily should not replace them. *Id.* at 84.

However, diagnosing mental retardation will often require applying "clinical judgment" if earlier information is lacking or incomplete, if the individual's adaptive behavior cannot be assessed using standardized scales in his current environment, or if determining whether the onset was prior to age eighteen in an adult. *Id.* at 94. In fact, there is no valid and widely accepted measure exists to assess retrospectively the adaptive functioning of an adult who is incarcerated, or who may have inaccessible historians to recount his adaptive behavior. Such is the situation here. Clinical judgment is based on training, experience with others who are mentally retarded, and familiarity with the individual and his environment. *Id.* at 95. However, The AAMR emphasizes that:

> Clinical judgment should ***not*** be thought of as a justification for abbreviated evaluations, a vehicle for stereotypes or prejudices, a substitute for insufficiently explored questions, [or] an excuse for incomplete or missing data. . . .

AAMR at 95 (emphasis in original). Instead, the AAMR states, "[c]linicians who have not gathered ***extensive relevant assessment data*** should not claim clinical judgment." AAMR at 95. Mr. Long posits that Dr. Goodness did not have the extensive relevant data to claim clinical judgment with regard to assessing Mr. Long's mental retardation.

With respect to Mr. Long, his school records are some of the most objective and enlightening evidence presented.[71] The trial team should have been aware of this, as

---

[71]      Similar to *Moore v. Dretke*, 2005 U.S. Dist. LEXIS 37431, p. 19 (E.D. Tex. 2005).

his mother testified that Mr. Long was: (1) in special education, (2) did not successfully complete the fourth grade, and (3) never went past the eighth grade, despite being "socially promoted." (RR 30:49,151-53) Even the state's expert, Dr. Price stated "That would be – that would constitute an adaptive behavior problem, or a deficit that he did not achieve in school." (SH 2:132)

Dr. Milam noted that the fact that Mr. Long failed first grade, failed the fifth grade twice, never passed a grade past fourth grade, would indicate his academic performance was an adaptive skill deficit. (SH 2:59-60) Further, he never lived independently, had trouble with maintaining jobs, and has always been supported by others. (SH 2:60) She noted adaptive deficits in school, work and social. (SH 2:66). "He has not been successful in any area of his life." (SH 2:66) Dr. Milam testified that Mr. Long was absolutely mentally retarded. (SH 2:83)

Given this severity of sub-average intellectual functioning, it is virtually inconceivable that Mr. Long would not demonstrate deficits in adaptive living, and his life record is replete with evidence of such deficits. Mr. Long has never been able to live independently or manage his finances. (PX2 ¶ 24) Other than the year he worked at a job with his mother in a strictly supervised setting where she took him back and forth to work, he mostly has either been unemployed or lived in the highly institutional setting of prison. *Id.* Clearly, there was ample evidence of adaptive deficits, and it was unreasonable for the state habeas court to find otherwise.

### E.     <u>Onset Prior to Age 18.</u>

Mr. Long's sub-average intellectual functioning is clearly not something that

only arose later in his life.  He failed the first grade twice, repeated the fourth and fifth grades, and was apparently in Special Education for most of his time in school.  (PX 2 ¶ 24).  This is virtually conclusive proof that onset of his mental retardation was prior to age eighteen.  The state habeas court found that there was "no evidence" of onset prior to age 18", which is again clearly, convincingly, and objectively unreasonable.

### F.    **Failure to Raise and Present Mental Retardation Was Ineffective**

After *Atkins*, persons with mental retardation are no longer death-eligible.  In this case Mr. Long's trial attorneys failed to raise the issue of his mental retardation.  If the Court agrees with Mr. Long's contention that he is mentally retarded, in all likelihood the Court will find his defense team at trial was ineffective for failing to raise the issue.

### 1.    **No Procedural Bar**

Although the trial court recommended that the ineffective assistance issues and mental retardation issues were procedurally barred, the Court of Criminal Appeals specifically rejected those findings.[72]  In the unlikely event that the Court finds that Mr. Long is probably retarded, but his defense team cannot be faulted for failing to discover this fact and presenting this evidence to the jury, the question arises whether an *Atkins* claim is subject to a procedural default due to the fact that the claim was not raised at trial.

First, Mr. Long contends that an *Atkins* claim is similar to a *Ford v.*

---

[72]    *Ex parte Steven Long*, 2012 Tex. Crim. App. Unpub. LEXIS 201, rejecting findings 1-3 and 143-145..

*Wainwright*, 536 U.S. 304 (2002) claim. A *Ford* claim is one in which an individual subject to a sentence of death contends that he is incompetent to be executed.  An *Atkins* claim is similar to a *Ford* claim in that they are both "constitutional restrictions upon [the States'] *execution* of sentences."  *Id*. (emphasis supplied).  The Supreme Court in *Atkins* expressly relied upon and cited the procedural prescriptions from its *Ford v. Wainwright*, 536 U.S. at 317, decision that dealt with the issue of competency to be executed.  The Court in *Atkins* stated, "As was our approach in *Ford v. Wainwright* with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'"[73]

Both *Atkins* and *Ford* claims differ from typical *habeas* claims, in that typical *habeas* claims challenge the lawfulness under the federal Constitution of how a judgment or sentence was obtained by the State, whereas *Atkins* and *Ford* claims concern the constitutionality of the *execution* of an otherwise lawfully obtained sentence.  As the *Atkins* Court held: "the Constitution places a *substantive* restriction on the State's power *to take the life* of a mentally retarded offender."  *Id*. at 321 (quoting *Ford*, 477 U.S. at 405)(emphasis supplied).  Consequently, a state must afford a full and fair hearing, and otherwise observe procedural due process, whenever potentially meritorious *Ford* or *Atkins* claims are raised.

In *Panetti v. Texas*, 127 S.Ct. 2842 (2007), the Court held that when a state fails

---

[73]     *Atkins*, 536 U.S. at 317 (citing *Ford*, 477 U.S. at 405, 416-417) (internal citations omitted).

to afford the process due a petitioner under *Ford*, it has unreasonably applied clearly established federal law:

> The state court's failure to provide the procedures mandated by *Ford* constituted an unreasonable application of clearly established law as determined by this Court. It is uncontested that petitioner made a substantial showing of incompetency. This showing entitled him to, among other things, an adequate means by which to submit expert psychiatric evidence in response to the evidence that had been solicited by the state court. And it is clear from the record that the state court reached its competency determination after failing to provide petitioner with this process, notwithstanding counsel's sustained effort, diligence, and compliance with court orders. As a result of this error, our review of petitioner's underlying incompetency claim is unencumbered by the deference AEDPA normally requires.

*Panetti*, 127 S.Ct. at 2855. *See also id.* at 2858 ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.").

In addition to the above-made comparison of an *Atkins* claim to a *Ford* claim, strictly enforcing procedural default rules to the mentally retarded serves no legitimate purpose when the Constitution itself deprives the State of the power to impose capital punishment on this class of individuals. Under these circumstances, the principles of comity and finality that the statute of limitations protects must yield to the imperative of correcting a fundamentally unjust punishment.

The Supreme Court has accommodated the tension between the need for finality of state court criminal convictions and the "ends of justice" by strictly enforcing rules limiting federal *habeas* review. Consequently, a court may not reach the merits of claims that are successive, abusive, or procedurally defaulted, unless a petitioner can

94

show "cause and prejudice," *Murray v. Carrier*, 477 U.S. 478 (1986), or a "fundamental miscarriage of justice," *Schlup v. Delo*, 513 U.S. 298 (1995).  The Supreme Court has explicitly tied the fundamental miscarriage of justice exception to innocence, because it preserves the balance between "the societal interests in finality, comity, and conservation of judicial resources with the individual interest in justice in the extraordinary case." *Id*. at 324.

The fundamental miscarriage of justice exception encompasses not only a petitioner who is actually innocent of the crime, but also one who is actually innocent of the death penalty.[74]  The Supreme Court held that "innocence of the death penalty" should focus on the objective elements "that render a defendant eligible for the death penalty." *Id*. at 347.  The Eighth Amendment's ban on imposing capital punishment on certain classes of persons provides definition to the concept of "innocence of the death penalty."

Claims of categorical ineligibility for the death penalty, like mental retardation, are uniquely unsuitable for application of a rule intended to promote finality, because society has no legitimate interest in sentencing these defendants to death in the first place.  *See Penry v. Lynaugh*, 492 U.S. 302, 330 (1989)("There is little societal interest in permitting the criminal process to rest at a point where it ought never to repose.")(internal quotation marks omitted).  Like *Teague*, procedural default, and failure to exhaust state remedies, AEDPA's limitations period "quite plainly serves

---

[74]        *Sawyer v. Whitley*, 505 U.S. 333 (1992).

the well-recognized interest in the finality of state court judgments."[75]  Because the statute of limitations protects the same values as those implicated in other procedural contexts, considerations of justice mandate adopting actual innocence as an exception to the limitations period or as a means of equitably tolling it.

## 2.   Ineffective Assistance by Mr. Long's Counsel

As eggregious as executing a retarded individual, it is equally shocking that Mr. Long's legal team did not even attempt to present a case to the jury that Mr. Long was mentally retarded.  Defendants in *Atkins* proceedings have the right to effective counsel secured by the Sixth and Fourteenth Amendments.[76]  Trial counsel did not have to *prove* a diagnosis to affect the proceedings.  Even if experts would have been subjected to extreme impeachment their testimony could still be mitigating, as the defense only needed to reach one juror.

So too, as a matter of ineffective assistance of counsel, Mr. Long does have to actually prove that he is retarded.  It is sufficient that there is a reasonable probability that the jury could have determined him to be mentally retarded at trial.   It would have been up to the jury to resolve the battle of the experts over whether Mr. Long was not giving his best effort.

Further, the first reason that Kelly Goodness stated that Mr. Long was not

---

[75]     *Duncan v. Walker*, 533 U.S. 167, 179 (2001)(citation omitted).

[76]     *Hooks v. Workman*, 689 F.3d 1148, 1184 (10th Cir. 2012)("[T]the right to counsel flows directly from, and is a *necessary* corollary to, the clearly established law of *Atkins*. Consequently, we hold that the right to counsel in *Atkins* proceedings is 'clearly established Federal law, as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)(1)").

retarded was because he had been tested in prison in the average range. (SH 3:9)  This was a group test, and even the State's own expert, Dr. Randall Price discounted it: "We don't use group IQ tests, we use them for screening instruments.  They are not as accurate as individually administered IQ tests."  (SH 2:171)

The markers were all present, and should have been obvious to a trained professional of any pedigree.  Despite  the known connection between heredity and mental defects,[77] Dr. Goodness was not able to tell if Mr. Long had an organic brain problem or brain injury, but was aware that his mother's intelligence is much lower than average and he did not score well on his neuro-psychological testing. (RR 31:25)  She also noted that Mr. Long comes from an incredibly dysfunctional family.  (RR 31:27)  Dr. Goodness also said Mr. Long's severe lack of nurturing as a child quite possibly stunted his brain functioning.  (RR 31:41)

Additionally, although education deficits can be an adaptive deficit, Dr. Lacritz was never provided any of Mr. Long's school records.  (SH 3:25, 28)  She asked for school records, any information about his previous IQ score, and records relating to his mother's IQ score of 59, but was not provided that information.  (SH 4:45)  Kelly Goodness was not providing her with additional information.  (SH 4:48)  Ms. Knox was particularly concerned with Mr. Long's school records, and she did not understand why it was not developed further.  (SH 2:205)

### G.   Conclusion

In that the central issue was the "effort" given by Mr. Long – and there was

---

[77]     "Evidence suggests that at least 50% of intelligence can be explained by heredity."  Boone, PX 5, at page 316.

seeming unanimity among Drs. Milam, Lacritz and Price that only through a full and complete best effort could one achieve consistent scores – the state habeas court's finding that Mr. Long was malingering is clearly, convincingly, and objectively unreasonable.

Using scales developed to update the newest version of the WAIS-IV and WMS-IV, along with norms developed from known samples of individuals documented to be intellectually disabled, Mr. Long was found to be functioning in the mentally retarded range by Dr. Milam.  Mr. Long's scores are replicated across four assessments.  He also exhibited a severely limited ability to care for himself and there is significant antidotal evidences of this fact is available which meets the criteria of poor adaptive functioning.   He is now, and was at the time of his state court proceedings, mentally retarded.  (PX 10, ¶ 17)   Habeas relief is warranted here.  28 U.S.C. § 2254(d)(2).

## Claim 4

**The failure of the Texas death penalty statute to inform jurors that the effect of the jury's failure to reach a unanimous verdict on any issue at the punishment phase of the trial would result in a life sentence violated Mr. Long's rights against cruel and unusual punishment and to due process of law under the 8th and 14th Amendments to the United States Constitution.[78]**

This was presented and rejected as subparts A and B to the first point of error on direct appeal. It was also preserved as error by Mr. Long's specific written objections to the indictment and the jury charge, based on *Mills*, and the "10-12 rule" which were overruled . (CR. 48-50, 52, 184-187, 189, 230-249, 250).

The trial court's failure to inform the jury properly about the effect of a non-unanimous verdict on the special sentencing issues constitutes a violation of the Eighth Amendment. In other words, it is unconstitutional that the court did not instruct the jury if they fail to reach a verdict on punishment that the defendant would have received a sentence of life. *Mills v. Maryland*, 486 U.S. 367 (1988); *McKoy v. North Carolina*, 494 U.S. 433 (1990).

All twelve jurors must answer the first two special issue (future dangerousness and parties application) affirmatively before the trial court may impose the death penalty; a life sentence, on the other hand, requires that at least ten jurors answer the

---

[78]     Claim 4 and those which follow are presented to preserve them for further review. They are all presently not legally viable under existing Circuit precedent. It is not unrealistic to expect that some of these rulings might be modified. It has happened previously. For example, in dealing with constitutional mitigating evidence, the *en banc* Fifth Circuit in *Graham v. Collins*, 950 F.2d 1009 (1992), outlined the principles that it would later distill into a "constitutional-relevancy test," under which the Fifth Circuit denied all *Penry* claims before 2002. *Robertson v. Cockrell*, 325 F.3d 243, 256 (5th Cir. 2003). In 2004, the Supreme Court rejected the Fifth Circuit's constitutional relevancy test as a "restrictive gloss on *Penry I.*" *Tennard v. Dretkel*, 542 U.S. 274 (2004). The *Tennard* court found that the Fifth Circuit's precedent "ha[d] no foundation in the decisions of [the Supreme] Court." *Id.* at 284.

special issues negatively.[79]   The jury must also be unanimous in answering the mitigation issue no, while only ten jurors can vote yes.   The jury received these instructions in this case.[80]

However, the jury in this case, as in all death penalty cases, failed to learn that there were in fact two ways that a life sentence would result.   The other way, of course, is for the jury to fail to reach a verdict at all; which has exactly the same effect as ten of the jurors voting with the defense.

The Texas rule generates the danger that confused jurors otherwise predisposed to hold-out on voting for a death sentence will conform to a "majority-rules" mentality.   Reasonable jurors are led to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors agree that particular mitigating factors exist.   Stated another way, potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them.   If a majority of other jurors are firmly voting "yes," holdouts may feel obligated to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict.[81]   This scheme does not allow the juror to understand their ability to impose a life sentence based upon a single vote contrary to the remainder of the

---

[79]      TEX. CODE CRIM. P. art. 37.071 Sec. 2(d)(2).

[80]      This is commonly known as the "12-10" rule.   However, under Texas state law, if the jury fails to reach a decision regarding either special issue in a capital murder case, the defendant will receive a life sentence.

[81]      *Mills*; *Lowenfield v. Phelps,* 484 U.S.231, 239-240 (1988).

jury.

The several instructions that informed the jury that ten votes were essential for imposition of life imprisonment inaccurately stated Texas law and affirmatively misled the jurors. Each individual juror knew, from the instructions, that his or her single vote could not determine the outcome. Rather, that juror must convince at least nine others to join the decision. Of course, that instruction was at odds with the questioning during *voir dire* concerning each juror's ability to vote independently and not unfairly compromise.[82]

The Texas sentencing scheme violates the Eighth amendment principle expressed in  *Mills v. Maryland,* that it is unconstitutional to instruct capital sentencing jurors in a manner leaving reasonable jurors to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors agree that particular mitigating factors exist. *Mills* holds that the Constitution prohibits a state from requiring jurors unanimously to agree that a particular mitigating circumstance exists before they are permitted to consider that circumstance in their sentencing determination. That is, a constitutional violation occurs if a reasonable juror could interpret the jury charge to instruct the jury that there must be a meeting of the minds among some threshold number of jurors as to whether the mitigating evidence offered by the capital defendant warrants either a negative answer to the first special issue or, an affirmative

---

[82]        RR.6:79-80, RR.7:45, RR.8:79, RR.9:151-152, RR.10:88-90, RR.12:164, RR.14:45, RR.16:123, RR.19:54, RR.20:62-63, RR.23:58, RR.24:54

response to the second, thus resulting in the imposition of a life sentence.[83]  Unless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will give a "majority rules" mentality is too great under the Eighth Amendment, particularly in a capital case.

When jurors are not informed that the vote of even one juror would result in the death penalty not being imposed, there is a substantial probability that a juror might have been precluded from voting for mercy because of a mistaken belief that the sufficiency of mitigating factors must be shown.[84]

Mr. Long acknowledges that the current expression of this Circuit's law is that *Mills* is not applicable to the capital sentencing scheme in Texas.  *Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000).  However, Mr. Long believes this claim is based upon *Mills* and *McKoy* and is not seeking a new rule that would be prohibited pursuant to *Teague v. Lane*, 489 U.S. 288 (1989).  However, he acknowledges as well that this Circuit has also held that any ruling that the "12-10" rule violated the federal constitution would be a new constitutional rule of criminal procedure as defined in *Teague v. Lane*, 489 U.S. 288, 311-13 (1989), that did not place certain kinds of individual conduct beyond the power of the criminal law-making authority to proscribe and was not a watershed rule of criminal procedure, and therefore could not form the basis for federal habeas corpus relief. *See Hughes v. Dretke*, 412 F.3d 582, 591 (5th Cir. 2005).  Mr. Long wishes to preserve the issue for review.

---

[83]     *Mills,* 486 U.S. at 373-75.

[84]     *Kubat v. Thierot,* 867 F.2d 351, 369-73 (7th Cir.)*, cert. denied,* 493 U.S. 874 (1989).

## Claim 5

**Mr. Long's Eighth and Fourteenth Amendment rights were violated because the Texas death penalty statute impermissibly placed the burden of proving the mitigation issue on Mr. Long, rather than requiring the State to prove the absence of mitigating factors beyond a reasonable doubt.**

This was presented and rejected as subpart c of the first point of error 1 on direct appeal.  It was preserve when defense counsel unsuccessfully  objected to the charge on the mitigation issue for failure properly to place the burden of proof on the State in violation of the Fourteenth Amendment's Due Process Clause.  (RR188:217-219)

Under the Texas statutory scheme, the jury was not instructed on a burden of proof on the mitigation special issue.  *See Lawton* 913 S.W.2d 542, 557 (Tex. Crim. App. 1995)("the Texas legislature has not assigned a burden of proof regarding mitigating evidence").  *Apprendi v. New Jersey*, 530 U.S. 466 (2000), necessitates a finding that the Texas death penalty scheme is unconstitutional because it does not place the burden of proof on the State that would require the jury to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to warrant the imposition of life rather than death.[85]

Moreover, because of the juxtaposition of the reasonable doubt instruction with the Special Issue Number 3, the jury could have read the charge to mean that Mr. Long had the burden of proving beyond a reasonable doubt mitigation sufficient to warrant life rather than

---

[85]        Mr. Long acknowledges that *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005), holds that no Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof, but wishes to preserve the issue for review.

death.  The mitigation instruction effectively asks the jury to find whether the sentence of death is appropriate – a fact on which the State bears the burden of proof. However, the jury receives no instruction that the State bears this burden, much less the scope of that burden.  This transgresses the Due Process Clause and the Eighth Amendment.  *See Apprendi*, 530 U.S. at 469 ("the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case"); *In re Winship*, 397 U.S. 358, 394 (1970). Because the statute under which Mr. Long was sentenced to die does not require the jury enter a negative finding on the mitigation special issue, only if the State has proven beyond a reasonable doubt that there was an absence of mitigating evidence sufficient to warrant a sentence of life, rather than death, the statute and Mr. Long's trial are unconstitutional deprivations of Due Process as secured by the 14th Amendment as interpreted by *Apprendi* and an arbitrary punishment in violation of the 8th Amendment.

The State cannot shift to a capital defendant the burden of proving he does not merit death.  This shifting of burdens effectively imposes upon the defendant the burden of disproving the State's case – something the federal Constitution does not permit.  If the State chooses to seek death, it must prove, beyond a reasonable doubt, all elements necessary to imposition of that punishment, including that mitigating circumstances do not warrant a lesser penalty.  Due process – and the Eighth Amendment in the context of capital cases – requires the State bear the onus of proving its case.  Because it did not do so at Long's trial, the Court must vacate Long's sentence.

## Claim 6

### Mr. Long's right to Due Process of Law and his Eighth Amendment right to be free from cruel and unusual punishment were violated by the failure to define the term "probability."[86]

The Fifth Amendment to the United States Constitution provides that "no person shall . . . be deprived of life, liberty, or property without due process of law . . .".  U.S. CONST., AMEND. V.  Similarly, the Fourteenth Amendment to the United States Constitution proscribes any State from "depriv[ing] a person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV.  The Eighth Amendment to the United States Constitution mandates that "nor [shall] cruel and unusual punishment [be] inflicted."  U.S. CONST. AMEND. VIII. Long submits that the failure of the statute and the charge to instruct the jury on the definition of "probability," a term in the "future dangerousness" issue in the punishment phase of his trial, over his objections,[87] violated due process and resulted in infliction of cruel and unusual punishment.[88]

The trial court instructed the jury to answer Special Issue One, which read as follows:

---

[86]    This was raised as his second point of error on direct appeal, and rejected.

[87]    Numerous objections were lodged to this omission. (CR 170-175; 214-216; 282-283).

[88]    Mr. Long acknowledges that the Fifth Circuit has consistently held that the terms in the Texas statute are not unconstitutionally vague and can instead be understood in their common meaning. *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996)(noting the long line of Fifth Circuit cases holding that the terms in the Texas punishment special issues need not be defined in the jury instructions); *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993)(not necessary to define "deliberately," "probability," "criminal acts of violence," or continuing threat to society"); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993)(not necessary to define "deliberately," probability," or "society").  Mr. Long wishes to preserve this claim for review.

> Do you find from the evidence beyond a reasonable doubt that there is
> a probability that the defendant would commit criminal acts of violence
> that would constitute a continuing threat to society?

(CR 311)  The trial court never defined for the jury the term "probability" as used in

Issue One.  The instruction was derived from TEX. CODE CRIM. PROC. ANN., art.

37.071 § 2 (b)(1).  All members of the jury answered the issue affirmatively.  (CR

311)

As Justice Souter recognized in *Simmons v. South Carolina*, the need for

"heightened reliability mandates recognition of a capital defendant's right to require

instructions on the meaning of the legal terms used to describe the sentences . . . a jury

is required to consider, in making the reasoned moral choice between sentencing

alternatives."  512 U.S. 154, 172 (1994) (Souter, J., concurring).  Thus, whenever a

reasonable likelihood exists that a juror will misunderstand a sentencing term, the

Court must instruct on the meaning of the term.  In fact, "[a] trial judge's duty is to

give instructions sufficient to explain the law, an obligation that exists independently

of any question from the jurors or any other indication of perplexity on their part."[89]

As used in the first special issue, the word "probability" has no common or

uniform meaning.  In statistical terms, the probability of an event comprises the

likelihood, either great or small, of a given occurrence.  Every possibility thus carries

a "probability" greater than zero, but equaling no more than one hundred percent.  A

reasonable juror in the instant case was left to apply this or any of the other many

---

[89]     *Kelly v. South Carolina*, 534 U.S. 246, 256 (2002) (citing Charles A. Wright and
Arthur Miller, FEDERAL PRAC. AND PROC. § 485 at 375 (3d ed. 2000))(stating, "It is the duty of
the trial judge to charge the jury on all essential questions of law, whether requested or not").

possible interpretations of the word, including: above fifty percent; a substantial likelihood; or, technically, any chance at all, even one-in-a-million.

The Due Process Clauses require a definition of legal terms. The Texas special issues, both as written and as applied in the instant case, function as aggravating circumstances. An aggravating circumstance is any finding by a capital sentencer which "circumscribe[s] the class of persons eligible for the death penalty."[90] An affirmative finding to each special issue thus comprises a finding on an aggravating circumstance as defined by the Supreme Court in *Zant.* When an aggravating circumstance is vague, however, it fails to serve its constitutionally mandated narrowing function. A sentence of death may not be imposed using such a vague aggravating factor unless the state court cures such vagueness by applying a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope.[91] As the Supreme Court has said:

> When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face.[92]

The complete failure to define the term "probability" left the jury free to speculate on its meaning, rendering the term unconstitutionally vague and indefinite. The mere articulation of aggravating circumstances will not suffice as a framework

---

[90]     *Zant v. Stephens*, 462 U.S. 862, 878 (1983).

[91]     *Maryland v. Cartwright*, 486 U.S. 356 (1988); *Godfrey v. Georgia*, 446 U.S. at 428; *Profitt v. Florida,* 428 U.S. 242, 253 (1976).

[92]     *Walton v. Arizona*, 497 U.S. 639, at 653 (1990)

for the imposition of the death penalty if the statutory aggravating circumstances contain terms that are inherently vague and standardless.  In this situation, it is imperative that this Court apply a limiting construction that is passed on to the jury in a capital case.

That the jury is able to know, without any explanation, that "probability" means more than a bare chance or mere probability – a definition necessary to make the term constitutional – is ludicrous.  In voir dire the jurors confirmed this inherent problem. Juror Stahl defined probability as a "possibility" even after the state suggested that probability meant more likely than not.  (RR 6:40)  Likewise,  juror number four, Adkins, thought that probability meant chance (RR.9:103) and juror number six, Cisneros, thought probability meant "possible." (RR.12:125)

Because the Texas special issues contain terms that are unconstitutionally vague, and to which the trial court applies no limiting construction, the special issues are unconstitutional as applied to Long.[93]  Under the circumstances presented, Long's death sentence was "arbitrarily or discriminatorily" and "wantonly and . . . freakishly imposed" in violation of the Eighth Amendment.  *See Furman v. Georgia*, 408 U.S. 238, 249 (1972).   The Court must vacate Long's sentence and provide him with the requisite relief he legally is entitled to receive.

---

[93]     See *Walton*, 497 U.S. 639; *Lewis v. Jeffers*, 497 U.S. 766 (1990).

## Claim 7.

**The State's failure to provide meaningful appellate review of the insufficient evidence to support the jury's verdict with regard to mitigating evidence violates the Eighth Amendment's prohibition against cruel and unusual punishment.**[94]

Because the second statutory special issue is open-ended and unstructured, not enumerating a list of mitigating and aggravating factors and not requiring jurors to make specific "findings" in this regard, the Court of Criminal Appeals has no means to know which aggravating and mitigating factors jurors considered. Thus, the appellate court has no means to know how, and indeed whether, the jury considered all of the constitutionally relevant mitigating evidence offered at trial. In this way, meaningful appellate review is impossible.

Texas's unstructured sentencing scheme is unconstitutional because it does not permit meaningful appellate review, which is not only required by a Texas statute[95] but also is a prerequisite to a constitutionally implemented capital sentencing scheme.[96]  Mr. Long's objections to this construct were overruled.

The Supreme Court has recognized that an appellate court is in a virtually impossible position to review a jury's consideration of mitigating and aggravating evidence without knowing which factors the jury in fact considered. *See Sawyer v.*

---

[94]    This point of error was raised on direct appeal, as point of error number four.

[95]    *See* TEX. CODE CRIM. PROC. art. 44.251.

[96]    *See Gregg v. Georgia,* 428 U.S. 153 at 195, 206 (1976); *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *Jurek v. Texas*, 428 U.S. 262, 278 (1976); *see also Stringer v. Black*, 503 U.S. 222 (1992).

*Whitley,* 505 U.S. 333, 346 (1992)(noting "how difficult [a] task" a reviewing court faces in "assess[ing] how jurors" reacted to mitigating and aggravating evidence "particularly considering the breadth of those factors that a jury . . . must be allowed to consider" without knowing how jurors actually considered the totality of the evidence.)[97]

Because of the trial court's failure to charge the jury in a constitutionally adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death sentence upon Long in comparison to those cases in which a life sentence has been imposed.   Because the Court of Criminal Appeals is required by statute and by the Constitution to review the sufficiency of the evidence supporting a jury's negative answer to the statutory *"Penry"* special issue, the open-ended and unstructured nature of arts. 37.071 and 37.0711, prevents meaningful appellate review, rendering the Texas capital sentencing statute unconstitutional under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.  U.S. CONST. AMENDS. V, VIII, XIV.  The

The Texas Court of Criminal Appeals has rejected every opportunity to review a challenge to the sufficiency of the evidence to support a negative answer to the

---

[97]     *Sawyer* did not address the exact issue in this case.  Rather, the Court was speaking of the difficulty of an appellate court's attempted hypothetical recreation of a capital sentencing phase involving mitigating evidence that trial counsel failed to introduce.   However, for purposes of the present case, the Court's discussion is highly apposite.  The point both in *Sawyer* and in this case is that without actually knowing whether and how a particular jury considered evidence during a capital sentencing phase, an appellate court cannot accurately assess the jury's decision making.

mitigation special issue.[98] The rationale has been variously identified by that court in *Morris v. State*, 940 S.W.2d 610, 614 (Tex. Crim. App. 1996): "Because the weighing of mitigating evidence is a subjective determination undertaken by each juror, we will not review mitigating evidence for sufficiency." Earlier in *McFarland v. State*, 928 S.W.2 482, 498 (Tex. Crim. App. 1996):

> While this Court can review objective evidence of future dangerousness, we cannot meaningfully review the jury's normative decision on mitigation, whether it answers in the affirmative or the negative.

It should have come as little surprise when Mr. Long raised a challenge to the sufficiency of the evidence to support a negative finding to mitigation, the Texas Court of Criminal Appeals rejected it as well:

> This court has repeatedly rejected this argument, and we have said, "So long as the jury is not precluded from hearing and effectuating mitigating evidence, we have never regarded appellate review of mitigating evidence to be an essential component of a constitutionally acceptable capital punishment scheme." Point of error four is overruled.[99]

The Supreme Court has repeatedly emphasized the importance of appellate review in upholding death penalty statutes. *See, e.g.*, *Zant v. Stephens*, 462 U.S. 862, 875 (1983)(in upholding the Georgia death penalty scheme, noting that one of the "important features" of the statute is that it "mandates meaningful appellate review of every death sentence."); *Gregg v. Georgia*, 428 U.S. 153, 198 (1976) (plurality op.)(automatic appeal is "important additional safeguard against arbitrariness and

---

[98]   *Fuller v. State*, 253 S.W.3d 220, 234 (Tex. Crim. App. 2008); *Salazar v. State*, 38 S.W.3d 141, 146 (Tex. Crim. App. 2001); *Prystash v.* State, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999); *Green v. State*, 934 S.W.2d 92 (Tex. Crim. App. 1996).

[99]   *Long v. State*, slip. op., at page 16.  Citations omitted.

caprice"); *Proffitt v. Florida*, 428 U.S. 242, 253 (1976)(under constitutional Florida statute, death verdicts "are reviewed to ensure that they are consistent with other sentences imposed in similar circumstances" and thus, it is no longer true that there is "'no meaningful basis for distinguishing the few cases in which (the death penalty) is imposed from the many cases in which it is not.'" (citations omitted)).

"The unique nature of the death penalty . . . enhances the importance of the appellate process." *Murray v. Giarratano*, 492 U.S. 1, 22 (1989) (Stevens, J., dissenting); *see also Whitmore v. Arkansas*, 495 U.S. 149, 167-71 (1990) (Marshall, J., dissenting)(discussing importance of meaningful appellate review in death penalty cases).

In 1972, the Supreme Court invalidated the Texas death penalty scheme  as being violative of the Eighth and Fourteenth Amendments.  *See Furman v. Georgia*, 408 U.S. 238 (1972).  The Texas legislature responded by passing a new death penalty statute which was subsequently upheld in *Jurek v. Texas*, 428 U.S. 262 (1976).

In *Jurek*, the joint opinion of Justices Stewart, Powell and Stevens conditionally approved of the constitutionality of the post-*Furman* Texas capital sentencing scheme in part because the statute provided for "prompt judicial review of the jury's decision" to impose the death penalty.  *See Jurek*, 428 U.S. at 276.  The joint opinion expressed the belief that such appellate review would "promote the evenhanded, rational, and consistent imposition of death sentences" in Texas.  *See id.*  Thus, meaningful appellate review in this Court is a predicate to the constitutionality of the Texas death penalty scheme.

112

The joint opinion in *Jurek* specifically approved of the type of appellate review undertaken by this Court in the early post-*Furman* era because this Court had *"focused on whether mitigating factors were present in the case*." *See id.*, 428 U.S. at 273 (emphasis added) (discussing *Smith v. State*, 540 S.W.2d 693 (Tex. Crim. App. 1976), *cert. denied*, 430 U.S. 922 (1977)).

*Jurek's* discussion of the operation of the Texas capital sentencing scheme at trial stated that "the constitutionality of the Texas procedure turns on whether the [statutory punishment issues, in particular the 'future dangerousness' issue] allow consideration of particularized mitigating factors." *Id.* at 272.[100]

In *Jurek v. State*, 522 S.W.2d 934 (Tex. Crim. App. 1975), *aff'd*, 428 U.S. 262 (1976) the court listed representative mitigating factors that it believed were directly relevant to the statutory language of the "future dangerousness," although the court "indicated that it [would] interpret [the future dangerousness issue] so as to allow a defendant to bring to the jury's attention *whatever mitigating circumstances he may be able to show*." *Jurek v. Texas*, 428 U.S. at 272 (*citing Jurek v. State*, 522 S.W.2d

---

[100] In that regard, the joint opinion noted that:

> The [future dangerousness] question asks the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" if he were not sentenced to death. The Texas Court of Criminal Appeals has yet to define precisely the meanings of such terms as "criminal acts of violence" or "continuing threat to society." *In the present case, however, it indicated that it will interpret this [special issue] so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show* . . . . It thus appears that . . . the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a death sentence.

*Jurek*, 428 U.S. at 273-74 (emphasis added) (citations and footnotes omitted).

at 939-40) (emphasis added). In *Jurek v. Texas*, the Supreme Court's discussion of the Texas Court of Criminal Appeals' sufficiency review specifically mentioned the same catalogue of representative mitigating factors listed by this court in *Jurek v. State*. *See Jurek v. Texas*, 428 U.S. at 273.

Beginning with *Burns v. State*, 761 S.W.2d 353 (Tex. Crim. App. 1988), and continuing throughout, the Texas Court of Criminal Appeals has largely refused to consider a capital defendant's mitigating factors in determining whether the jury's affirmative answer to the "future dangerousness" issue was appropriate. That court rejected the argument that such a narrow appellate review – which focuses primarily on aggravating evidence and simply ignores a wide variety of mitigating factors – violates the Eighth Amendment's requirement of "meaningful appellate review." *See Wilkerson v. State*, 881 S.W.2d 321, 328-29 (Tex. Crim. App.)(Baird, J., dissenting), *cert. denied*, 513 U.S. 1060 (1994) (contending that the type of appellate review of the future dangerousness issue in capital cases tried under the pre-*Penry* sentencing statute violates the Eighth Amendment).

As the Supreme Court held in *Jurek*, meaningful appellate review requires the appellate court to consider all of the defendant's mitigating evidence to determine whether a death sentence is appropriate. The Supreme Court explained that appellate review of each and every death sentence ensures that jurors did not act irrationally in view of the totality of aggravating and mitigating factors in a particular case. *Clemons*, 494 U.S. at 749:

> It is . . . important to note that state supreme courts in states authorizing the death penalty may well review many death sentences and that typical

> jurors, in contrast, will serve on only one such case during their lifetimes
> . . . . Therefore, we conclude that state appellate courts can and do give
> each defendant an individualized and reliable sentencing determination
> based on the defendant's circumstances, his background, and the crime.

Under the current Texas statute, the future dangerousness issue is no longer the jury's primary vehicle for considering mitigating evidence, as it was under the former sentencing scheme. *See, e.g.*, *Johnson v. Texas*, 509 U.S. 350, 370-72 (1993)(discussing the pre-*Penry* Texas statute). Rather, the mitigation issue is now the primary vehicle for juries to consider mitigating evidence.

Reasonable jurors no longer view the future dangerousness issue as a "comprehensive inquiry" that logically encompasses a wide variety of mitigating as well as aggravating factors. *See Johnson*, 509 U.S. at 370-71 (in discussing the former Texas sentencing scheme, the Supreme Court observed that "a Texas capital jury deliberating over the [former] Special Issues is aware of the consequences of its answers, and is likely to weigh mitigating evidence as it formulates these answers in a manner similar to that employed by juries in 'pure balancing' States. . . . . [T]he [future dangerousness special issue] is a comprehensive inquiry that is more than a question of historical fact." (citations omitted)). Rather than a "comprehensive" assessment of a capital defendant's background and character and circumstances of the offense, the jury's finding of future dangerousness simply serves as an aggravating factor. *Cf.*, *e.g.*, OKLA. STAT., § 701.12(7) (listing future dangerousness as one of many statutory aggravating factors).

The only way to afford a capital defendant meaningful appellate review is for the Texas Court of Criminal Appeals to conduct an appellate review of mitigating

circumstances relevant to the statutory punishment issue.   *Cf. State v. Jeffers*, 661 P.2d 1105, 1129 (Ariz. 1983), *cert. denied*, 464 U.S. 865 (1983)("In death penalty cases this Court independently reviews the facts that the trial court found to establish the presence or absence of mitigating [and aggravating] factors, and we determine whether the latter outweighs the former where we find both to be present.").

However, the Texas Court of Criminal Appeals has held that:

> [s]o long as the jury is not precluded from hearing and effectuating mitigating evidence, we have never regarded appellate review of mitigating evidence to be an essential component of a constitutionally acceptable capital punishment scheme.

*McFarland*, 928 S.W.2d at 482.   Contrary to the Court of Criminal Appeals' assertion, under the Eighth and Fourteenth Amendments, the appellate court must consider a capital defendant's mitigation in some meaningful manner in reviewing a death sentence.[101]

The evidence presented in Mr. Long's trial, even viewed in the light most favorable to the jury's verdict, was insufficient.   Mr. Long presented compelling evidence from his background which not only was mitigating, but also reduced his moral blameworthiness for the instant offense.

Mr. Long does not argue that the mitigation evidence excuses the commission of this offense in such a way that appellant is not responsible for his action: he only argues that the circumstances of his character and background as set out above are

---

[101]      Mr. Long recognizes that this argument has been presented to and rejected by the Fifth Circuit in *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005).   However, petitioner would argue that the different statutory schemes have created an arbitrary and capricious violation of the Eighth Amendment due to evolution of capital litigation.

116

such as to call for the imposition of a life sentence, i.e., to spare his life. Because the evidence adduced at trial was insufficient to sustain the jury's negative answer to the mitigation special issue, this Court should hold that the evidence is insufficient to support the jury's finding, vacate the death sentence, and reform the judgment to reflect a sentence of life in prison.

## VI.

## CONCLUSION AND PRAYER

Mr. Long submits that his case should be reversed as to punishment; and prays that this Honorable Court afford him an evidentiary hearing; and, that upon such consideration that the Court issue a writ of habeas corpus vacating his unlawfully obtained sentence of death; allow him a constitutionally sufficient period within which to file such amendments to this Petition as may be necessary to bring all proper matters before this Court and avoid unnecessary piecemeal litigation of his challenges to the legality of his conviction and sentence; grant him full and complete discovery pending such evidentiary hearing; and for such other and further relief as may be just and proper.

Respectfully submitted,

*/s/      Thomas Scott Smith*

By:_____

Thomas Scott Smith
State Bar Number 18688900
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
e-mail: smithlaw@airmail.net
Facsimile (903) 870-1446
Telephone (903) 868-8686

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of this Petition for Writ of Habeas Corpus upon counsel for Office of the Attorney General of Texas, P.O Box 12548, Austin, Texas 78711-2548, by placing electronic delivery, to the above address, this February 27, 2013.

*/s/      Thomas Scott Smith*

_____

Thomas Scott Smith

118

## <u>APPENDIX OF EXHIBITS</u>

1.  Toni Knox Investigation for state habeas proceedings.

2.  Dr. Daneen Milam's Declaration (4-30-08)

3.  Neuropsychological Evaluation by Dr. Laura Lacritz (2006)

4.  Psychological Evaluation by Dr. Randall Price (7-13-09)

5.  Chapter 14 of Boone treatise.

6.  Article by Dr. Randall Price

7.  ABA Guideline 10.7

8.  DSM-IV excerpts

9.  AAMR excerpts

10. Dr. Daneen Milam Declaration (2013)

119