Steven had a couple of suicide attempts while incarcerated.  Prior to his release in 2002, he was transferred to a psychiatric unit for five months.  Steven did seem to benefit some from these five months, but rarely was compliant with medication or other recommendations made by the mental health professionals treating him.  Steven has been place on various anti-psychotic medications, anti-depressants, and anxiety medications over the later years.  He was on medications when he was discharged from prison and seems to be more stable when he was on medications, but rarely was compliant with taking his medications and stops for various reasons.  Steven has been given a number of diagnosis over the years, from Major Depression with and without psychotic features, Anxiety Disorder and Malingering.  He has received several different personality disorders on Axis II, most have been cluster B.

### Military History

Steven has never served in the military in any capacity.  His Aunt Dorothy was in the Navy.

### Substance Abuse History

Steven was caught sniffing glue on the school bus when he was in the 5th grade.  Steven began using drugs at a young age.  There was little supervision in the home and as a result his older sister, Cindy, was drinking and smoking marijuana.  Cindy allowed Steven to smoke marijuana at age 10.  Steven's mother was also buying beer for Cindy and her friends when she was fourteen and Steven was eleven.  Judy believed it was better to have Cindy and her friends drinking at home than be out somewhere.  Judy told Steven not to drink the beer, but did not supervise him closely.  When Steven was eleven, Judy also got involved with Phil Blankinship, who constantly had drugs available, from marijuana to cocaine.  Steven was referred to Parkland for a psychiatric assessment at age fifteen, and he reported he was using marijuana, alcohol, cocaine and LSD.

Steven has been arrested several times for DWI's and for possession of marijuana.  Steven's sister, Cindy, and her husband had a long history of drug use and she has only been

sober for the last couple of years.  Prior to that Cindy and her husband were using crack cocaine
and methamphetamines with Steven.  In addition to using various drugs, Steven, also frequently
drinks alcohol.  Steven has been described as a "mean drunk" and his mother, Judy, states she is
also angry and violent when she is drinking.

Steven was court ordered to have substance abuse treatment while he was on probation in
1994, but there was no bed available and he never received the treatment.  Steven did attend
counseling while he was on probation and there was some focus on his addiction, but very little.
As part of his probation, Steven was to attend AA meetings, but he rarely attended.

### Sexual Abuse History and Sexuality

Steven slept with his mother until he was a teenager and then his mother kicked him out.
When Steven was about eight or nine, he "felt up" his mother one night in bed.  Mother kicked
him out and spanked him the next day, but they never talked about what had happened.
Steven remembers his first sexual experience at age 10.  A friend of his sister, Charmain
Carpenter tried to masturbate Steven, but he was unable to get an erection.  Some time later
Charmain showed Steven her vagina.

Cindy had a friend named Carla who had an older cousin, Dana.  Steven understood she
was a "truck stop whore".  Dana was often sexually inappropriate with Steven, as she would
show him her breasts and vagina.  She would also fondle Steven's penis.  Dana was 23 to 25 at
the time and Steven was about 11 or 12.   Steven reports his contact with Dana was over about a
three month period of time.  Steven liked to look at her breasts, but was upset when she would
fondle him and then tell him he was not a man.  There was no sexual intercourse between Dana
and Steven, but he performed oral sex on Dana.

The next incidence of sexual abuse occurred with one of his sister's friends, Rhonda
Cole.  Steven was 11 or 12 at the time and she would frequently show him her breasts.
Steven says his first instance of sexual intercourse was with one of his sister's friend's,
Charmane.  Charmane became sexual with Steven and wanted to have intercourse.  She was

angry at Steven because he didn't know how to do it.  While they were having intercourse, his penis kept coming out because he was pulling out too far.   Charmane was extremely critical of him because he was so inept.

Steven had a friend named Jason (possibly Baker) who had an older sister, Kim Baker. Steven was twelve at the time and Kim was nineteen.  Steven has a vivid memory of accompanying Jason and his mother to pick up Kim in Ft. Worth from her father.  Her father was a pilot of a small plane (probably crop duster).  They picked up Kim at the airport and her father took Steven and Jason for a quick ride on the airplane.  It was very exciting for Steven and he remembers it well.  He was unable to remember his exact age, but states that it was two days after he had been arrested as a juvenile for stealing a spiked dog collar in Mesquite.  After picking up Kim, Steven spent the night with the family.  Kim later engaged Steven in inappropriate sexual behavior.  Kim asked Steven to put his fingers in her and then he later gave her oral sex.

At age fourteen, while high, Steven had sexual relations with a man named Robert. Steven reports they were both masturbating and later Robert pushed Steven down to give him oral sex.

At times, Steven was turned off by sex with Mindy because he knew she was turning tricks.  Steven and Mindy often had rough sex and she wanted him to choke her.  Mindy thought that Steven was gay because he often wanted her to "do" him in the butt and wanted to have anal sex with Mindy.  There is a difference in opinion between Mindy and Steven as to who wanted the choking during sex.  Mindy says Steven wanted to do it and Steven says Mindy wanted him to do it.  Mindy reports that in the end, "the choking during sex" was the reason she stopped living with Steven.

When Steven went to prison at age 24, he was raped and sodomized by two men.  It was violent and Steven did not enjoy it or have any sexual pleasure.  Steven filed a grievance but nothing happened, so Steven decided it would be better to go along with the anal sex so he didn't

Steven Long Psychosocial History
12/28/07

get beat up.  Steven does report he does like to be hurt during sex.  Steven reports at age 15 to 17, he was sticking thing in his anus.  He hurt himself sticking a pan handle in his anus.  Steven did not have anal sex until prison

Steven saw his mother having sex a couple of times.  He also saw Phil and Cindy having sex several times when he accidentally walked in on them and Phil would laugh.

Steven had a couple of different sexual partners in prison and he asked both to do it roughly.  His first sexual partner was Anthony Wayne Hogan while Steven was in the McConnell Unit.  His next sexual partner was John Paul Duan on the Briscoe Unit.  Steven was then sent to the Daniel Unit, where he felt safer and he did not have any trouble.

Steven has always been attracted to oral sex.  After Steven got out of prison, he would go to Adult book stores and would give guys oral sex at these Adult book store (Paris).

Steven saw numerous incidents of rape and brutality while in prison.  He saw three people who had been stabbed with a shank.  In 1995, Steven saw a Mexican man's head split open.  Steven saw a young black male raped and then thrown off the third tier of the prison.  Steven believes he was killed.  The young black male was a psychiatric patient.  Steven frequently saw other men being raped in the showers and he would turn away and just pray.

Steven admits to frequent masturbation, but frequently could not ejaculate.  Because of his ADHD and difficulty in staying focused, he often lost interest in the middle of sex.  Steven often wanted Mindy to put things in his anus, and Mindy believed he was gay because of this.

Steven struggles with sexual identity issues.  He see-saws back and forth between saying that he is gay and then only gay at certain times.  Steven is probably bi-sexual, but is unable to take the pressure of admitting to being gay to family and others.

LONG EXHIBIT 1, p. 055

### Conclusions

Steven is the second generation of a dysfunctional family and he was raised by a mother who had been psychological damaged by being sexually abused by her father and being abandoned by the rest of her family. Even though Steven's mother had good intentions for raising her children, she did not have the appropriate parenting skills and was unable to show any emotion other than anger to the children. She was a hard worker and did make every effort to provide financially for her children, but was unable to provide the emotional support and attachment needed for normal development. As a result, for most of Steven's childhood, he did not have appropriate supervision and guidance.

Even though Steven's mother worked hard to provide financially for the family, she was unable to afford appropriate child care for the children. By age ten, Steven's older sister, Cindy, was caring for herself and Steven, as best she could. There were the usual problems associated with children attempting to parent other children. Cindy became involved with drugs at a young age and contributed to Steven getting involved with drugs. Cindy got pregnant at age fifteen and left the home. Although, she had not been supervising Steven well, she was all he had.

Steven, like his mother, suffers from fears of abandonment. Steven feels as though he was abandoned by his mother for work, by his sister for her another, by his biological father from the beginning, his girl friend Olga, and later his children. Steven has an external locus of control and therefore is constantly allocating blame to various members of his family for his problems. Steven rarely takes responsibility for any of his actions.

Steven did poorly in school, probably related to a number of reasons. He was diagnosed with ADD and did not receive his medication on a regular basis. Steven had no guidance and encouragement with his school work at home as his mother was not available. Steven started using drugs at an early age which did not motivate him for school. Steven really only completed the course work through the fourth grade, although he was promoted through the grades. He was barely able to read and write when he went to prison.

Steven Long Psychosocial History                          Page 43 of 45
12/28/07

Steven had a long history of drug use starting at a young age and he is genetically predisposed to alcohol and drug addiction.  For most of Steven's life, he has lived in an environment of drug usage and ready availability of drugs.   Steven's psychiatric problems are worsened by alcohol use and must of his bad behavior has been after he has been drinking.  Steven is highly impulsive without alcohol, but with alcohol he has no impulse control and acts out his angry feeling on whoever is in the area.  This has included his mother and in many of his relationships.

Steven has a long history of inappropriate sexual behavior and there have been frequent occurrences of Steven masturbating in public, in front of women and in front of men.  Steven has some sexual identity issues and is probably bi-sexual.  He has been involved in both homosexual and heterosexual relationships.  In most cases, Steven seems to have angry feelings toward women and feels they should "take care of him".  Steven does better in the more dependent role in a relationship and is frequently angry and acts out when he is required to be in the more responsible role in the relationship.  Steven was attractive as a young man and was frequently approached by girls and women requiring little effort from him.  Steven currently has very bad teeth and has lost several teeth in front which has been detrimental to his appearance.

Steven is poorly education, has a low IQ, fairly limited social skills, an inability to control his impulses in most cases and an outward locus of control.   This frequent blaming behavior toward family and others can cause others to try and distance themselves from him.  He has been diagnosed with various Axis II diagnoses, which cause him to frequently be non-compliant with treatment and medication.   Steven does seem to function in the environment of prison better than in the free world, where he is unable to handle the everyday stresses of job, finances, relationships and exposure to drugs.  Steven frequently engaged in self sabotaging behavior.  Prior to his release from prison previously, he was fearful about functioning in the free world and realized he was likely to do something so he could remain in prison.

# Steven Long Time Line

| Date | Event | Source |
|---|---|---|
| 10/10/1920 | Thomas Lee Tidwell is born in Kaufman, Texas. | Buckner |
| 03/29/1924 | Steven's grandmother, Ruby Lynn Drewry is born. | Death C |
| 12/07/1942 | Thomas Lee Tidwell, Jr. is born to Thomas Tidwell and Ruby Drewery.  He will be called Tommy Glenn. | |
| 01/15/1944 | Dorothy Jack Tidwell is born to Ruby and Thomas Tidwell. | Ancestry |
| 06/07/1945 | Roy Donald Tidwell is born to Ruby and Thomas Tidwell. | Ancestry |
| 06/07/1946 | Roy Donald dies from a stomach type virus. | Estimate |
| 09/29/1946 | Steven's mother, Judy Ann Tidwell, is born to Thomas Lee Tidwell and Ruby Lynn Drewry/Tidwell.  It was reported to Buckner that Judy was born 9/29/45, but it is impossible because her brother was born 6/7/45.  Buckner believed Judy to be one year older than she actually was. | Estimate |
| 12/31/1950 | Ruby Lynn Tidwell dies from TB. | DC |
| 04/28/1957 | This is the day reported by Dorothy Tidwell as being sexually molested by her father, Thomas Tidwell, in the court documents. | Ct. rec. |
| 07/07/1957 | This is the day reported by Teressa Johnson that she was sexually molested by her step father, Thomas Tidwell, | Ct. rec. |
| 08/27/1957 | This is the day reported by Judy Ann Tidwell that she was sexually molested by her father. | Ct. rec. |
| 09/10/1957 | Rape charges are filed against Thomas Tidwell related to sexual abuse of Judy, Dorothy and Teressa. | Ct rec |
| 09/14/1957 | Tommy Glenn has been left alone after his father's arrest and he is finally picked up his uncle Grady and taken to Irving.   Tommy and his sisters had just started school in Blue Ridge, but that life is over. | Tommy interview |
| 09/28/1957 | An attorney, John Gay, is appointed for Thomas Tidwell. | Ct rec |
| 10/30/1957 | Witnesses are subpoenaed for Thomas Tidwell's trial.  The witnesses are Mrs. Lottie Tidwell, Dorothy Jack Tidwell, Judy Ann Tidwell, Teressa Ann Johnson and Dr. Glenn L. Mitchell. | Ct rec |
| 11/13/1957 | The trial is set for Thomas Tidwell and he pleads guilty to the one charge for Judy Tidwell.  Mr. Tidwell is sentenced to 15 years in prison. | Ct rec |
| 11/14/1957 | Judy and Dorothy's father has gone to prison and they begin the transition from their step-mother's home to various relatives and eventually their step-mother will be unable to care for them. | Estimate |
| 09/21/1958 | Home Visit from Buckner with Mrs. Tidwell, Judy's stepmother.  She tells the caseworker that her husband suffers from a "split personality".  Mrs. Tidwell states that Mr. Tidwell had attacked Judy and Dorothy several times before they had the courage to tell her.  Mr. Tidwell had previously been a deacon in the Baptist church.  Mrs. Tidwell believes her ex-husband is receiving psychiatric care in prison. | Buckner |

LONG EXHIBIT 1, p. 058

| Date | Event | Source |
|------|-------|--------|
| 10/02/1958 | Judy Ann Tidwell is admitted to Buckner Orphans Home | Buckner |
| 10/18/1958 | On the intake form for Buckner, Judy Tidwell's IQ is listed as 59. | Buckner |
| 10/29/1958 | Dorothy and Judy have a first time meeting with their CW at Buckner. Judy was tearful during much of the session. Both girls were homesick. The girls had not received a letter from their step-mother, Lottie. | Buckner |
| 11/19/1958 | Judy meets with her caseworker at Buckner and it is noted that Judy rarely smiles and seemed unhappy. Judy did not understand why she could not return to live with her mother. Letter to Lottie Tidwell informing her that Judy and Dorothy are adjusting to Buckner, but encourage her to visit them. | Buckner |
| 12/05/1958 | Judy visits with her caseworker and is crying because she believes her mother has moved and she does not know her address and she has not visited. | Buckner |
| 01/04/1959 | Dorothy runs away from Buckner with a friend, Ruth Hughes. | Buckner |
| 02/06/1959 | Judy Tidwell's case worker describes Judy's problems as: 1) cannot accept rejection by stepmother; 2) not accepted by other girls at the home, 3) is emotionally unstable and cannot get through an interview without crying; 4) is bitter toward her father because of what happened; 5) she has unpleasant habits that cause the other girls not to like her. | Buckner |
| 10/30/1959 | Dorothy talks with the CW at Buckner about the possibility of living with her Uncle Ray Tidwell, rather than Buckner. | Buckner |
| 11/13/1959 | Buckner makes a visit to the Tidwell home. Judy's stepmother, Mrs. Tidwell, is drawing social security on the children's mother. | Buckner |
| 11/13/1959 | CW from Buckner visits the Ray Tidwell home, 324 Elston Drive. CW if informed that Judy and Dorothy had lived briefly wit them prior to going to their stepmother's home. | Buckner |
| 02/10/1960 | Letter from CW at Buckner to Mrs. Luetta Tidwell (Judy and Dorothy's paternal grandmother). | Buckner |
| 04/14/1960 | Dorothy reports her to caseworker at Buckner that a cousin, who is a Baptist preacher, visited and tried to kiss and fondle her. This cousin is Boyd Bannister. | Buckner |
| 07/06/1961 | Judy and Dorothy plan to visit their auth Mrs. Jimmie Cooper for a summer vacation in August. | Buckner |
| 09/08/1961 | Judy Tidwell has decided to go to a vocational program as she has failed the eighth grade several times. | Buckner |
| 09/08/1961 | Dorothy tells the Buckner CW that Judy is upset because she feels torn between staying in the vocational program and the regular program. | Buckner |
| 09/20/1961 | Buckner CW and Dorothy talk about Mrs. Cooper as possibly being able to take Judy, but at this Dorothy does not want to go because of her boyfriend. | Buckner |
| 11/27/1961 | Dorothy Tidwell's case manager at Buckner talks to Dorothy about hoping to get a sponsor for her as she needs some winter | Buckner |

| Date | Event | Source |
|------|-------|--------|
|  | clothes. Dorothy tells the CW she is engaged to the boy she has been going with. |  |
| 03/27/1962 | The other charges against Thomas Tidwell are dropped by the County Attorney because he feels he will be unable to locate witnesses. | Ct. rec. |
| 07/08/1962 | Phillip Ralph Blankinship is born to Earl Ogden and Clesta Ruth Blankinship. | Ancestry |
| 04/18/1963 | Letter from Buckner to Mr. and Mrs. Jimmie Cooper expressing thanks for having Judy and her friend over to their home for the holidays. | Buckner |
| 05/30/1963 | Dorothy graduated from high school and left Buckner's. | Buckner |
| 06/01/1963 | Judy left Buckner's to live with Dorothy. Judy was working at St. Paul Hospital. | Buckner |
| 01/01/1964 | Dorothy joined the Navy on a bet made while she was drinking. Dorothy's boyfriend went into the Navy before her. After boot camp, she married her high school boyfriend John Randolph Samford, II. | estimate |
| 12/01/1966 | Dorothy gets out of the Navy. | estimate |
| 12/20/1966 | Judy is living with the Coopers in Crandall. Judy gives birth to a son and gives him up for adoption. | estimate |
| 01/15/1967 | Judy is hospitalized at Terrell State Hospital. Suicidal related to her sexual abuse issues and giving up her child for adoption. | estimate |
| 03/12/1968 | John Sampson is born to Dorothy and John Sampson. | BC |
| 07/28/1968 | Judy Long gives birth to Cynthia Ann Long. | BC |
| 10/08/1969 | Judy Tidwell and Ronnie Jack Long remarry. |  |
| 01/01/1971 | Judy and Ronnie are separated and Judy is living with Steve Ramon. | estimate |
| 08/17/1971 | Steven Long is born. His mother is Judy Long and his father is Steve Ramon. Since Judy is still married to Ronnie Long, he allows his name to be placed on the birth certificate. Judy is living in Oak Cliff at the time of Steven's birth. | BC |
| 01/01/1972 | Judy and family move to the Piedmont Apartments in Pleasant Grove, Texas. | Estimate |
| 04/20/1972 | Letter from Parkland Hospital to Public Welfare Office indicates that Steven's mother, Judy, has applied for Welfare. |  |
| 08/17/1972 | Steven is one year old. | BC |
| 08/17/1973 | Steven is two years old. | BC |
| 08/17/1974 | Steven is three years old. During this period, Judy is still drinking and going to bars. On a couple of occasions, Judy takes Cindy and Steven to the bar and leaves them out in the car. | BC |
| 08/17/1975 | Steven is four years old. Judy is having problems financial and has no one to care for her children. She moves in with her father. | BC |
| 08/17/1976 | Steven is five years old. | BC |
| 08/23/1976 | Steven is enrolled in Kindergarten at Seagoville Elementary. The family is living at 407 Simonds, Seagoville, Texas. | DISD |

Steven Long Time Line

| Date | Event | Source |
|------|-------|--------|
| 08/17/1977 | Steven is six years old. | BC |
| 08/24/1977 | Steven is enrolled in first grade at Walnut Glen Elementary in Garland. | GISD |
| 08/17/1978 | Steven is seven years old. | BC |
| 08/25/1978 | Steven is enrolled in second grade at Walnut Glen Elementary in Garland. | GISD |
| 04/10/1979 | Judy Long and Ronnie Long divorce. | |
| 08/17/1979 | Steven is eight years old. | BC |
| 08/24/1979 | Steven is enrolled in second grade at Buckner. He was previously in 2nd grade at Walnut Glen Elementary. | |
| 08/17/1980 | Steven is nine years old. | BC |
| 08/25/1980 | Steven is enrolled in third grade at Buckner. | DISD |
| 08/08/1981 | Dorothy marries Jarrel S. Hutson (Bud). | Ancestry |
| 08/17/1981 | Steven is ten years old. | BC |
| 08/24/1981 | Steven in enrolled in fourth grade at San Jacinto. | DISD |
| 08/17/1982 | Steven is eleven years old. Cindy is having parties at the house and since Judy is gone, their home is frequently the hang-out house. | BC |
| 08/23/1982 | Steven is enrolled again in fourth grade at School 530. | DISD |
| 08/17/1983 | Steven is twelve years old. Steven's sister, Cindy, is involved with Phil Blankinship and is no longer paying attention to Steven and he is left to care for himself. | BC |
| 08/29/1983 | Steven is enrolled in fifth grade at Rowe Elementary. The family has moved to Overlook. | DISD |
| 08/17/1984 | Steven is thirteen years old. Phil Blankinship is constantly at the home and is exposing Steven to drugs and pornography. Cindy is also allowing Steven to use drugs. | BC |
| 11/09/1984 | Steven's sister, Cindy, is pregnant and marries Phil Blankinship | Ancestry |
| 05/11/1985 | Samuel Wayne Blankinship is born to Cindy and Phil Blankinship. | Ancestry |
| 08/17/1985 | Steven is fourteen years old. Steven is home and receiving little supervision as Cindy has moved out with Phil and the baby. Judy is leaving for work about 3:00 am and is in bed by 7:00 pm, which leaves Steven unsupervised for many hours. | BC |
| 09/03/1985 | Steven is promoted to seventh grade by Dr. Coward. Steven is enrolled at John W. Hood Middle School. Steven does not pass any courses and earns no credits. | DISD |
| 02/05/1986 | Steven has no scores on the achievement tests. | DISD |
| 08/17/1986 | Steven is fifteen years old. | BC |
| 08/25/1986 | Steven is enrolled in seventh grade at W. W. Samuel High School. Steven is failing all grades and receives no credits for this year. | DISD |
| 09/03/1986 | Steven is enrolled in seventh grade Fall semester at Fred Florence -- which is an alternative school. He passes no classes and obtains no credits. | DISD |
| 02/01/1987 | Steven is enrolled in the eighth grade Spring semester at Fred | DISD |

Steven Long Time Line

| Date | Event | Source |
|------|-------|--------|
|  | Florence. The only grade above 50 is in U.S. History, where he gets a 75. No credits are obtained. Steven has no scores on the achievement test for the seventh grade. |  |
| 03/10/1987 | Steven is referred to Parkland Hospital for a young adult clinic consultation. Steven reports prior homicidal and suicidal thoughts and hates school. He plans to drop out at age 16. Steven reports extensive drug use. | Parkland |
| 08/17/1987 | Steven is sixteen years old. | BC |
| 06/29/1988 | Shawn Ryan Blankinship is born to Cindy and Phil Blankinship. | Ancestry |
| 08/17/1988 | Steven is seventeen years old. | BC |
| 08/17/1989 | Steven is eighteen years old. | BC |
| 10/14/1989 | Steven marries Maritsa Garces. They only live together for a brief period of time. Maritsa believed she was pregnant when they married, but she was not. | Dallas County Rec |
| 07/01/1990 | Steven is dating Olga Gonzalez. Olga is seventeen when they meet and is a virgin. | Estimate |
| 08/17/1990 | Steven is nineteen years old. | BC |
| 08/25/1990 | Tonya Michelle Blankinship is born to Cindy and Phil Blankinship. |  |
| 05/01/1991 | Steven is arrested for murder by Mesquite PD. He lists his address as 1322 Crestridge Street, Mesquite, Texas. | Mesq PD |
| 05/27/1991 | Steven is arrested in Gun Barrel by the Mabank police for larceny and theft under $20.00 | Mabank PD |
| 07/21/1991 | Steven is arrested for public intoxication while living at 178 Deer Run in Gun Barrel, Texas | APC |
| 08/17/1991 | Steven is twenty years old. | BC |
| 08/30/1991 | Olga is pregnant with Steven's child and has had a miscarriage. | Estimate |
| 12/21/1991 | Margaret Marie West presses charges against Steven for sexual intercourse with a juvenile victim. The police interview Amber Chewning, who is 13 years old. | APC |
| 01/08/1992 | Steven reports for probation and is oriented to the conditions or probation. | APC |
| 01/09/1992 | Steven is placed on Felony Probation for ten years by the Judge. | APC |
| 01/13/1992 | Steven reports and is informed of the conditions or probation. | APC |
| 01/23/1992 | Steven and Maritsa Garces' divorce is final. Maritsa has had a child with another man, Cesar Pena. |  |
| 02/17/1992 | Henderson County issues a letter to Steven to inform him of his supervision provisions. It is addressed to Steven at 178 Deer Run, Gun Barrel City, Texas | APC |
| 03/26/1992 | Steven is working at Just Brakes, Central Expressway and Royal, Dallas, Texas | APC |
| 04/21/1992 | Steven reports to PO, but states he was arrested several days ago in Henderson County for outstanding traffic tickets. | APC |
| 04/24/1992 | PO contacts Steven's PO Mary Alfred in Henderson County to ask about 5/91 theft. | APC |

| Date | Event | Source |
|------|-------|--------|
| 05/11/1992 | PO stops by 3714 Duck Creek and Steven reports he is working but has varied hours. | APC |
| 06/16/1992 | Steven is unemployed and is denying gang activity. PO states that Steven "seems to have an answer for everything". Steven is involved in a relationship with Olga Gonzalez. | APC |
| 06/17/1992 | Olga starts working at a blind factory near where Judy works. Olga is seven months pregnant and leaving home at 3:00 am with Judy and returning at 6:00 pm | Estimate |
| 07/06/1992 | PO calls on Steven at his home at 3714 Duck Creek, Garland. Steven is home. Steven says he has been mowing yards and passing out flyers. He has job leads and expects to be working soon. | APC |
| 07/14/1992 | Steven is still unemployed, but is considering working for Olga's brother in a salon shampooing hair. | APC |
| 07/22/1992 | Steven contacted Det. Muniz with the DPD Gang Unit about being an informant on gang activities. PO is concerned about Steven being an informant as he is currently not employed and he believes his motivation is questionable. PO believes the liability will probably out weigh the advantages. | APC |
| 08/11/1992 | Steven and his PO discuss Steven being an informant. PO discusses other involvement with youth. Steven is living at 3714 Duck Creek with Judy. It is difficult to get a job because Steven does not have a phone. | APC |
| 08/17/1992 | Steven is twenty-one years old. Steven is still involved with Olga Gonzalez and she is pregnant with his child. | BC |
| 08/19/1992 | Steven and Olga have a daughter, Breana Leticia Long. Steven is present during the birth. | |
| 10/30/1992 | Steven requests a pass from his PO to go to Houston for a wedding. | APC |
| 11/02/1992 | Steven shows up for employment class at TEC. | APC |
| 11/29/1992 | PO officer comes to McDonalds at Walnut to check that Steven is working and he is there. Steven reports he and Olga are splitting up. | APC |
| 12/08/1992 | Steven and Olga have decided to stay together and she may be coming to work at McDonalds. Steven reports his mother has been laid off from her job. Steven seems happy about his job and is closing most nights. | APC |
| 12/16/1992 | Steven has quit job at McDonalds. He is living at 3714 Duck Creek. | APC |
| 01/12/1993 | Steven has a new job at Lather & Lube. Olga is working at the same place and they are working on their relationship. | APC |
| 01/27/1993 | Steven's PO comes to his home and he is at home. Steven states he was not getting along at work. Steven says he has some good job leads. | APC |
| 02/09/1993 | Steven reports to PO that he is working odd jobs. He and Olga are | APC |

| Date | Event | Source |
|------|-------|--------|
|  | having problems again and separating frequently. PO reports that Steven and Olga are breaking up and getting back together on a "monthly basis". |  |
| 03/09/1993 | Steven obtained a job at Granite Roofing, 489 Shiloh, Dallas. | APC |
| 04/05/1993 | Steven and Olga have moved to a one bedroom apartment and Judy has moved away. PO talks with Steven about problems with him being in Mesquite around possible former gang members. | APC |
| 04/20/1993 | Steven reports to PO – he has lost his job. | APC |
| 05/06/1993 | Steven informs PO he was at a party and smoked marijuana. Steven and Olga are fighting and she does not want to work because she misses the baby and wants to stay home with the baby. | APC |
| 05/11/1993 | Steven tells PO he is very unhappy with all the things going on in his life. He and Olga are both unemployed. He does not have a car. He does not have a father. Steven described a good relationship with his stepfather, but a poor relationship with his mother. | APC |
| 05/11/1993 | Steven arrived to see PO and seemed "very confused about life". PO talked with Steven about "caring for himself". Steven appears in court before Judge Warden and tells her his dirty UA is the result of one party and he has "no problem with drugs" | APC |
| 05/26/1993 | Steven called PO to say he could not report as he was working at a new job at VIP Movers. Steven stated his wife was working at Target. | APC |
| 06/09/1993 | Steven called PO very depressed, unable to pay rent, Olga may be pregnant and there is something wrong with the vehicle he has purchased. | APC |
| 06/10/1993 | PO meets with Steven and Olga. Olga reports Steven has kicked her and the baby out of the apartment because she did not have a job. Steven reports he has attended some school for carpentry and is temporarily working at VIP Movers. Steven is cursing throughout the session with Olga and complaining about her appearance. Steven is upset that his mother is allowing Olga and the baby to stay at the apartment and not him. Steven was reprimanded by the PO for his cursing | APC |
| 07/14/1993 | Steven tells PO that he needs counseling. Steven reports he has been verbally abusive to his girl friend. Judy reports he has been verbally and physically abusive to his girl friend. Steven informed PO that Olga was pregnant with their second child. | APC |
| 07/14/1993 | Steven reports to PO with mother. Judy tells PO that Steven has emotional problems and has been destructive and verbally abusive to her. Judy stated she is getting an apartment and will allow Steven to move in ONE more time and this will be his last chance. | APC |
| 07/20/1993 | Steven's PO recommends that he see Kent Hartsoe for counseling. | APC |
| 07/21/1993 | Steven is living at 2328 Babalos and is working at Williams | APC |

| Date | Event | Source |
|---|---|---|
| | Concrete. Steven informs PO on the phone that his mother has paid for his warrant and his girl friend is back. PO heard Judy in the background stating that they had obtained the apartment. Steven and Judy planned to move to the apartment. | |
| 08/17/1993 | Steven is twenty-two years old. | BC |
| 08/29/1993 | Steven is arrested for a DWI. | APC |
| 08/29/1993 | Steven is involved in an automobile accident at 12:30 am at 2900 Elm street. He is driving a 1986 white Toyota and he is arrested for DWI | APC |
| 08/30/1993 | Steven reports to PO and has made some payments. Steven gives confidential medical information to the PO. Steven also provides AA sheets and is informed by PO they are not legitimate and he will need to provide PO with legitimate AA sign in sheets. | APC |
| 09/12/1993 | Steven reports to PO and is advised that PO will recommend that he be placed on Maximum Supervision. | APC |
| 09/12/1993 | PO goes to Steven's listed address at 11621 Ferguson. Po talks with Judy outside as she is getting out of her car with Steven's daughter. Judy tells PO that Steven has not been attending any AA meetings and spends all his money on partying. Judy tells PO that Steven is going to work and is not spending any time with his daughter. | APC |
| 09/13/1993 | PO receives an arrest report from DPD and Steven was arrested for a DWI on 8/29/93. PO prepares a notification of violation. | APC |
| 09/20/1993 | Warrant is issued for Steven for probation violation. | APC |
| 09/28/1993 | Steven calls PO from work reporting that he will turn himself into the sheriff tomorrow. Steven says he is working at a good job. | APC |
| 09/29/1993 | PO receives a call from Judy that Steven has left and taken his clothes. Judy states that Steven's girl friend has been staying with them off and on and Steven has not been working all week. Steven was told by friends he would probably be going to jail because he had an active warrant. | APC |
| 10/05/1993 | Steven appears before Judge Warden and he is sentenced to 30 days in jail and then is to resume his counseling after discharge. | APC |
| 10/15/1993 | Steven calls and says he has been released from jail on a work release program. | APC |
| 11/10/1993 | Steven is now working at Top Ten Fundraiser doing telemarketing at night. Steven reports Olga is pregnant again. | APC |
| 11/17/1993 | Steven reports to PO – has been off work because his foot is in a cast. Olga accompanied Steven to see his PO. | APC |
| 12/01/1993 | Steven reports to PO and says he has interviewed this date at Refrigeration Services. Steven is going to counseling and likes Diane McIntosh and they discussed negative peer influences at their last meeting. | APC |
| 12/08/1993 | Steven reports to PO and is seeing a counselor, Diane McIntosh once per week. | APC |

| Date | Event | Source |
|---|---|---|
| 12/31/1993 | Counseling progress report from Mrs. Jenkins rates Steven's overall progress as satisfactory. Ms. Jenkins indicates that Steven is beginning to accept some responsibility for his own actions, rather than blaming others. | APC |
| 01/06/1994 | Steven calls PO and says he is at the hospital because Olga is in labor | APC |
| 01/09/1994 | Steven and Olga have their baby boy, Christopher Lynn Long. | Ancestry |
| 01/24/1994 | Steven reports to PO and discussed financial problems caused by new baby, his car was stolen and had to buy a new one.  PO described these as his usual excuses and informed Steven he must make probation fees a priority. | APC |
| 01/26/1994 | PO calls Steven's home and Olga reports he was not home and is working. | APC |
| 02/07/1994 | Steven reports Olga has left him because they were fighting too much.  Steven is very upset over the loss of Olga and children and PO advises him to make counseling appt. | APC |
| 02/16/1994 | Steven reports to PO with another male and says he is on his lunch break.  Steven is delinquent in paying his fees. | APC |
| 02/28/1994 | Steven reports to PO and did not attend counseling.  Steven continues to be upset and emotional about his split up with Olga and children. | APC |
| 03/07/1994 | Steven reports to PO and he did not attend counseling.  He is angry because Olga will not give him the children she is out drinking all the time without the children. | APC |
| 03/23/1994 | Steven reports to PO and is not attending AA meetings. | APC |
| 04/04/1994 | Steven reports to PO with his mother.  Both are very upset because Olga will not allow Steven to see his children.  Judy reports she is getting an attorney.  PO reprimands Steven because he has missed counseling and tells him she doesn't want any more excuses for missing counseling. | APC |
| 04/18/1994 | Steven reports to PO with his mother.  Steven is upset because Olga will not allow him to visit the children without supervision. | APC |
| 05/02/1994 | Steven reports to his PO with his mother.  Steven saw his children the previous weekend, but missed his counseling because of work.  PO believes Steven is beginning to get on the right track. | APC |
| 05/05/1994 | Steven's counselor, Sylvia Jenkins submits her counseling progress report for Steven.  She reports Steven has missed due to work, but has been diligent in calling to report when he will miss.  She notes his anger has subsided and his self esteem seems to be improving.  Ms. Jenkins reports Steven's overall progress is good. | APC |
| 05/16/1994 | Steven reports to PO.  Not attending counseling because he has been ill – believes he has an ulcer.  Steven reports he has enrolled in GED classes at Garland High and will be attending Tues/Thur evenings. | APC |
| 05/23/1994 | Steven completes a supervision plan and reports he is | APC |

| Date | Event | Source |
|------|-------|--------|
|  | "emotionally unstable" and has "pressures in his life". He also reports he is confused and "unable to control my life". |  |
| 05/23/1994 | Probation Officer completes Reassessment Summary for Steven. Steven is doing well in counseling, but unable to keep stable employment. Steven had quit last job because of others drug use. He is currently working on a contract basis for his brother-in-law painting. Pt reports he is taking prescription of Xanax. | APC |
| 06/03/1994 | Steven submits a dirty UA on his May UDS | APC |
| 06/21/1994 | Steven fails to report for the Court summons. | APC |
| 07/08/1994 | Steven appeared before Judge Warden and the Judge informed Steven she was tired of Steven having to appear in front of her. Steven will remain on the Electronic Monitoring program for not less than 90 days and Steven is put on the waiting list for the Judicial Treatment Center. Steven is instructed to attend AA meetings until a bed is available. | APC |
| 07/11/1994 | Steven reports for probation and participated in CCP orientation. Steven is living at 11621 Ferguson, #2223, Dallas. He is unemployed. | APC |
| 07/12/1994 | Steven's probation officer checks on him and he is home with his mother. | APC |
| 07/20/1994 | Steven reports to probation officer and indicates last use of marijuana was 7/1/1994. | APC |
| 07/29/1994 | Steven reports he is unemployed and states where he was employed everyone was using marijuana. | APC |
| 08/03/1994 | Steven reports to his probation officer and he is employed at Lather & Lube on Centerville Road in Garland. Steven denies drug use and reports he is attending counseling. | APC |
| 08/17/1994 | Steven is twenty-three years old. | BC |
| 08/17/1994 | Probation officer reports Steven is reporting as directed, attending counseling and AA meetings. | APC |
| 08/29/1994 | Steven fails to report to his probation officer. | APC |
| 09/04/1994 | Steven's probation officer phoned Mrs. Jenkins with psychiatric and addiction services to check about Steven. | APD |
| 09/06/1994 | Steven fails to report to his probation officer. | APC |
| 09/08/1994 | Mrs. Jenkins reports to Steven's probation officer she has not seen Steven for about a month. | APC |
| 09/11/1994 | Dr. McIntosh provides a counseling progress report for Steven. She indicates that Steven has limited understanding of the recovery process and his motivation has been inconsistent. Steven also had been exhibiting resistance to dealing with core emotional issues. The report indicates there is not much movement toward his goals for treatment. | APC |
| 09/19/1994 | Warrant is issued for Steven. | APC |
| 01/05/1995 | Steven is incarcerated in jail with no new charges. | APC |
| 01/09/1995 | Revocation hearing is held and the judge revokes Steven's | APC |

| Date | Event | Source |
|------|-------|--------|
| | probation and he is sentenced to 10 years in prison. | |
| 05/01/1995 | TDJ administers group IQ and Steven reports that he gave someone cigarettes to take test for him so he could qualify to take GED courses.  IQ test score is 97. | TDCJ |
| 06/05/1995 | Steven enrolls in a cognitive skills class with Windham school district while incarcerated at the Gurney Unit, which is a transfer facility near Tennessee Colony, Texas. | Windham |
| 06/14/1995 | Steven drops the cognitive skills class at Gurney.  He completes 12 of the 24 hours. | Windham |
| 06/16/1995 | Steven is tested to see what education level he is functioning in different levels.   Steven scores 4.5 in Comprehension, 6.5 in Reading, 6.5, 4.0 in Math and 3.1 in Language.  These scores indicate that Steven was functioning on a 5th grade level in comprehension, a 4th grade level in comprehension, 6th grade level in reading, 4th grade level in math and 3rd grade level in language. | Windham |
| 06/30/1995 | Steven alleges that two inmates approached him for sex and he declined.  They then assaulted him and he had to pay them $10. | TDCJ |
| 08/17/1995 | Steven is twenty-four years old. | BC |
| 08/28/1995 | Steven enrolls in Literacy II III class at the Wallace Unit in Colorado City, Texas. | Windham |
| 08/30/1995 | Steven enrolls in a computer lab class at the Wallace Unit. | Windham |
| 08/31/1995 | Steven drops the Literacy II III class at the Wallace Unit. | Windham |
| 08/31/1995 | Steven drops the computer lab class. | Windham |
| 09/05/1995 | Steven enrolls in another Literacy II III class at the Wallace unit. | Windham |
| 09/06/1995 | Steven enrolls in another computer lab class at Wallace. | Windham |
| 11/12/1995 | Steven is alleged to have requested an officer to bring him something from the free world.  Steven is incarcerated at the Wallace unit. | TDCJ |
| 11/29/1995 | Steven doesn't turn out for work and is sanctioned. | TDCJ |
| 11/30/1995 | Steven alleges that he has been threatened by several inmates and he has been labeled a "snitch" and had to pay $45 in commissary to avoid being hurt.  Steven is requesting a transfer. | TDCJ |
| 12/08/1995 | Steven reports being threatened because he testified against Michael Garcia's cousin. | TDCJ |
| 12/12/1995 | It is recommended that Steven be transferred because he has snitched on an employee bringing in tobacco to the inmates and it is felt that he will be in danger. | TDCJ |
| 12/12/1995 | Steven drops the Literacy II III classes at the Wallace unit as he is being transferred.  He completed 127 of the 171 hours of the Literacy class.  Steven also drops the Computer Lab class after completing 37 of the 42 hours. | Windham |
| 01/08/1996 | Steven is transferred from Wallace Unit to Robertson Unit. | TDCJ |
| 01/14/1996 | Steven is written up for contraband, 3 towels, 3 blankets which are in excess of amount allowed. | TDCJ |
| 01/29/1996 | Steven reports he is raped while in transit status to the new unit. | TDCJ |

| Date | Event | Source |
|---|---|---|
| | Steven threatens to harm himself in order to get attention on the situation. Inter-office communication from Milholland to Isenberg concerning Steven's frequent claims of harm and protective custody. | |
| 02/14/1996 | Steven is interviewed and no longer believes his life is in danger. | TDCJ |
| 02/16/1996 | Steven enrolls in the Literacy I class at the Robertson unit. He was previously enrolled in the II III class and has dropped down to the Literacy I class. | Windham |
| 03/01/1996 | Steven continues to be enrolled in the Literacy I class at the Robertson unit. | Windham |
| 04/01/1996 | Steven continues to be enrolled in the Literacy I class at Robertson. | Windham |
| 04/04/1996 | Steven cuts his wrists with a razorblade. | TDCJ |
| 04/09/1996 | Steven drops the Literacy I class at Robertson. He completed 75 of the 87 hours. | Windham |
| 07/01/1996 | Steven files a grievance because he has not been moved after being threatened by his cellmate. | TDCJ |
| 07/12/1996 | Steven reports that he had to cut his own wrists to get moved from a previously unsafe situation with a cellmate. | TDCJ |
| 07/28/1996 | Steven is written up for yelling through his cell door. | TDCJ |
| 08/08/1996 | Steven dropped complaint about being in fear for his life. | TDCJ |
| 08/14/1996 | Steven is again written up for yelling through his cell door. | TDCJ |
| 08/17/1996 | Steven is twenty-five years old. | BC |
| 08/18/1996 | Steven is written up for failure to obey -- would not remove towel from window | TDCJ |
| 09/30/1996 | Interoffice communication from G. Isenburg to Capt. indicating Steven's history of being moved numerous times because of "problems" with his cellie and if he is not moved he claims his life is in danger. | TDCJ |
| 11/09/1996 | Steven reports that he has turned into a homosexual. He denies any gang activity, but is fearful of retaliation from others finding out he is homosexual. | TDCJ |
| 12/13/1996 | Steven is written up for allowing his cellmate, Rickey Little, to possess his state ID for the purpose of going out to rec. | TDCJ |
| 01/27/1997 | There is a riot at the prison and Steven is charged with six other inmates as participating in the riot. There was little corroboration concerning Steven's involvement in the riot. Steven was given two years TDC time. | TDCJ |
| 02/25/1997 | Steven in interviewed regarding his allocations that Michael Garcia has made several threats against him. Steven alleges that Garcia is a member of the Texas Syndicate. There is no substantial evidence. | TDCJ |
| 04/08/1997 | Steven says he has told several inmates he is homosexual and now is feeling threaten. | TDCJ |
| 04/22/1997 | Steven reports he is being forced into nonconsensual sexual | TDCJ |

| Date | Event | Source |
|------|-------|--------|
| | activities by stronger inmates. | |
| 08/17/1997 | Steven is twenty-six years old. | BC |
| 01/29/1998 | Steven writes a letter to his biological father, Steve Ramon. | TDCJ |
| 03/02/1998 | Steve Ramon writes a letter to Steven. Steve tells him he has been incarcerated for 14 years. | TDCJ |
| 03/12/1998 | Steven is written up for masturbating in front of a female guard. | TDCJ |
| 03/31/1998 | Steve Ramon writes another letter to Steven and encourages him to write his mother and have his mother write him to find out about what he is telling him about. | Ramon Letter |
| 04/22/1998 | Steven is written up for masturbating in his cell door in front of a female guard. | TDCJ |
| 08/17/1998 | Steven is twenty-seven years old. | BC |
| 04/20/1999 | Steven is written up for failure to obey order – Steven would not move into a different cell. | TDCJ |
| 05/13/1999 | Steven is written up for masturbating in public. | TDCJ |
| 08/17/1999 | Steven is twenty-eight years old. | BC |
| 10/22/1999 | Steven enrolls in the Literacy II class at the Briscoe Unit in Dilley, Texas. | Windham |
| 11/01/1999 | Steven continues to be enrolled in the Literacy II class at Briscoe. | Windham |
| 12/01/1999 | Steven continues to be enrolled in the Literacy II class at Briscoe. | Windham |
| 12/16/1999 | Steven drops the Literacy II class at Briscoe. He completed 105 of the 108 hours. | Windham |
| 01/03/2000 | Steven is administered tests to measure his educational achievement at the Briscoe Unit. He scores 5.4 on Comprehension, 7.0 in Reading, 4.9 in Math and 4.2 in Language. Based on these scores he is functioning at a 5th grade level in his comprehension, 7th grade in Reading, 4th grade in Math and Language. Steven has improved his reading score from 5th to 7th grade after taking the Literacy classes since 1995. | Windham |
| 02/14/2000 | Steven is written up for masturbating in public. | TDCJ |
| 02/17/2000 | Steven is written up for possession of contraband – rolling papers in cell, jelly and Velcro tape. | TDCJ |
| 06/03/2000 | Steven was written up for being in an unauthorized area – he was in the dayroom. | TDCJ |
| 07/05/2000 | Steven requires crisis management while incarcerated. | TDCJ |
| 07/21/2000 | Steven is written up for failure to obey order – order to stay at work area and did not obey. | TDCJ |
| 08/17/2000 | Steven is twenty-nine years old. | BC |
| 08/24/2000 | Steven is written up for failure to obey order – order to return to cell and he did not obey. | TDCJ |
| 08/27/2000 | Steven is written up for masturbating in public – with shower door open. | TDCJ |
| 08/30/2000 | Steven is written up for being present in unauthorized area – he goes into wrong cell and stays there for several minute. | TDCJ |

| Date | Event | Source |
|------|-------|--------|
| 08/31/2000 | Steven fears for his life as he has contacted his father, Steve Ramon, and Steve has decided to disassociate himself from the Texas Syndicate. | TDCJ |
| 08/31/2000 | Steven is written up for masturbating in public – with shower door open. Steven later indicates that he fears for his safety from the Texas Syndicate and his father. Steven tells the staff he is bi-sexual and is not participating in homosexual activities at this time. | TDCJ |
| 10/06/2000 | Steven requests a mental health session complaining of anxiety and sleeplessness. He states that his father is housed at another unit and is attempted to get out of a prison gang and Steven is concerned about his safety. | |
| 01/02/2001 | Steven is written up for failure to obey order – will not sit down in dayroom when ordered | TDCJ |
| 01/20/2001 | Steven requires crisis management while incarcerated. | TDCJ |
| 01/20/2001 | Steven is on suicide precautions. | |
| 01/21/2001 | Steven is on suicide precautions. | |
| 08/17/2001 | Steven is thirty years old. | BC |
| 08/20/2001 | Steven completes the HSM-31 while at the Daniel Unit. | |
| 11/05/2001 | Steven enrolls in the Changes class at the Daniel unit in Snyder, Texas. | Windham |
| 12/01/2001 | Steven continues in the Changes class at the Daniel unit. | Windham |
| 12/04/2001 | Steven completes the Career/Employment, and Re-entry into society Change Module | Windham |
| 12/19/2001 | Steven completes the Change Module for Personal Development at the Daniel Unit. | Windham |
| 12/24/2001 | Steven is written up for masturbating in public. When confronted by officer, Steven asked "Is it not big enough for you". Steven later apologized to the officer. After that, Steven claimed that it was not him, but his half brother, Steve Ramon, who had been masturbating and had given his ID card instead of his own. | TDCJ |
| 01/11/2002 | Steven completes the Change Module for Interpersonal Relations at the Daniel Unit. | |
| 01/12/2002 | Steven is written up for being in unauthorized area – dayroom. | TDCJ |
| 01/23/2002 | Steven completes the Change Module for Civil/Legal Responsibilities. | |
| 01/26/2002 | Steven drops the Changes class at the Daniel unit. | Windham |
| 03/19/2002 | Steven enrolls in the Changes class at the Daniel unit. | Windham |
| 04/10/2002 | Steven drops the Changes class at the Daniel unit. He completed 176 of the 192 hours. | Windham |
| 05/02/2002 | Steven receives a call from Judy that she has kidney stones and is not doing too well. | TDCJ |
| 05/21/2002 | Steven is at the Daniel unit and goes in for a mental health session. He is concerned that "he is going to do something stupid and get more time". | TDCJ |

| Date | Event | Source |
|------|-------|--------|
| 05/24/2002 | Steven is written up for unauthorized commodity transfer – he received an extra piece of cake | TDCJ |
| 05/30/2002 | Steven is charged with tampering with his restraints.  He loses 60 days of good time as a result.  When opening the van after transferring Steven, he had removed his lock box, pad lock and belly belt. | TDCJ |
| 05/30/2002 | Steven is found in his cell with a razor blade and is threatening to kill himself. | TDCJ |
| 05/31/2002 | Steven is transferred and admitted to the TDCJ John T. Montford Inpatient Psychiatric Facility.  Steven was transferred from the Daniel Unit.  Steven claimed he heard voices from a cup telling him to kill someone and then himself.  Pt reports stress as picking up more time from 1998 riot in prison.  Steven is diagnosed on Axis I as V65.2 and r/o malingering.  Axis II is deferred. | TDCJ |
| 06/04/2002 | Steven is administered the PAI at the Montford unit, but it could not be used as the results were considered to be invalid. | TDCJ |
| 06/12/2002 | Steven is administered the Folstein Mini-Mental State Exam (MMSE).  Steven displayed moderate abstract and practical reasoning deficits. | TDCJ |
| 06/18/2002 | Steven reports to the counselor that he had been very stressed about thinking about being released from prison and going home.  Steven talked about his fears related to real or imagined abandonment.   Steven was assessed as having symptoms consistent with major depression, including depressed mood, anhedonia, insomnia, loss of energy, feelings of guilt, and episodic suicidal ideation. | TDCJ |
| 06/25/2002 | The Montford unit completes a psychosocial evaluation on Steven.  Steven reports auditory hallucinations, depressed mood and anxiety.  Some of Steven's suicide risk factors are:  serious diagnosis of major depression, non-heterosexual, past interpersonal problems, chronically fears enemies, family history of serious psychiatric disorders, past non-compliance with treatment, approaching parole review, increasingly distressed about leaving TDCJ.  Steven reports his mother is an alcoholic.  Steven states that drugs affected his ability to communicate with others and he couldn't hold a job or maintain a relationship.  Steven did not get along with other children growing up and reports few friends.  Whenever there were teams, he was the "last one picked".  Steven always wanted to be around his mother and slept with her until age 17.  Steven's main fear about the future is that he will be the same and will not change.  Steven had a good relationship with his grandfather because he had never been told that his grandfather had been in prison for sexually molesting his mother and aunt.  After being told about his grandfather, he was very hurt. | TDCJ |

| Date | Event | Source |
|------|-------|--------|
| 06/25/2002 | When Steven was asked what would push him to hurt himself, he replied "somebody trying to hurt me". "Someone trying to force me to do something I don't want to do". Steven is given the diagnosis of Axis I: 296.34, Major Depression with psychotic features, Axis II: 301.90 Personality Disorder, NOS with borderline personality features | TDCJ |
| 06/25/2002 | Steven is asked about his sexuality in the Montford assessment and he replied he was "gay". Steven stated that at times he thinks he "is a girl". Steven says he enjoys a gay relationship, but has guilt about the gay relationship. | TDCJ |
| 08/17/2002 | Steven is thirty-one years old. | BC |
| 10/25/2002 | Steven is discharged from the Montford Unit. | TDCJ |
| 11/17/2002 | Steven alleges he has received an anonymous tip that he would die on Saturday because his father was an ex Texas Syndicate gang member. The threat was not substantiated. | TDCJ |
| 11/17/2002 | An anonymous I-60 was received that stated that Steven was going to die by Saturday, his dad is an ex – TS gang member. The investigation did not find any evidence to substantiate Steven's life being in danger. | TDCJ |
| 11/22/2002 | Steven is released on mandatory release. Steven is paroled until 11/14/2004. | TDCJ |
| 12/06/2002 | Steven has started work at Baker Metal Products and is making $7.30 per hour. | Baker Metal |
| 04/23/2003 | Sea West Financial Corporation faxed Baker Metal Products to verify that Steven is employed there as he is applying for credit. | Baker Metal |
| 07/01/2003 | Steven has met Melanie Gorham, who is living in Farmersville and knows his sister Cindy Blankinship. Melanie is older and has three children. | Estimate – Melanie Interview |
| 07/21/2003 | Steven is working at Baker Metal Products and gets a raise from $7.30 to $7.50. | Baker Metal |
| 08/17/2003 | Steven is thirty-two years old. | BC |
| 08/29/2003 | Steven is arrested for DWI. Melanie and her children have moved in with Steven and Judy because it is closer for her to drive to nursing school in Irving. | PD |
| 10/10/2003 | Baker Metals receives notice from the Attorney General related to money to be held out of Steven's check for child support. A total of $334.00 if to be held out of each monthly pay period. | Baker Metal |
| 10/15/2003 | Steven and Melanie move into their own home in Plano with Melanie's children. Their arguments are continuing, particularly about money. | Estimate – Melanie Interview |
| 10/30/2003 | Steven is applying for furniture at Rent-A-Center | Baker Metal |
| 12/10/2003 | Steven moves out of the house in Plano with Melanie and moves back with Judy in the trailer. | Estimate – Melanie Interview |

| Date | Event | Source |
|------|-------|--------|
| 01/28/2004 | Steven is terminated from Baker Metal Products | Baker Metal |
| 02/01/2004 | Steven has been occasionally returning to the house with Melanie, but their arguments are escalating. Melanie moves out of the house in Plano and moves in with her oldest daughter. | Estimate – Melanie Interview |
| 07/01/2004 | Steven and Melynda (Mindy) Frazier obtain a marriage license. | Dallas County |
| 08/17/2004 | Steven is thirty-three years old. | BC |
| 09/13/2004 | Steven is arrested for possession of Marijuana. | Balch Springs |
| 09/13/2004 | Steven is arrested for criminal mischief. Steven kicked rear right window of police car while in custody in vehicle and damaged the window. | |
| 09/13/2004 | Steven is arrested by Balch Springs PD for possession of marijuana under 20 oz. | PD |
| 10/26/2004 | Steven is arrested for possession of marijuana. | |
| 02/26/2005 | Letter from Steven's daughter, Briana, indicating she does not want to live with Steven and wants to live with her grandmother, Judy. | |
| 05/21/2005 | Kaitlyn Briana Smith is killed. | Police Rep |
| 05/23/2005 | Steven is charged with Capital Murder and aggravated sexual assault. | Police Rep |
| 05/25/2005 | Steven writes a letter to his mother, and goes back and forth in the letter blaming her and not blaming her for his lot in life. Steven encourages his mother to visit her using guilt. | TDCJ |
| 05/30/2005 | Steven is incarcerated at the Dallas County Jail and reports being depressed, a previous suicide attempt by cutting his wrists, two to three times, with the last attempt being in 2002. Steven reports a history of using meth, marijuana, alcohol, ecstasy, GHB, acid, crack. | MHMR |
| 05/31/2005 | Steven is prescribed Wellbutrin and Trazadone. AXIS I. MDD, GAF = 59 | MHMR |
| 06/09/2005 | Steven is present at his examining trial in the 265th District Court. | Court |
| 07/15/2005 | Steven is written up by Dallas County Jail for masturbating in front of officers. | Jail Rec |
| 07/21/2005 | Steven's mother-in-law, Judy, writes a letter to Steven while he is in Dallas County Jail. | Letter |
| 08/01/2005 | Letter from Mindy Long, 272 W. Lawson Road, Dallas, Texas, 75243 to Steven in Dallas County Jail. | Letter |
| 08/02/2005 | Mindi writes a letter to Steven in Dallas Jail saying that Steven's attorney has asked her to stay around. Mr. Johnson tells Mindi that she is the main one who is cooperating at this time. | Letter |
| 08/17/2005 | Steven is thirty-four years old. Steven is incarcerated on Death Row at Livingston. | BC |

LONG EXHIBIT 1, p. 074

Steven Long Time Line                                         Page 18 of 19

| Date | Event | Source |
|------|-------|--------|
| 09/01/2005 | Steven's aunt Dorothy Hutson, writes him a letter and talks about the differences she saw in him after he returned home from prison. | TDCJ |
| 01/01/2006 | Steven states that "Pretty Boy won't give me 50 cents and I have answered him over and over". Delusional, hallucinations. Steven is receiving anti-psychotic medications. | MHMR |
| 01/25/2006 | Steven is on suicide precautions. | MHMR |
| 01/25/2006 | Steven threatens to hang himself because a guy was bothering him. His Wellbutrin is stopped and Citalopram was started along with Trazadone. | |
| 02/23/2006 | Steven complains he is becoming more depressed and wants to go back to Prozac. | MHMR |
| 03/09/2006 | Steven does not cooperate with the doctor because he felt he was looking at him as though he wanted to do something to him. | MHMR |
| 03/23/2006 | Steven is on Resperidal and Trazadone and feels he is doing better. | MHMR |
| 04/26/2006 | Records indicate that Steven is refusing his medications. | MHMR |
| 05/01/2006 | Steven's Resperidal is increased and Cogentin is added. Note indicates delusions and hallucinations. | MHMR |
| 05/10/2006 | Steven is demanding different housing. | MHMR |
| 05/24/2006 | Documentation indicates that Steven has been diagnosed as Schizoaffective by history. | MHMR |
| 06/25/2006 | Records indicate Steven appeared paranoid and uncooperative. Steven stated "you want to kill me, don't you?" He is diagnosed as paranoid schizophrenic and his dose of Zyprexa is increased. | MHMR |
| 07/06/2006 | Steven meets with his attorneys. | Atty |
| 07/21/2006 | Steven's attorney has a conference with Dr. Crowder | Atty |
| 08/03/2006 | Steven's attorney interviews Steven's sister, Cindy Blankinship, and her family | Atty |
| 08/07/2006 | Mr. Johnson interviews Steven, Judy Long, Dorothy Hutson, and Steven's ex-wife Mindi Frazier. Conference with co-counsel and Dr. Goodness. | Atty |
| 08/14/2006 | Steven submits a grievance against Officer Scottie Myers and states he placed a piece of aluminum wire around Long's neck and threatening him while he was in hand restraints. | MHMR |
| 08/14/2006 | Mr. Johnson has conference with Dr. Crowder. | Atty |
| 08/16/2006 | Mr. Johnson interviews Steven's ex-wife, Olga | Atty |
| 08/17/2006 | Steven is thirty-five years old and incarcerated at the Dallas County Jail. | BC |
| 08/21/2006 | Letter from Steven's daughter, Breana and she is living in Kaufman, Texas. She wishes her father happy birthday. | Letter |
| 09/23/2006 | Mr. Johnson speaks with mitigation expert, S. O. Woods. | Atty |
| 09/28/2006 | Visit with Steven by Paul Johnson, Richard Harrison and Dr. Kelly Goodness in visitation area. | Court |
| 09/28/2006 | Dr. Goodness visits with Steve Ramon in visiting area with Paul Johnson and Richard Harrison. | Court |

LONG EXHIBIT 1, p. 075

Steven Long Time Line

Page 19 of 19

| Date | Event | Source |
|---|---|---|
| 09/28/2006 | Mr. Johnson interviews Steven and his father, Steve Ramon. | Atty |
| 10/03/2006 | Mr. Johnson has six hour trail preparation conference with Dr. Goodness | Atty |
| 10/04/2006 | Steven's trial for capital murder begins under Judge Dean in Dallas County. | Court |
| 10/05/2006 | Steven's trial for capital murder continues under Judge Dean in Dallas County. | Court |
| 10/06/2006 | Steven's trial for capital murder continues under Judge Dean in Dallas County. Closing arguments for the guilt/innocence phase of the trial. Steven is found guilty of capital murder. | Court |
| 10/08/2006 | Mr. Johnson interviews Cindy Blankinship, Judy Long and Dorothy Hutson. | Atty |
| 10/09/2006 | Mr. Johnson interviews Steven's father, Steve Ramon, and inmate, Anthony Hogan. | Atty |
| 10/10/2006 | Mr. Johnson meets with S. O. Woods and co-counsel. Steven's punishment phase of the trial begins. | Atty |
| 10/11/2006 | Steven's trial on the punishment phase continues in Dallas County. The state rests their case and the defense begins their case by calling Kenneth Edwards, Dorothy Hutson, Cindy Blankinship, Judy Long and Anthony Hogan. | Court |
| 10/12/2006 | Steven's trial for capital murder continues under Judge Dean in Dallas County. Dr. Kelly Goodness testifies. Both sides close their case. | Court |
| 10/13/2006 | Steven's trial for capital murder continues under Judge Dean in Dallas County. Closing arguments are given; the jury deliberates and returns with a death sentence for Steven. | Court |
| 10/17/2006 | Dr. J. Douglas Crowder, a psychiatrist, submits his report to Mr. Johnson on Steven. He does not find him incompetent to stand trial. Dr. Crowder believes that Steven may have been malingering when he examined him on 7/14/06. | Crowder Let |
| 08/17/2007 | Steven is thirty-six years old. Steven is incarcerated on Death Row at Livingston, Texas. | BC |

LONG EXHIBIT 1, p. 076

LONG EXHIBIT 1, p. 077



LONG EXHIBIT 1, p. 078



Virgil Drewery
Detail Genogram

LONG EXHIBIT 1, p. 079





Bonnie Fay Drewery
Bannister Detail

Basil Lavoy Bannister

7/23/1931
9/1970
(39) Bonnie Fay Bannister/Drewery

Denise Cantu

9/25/1962
(45) Paul Bannister

Mar 2/3/1996

11/4/1953
(54) Deborah Kay Bannister

Married 12/28/1979

4/12/1980
(27) Christy Dawn Dull

Pamela Jean Dull/Beltz

3/12/1996
(11) Christopher Allen Dull

1949
(59) Carolyn Sue Belt

2/20/1974
(33) Darla Jean Dull

5/7/1995
(12) Traci Lynn Dull

10/23/1969
(38) Warren Don Dull

Divorced 6/11/71

10/9/1968
(39) Ricky Wayne Dull

1947
(61) Warren Lafayette Dull

8/17/1967
(40) Michael Shane Dull

1/18/1952
(55) Belinda Sue Bannister

12/31/1977
(30) Charla Suzette Crump

5/5/1951
(56) Charles Everett Crump

6/23/1972
(35) Cory Gene Crump

LONG EXHIBIT 1, p. 080



LONG EXHIBIT 1, p. 081

LONG EXHIBIT 1, p. 082



Steven Long
Detail Genogram



LONG EXHIBIT 1, p. 083







THOMAS LEE TIDWELL DETAIL
(TOMMY GLENN)

10/10/1920
Thomas
Lee Tidwell

3/28/1924
12/31/1950
Ruby Lynn
Tidwell/Drewery

12/7/1941
68
Tommy
"Glenn"
Lee Tidwell

Jerry
Wayne
Matthews

1/23/1976
31
Shonda
Renee
Matthews

7/25/1975
32
Nathan
Andrew
Dickerson

10/15/1996
17
Shayla
Laura
Dickerson

Renee Labonne
Matthews/
Norton

4/13/1992
15
Taylor
Lee
Matthews

10/22/1971
39
Lee
Lamar
Matthews

1950
60
Laura Belle
Tidwell/Watterson/
Matthews

9/2/1969
39
Tracy
Marlette
Matthews

10/15/1992
15
Destinee
Shyanne
Matthews

Unknown

Mar 1/31/1981

1947
61
Donna
Marshall

Mar 4/22/75  Div 4/19/82

Rebecca
Tidwell/
Chavez

mar 4/28/61  div 12/20/73

4/18/1964
43
Norma Jean
Ramos/Tidwell

3/31/1990
17
Jessica
Ramos

6/2/1988
19
Cristal
Ann
Ramos

1/15/1986
22
Juan
Ramos, Jr.

Juan
Ramos

LONG EXHIBIT 1, p. 086

LONG EXHIBIT 1, p. 087





LONG EXHIBIT 1, p. 088



LONG EXHIBIT 1, p. 089



LONG EXHIBIT 1, p. 090



LONG EXHIBIT 1, p. 091

LONG EXHIBIT 1, p. 092



Lois Tidwell/Floyd Thompson
Detail Genogram



LONG EXHIBIT 1, p. 093

Peggy Tidwell
Detail Genogram



LONG EXHIBIT 1, p. 094



LONG EXHIBIT 1, p. 095

# EXHIBIT 1

*Excerpt from: Title 22 (Examining Boards), Texas Administrative Code, Part 3, Chapter 781,* **Rules Relating to the Licensing and Regulation of Social Workers,** Adopted by the Texas State Board of Social Worker Examiners Effective on August 24, 2005

## Subchapter C.  Licenses and Licensing Process.

### §781.301.  Qualifications for Licensure.

(a) The following education and experience is required for the specified licenses and specialty recognitions:

(1) **Licensed Clinical Social Worker (LCSW).**
(A) Must be licensed as an LMSW.
(B) Obtain 3000 hours of Board approved supervised professional full-time clinical employment experience over a minimum two-year period, but within a maximum four-year period or its equivalent if the experience was completed in another state.
(C) Complete a minimum of 100 hours of face-to-face supervision, over the course of the 3000 hours of full-time experience, with a board-approved supervisor. Supervised experience must have occurred within the five previous calendar years occurring from the date of application.
(D) Passing score on the clinical exam administered nationally by ASWB.

(2) **Licensed Master Social Worker (LMSW).**
(A) A doctoral or master's degree in social work from a CSWE accredited social work program.
(B) Passing score on the intermediate or master's exam administered nationally by ASWB.

(3) **Licensed Master Social Worker-Advanced Practitioner (LMSW-AP).**
(A) Must be licensed as an LMSW.
(B) Obtain 3000 hours of Board approved supervised professional full-time non-clinical employment experience over a minimum two-year period, but within a maximum four-year period or its equivalent if the experience was completed in another state.
(C) Complete a minimum of 100 hours of face-to-face supervision, over the course of the 3000 hours of full-time experience, with a board-approved supervisor. Supervised experience must have occurred within the five previous calendar years occurring from the date of application.
(D) Passing score on the advanced or advanced generalist examination administered nationally by ASWB.

(4) **Licensed Baccalaureate Social Worker (LBSW).**
(A) A baccalaureate degree in social work from a CSWE accredited social work program.
(B) Passing score on the basic exam administered nationally by ASWB.

(b) Only a person who is licensed and has been recognized by the board for independent practice is qualified for the independent practice of social work.

Page 1

LONG EXHIBIT 1, p. 097

Excerpt from: *Title 22 (Examining Boards), Texas Administrative Code, Part 3, Chapter 781*, **Rules Relating to the Licensing and Regulation of Social Workers**, Adopted by the Texas State Board of Social Worker Examiners Effective on August 24, 2005 (Continued)

(1) A LCSW may provide any clinical or non-clinical social work services in either an employment or independent practice setting.

(2) An LMSW-AP, LBSW or LMSW recognized for independent practice must restrict his or her independent practice to the provision of non-clinical social work services.

(3) A licensee must not engage in any independent practice that falls within the definition of social work practice (relating to definitions) without being licensed and recognized by the board unless the person is licensed in another profession and acting solely within the scope of that license. The person may not use the titles "licensed clinical social worker," "licensed master social worker," "licensed social worker," "licensed baccalaureate social worker," or "social work associate" or any other title or initials that states or implies licensure or certification in social work unless one holds the appropriate license or recognition.

(4) A licensee who is not recognized for independent practice may not provide direct social work services to clients from a location that she or he owns or leases and that is not owned or leased by an employer or other legal entity with responsibility for the client. This does not preclude in home services such as in home health care or the use of telephones or other electronic media to provide services in an emergency.

LONG EXHIBIT 1, p. 098

# EXHIBIT 2

LONG EXHIBIT 1, p. 099

## *Mitigation Partners*

**ATTORNEY – CLIENT PRIVILEGED**

MEMORANDUM

To:     Mick Mickelsen

From:   Toni Knox

Date:   December 9, 2007

Re:     Steven Long, Report #014

> Interview with Ancil Adkins, 12/9/07
> 1610 Baylor, Richardson, Texas, 75081, 972 234-0261 (home)

**Relevance:**  Juror in Steven Long's trial.

**Interview:**  Mr. Adkins seemed very willing to discuss his experience and opinions regarding Steven's trial.  I explained to Mr. Adkins that I mainly wanted to focus on information related to the punishment phase of the trial.  Mr. Adkins thought he had a good understanding of the meaning of mitigation.

Mr. Adkins was not particularly sympathetic to Steven's mother's testimony.  In his opinion, she should have worked harder to "pull herself" out of her situation.  He also blamed Steven for being in prison and not bettering himself – such as "getting a college education".

Mr. Adkins remembered Dr. Goodness and stated he didn't feel it was a good idea for the defense attorney to have used her.  Mr. Adkins stated her demeanor was "bad".  When I asked him to explain, he said that it was apparent that she would rather be anywhere but there and particularly didn't want to be in the same room with Steven Long.  It was apparent that Dr. Goodness did not like Steven.  Although he thought Dr. Goodness' demeanor was poor in relation to the client, he stated the defense attorneys' demeanor was similar in that he could tell they didn't really want to be around the defendant because he was so "evil".

Mr. Adkins couldn't think of much mitigation that would have made a difference because of the crime and the circumstances of the crime.  He was also concerned about parole and didn't want to take any chances of Steven being back out on the street.  Mr. Adkins stated he perceived Steven as being very "cunning".

I asked Mr. Adkins hypothetically if someone were mentally retarded if it would make a difference.  He stated that it wouldn't under these circumstances as they were still making a choice.

Ancil Adkins
December 9, 2007

Mr. Adkins liked the judge and thought he was quite fair.  He stated that the dentist that had
testified about the bite marks was "weird" and not a good witness, although technically he
seemed competent.

LONG EXHIBIT 1, p. 101

# EXHIBIT 3

LONG EXHIBIT 1, p. 102

## *Mitigation Partners*

**ATTORNEY – CLIENT PRIVILEGED**

MEMORANDUM

To:      Mick Mickelsen

From:  Toni Knox

Date:  December 9, 2007

Re:      Steven Long, Report #013

> Interview with Nancy Gillham, 12/9/07
> 4537 Belcaire Avenue, Dallas, Texas, 75205, 214/526-9092

**Relevance**:  Juror in Steven Long's trial.

**Interview**:  Ms. Gillham was willing to discuss her experience at Steven's trial, although she did feel very traumatized by the testimony and pictures from the trial.  She was not bothered by her decision concerning death for Steven, but has bad memories from the experience itself.

Ms. Gillham seemed to have a fairly good memory of the trial and the evidence and testimony presented.  Ms. Gillham felt very sorry for Steven's mother and was having some sympathy for Steven and the family during that part of the mitigation phase.  The "deciding factor" for Ms. Gilliam regarding the death sentence was after Dr. Goodness testified.  Ms. Gillham stated that Dr. Goodness made it clear that Steven would "do it again" and that he did not have a conscience.  Dr. Goodness' testimony made it seem absolutely hopeless that Steven could ever change in any way.   She believed that Dr. Goodness' testimony made her understand that Steven's behavior would just get worse and worse as he got older and there was no telling what might happen.

Ms. Gillham stated that it was "ironic" that Dr. Goodness was the defense witness as she made the case for the state.  Ms. Gillham remembers that even the DA thanked Dr. Goodness for her testimony as "it made his case".  Ms. Gillham was fearful that Steven might be paroled at some point in the future.

She did not believe that Steven's emotions were genuine and when he was tearful, she did not believe it was real.

# EXHIBIT 4

LONG EXHIBIT 1, p. 104

*May 13, 2007*

## PROPOSED SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES

### Introduction

The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 revision) assign to lead counsel (at Guideline 10.4(B)) the responsibility for conducting a thorough investigation relating to both guilt and penalty, regardless of any statement by the client opposing such investigation. (Guideline 10.7) To meet this responsibility, lead counsel must assemble a capital defense team consisting of no fewer than two qualified attorneys, an investigator, and a mitigation specialist – with at least one member of that team qualified by training and experience to screen for the presence of mental or psychological disorders or impairments. (Guidelines 4.1 and 10.4 C)

Inherent in the approach to competent capital defense dictated by the Guidelines is the recognition that the mitigation function is multi-faceted and multi-disciplinary, even though ultimate responsibility for the investigation of such issues rests irrevocably with counsel. Because the mitigation function is of utmost importance in the defense of capital cases, and because counsel must rely on the assistance of experts, investigators and mitigation specialists in developing. mitigating evidence, these supplemental interdisciplinary performance standards are necessary to ensure that all members of the defense team perform in accordance with prevailing national norms when representing a client who may be facing execution.

These Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases were prepared at the request of the ABA Death Penalty Representation Project to reflect prevailing professional norms. They are the result of a two-year drafting and review process by experts in the field of death penalty litigation. The Mitigation Guidelines provide comprehensive, up-to-date guidance for all members of the defense team, and following the Guidelines will help ensure effective assistance of counsel for all persons charged with or convicted of capital crimes. These Mitigation Guidelines explain in greater detail the elements of the mitigation function of capital defense. Because they build upon, endorse, and incorporate by reference the ABA Guidelines, the Mitigation Guidelines follow the same general organizational structure as the ABA Guidelines for the   Appointment and Performance of Defense Counsel in Death Penalty Cases.

The skills, abilities, and functions outlined in the Guidelines must be present throughout the defense team, and the responsibility for the development and presentation of mitigation evidence must be incorporated into the defense case at all stages of the

1

proceedings from the moment the client is taken into custody, and extending to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, appeal, post-conviction review, clemency proceedings and any connected litigation. The duty to investigate, develop and pursue avenues relevant to mitigation of the offense or penalty, and to effectively communicate the fruits of those efforts to the decision-makers, rests upon every member of the team.

### Guideline 1.1- Objective and Scope of Guidelines

A.   The objective of these Guidelines is to summarize prevailing professional norms for mitigation investigation, development and presentation by capital defense teams, in order to ensure high quality representation for all persons facing the possible imposition or execution of a death sentence in any jurisdiction. All capital defense teams must be comprised of individuals who, through their experience, training and function, strive to fulfill the constitutional mandate that the sentencer consider all evidence in support of a sentence other than death. Mitigation evidence includes, but is not limited to, compassionate factors stemming from the diverse frailties of humankind, the ability to make a positive adjustment to incarceration, the realities of incarceration and the actual meaning of a life sentence, capacity for redemption, remorse, execution impact, vulnerabilities related to mental health, explanations of patterns of behavior, negation of aggravating evidence regardless of its designation as an aggravating factor, positive acts or qualities, responsible conduct in other areas of life (e.g. employment, education, military service, as a family member), any evidence bearing on the degree of moral culpability, and any other reason for a sentence less than death.

B.   These Guidelines apply from the moment that counsel is appointed and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, appeal, post-conviction review, competency-to-be-executed proceedings, clemency proceedings and any connected litigation.

*Cross- References:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 1.1- Objective and Scope of Guidelines; 4.1- The Defense Team and Supporting Services.

LONG EXHIBIT 1, p. 106

2

**Guideline 4.1: The Capital Defense Team: The Role of Mitigation Specialists**

A.    In performing the mitigation investigation, counsel has the duty to obtain services of persons independent of the government and the right to select one or more such persons whose qualifications fit the individual needs of the client and the case. Applications to the court for the funding of mitigation services should be conducted ex parte, in camera, and under seal.

B.    Counsel has a duty to hire, assign or have appointed competent team members; to investigate the background, training and skills of team members to determine that they are competent; and to supervise and direct the work of all team members. Counsel must take whatever steps are necessary to conduct such investigation of the background, training and skills of the team members to determine that they are competent and to ensure on an ongoing basis that their work is of high professional quality.

C.    All members of the defense team are agents of defense counsel. They are bound by rules of professional responsibility that govern the conduct of counsel respecting privilege, diligence, and loyalty to the client. The privileges and protections applicable to the work of all defense team members derive from their role as agents of defense counsel. The confidentiality of communication with persons providing services pursuant to court appointment should be protected to the same extent as if such persons were privately retained. Like counsel, non-attorney members of the defense team have a duty to maintain complete and accurate files, including records that may assist successor counsel in documenting attempts to comply with these Guidelines.

D.    It is counsel's duty to provide each member of the defense team with the necessary legal knowledge for each individual case, including features unique to the jurisdiction or procedural posture. Counsel must provide mitigation specialists with knowledge of the law affecting their work, including an understanding of the capital charges and available defenses; applicable capital statutes and major state and federal constitutional principles; applicable discovery rules at the various stages of capital litigation; applicable evidentiary rules, procedural bars and "door-opening" doctrines; and rules affecting confidentiality, disclosure, privileges and protections.

*Cross- References:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 4.1- The Defense Team and Supporting Services.
ABA Model Rules of Professional Conduct 1.3- Diligence; 1.6- Confidentiality of Information; 1.7- Conflict of Interest: Current Clients; 1.8- Conflict of Interest: Current Clients: Specific Rules; 1.9- Duties to Former Clients; 1.10- Imputation of Conflicts of Interest: General Rule; 1.11-Special Conflicts of Interest for Former and Current Government Officers and Employees; 1.14- Client with Diminished Capacity; 2.3- Evaluations for Use by Third Person.

LONG EXHIBIT 1, p. 107

**Guideline 5.1: Qualifications of the Defense Team**

A.  Capital defense team members should demonstrate a commitment to providing high quality services in the defense of capital cases; should satisfy the training requirements set forth in these Supplementary Guidelines; and should be skilled in the investigation, preparation and presentation of evidence within their areas of expertise.

B.  The defense team must include individuals possessing the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history. Life history includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances *in utero* and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

C.  Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance.

D.  Team members must have the training and ability to use the information obtained in the mitigation investigation to illustrate and illuminate the factors that shaped and influenced the client's behavior and functioning. The mitigation specialist must be able to furnish information in a form useful to counsel and any experts through methods including, but not limited to: genealogies, chronologies, social histories, and studies of the cultural, socioeconomic, environmental, political, historical, racial and religious influences on the client in order to aid counsel in developing an affirmative case for sparing the defendant's life.

E.  At least one member of the team must have specialized training in identifying, documenting and interpreting symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on

4

LONG EXHIBIT 1, p. 108

behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma. Team members acquire knowledge, experience, and skills in these areas through education, professional training and properly supervised experience.

F.   Mitigation specialists must possess the knowledge and skills to obtain all relevant records pertaining to the client and others. They must understand the various methods and mechanisms for requesting records and obtaining the necessary waivers and releases, and the commitment to pursue all means of obtaining records.

*Cross- References:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7- Investigation; 4.1- The Defense Team and Supporting Services; 5.1- Qualifications of Defense Counsel.

**Guideline 6.1: Workload**

Counsel should ensure that the workload of defense team members in death penalty cases is maintained at a level that enables counsel to provide each client with high quality legal representation in accordance with these supplementary Guidelines and the ABA Guidelines as a whole. In the case of mitigation specialists on the staff of an institutional defender office, the office should implement mechanisms to ensure that their workload is maintained at a level that enables them to provide each client with high quality services and assistance in accordance with these Guidelines.

*Cross- Reference:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 6.1- Workload.

**Guideline 8.1: Training**

A.   All capital defense team members should attend and successfully complete, at least once every year, a specialized training program that focuses on the defense of death penalty cases offered by an organization with substantial experience and expertise in the defense of persons facing execution and committed to the national standard of practice embodied in these supplemental Guidelines and the ABA Guidelines as a whole.

B.   Funding should be provided for team members to receive effective training and continuing professional education in their respective fields of expertise.

*Cross- Reference:*

LONG EXHIBIT 1, p. 109

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 8.1- Training.

### Guideline 9.1: Funding and Compensation

Non-attorney members of the defense team should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the specialized skills needed to assist counsel with the litigation of death penalty cases. Flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases.

*Cross- Reference:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 9.1- Funding and Compensation.

### Guideline 10.3: Obligations of Team Members Respecting Workload

All members of the defense team in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these supplementary Guidelines and the ABA Guidelines as a whole.

*Cross Reference:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.3- Obligations of Counsel Respecting Workload.

### Guideline 10.4: The Defense Team: The Role of Counsel With Respect to Mitigation Specialists

A.   Counsel bears ultimate responsibility for the performance of the defense team and for decisions affecting the client and the case. It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.

B.   Counsel guides the defense team and, based on consultation with team members and experts, conducts ongoing reviews of the evidence, assessments of potential witnesses, and analyses of the most effective manner in which to convey the mitigating information. Counsel decides how mitigation evidence will be presented.

6

LONG EXHIBIT 1, p. 110