*Cross- Reference:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.4- The Defense Team.   ABA Model Rules of Professional Conduct 5.3- Responsibilities Regarding Nonlawyer Assistant.

**Guidelines 10.11: The Defense Case -- Requisite Mitigation Functions of the Defense Team**

A.   It is the duty of the defense team to aid counsel in coordinating and integrating the case for life with the guilt or innocence phase strategy.

B.   The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death.  The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

C.   Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death.  Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.  Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

D.   Team members must provide counsel with documentary evidence of the investigation through the use of such methods as genealogies, social history reports, chronologies and reports on relevant subjects including, but not limited to, cultural, socioeconomic, environmental, racial, and religious issues in the client's life.  The manner in which information is provided to counsel is determined on a case by case basis, in consultation with counsel, considering jurisdictional practices, discovery rules and policies.

E.   It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify, including but not limited to:

LONG EXHIBIT 1, p. 111

1.  Expert witnesses, or witnesses with specialized training or experience in a particular subject matter. Such experts include, but are not limited to:

    a)  Medical doctors, psychologists, toxicologists, pharmacologists, social workers and persons with specialized knowledge of medical conditions, mental illnesses and impairments; substance abuse, physical, emotional and sexual maltreatment, trauma and the effects of such factors on the client's development and functioning.

    b)  Anthropologists, sociologists and persons with expertise in a particular race, culture, ethnicity, religion.

    c)  Persons with specialized knowledge of specific communities or expertise in the effect of environments and neighborhoods upon their inhabitants.

    d)  Persons with specialized knowledge of institutional life, either generally or within a specific institution.

2.  Lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:

    a)  The client's family, extending at least three generations back, and those familiar with the client;

    b)  The client's friends, teachers, classmates, co-workers, employers, and those who served in the military with the client, as well as others who are familiar with the client's early and current development and functioning, medical history, environmental history, mental health history, educational history, employment and training history, military experience and religious, racial, and cultural experiences and influences upon the client or the client's family;

    c)  Social service and treatment providers to the client and the client's family members, including doctors, nurses, other medical staff, social workers, and housing or welfare officials;

    a)  Witnesses familiar with the client's prior juvenile and criminal justice and correctional experiences;

8

LONG EXHIBIT 1, p. 112

e)     Former and current neighbors of the client and the client's family, community members, and others familiar with the neighborhoods in which the client lived, including the type of housing, the economic status of the community, the availability of employment and the prevalence of violence;

f)     Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

g)     Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

F.     It is the duty of team members to gather documentation to support the testimony of expert and lay witnesses, including, but not limited to, school, medical, employment, military, and social service records, in order to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state, intellectual capacity, and life history that may explain or diminish the client's culpability for his conduct, demonstrate the absence of aggressive patterns in the client's behavior, show the client's capacity for empathy, depict the client's remorse, illustrate the client's desire to function in the world, give a favorable opinion as to the client's capacity for rehabilitation or adaptation to prison, explain possible treatment programs, rebut or explain evidence presented by the prosecutor, or otherwise support a sentence less than death.

G.     It is the duty of the team members to aid counsel in preparing and gathering demonstrative evidence, such as photographs, videotapes and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts and letters of praise or reference.

*Cross References:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 4.1- The Defense Team and Supporting Services; 10.7- Investigation; 10.10.1- Trial Preparation Overall; 10.11- The Defense Case Concerning Penalty.

LONG EXHIBIT 1, p. 113

# How to Conduct a Thorough Mitigation Investigation

Defense counsel in death penalty cases are required to investigate all aspects of the client's life history and present all possible mitigating factors. The goal of a mitigation presentation is to take the jury for a walk in the defendant's shoes. Mitigation evidence should never sound like an excuse for committing the crime. The defense counsel should also seek the assistance of a mitigation specialist.

## ABA Standard:

Eric M. Freedman, *American Bar Association: Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L Rev. 913 (2003). ABA Guidelines.doc

## Statutes:

§ 565.030 R.S.Mo.

§ 565.032 R.S.Mo.

K.S.A. § 22-3424

K.S.A. § 21-4637

## Cases:

*Rompilla v. Beard*, 545 U.S. 374 (2005).
Defense counsel has a duty to client to investigate all available mitigation evidence even if client claims to have had a "normal" childhood
Rompilla v. Beard, 545 U.S. 374 (U.S. 2005)

*Wiggins v. Smith*, 539 U.S. 510 (2003).
Defense counsel has a duty to investigate mitigating circumstances in defendant's background
Wiggins v. Smith, 539 U.S. 510 (U.S. 2003)

*Williams v. Taylor*, 529 U.S. 362 (2000).
Defense counsel had a duty to present evidence that defendant would not pose a danger if kept in a structured environment and evidence that defendant was "borderline mentally retarded"
Williams v. Taylor, 529 U.S. 362, 371 (U.S. 2000)

*Mills v. Maryland*, 486 U.S. 367 (1988).
A jury cannot be precluded from considering mitigation evidence.
Mills v. Maryland, 486 U.S. 367 (U.S. 1988)

*Sumner v. Shuman*, 483 U.S. 66 (1987).

# EXHIBIT 5

LONG EXHIBIT 1, p. 115

CURRICULUM VITAE

# KELLY R. GOODNESS, Ph.D.
### *Clinical and Forensic Psychology*
Web site: http://www.drgoodness.com

LONG EXHIBIT 1, p. 116

121 Olive Street
Keller, Texas 76248
(817) 379- GOOD (4663)
Fax: (817) 379-0320
E-mail: goodness@sprintmail.com

## PROFESSIONAL OBJECTIVES

Conduct state-of-the-art, forensic psychological evaluations, consultation, record review, and expert witness services. Provide highly specialized assessment of idiosyncratic risk factors for violence, as well as consultative services concerning the management and treatment of violent behavior and potential for dangerousness. Provide comprehensive mitigation, litigation and trial consultation services. Design and implement forensic evaluation and treatment programs.

## LICENSE

Texas State Board of Examiners of Psychologist License number 3-1223.

## EDUCATION

**Doctor of Philosophy, Clinical Psychology,** University of North Texas (APA approved), Denton, Texas, August 1999. Degree emphasis: psychological assessment and forensic psychology. Grade Point Average: 4.0.

**Masters of Science, Clinical Psychology,** University of North Texas, Denton, Texas, August 1996. Grade Point Average: 4.0.

**Bachelor of Science, Psychology,** University of Texas at Dallas, Richardson, Texas, May 1994. Grade Point Average: 4.0 (Summa Cum Laude).

## CLINICAL EXPERIENCE

**Private Practice,** Keller, Texas, 2000 – present. Practice focuses on criminal and civil forensic evaluations conducted throughout the state of Texas, but includes general psychological evaluations and clinical treatment. Qualifications exceed the qualifications mandated for forensic examiners and set forth in Chapter 46B of the Texas Code of Criminal Procedures. Specializing in the evaluation and treatment of difficult cases. Expert witness testimony, staff training, and psycholegal case conceptualization are offered. Provide specialized consultation services regarding the treatment of violent individuals. Please see http://www.drgoodness.com for more information about the services offered to the court, defense attorneys, prosecutors, and civil attorneys.

**Chief Forensic Psychologist,** Behavior Management Treatment Program and **Social Learning Diagnostic Program Coordinator,** North Texas State Hospital, Vernon, Texas, July 1999 – October 2002. Treating clinician and Interdisciplinary Treatment Team Leader for 60 highly stimulus-seeking patients who were served on a maximum-security forensic unit. Clinically supervised Multidisciplinary Treatment Team members and all aspects of the Psychology Service for a treatment resistant patient population that included both criminally and civilly committed individuals who were considered the State's most dangerous and difficult to treat psychiatric patients and therefore, too dangerous to be treated elsewhere. Patients included individuals who had been found: Manifestly Dangerous, Not Guilty by Reason of Insanity, and Incompetent to Stand Trial. Duties included conducting and supervising functional behavior analysis, the design of individualized behavior modification

programs and individual psychotherapy. Performed both general psychological and specialized forensic assessments. Provided inter- and intra-agency difficult case consultation. Designed and implemented a treatment and assessment program that emphasized Social Learning Principles and the identification of individual-specific violence and dangerousness management strategies. Responsibilities involved administration and quality assurance for the North Texas State Hospitals at Wichita Falls and Vernon. Provided hospital wide consultation services and oversight of Social Learning Programming. Designed and implemented a treatment planning process that emphasized the development of an individually tailored dangerousness risk management plan for each patient. This includes both proactive and reactive management strategies aimed at addressing violent behavior before its occurrence and controlling dangerous behavior once it was in process.

**Pre-Doctoral Residency,** The University of Texas Medical Branch at Galveston, Galveston, Texas, August 1998 – July 1999. Provided assessment, individual and group psychotherapy, and consultation services during rotations in Neuropsychology and Brain Injury Rehabilitation, Adult Psychiatry, Behavioral Pediatrics, and Adult Physical Medicine. Emphasis was on identification and treatment of neuropsychological impairments. Responsibilities also included case presentations, research presentations, and teaching.

**Associate Clinical Psychologist II,** Vernon State Hospital, Vernon, Texas, December 1996 – June 1998. Provided group and individual psychotherapy services to this maximum-security forensic inpatient population. Performed psychological assessments including comprehensive diagnostic, intellectual, personality, and focused forensic assessments (e.g., malingering determination, competency to stand trial). Primary diagnoses included schizophrenia, delusional disorder, depression, antisocial personality disorder, pedophilia, substance abuse and dependence. Provided consultation services. Initiated stress management groups for staff, promoted staff cohesiveness and facilitated team building. Conducted conference presentations and staff training with an emphasis on assessment and diagnostic issues.

**Externship,** Vernon State Hospital, Vernon, Texas, August 1996 - December 1996. Provided group and individual psychotherapy services to a primarily male, forensic inpatient population. Provided cognitive-behavioral treatment for sex offenders. Adapted Dialectical Behavior Therapy (DBT) for use with this population. Performed psychological evaluations using psychometric, structured and projective testing. Made treatment recommendations and provided consultation services to treatment teams.

**Training Clinician,** University of North Texas Psychology Clinic, Denton, Texas, August 1994 - August 1996. Conducted intake and diagnostic evaluations of adults and children. Conducted comprehensive assessments using projective and objective tests in the areas of intelligence, achievement, personality, learning disabilities, neuropsychological screening, and vocational interests and abilities with children, adolescents, and adults. Formulated treatment plans and provided brief and long-term psychotherapy services to adults with diverse presenting problems. Participated in weekly vertical practicum meetings in which client cases were presented and discussed. Supervised less advanced team members.

### RELATED CLINICAL EXPERIENCE

**American Red Cross Disaster Response Team Volunteer,** 2005 to present. Provide mental health triage and services following natural disasters.

**Forensic Psychiatry Fellowship Program,** University of Texas Medical Branch at Galveston, Galveston, Texas, May 1997. Assisted Roman Gleyzer, M.D. in evaluating and treating patients at Brazoria County Detention Center and Galveston City Jail during a week long intensive training experience in this fellowship program headed by Alan R. Felthous, M.D. Also attended and participated in lectures, research meetings, grand rounds, and seminars.

**Crisis Hotline Counselor,** Contact 214, Dallas, Texas, February 1993 - August 1994. Used a crisis intervention model to counsel callers with a wide range of problems.

LONG EXHIBIT 1, p. 117

## SELECTED SAMPLING OF CONSULTATIONS

(Note: The list below is meant as a sampling of cases and is by no means a complete accounting of the cases I have conducted.)

**Mental State at the Time of the Offense Evaluation**, Edinburg, Texas. <u>Charge</u>: Murder.

**Pretrial Mitigation Investigation and Case Development**, Fort Worth, Texas. <u>Charge</u>: Capital Murder. <u>Outcome</u>: Life Verdict.

**Pretrial Mitigation Investigation and Case Development**, Fort Worth, Texas. <u>Charge</u>: Capital Murder. <u>Outcome</u>: Plea.

**Pretrial Mitigation Investigation and Case Development**, Odessa, Texas. <u>Charge</u>: Attempted Capital Murder.

**Sex Offender Evaluation**, Wise County, Texas.

**Juvenile Fitness to Proceed** - Denton, Texas

**Pretrial Mitigation Investigation and Case Development**, Palestine, Texas. <u>Charge</u>: Capital Murder.

**Pretrial Mitigation Investigation and Case Development**, Denton, Texas. <u>Charge</u>: Capital Murder.

**Pretrial Mitigation Investigation and Case Development**, Sweetwater, Texas. <u>Charge</u>: Capital Murder. <u>Outcome</u>: Plea.

**Insanity Evaluation**, Fort Worth, Texas. <u>Charge</u>: Capital Murder.

**American's with Disabilities Act Civil Case**, Fort Worth, Texas. <u>Retained by</u>: Plaintiff. <u>Outcome</u>: Summary Judgment in Plaintiff's favor.

**Pretrial Mitigation Investigation and Case Development**, Mineral Wells, Texas. <u>Charge</u>: Capital Murder. <u>Outcome</u>: Plea.

**Pretrial Mitigating Circumstances and Dangerousness Evaluation**, McAllen, Texas. <u>Charge</u>: Capital Murder. <u>Outcome</u>: Life verdict.

**Dangerousness Evaluation of an Individual Adjudicated NGRI**, Harris County District Attorney's Office, Houston, Texas.

**Appellate Level Mitigating Circumstances Evaluations**, Ellis Unit - Death Row, Huntsville, Texas.

**Clinical Identification of Violence Risk Factors**, Rusk State Hospital, Rusk, Texas. Two day consultation requested by Rusk State Hospital aimed at educating this state, civil hospital about the identification and management of violence risk factors.

**Competency to be Executed Evaluations**, Ellis Unit - Death Row, Huntsville, Texas.

## LEADERSHIP POSITIONS

**Texas Forensic Network**, Committee Member, January 2001 – Present. Member of a multidisciplinary group that works to guide and improve forensic services in Texas through presenting specialized training and providing information to legislators.

**North Texas State Hospital Social Learning Diagnostic System Implementation Group**, Committee Member, North Texas State Hospital, January 2001 – October 2002. Committee member of an administrative body charged with guiding the implementation of Social Learning and Dangerousness Management programming throughout the hospital.

**Behavior Management Treatment Program Quality Assurance Team Member**, Committee Member, North Texas State Hospital – Vernon Campus, Vernon, Texas, August 1999 – October 2002. Committee member of a governing body that provides unit leadership, sets unit guidelines and goals, and made administrative decisions.

**Psychology Executive Committee**, Committee Member, North Texas State Hospital, Wichita Falls, Texas, August 1999 - October 2002. Responsible for establishing guidelines for problem solving of psychology related issues. Assisted in evaluating the professional conduct and clinical skills of hospital psychologists.

**Organization's Performance Evaluation Team**, Team Member, North Texas State Hospital, Vernon, Texas, December 1999 - October 2002. Responsible for evaluating randomly chosen patient chart samples for appropriate patient care, staff cultural sensitivity, family education, and patient rights protection.

**Training Team Representative – Chief Resident,** The University of Texas Medical Branch at Galveston, Galveston, Texas, August 1998 – July 1999. Attended meetings of the faculty training team to represent the interests and concerns of the eight Psychology Residents.

**Psychology Quality Assurance Team Member,** Vernon and Wichita Falls State Hospitals, Wichita Falls, Texas, December 1996 – June 1998. Assisted in establishing guidelines for evaluating the professional conduct and clinical skills of masters and Ph.D. level psychologists at these hospitals. Participated in evaluations of staff psychologist's clinical knowledge and skills in order to ensure quality psychological services. Also assisted in establishing a peer review process.

**Psychology Clinical Leadership Council,** Vernon and Wichita Falls State Hospitals, Wichita Falls, Texas, December 1996 – June 1998. Assisted in defining the scope of psychology as a discipline and establishing guidelines and standards for the professional conduct and practice of psychologists at these hospitals.

**Case Management Committee, Acting Chairperson,** Contact 214, Dallas, Texas, September 1993 - August 1994. Evaluated caller logs and case histories for potential caller problems, presented cases to the committee, deliberated on the most appropriate counseling for particular callers, and updated case files.

## RESEARCH EXPERIENCE

### MAJOR RESEARCH PROJECTS

**Treating and Managing Dangerousness in a Forensic Hospital: The State of Staff Knowledge,** (2002). This study took a snapshot of the state of staff knowledge concerning the treatment and management of dangerousness prior to the implementation of new programming designed to treat dangerous and violent patients.

**Scale Development,** (2001). Developed the Structured Interview of Combined Homicide-Suicide (SICHS), which is the first comprehensive, standardized instrument for the study of both perpetrators and victims of Combined Homicide-Suicide.

**Dissertation,** University of North Texas, (1999). Retrospective evaluation of malingering: A validational study of the R-SIRS and CT-SIRS. Developed and validated the first retrospective malingering measures. Chair: Richard Rogers, Ph.D., ABPP.

**Research Team Member,** University of Texas Medical Branch, Galveston, Texas, (1997 – 1999). Project: Characteristics and correlates of individuals who commit combined homicide-suicide. Developed research instruments for this project funded by the National Suicide Foundation. Team Members: Armando Heredia, M.D., Alan R. Felthous, M.D., Kelly Goodness, M.S., and Anthony G. Hempel, D.O.

**Masters Thesis,** University of North Texas, (1996). Depression in sixth-grader early adolescents: Effects of self-efficacy, intimate support, and relationship conflict. Study evaluated the effects of self-efficacy, intimate support, and conflict on adolescent depression levels. Chair: Sharon Rae Jenkins, Ph.D.

**Research Vertical Team Member,** University of North Texas, Denton, Texas, (August 1994 - May 1996). Assisted team members in developing both individual and team research projects; participated in weekly research team meetings. Supervisor: Sharon Rae Jenkins, Ph.D.

**Research Assistant,** University of North Texas, Denton, Texas, (August 1994 - May 1995). Project: Individuals who presented to a clinic for an HIV test completed detailed questionnaires concerning how they would react if their test results were positive for the HIV virus. Duties: Assisted in the development of a content analysis coding system; coded open-ended responses; participated in weekly research team meetings. Supervisor: Sharon Rae Jenkins, Ph.D.

**Honors Thesis,** University of Texas at Dallas, (1994). Effects of intimate support and conflict management self-efficacy on adolescent depression. Evaluated the effects of self-efficacy in effectively handling interpersonal relationships on adolescent depression. Chair: Duane Buhrmester, Ph.D.

**Research Technician II,** University of Texas at Dallas, Richardson, Texas, (May 1993 – August 1994). Project: A three-year longitudinal study of adolescents' family and social relationships and interpersonal difficulties. Duties: Collaborated on study design, implementation, and future direction. Recruited subjects, recruited and trained undergraduate research assistants, and administered questionnaires during home visits with subject families. Additional duties were coding data, writing computer

programs, conducting TARP and NIH grant accounting, compiling budget projections, and managing the study's data base. <u>Supervisor:</u> Duane Buhrmester, Ph.D.

**Research Assistant,** University of Texas at Dallas, Richardson, Texas, (January 1993 - August 1993). <u>Project:</u> A three-year longitudinal study of adolescents' family and social relationships and interpersonal difficulties. <u>Duties:</u> Administered a variety of questionnaire instruments during home visits with families and conducted nightly telephone interviews with subjects regarding their social interactions. <u>Supervisor:</u> Duane Buhrmester, Ph.D.

## RESEARCH GRANTS

**1998**        Research grant awarded by the American Academy of Forensic Psychology.

## SCHOLARLY PRESENTATIONS AND PUBLICATIONS

Goodness, K. G., & Renfro, N. S. (2002). *Changing a Culture: A Brief Program Analysis of a Social Learning Program on a Maximum-Security Forensic Unit.* Behavioral Sciences and the Law, 20, 1-12.

Goodness, K. G., Buhrmester, D., & Jenkins, S. R. (2002). *Gender differences in early adolescents' relationship qualities, self-efficacy, and depression symptoms.* Journal of Early Adolescence, 22 (3), 277 – 309.

Goodness, K. (2002). *Designing an effective psychiatric treatment program in a secure hospital: The Social Learning Diagnostic System approach.* Invited presentation at Chester State Hospital Grand Rounds – Chester, Illinois.

Felthous, A. R., Hempel, A., Heredia, A., Freeman, E., Goodness, K. R., Holzer, C., Bennett, T. J., & Korndorffer, W. E. (2001). *Combined homicide-suicide in Galveston county.* Journal of Forensic Sciences, 46, 586-592.

Goodness, K. G. & Rogers, R. (1999). *Retrospective evaluation of malingering: A validational study of the R-SIRS and CT-SIRS.* Paper session presented at the 1999 American Psychological Association Convention, Boston, Massachusetts.

Felthous, A. R., Hempel, A., Heredia, A., Freeman, E., Goodness, K. R., Bennett, T. J., & Korndorffer, W. E. (1999). *Combined homicide-suicide in Galveston county.* Symposium presented at the ASFF.

Goodness, K. G. (1999). *Retrospective evaluation of malingering: Presenting the R-SIRS and CT-SIRS.* Paper presented at The University of Texas Medical Branch psychology residency seminar series, Galveston, Texas.

Goodness, K. G., Buhrmester, D., & Jenkins, S. R. (1996). *Depression in early adolescents: intimate support, relationship conflict, and self-efficacy.* Poster session presented at the 1996 Texas Psychological Association Convention, Dallas, Texas.

Goodness, K. G., Buhrmester, D., & Jenkins, S. R. (1996). *Gender differences in early adolescents' relationship qualities and self-efficacy.* Poster session presented at the 1996 Texas Psychological Association Convention, Dallas, Texas.

Goodness, K. G., Tao, R., & Buhrmester, D. (1995). *Convergence and divergence of mother-reported and self-reported depressive symptomology and adjustment in sixth-grade children.* Poster session presented at the 1995 Biennial Meetings of the Society for Research in Child Development, Indianapolis, Indiana.

Goodness, K. G. (1995). *Closeness, conflict, and support with family and friends among sixth-graders high in depressive symptomology.* Poster session presented at the 1995 Biennial Meetings of the Society for Research in Child Development, Indianapolis, Indiana.

Gouws, K. R., & Huffman, A. (1994). *Depressive symptomology and quality of relationships with family and friends.* Poster session presented at the meeting of the Society for Research on Adolescence, San Diego, CA.

LONG EXHIBIT 1, p. 120

## ORGANIZATIONS FOR WHICH MANUSCRIPTS HAVE BEEN REVIEWED

- Behavioral Sciences and the Law
- Sage Publications
- Academic Press Elsevier Science and Technology Books

## TEACHING AND PRESENTATION EXPERIENCE

### UNIVERSITY TEACHING EXPERIENCE

**Lecturer II,** The University of Texas at Dallas, Fall 2001 - Present. Teach a forensic psychology course, which focuses on evaluation and treatment issues in clinical forensic practice and the importance of highly specialized forensic training for forensic mental health professionals. Ethics is emphasized.

**Instructor,** The University of Texas Medical Branch, January 1998 – February 1999. Conducted a small group experiential course in Patient Education for physician assistant students.

**Instructor,** The University of Texas Medical Branch, September 1998 – December 1999. Assisted in teaching a Clinical Psychiatry course to physician assistants. This course utilized Telemedicine Video to include students in another city.

**Teaching Fellow,** University of North Texas, Denton, Texas, August 1995 - May 1996. Duties: Taught three sections each semester of UCRS 1000, a course designed to teach and enhance personal and academic effectiveness skills.

### CLINICAL TEACHING EXPERIENCE

**Post-Doctoral Fellowship Supervisor,** Private Practice, October 2002 - Present. Supervise post-doctoral psychologist in general and forensic psychology.

**Practicum Supervisor,** North Texas State Hospital, August 2001 – February 2002. Supervised doctoral candidate in a forensic rotation.

### SELECTED GUEST LECTURES AND PRESENTATIONS

Goodness, K. R. (2005). *Mitigation Evaluation Practices in Texas*. Invited presentation presented at the Conducting Forensic Evaluations in Capital Cases Workshop sponsored by The Capacity for Justice, Dallas, Texas.

Cunningham, M. & Goodness, K. R. (2005). *Practical Practice Issues in Death Penalty Work*. Invited presentation presented at the Conducting Forensic Evaluations in Capital Cases Workshop sponsored by The Capacity for Justice, Dallas, Texas.

Goodness, K. R. (2004). *Coping skills manual for representing death penalty and other really challenging clients*. Invited paper and presentation presented at the Capital Trial Advocacy Program co-sponsored by the Center for American and International Law and The Texas Criminal Defense Lawyers Project in cooperation with the Texas Defender Service, Plano, Texas.

Goodness, K. R. (2003). *Dealing with the challenging capital client and getting a plea to life*. Invited paper and presentation presented at the Capital Trial Advocacy Program co-sponsored by the Center for American and International Law and The Texas Criminal Defense Lawyers Project in cooperation with the Texas Defender Service, Plano, Texas.

Goodness, K. R. (2003). *Bridging the communication gulf: how to get what you need from a juvenile forensic mental health evaluation*. Invited paper and presentation presented at the Representing the Juvenile Delinquent: Tools and Strategies Southwest Regional Juvenile Defender Center and The University of Houston Law Center, Houston, Texas.

Goodness, K. R. (2002). *The life or death psychology of plea persuasion: Getting a plea to life*. Invited paper and presentation presented at the Capital Murder Seminar sponsored by the Texas Criminal Defense Lawyers Association, Galveston, Texas.

Goodness, K. R. (2002). *An overview of forensic psychiatry.* Invited presentation at the Annual Nurse Training Seminar, Vernon, Texas.

Goodness, K. & Bearden, J. (2001). *A systematic approach to management of violence risk.* Invited presentation at the Annual Dangerousness Review Board Training Seminar, Vernon, Texas.

Goodness, K. (2001). *Using the Social Learning Diagnostic System to improve hospital administration.* Invited presentation at North Texas State Hospital – Wichita Falls Campus Program Directors Meeting, Wichita Falls, Texas.

Goodness, K., Bearden, J, & Parsons, M. (2001). *Risk management and the forensic client.* Invited presentation at the National Association of State Mental Health Program Directors Conference, Cincinnati, Ohio.

Goodness, K. & Bearden, J. (2001). *Formulating treatment plans to address the assessment, management, and treatment of risk behaviors.* Invited presentation at Forensic Networking Conference, Kerrville, Texas.

Goodness, K. (2001). *An overview of the Social Learning Diagnostic Program in managing dangerousness: The psychologist's role.* Invited presentation at North Texas State Hospital Psychological Conference, Wichita Falls, Texas.

Goodness, K. (2001). *The Social Learning Diagnostic Program: Where it has been and where it is headed.* Invited presentation at North Texas State Hospital, Vernon, Texas.

Goodness, K. (2001). *Using the Rorschach in assessing personality disorders: A structured summary approach.* Invited presentation at North Texas State Hospital Psychological Conference, Wichita Falls, Texas.

Goodness, K., (2000). Discussant for Joel Dvoskin, Ph.D., ABPP: *Managing the risk of violence associated with mental illness.* The Annual Texas Forensic Mental Health Conference, Vernon, Texas.

Goodness, K., Mills, B., Parsons, M., Kisinger, P., & Parsons, A. (2000). *Developing a Social Learning Program: Windfalls and pitfalls.* Invited presentation at the North Texas State Hospital Clinical Leadership Program, Vernon, Texas.

Goodness, K. (1999). *An overview of objective and projective psychological testing.* Medical School seminar presented to the Psychiatric Service at the University of Texas Medical Branch, Galveston, Texas.

Goodness, K. (1998). *Negotiating the internship interview and selection process.* Invited presentation and panel member at The Texas Psychological Association Annual Convention, Houston, Texas.

Goodness, K. (1998). *Structured interviewing workshop: An introduction to structured interviewing and the SADS.* Invited presentation at Vernon/Wichita Falls State Hospital Psychological Conference, Wichita Falls, Texas.

Goodness, K. (1998). *Structured interviewing workshop: Evaluating malingering using the Structured Interview of Reported Symptoms.* Invited presentation at Vernon/Wichita Falls State Hospital Psychological Conference, Wichita Falls, Texas.

Goodness, K. (1997). *An introduction to structured interviewing and the SADS.* Invited presentation at Wichita Falls State Hospital, Wichita Falls, Texas.

Goodness, K. (1997). *Evaluating malingering using the Structured Interview of Reported Symptoms (SIRS).* Invited presentation at Wichita Falls State Hospital, Wichita Falls, Texas.

Hempel, A., Goodness, K., & Schiwart, C. (1997). *Assessing individuals for violence potential: Managing violence risk factors in and outside the hospital setting.* Invited presentation presented at Rusk State Hospital, Rusk, Texas.

Goodness, K. (1997). *Developmental issues across the lifespan for Cajun families: impact on mental health beliefs.* Invited presentation presented at Wichita Falls State Hospital, Wichita Falls, Texas.

Aitcheson, G., Goodness, K., & Hill, C. D. (1997). *Case conceptualization of an individual found NGRI for matricide: Assessment, therapy, and risk management.* Case presented to The Annual Texas Forensic Mental Health Conference, Vernon, Texas. Discussant: Reid Meloy, Ph.D., ABPP.

Hempel, A., Goodness, K., & Hill, C. D. (1997). *Case conceptualization of a mass murderer want-to-be: Assessment, therapy, and risk management issues concerning an aspiring mass murderer.* Case presented to The Annual Texas Forensic Mental Health Conference, Vernon, Texas. Discussant: Reid Meloy, Ph.D., ABPP.

Goodness, K. (1997). *An introduction to structured interviewing and the SADS.* Invited presentation at Vernon State Hospital, Vernon, Texas.

Goodness, K. (1997). *An overview of psychological testing.* In-Service presented to Vernon State Hospital, Vernon, Texas.

Goodness, K. (1997). *Personal effectiveness seminar.* Two day seminar presented to the I. V. Plano Booster Club, Plano, Texas.

Goodness, K. (1996). *Personal effectiveness seminar.* Two day seminar presented to Odyssey of the Mind, Richardson, Texas.

## HONORS AND SCHOLARSHIPS

| | |
|---|---|
| 2002 | Certificate of Recognition: Distinguished Accomplishment in BMTP Social Learning Program |
| 2001 | You Are Tops Award North Texas State Hospital |
| 2000 | Certificate of Achievement for Excellence in developing and implementing The Social Learning Program at North Texas State Hospital |
| 1997 | Nominated by the University of North Texas for the Conference of Southern Graduate Schools (CSGS) 1997 Master's Thesis Award |
| 1994-1995 | UNT Clinical Fund Scholarship |
| 1994 | Graduated Summa Cum Laude |
| 1993 | Psi Chi |
| 1992-1994 | Dean's List, University of Texas at Dallas |
| 1992 | Academic Recognition, Richland College |
| 1992 | President's Honor Roll, North Lake College |

## SELECTED CONTINUING EDUCATION ACTIVITIES

♦ Workshop on Child Custody Problems and Post Custody Issues (2005). Milton Altschuler, M.D., Joan S. Anderson, Ph.D., George Glass, M.D., Jean Guez, Ph.D., Morton Katz, Ph.D.

♦ Treatment, Ethical Issues, Hope for Change in Problematic Sexual Behavior (2005). J. Ray Hays, Ph.D., J.D., Karen Lawson, Ph.D.

♦ Postpartum Disorders: Treatment and Social/Legal Implications (2005). Sherry Duson, M.A., L.P.C., L.M.F.T., George Parnham, J.D., Patricia Perrin, Ph.D.

♦ Methodological and Ethical Issues in Evaluation of Trial Competency: A Case Study Approach (2005). B. Thomas Gray, Ph.D , Michael Jumes, Ph.D., Troy Martinez, Psy.D.

♦ Threat Assessment: A Practical Approach to Prevent Targeted Violence (2005). Presented by Harley V. Stock, Ph.D. for the AAFP.

♦ Compulsive Sexual Behavior and the Internet (2005). Presented by Bruce Cameron, M.S., LPC.

♦ Conducting Forensic Evaluations In Capital Cases (2005). Presented by Mary Alice Conroy, Ph.D. Mark Cunningham, Ph.D. and Kelly Goodness, Ph.D.

♦ The Insanity Defense in Texas (2005). Presented by Joe Lovelace, J.D. and Jaye Crowder, M.D.

♦ The Expert Witness: Impartiality and Advocacy in Mental Health Testimony (2004). Presented by Stuart A. Greenberg, Ph.D., ABPP

♦ Expert Mental Health Testimony (2004). Paneled by: Paula Larsen. Reed Prospere, Mitchell Dunn, M.D., ABPN, Swen Helge, Ph.D.

♦ The Therapeutic Contract (2004). Developed by Eric Marine

♦   A Practical Guide to Risk Assessment (2004). Developed by Mary Alice Conroy, Ph.D., ABPP

♦   Ethics and the Business of Forensic Practice (2004). Presented by Eric Drogin, J.D., Ph.D.

♦   Practical Legal Research Techniques for Forensic Psychologists (2004). Presented by Alexander Greer, J.D., Pn.D.

♦   Professional Ethics and Family Law: Lawyers and Mental Health Professionals (2004). Presented by Kevin R. Fuller and Mary A. Connell, Ed.D., ABPP

♦   Trial Competency Exams and the New Texas Statutes (2004). Presented by Mary Alice Conroy, Ph.D., & Philip Lyons, J.D., Ph.D.

♦   Evaluating Competency to Stand Trial (2003). Presented by Mary Alice Conroy, Ph.D.

♦   Psychological Evaluations at Capital Sentencing (2003). Presented by Mark Cunningham, Ph.D.

♦   Advanced Forensic Psychology Practice: Issues and Applications (2003). Presented by the American Academy of Forensic Psychology
  •   Competence of juvenile defendants
  •   Evaluations for juvenile waiver/transfer hearings
  •   Malingering Assessment
  •   Evaluating validity of Miranda rights waivers
  •   Diminished capacity and mens rea examinations
  •   Assessment in death penalty cases
  •   Developments in violence risk assessment
  •   Developments in sex offender risk assessment
  •   Personal injury cases: laws and liability
  •   Personal injury cases: the damages
  •   Testamentary capacity and undue influence
  •   Child custody evaluations
  •   Termination of parental rights
  •   Employment discrimination/sexual harassment and the ADA

♦   Forensic Update Training (2002). Kerrville, Texas, miscellaneous presenters.

♦   Recent Development in the Admissibility of Psychological Evidence (2002). Presenter: Daniel Shuman, JD.

♦   Expert Witness Liability, Immunity and Ethics (2002). Presenter: Stuart Greenberg, Ph.D.

♦   Preparing for the Diplomate Exam in Forensic Psychology – ABPP (2002). Presenter: Ira K. Packer, Ph.D., ABPP

♦   Defrocking the Fraud: The Detection of Malingered Psychosis (2001). Presenter: Phillip J. Resnick, M.D.

♦   Legal Update (2001). Presenter: Chris Slobogin.

♦   Clinical Update: Risk Management (2001). Presenter: Kirk Hellbrun.

♦   Neuropsychology for Non-Neuropsychologists (2001). Presenter: Jeff T. Barth, Ph.D., ABPP.

♦   Assessment of Mild Traumatic Brain Injury (2001). Presenter: Jeff T. Barth, Ph.D., ABPP.

♦   Managing the Risk of Violence Associated with Mental Illness (2000). Presenter: Joel Dvoskin, Ph.D., ABPP

♦   Legal and Ethical Issues in Adult and Adolescent Forensic Mental Health (2000). Presenter: Daniel Shuman, B.S., J.D.

♦   Current Clinical and Legal Issues in Children's and Adolescents' Adjudicative Competence (2000). Presenter: Thomas Grisso, Ph.D.

♦   Assessing and Treating Personality Disorders (2000). Presenters: Ted Millon, Ph.D., John M. Oldham, M.D., Michael Stone, M.D., Reid Meloy, Ph.D., A.B.P.P., Robert F. Bornstein, Ph.D., Glen Gabbard, M.D.

♦   Rorschach Assessment of Personality Disorders (2000). Presenter: Philip Erdberg, Ph.D., ABPP

♦   Assessment and Treatment of Sex Offenders and Sexual Predators (1999). Presenter: Gene Abel, M.D.

♦   Psychopathy Checklist Workshop (1998). Presenter: Christie Hill, Ph.D.

♦   Psychiatric Grand Rounds: Forensic Practice (1997). Presenter: Daniel Shuman, JD.

♦   Assessment of Violence Potential: The Psychopathic Personality (1997). Presenter: Reid Meloy, Ph.D., ABPP.

♦   The Psychopathic Personality (1997). Presenter: Reid Meloy, Ph.D., ABPP.

## PROFESSIONAL AFFILIATIONS

•   Forensic Special Interest Group
•   American Psychological Association

LONG EXHIBIT 1, p. 124

Updated on November 9, 2005                                                      Goodness, 10

- Texas Psychological Association
- Texas Forensic Network
- Division 12 Division of Clinical Psychology of the American Psychological Association
- Division 41 Division of Psychology and the Law of the American Psychological Association
- Psi Chi, National Honor Society in Psychology

## REFERENCES
### (Attorney References Available Upon Request)

**Allen Childs, M.D.**
Chief Forensic Psychiatrist, Pines Unit
North Texas State Hospital - Vernon Campus
4730 College Drive
Vernon, Texas 76385
(940) 552-9901

**Alan Hopewell, Ph.D.**
Neuropsychologist
Psychiatric Consultants of Fort Worth
3704 Mattison Avenue
Fort Worth, Texas 76107
(817) 732-8441

**Troy Martinez, Psy.D.**
Forensic and Clinical Psychologist
4925 Everhart
Suite 102
Corpus Christie, Texas 78411
(361) 851-8102

**Richard Rogers, Ph.D., ABPP**
Professor of Psychology
University of North Texas
PO Box 311280
Denton, Texas 76203-1280
(940) 565-2645

LONG EXHIBIT 1, p. 125

# EXHIBIT 6

LONG EXHIBIT 1, p. 126



**DR. GOODNESS & ASSOCIATES**
*A Clinical and Forensic Psychology Practice*

# Practice Overview

Dr. Goodness & Associates is a Clinical and Forensic Psychology practice devoted to providing. We provide clinical treatment, assessment and consultation services to the community in general while also providing an array of services to the legal community.

Clinical clientele may be self-referred via the yellow pages or the Internet, may be referred by our colleagues or others who have worked with us in the past, or may be referred by individuals who know us by reputation. Therapy clientele present with a wide range of treatment concerns such as depression, cognitive problems, social isolation, life crisis, career concerns, anxiety, addiction, family dysfunction, parenting education, and so on. Likewise, clients seeking assessments come to us with a myriad of referral questions, such as "Do I have a learning disability?" or "My doctor can't figure out why I feel bad all the time...what's wrong with me?"

Much of the practice involves forensic psychology in the criminal arena. This focus necessitates frequent interactions with attorneys, court personnel, as well as defendants who have been charged with crimes ranging from criminal trespass to capital murder. Our work in criminal forensic cases varies widely, but may include the assessment of such issues as, Competence to Stand Trial, Mental Status at the Time of the Offense, the defendant's dangerousness, or specific diagnostic questions related to the defendant or his behavior during the offense. Additionally, we may be asked to conduct an investigation that will assist a prosecutor in recognizing psycholegal factors relevant to sentencing or a defense attorney in presenting a mitigation defense in a capital death trial. In capital death and other major cases, we may be utilized as expert witnesses or as trial consultants who assist in the creation of legal strategies, development of questions for examination or cross-examination, and facilitation of the attorney-client working relationship.

The practice is also employed in forensic cases that are civil in nature. Civil forensic evaluations may include assessment of personal psychological injury, malpractice by mental health professionals, Worker's Compensation claims, or other tortious claims that can be informed by a forensic mental health professional.

LONG EXHIBIT 1, p. 127

# EXHIBIT 7

LONG EXHIBIT 1, p. 128

**Credentials:**

My credentials as they pertain to this case are as follows:

1. I am a clinical forensic psychologist, licensed to practice in the state of Texas.

2. I am in private practice. My practice focuses solely on forensic cases (evaluation and treatment of individuals who have had, or are having, some interaction with the legal system be that in civil or criminal matters).

3. I was the Chief Forensic Psychologist for the Behavior Management Treatment Unit of North Texas State Hospital – Vernon Campus (NTSH-VC) for over three years before resigning to focus on my private practice. NTSH-VC is the only maximum-security forensic psychiatric hospital in the state of Texas. There, I treated the forty to sixty individuals considered the state's most difficult, dangerous and violent psychiatric patients. As such, each month I evaluated numerous individuals and made many clinical decisions concerning the level of dangerousness posed by those who were in my care.

4. Before leaving to focus on my private practice, I spent over three years as the Chief Forensic Psychologist for the Behavior Management Treatment Unit of North Texas State Hospital – Vernon Campus, which is the only maximum-security forensic psychiatric hospital in the state of Texas. There, I treated the 40 - 60 individuals considered the most difficult, dangerous and violent psychiatric patients in the state of Texas.

5. I teach forensic psychology (psychology as it relates to the law) at the University of Texas at Dallas, supervise postdoctoral fellows in clinical psychology, as well as mental health professionals in various phases of training.

6. I have presented at both State and National conferences of forensic and mental health professionals concerning a variety of forensic issues, including mitigation investigations, psychological evaluations in death penalty cases, and the identification and management of dangerousness risk.

7. I have provided psychological evaluation, treatment, and programming consultation services to forensic institutions and professionals throughout the state of Texas, as well as in other states.

8. In the course of my training, employment with the State of Texas and my private practice as a Forensic Psychologist, I have evaluated over two thousand individuals.

9. I have worked for the prosecution, for the defense and for the court without concern for which "side" I work, as I provide my honest, clinical opinion regardless of who hires me.

LONG EXHIBIT 1, p. 129

1

10. A large percentage of my practice involves the psychological evaluation of individuals who have committed, or who are charged with committing, murder. Moreover, the evaluation of capital murder defendants comprises a goodly amount of my forensic practice.

11. My extensive forensic clinical experience provides me with a uniquely applicable knowledge base for forensic cases that is difficult to mimic or surpass in terms of the depth and breadth of my experience with unusual, damaged, heinous, dangerous, challenging or difficult to treat or evaluate individuals.

12. I am qualified to conduct forensic evaluations in Texas as required by statute.

13. A large percentage of my practice involves the psychological evaluation of individuals who have brain damage, severe mental illness, or both.

LONG EXHIBIT 1, p. 130

# EXHIBIT 8

LONG EXHIBIT 1, p. 131

National Catholic Reporter: Rare Breed - profiles of three defense lawyers who work death penal... Page 1 of 9

.....com

FindArticles > National Catholic Reporter > Oct 5, 2001 > Article > Print friendly

**Rare Breed - profiles of three defense lawyers who work death penalty cases, Stephen Bright, Bryan Stevenson, and John Holderidge**

Claire Schaeffer-Duffy

LONG EXHIBIT 1, p. 132

Death penalty lawyers defend rights of politically invisible

Bryan Stevenson graduated from Harvard University magna cum laude with a bachelor's in philosophy, got his master's in government, picked up a law degree and then headed south to represent poor people. An obviously talented attorney, he could be hauling in a six-digit income filing briefs for corporate executives. Instead, for about $30,000 a year, he juggles an overwhelming caseload of capital clients, defending those whom an entire state is gearing up to kill.

In a country of 1 million attorneys, there are approximately 50 who work for private, nonprofit agencies specializing in capital representation. Many work in states where political will for executions is high and the commitment to public defender programs nonexistent. They defend the innocent and the very guilty. They work hard to understand the lives of people who take the lives of others.

"They are deeply committed people who have chosen to make their mark on this world," said Northwestern University law professor Larry Marshall. "They could have been priests. They could have been rabbis."

Or rescue workers. One capital trial attorney, an expert in the field, likened his work to the Underground Railroad. "We're trying to save people any way we can," he said. The analogy is too limited. Many of these experts in capital defense do more than fight for the life of a particular client. An extremely articulate bunch, they lecture, teach, write and submit well-argued appeals for the rights of a politically invisible and often despised populace. Sometimes their appeals are reviewed by the U.S. Supreme Court.

Today death penalty lawyers are a rare though increasingly much-needed breed. Greater restrictions on the law governing the filing of habeas corpus petitions -- a potentially life-saving procedure for capital clients -- coupled with the termination of federal funds for death penalty resource centers have left many on death row without access to desperately needed counsel. In addition, private firms, once willing to do pro bono work for a capital client, now consider these cases to be a costly sinkhole and are reluctant to take them on.

In recent weeks, NCR interviewed three capital trial lawyers credited with considerable accomplishments in their field. Their stories, remarkable in themselves, provide a unique insider's commentary on the implementation of the death penalty in America.

Stephen Bright always knew he wanted to represent poor people. After graduating from the University of Kentucky School of Law in 1975, he worked for legal services in the coal-fields of Appalachia. Even as a kid, he was appalled by the death penalty, but capital representation was far from his mind until he "got the call" in 1978 to help out with a death penalty case in Georgia. He has remained there ever since, representing indigent clients, some with IQ's as low as 70 or 80, in a state where the capital defender program is "just a shell of its former self."

"The legal system," he said, "is so fundamentally unfair to the poor." And Bright is a stickler for fairness, quick to call foul at every inequity in the duel between defendant and the state that prosecutes. Outrage and a love of the fight keep him going. "I'm wearing my heart out in pursuit of the unobtainable," he admitted, "but I wouldn't be anywhere else."

The executive director of the Southern Center for Human Rights, based in Atlanta since 1982, Bright also teaches courses on the death penalty and criminal law at Harvard, Yale and Emory law schools. Considered one of the country's leading experts on capital representation, he has received several awards in the last decade for his work as legal advocate for the poor. He has written extensively on criminal justice and judicial independence, testified before the U.S. House and Senate and worked with the American Bar

Association Task Force to provide recommendations to Congress for improving the fairness of the death penalty process.

Established in 1976, the center is a public interest legal project that provides representation throughout the South for prisoners and persons facing the death penalty. It operates on an annual budget of less than $1 million, receives no government funding and is supported by individuals, law firms and foundations, and by quite a bit of pro-bono lawyering.

The center's nine attorneys are each paid $30,000 a year. Bright, who is currently subsidized by a grant from the Lindhurst Foundation, receives no salary from the center. Incomes are deliberately kept modest, he said, "to free up money for trial work. There is so much that needs to be done and so little resources. Besides," he adds, "there is no divine right of lawyers to live like kings. They can live like plenty of other people who make it on a modest salary."

The center operates in a region where the quality of capital representation is "dismal," said Bright. People facing executions are assigned lawyers who lack expertise and funds. Alabama, Georgia, Virginia, Mississippi and Texas have no state-funded public defender programs, although the latter two have recently allotted some funding for indigent defense. He finds it "appalling" that the "states most willing to execute people" are not willing to pay for adequate counsel. "In those states," he said, "it is better to be rich and guilty than poor and innocent because the poor are represented by court-appointed lawyers who often lack the skill, resources and, on occasion, even the inclination to defend a case properly."

In 1989, in response to litigation from the center, the Georgia Supreme Court required that a person accused of a capital crime receive adequate representation. But the state has done little to implement its own law, Bright said, and poor clients are still defended by attorneys who specialize in "title searches, wills and divorces."

In his June testimony before the Senate Judiciary Committee, favoring the passage of the Innocence Protection Act, Bright cited case after case in which the defense counsel failed to represent a client well.

"In at least four cases in Georgia, counsel referred to their clients before the jury with a racial slur. A woman in Alabama was represented by a lawyer so drunk that her trial had to be suspended for a day, and the lawyer sent to jail to sober up. The next day, both lawyer and client were produced from jail and trial resumed. Defense lawyers in Alabama and Missouri cases had sexual relations with clients facing the death penalty. In far too many cases, lawyers defending capital cases were impaired by alcohol, drugs or infirmity," Bright said.

Such incompetence rankles Bright, who describes capital representation as a fairly specialized skill requiring knowledge of proceedings that are "arcane and complex." Quite frequently, a capital trial attorney has to contend with "very complex mental health issues," he said. If a client has a history of neglect or deprivation or suffers from fetal alcohol syndrome, the attorney has to be able to identify these problems and articulate how they influence a person's behavior.

Bright believes that it is the lawyer's job to "humanize the client" for the jury because ultimately death penalty cases rely "far more on human compassion than the technicalities of the law. It's very hard to kill someone you know. You are asking the jury to make a premeditated decision to kill someone. A lot of times our client is guilty. But there are different levels of culpability. Who was this person? There is always a story. No one wakes up and decides to be a bad person."

In 1988, Bright, along with a team of attorneys, successfully challenged the death sentence for Tony Amadeo in the U.S. Supreme Court by showing that the prosecutor secretly instructed jury commissioners to underrepresent African-Americans in the jury pool.

Racial bias, said Bright, permeates the administration of the death penalty. His center's Web site reports that 27 percent of Georgia's population and 68 percent of its homicide victims are African-American. Yet among the state's death row population, 90 percent of the victims are white. The discrepancy suggests that the race of the victim has more bearing on a capital prosecution than the crime itself.

"Often the only person of color participating in a capital trial is the defendant," Bright said. Prospective jury members are frequently

LONG EXHIBIT 1, p. 133

asked if they consider the death penalty an acceptable form of punishment for certain crimes, and those who answer no are often struck from the jury pool. That question has "tremendous impact" on the racial make-up of the jury, he said.

Statistics from the Equal Justice Initiative, a death penalty resource center in Alabama, confirm Bright's description of all-white courtrooms trying black defendants. In Alabama, African-Americans constitute 2 percent of the state's prosecutors, 4 percent of its criminal court judges and 66 percent of its prison population.

"Executions colored by race and poverty necessarily become a civil rights issue," said Bryan Stevenson, executive director of The Equal Justice Initiative. "More important, they become a human rights issue."

Stevenson interned at the Southern Center for Human Rights while still a law student at Harvard. Issues of race and poverty had always interested him, but he had "no clear expectations" for himself and he admits that he "went to law school by default." But his months in Atlanta gave him a vocation that still rings true. "I saw people literally dying from lack of representation. Once I was exposed to the insidious racial bias, it became difficult to imagine doing anything else."

A native of Delaware, Stevenson wages his fight for the civil rights of the condemned in Alabama, one of the poorest and most conviction-prone states in the country. According to the Equal Justice Initiative, Alabama, which currently has 187 people on death row and 300 facing capital trials, has issued more death sentences than any other state in the country. Its death row population has doubled in the past 10 years. The elevated numbers are due in part to a quirky Alabama law that allows a judge to reject a jury's verdict of life imprisonment, replacing it with death.

Twenty-five percent of the state's death row population received a life sentence that was overridden by a judge, the initiative reports.

Moreover, Alabama and Georgia are the only two states in the country that do not guarantee counsel to death row inmates after a direct appeal to the highest state court. In Alabama, lawyers representing inmates who wish to raise additional claims at the state or federal level cannot be paid more than $1,000 per post-conviction proceeding. It's an absurdly low fee for the legal world, where "attorneys can charge $25,000 to $50,000" just to keep out of prison a client accused of driving under the influence of drugs or alcohol, said Stevenson.

The state cap has meant that death row inmates, desperate to have their cases reviewed, are dependent on the good will of volunteer lawyers.

"If you don't find the attorney, you don't get the review, and for death penalty clients, these are the most important," he said. Post-conviction reviews provide the defendant with a last opportunity to point out errors made at the trial level, errors that can be as egregious as having a defense attorney who falls asleep in court.

Stevenson estimates that 40 prisoners on Alabama's death row are currently without counsel.

In 1989, the state of Alabama was paying only $600 to any attorney willing to take on a post-conviction review. That was the year Stevenson met Walter "Johnny D" McMillian, accused of killing young Ronda Morrison. McMillian's story is the subject of Pete Earley's book Circumstantial Evidence (Bantam, 1996).

"Johnny D," already incarcerated on death row for 15 months, was a little leery of lawyers. His previous team of two attorneys had spent "no time on the case" and as far as Johnny D. was concerned "weren't worth $5."

Stevenson, 28 at the time, had just been appointed executive director of the fledgling Alabama Capital Representation Resource Center. Johnny D. was his third death row interview at Holman prison that January afternoon. Upon seeing the inmate, Stevenson launched into his "standard speech," Earley wrote. It was one he gave to all his clients, some of whom were too afraid to confess the heinous nature of their crime, even to their lawyers.

LONG EXHIBIT 1, p. 134

"It doesn't matter to me whether a person has killed 900,000 people or if a person has never killed anyone. The objective is still the same. I don't want to see you executed. The bottom line is, your life is of value regardless of what you have done."

"He was just like a brother," Johnny D said of his devoted attorney who, along with co-counsel Michael O'Connor, obtained exoneration for his client in 1993. On the day of Johnny D's release, Stevenson was waiting to take him home.

"They didn't need to bring the car for me that day," McMillian mused. "I could've just run out of there and on down the road. I felt like I wanted to fly."

In 1996 the Alabama Capital Representation Resource Center lost its federal funds and was replaced by Equal Justice Initiative, a private, nonprofit organization. Its staff of five attorneys, two fellows and four legal assistants are currently involved in 100 death penalty cases, "which is way more than a staff of our size should do," said Stevenson.

Capital trials are notoriously long and complicated -- stretching out for years and requiring hundreds of hours of legal work. According to The New York Times, a Florida firm reported that it spent 10 years and $10 million worth of lawyering hours representing one death row client.

Like their Atlanta counterparts, the initiative's attorneys, three of whom graduated from Harvard Law School and one from Yale, work for meager wages -- somewhere under $30,000. They have had "uncommon success," according to Stevenson. "Seventy death sentences were overturned through our litigation."

In May, the initiative obtained a stay of execution for mentally retarded death row inmate Gary Holloday, pending a review by the U.S. Supreme Court. Stevenson hopes the case will lead to a change in Alabama legislation. Twenty-one states have expressly exempted the mentally retarded from execution. Alabama is not among them.

But for the Alabama attorney, these successes "are not enough, given how many people are at risk." His work as a death penalty lawyer is not what he imagined for himself.

Many death sentences reversed

A study of U.S. death penalty convictions between 1973 and 1995 found that two-thirds of the verdicts reviewed were reversed:

68% were
reversed

Direct appeal,
state level         41%

Federal review      21%

Post-conviction,
state level          6

LONG EXHIBIT 1, p. 135

32%
were not
reversed

[*] 2000 FRT SOURCE: "A Broken System: Error Rates
in Capital Cases 1973-95" A study of 4,578 convictions

Note: Table made from pie chart.
What happened
in reversed cases:

76      Sentence
        reduced

18      Retried and
        sentenced to
        death again

7       Found
        innocent

LONG EXHIBIT 1, p. 136

"It is incredibly engaging and debilitating," he said. Defending the rights of the imprisoned is a crucial piece in the broader movement for human rights, and he loves being a part of it all. But the poverty of his clients' lives overwhelms him at times. Many are victims of "horrific violence and neglect," and he is almost formulaic about the pattern of their suffering: abused at 3, sexually assaulted at 6, discarded at 9, when many of them began experimenting with drugs.

"As a society, we have used punishment and incarceration as a mechanism for responding to the absence of hope in people's lives. We are still dealing with the legacy of racism," he adds, "and we don't value the needs of the poor."

The needs of capital defense attorneys are not a high priority either, according to John Holderidge. Holderidge, who "has always been against the death penalty," took on his first capital case while working as a summer associate with a prominent Wall Street firm, Cahill Gordon Rindell. He won the appeal and, after graduating from law school, got a grant from the American Civil Liberties Union to go South.

Initially, he worked at the trial level. "I wanted to focus on first appeal because that is where you have the best chance of saving someone's life," he said. But he began to feel like a man pulling a drowning person from a river of dying people.

"I would go into a county and they might have seven death penalty cases. I could save one person's life but I found that everyone else was getting killed."

So Holderidge turned his attention to the bigger problem -- woefully underfunded and overworked public defenders. People on death row were getting lawyers who had no time.

Or money. In some Louisiana parishes Holderidge observed, public defenders were juggling 600 felony cases -- three to four times the national average -- plus three or four capital cases.

Mississippi was no better. The two part-time public defenders in Jones County, operating on a budget of $32,000, had "650 felony cases between them" and eight capital trials as well, Holderidge said.

Until fairly recently, both states imposed a $1,000 cap on capital trials, according to Holderidge. This ridiculously low fee was expected to cover overhead costs as well as hours (which could number in the hundreds) for legal work on a trial. The incredible lack of funds meant that attorneys defending capital clients were faced with a terrible choice, Holderidge said. "You go into bankruptcy or you don't defend your client well."

In 1990, the Mississippi Supreme Court adjusted state funding for capital cases and allotted an hourly fee of "approximately $25" for

National Catholic Reporter: Rare Breed - profiles of three defense lawyers who work death penal...   Page 6 of 9

overhead costs. Holderidge said. But the $1,000 cap on trial fees remained. In 1993, the Louisiana Supreme allocated $57 an hour to cover fees and overhead costs.

This year, the National Legal Aid and Defender Association honored Holderidge with the Life in the Balance Achievement Award for his work in Mississippi and Louisiana "representing not only the poorest clients but the poorest lawyers." His work contributed to the establishment of a capital trial and post-conviction unit in Mississippi. The state has allocated an annual budget of $750,000 for four attorneys who specialize in capital representation.

"They will provide training for local lawyers appointed to a capital case," said Holderidge, who described the creation of the program as "progress."

"But the funding is nowhere near enough for what's required. Mississippi has over 100 death penalty cases right now and 12 appeals."

Holderidge also wrote the leading brief and argued the case that led to the creation of the Louisiana Indigent Defense Assistance Board. Established in the mid-1990s, the board operates on an annual budget of $7.5 million.

Private attorneys defending poor clients are no longer confined to the $1,000 cap per trial. "It's a huge victory," he said.

Holderidge estimates that he was directly involved with 70 capital cases. Not every client was his friend.

Some resented, even appealed the life sentence they received in lieu of execution. But Michael Graham will always remain eternally grateful to "the pro bono lawyer who worked his tail off."

On March 3, 2000, after nine years of litigation, Holderidge obtained exoneration for the Virginia roofer who spent 14 years on death row for a crime he did not commit.

Taking on a death row case "really thrilled" Holderidge. But after working for a decade to increase funding for capital trial lawyers, he left the deep South and headed to Connecticut because of money. "I wasn't burned out by doing the death penalty stuff. I was just burned out by money."

He estimates that he spent half his time chasing down grant money, which was "never near enough" and trying to get judges to pay him.

"I never had a secretary. I never had a paralegal. I had a 30-year-old desk and a computer that shut down on me periodically." It was his wife's salary, he admits, that ultimately got him through those years.

Holderidge now works as a capital trial lawyer for Connecticut's public defender program. Stevenson and Bright continue to fight the good fight from their Southern bases. Although Bright has lobbied for death penalty reform, he believes capital punishment is a fundamentally flawed legal option.

"You cannot design a system that will fairly and rationally execute people," he said, quoting Supreme Court Justice Harry, Blackmun.

"In most [court] cases, the focus is very narrow and you are dealing with factual questions concerning who was at fault. But in a capital trial, the jury has to decide a much bigger issue: `Is this person so beyond redemption that they ought to be eliminated from the human community?' It's a boundless question."

Federal legislation impedes work of death penalty lawyers

Stephen Bright, attorney and death penalty expert, describes the 1990s as a time of "terrible problems" for capital trial lawyers.

http://findarticles.com/p/articles/mi_m1141/is_42_37/ai_79339788/print                                12/25/2007

In 1996, two Congressional decisions drastically changed the legal landscape. Early in the year, legislators cut all federal funding for death penalty resource centers and then, several months later, issued a bill severely limiting federal appeal options for death row inmates.

"It was a devastating one/two blow for the defense of capital clients," said Bright. Congress shortened the time in which death row inmates could file their federal appeals right after taking away the attorneys who could assist with those appeals, he said.

The $18 million federal budget cut meant the complete demise of most death penalty resource centers, said Richard Dieter of the Death Penalty Information Center. In many states, these centers "did the key death penalty legal work."

They acted as a resource for outside lawyers taking capital cases and often, because of shortages, tried cases themselves, he said. After cuts, the national total of death penalty centers dropped from 20 to about seven.

"Some centers were able to survive on private or state funding," said Dieter, "but all are smaller than they used to be."

Bright reports that in other states, such as Texas, the federally funded program has completely disappeared. Texas, he said, "has the worst public legal system of any state. It just has the appearance of a process. There is no public defender system. No capital trial unit. No post-conviction unit."

On April 24, 1996, Congress passed the Anti-Terrorism and Effective Death Penalty Act. The bill severely limits the role of federal review in a capital case by restricting when an inmate can obtain a federal hearing and when a federal court may set aside state-imposed convictions or sentences. The bill also imposed a one-year deadline for the filing of a habeas corpus petition, which is submitted when valid claims of constitutional error can be made.

The Death Penalty Act encumbered the habeas petition with new procedural rules, said Dieter, and inmates can apply only once. They "now have a time limit, number limit and content limit."

Proponents of the act say it has streamlined the death penalty process, which typically drags on for years. Opponents say it has increased the likelihood that innocent people will be executed. Law professor Lawrence Marshall of Northwestern University believes the bill has "fundamentally changed the role of the federal court in reviewing a death penalty case."

"Throughout the '50s, '60s, '70s and '80s, the courts operated in a manner that recognized that sometimes the political pressures at the state level are such that constitutional rights are not protected."

The state judiciary is elected, Marshall pointed out and therefore can be vulnerable, "subconsciously or unconsciously to the politics around a crime."

In some instances. Marshall said, the habeas proceeding helped specific individuals because it sent a message that state courts were not the final judge. He believes that the possibility of federal review acted as an "effective deterrent" against "judiciary sloppiness or politically-based judgments."

"If the homework's being reviewed, that's a strong incentive for doing it carefully." --Claire Schaeffer-Duffy

Innocence Protection Act

Frederico Martinez-Macias was represented at his capital trial in Texas by a court-appointed attorney paid $11.84 per hour. His counsel failed to present an available alibi witness, failed to interview and present witnesses who could have rebutted the prosecutor's case and failed to thoroughly examine key evidence.

Not surprisingly, Martinez-Macias was sentenced to death. He spent nine years on death row before a Washington law firm stepped in, took his case and got an exoneration.

In Georgia, a court-appointed lawyer received $15 to $20 an hour for representing Gary Nelson, a man facing execution. Nelson's attorney worked without co-counsel and without a private investigator. At the trial, the closing argument for the defense was 255 words long. Nelson spent 11 years on death row before attorneys specializing in capital trials volunteered to obtain his release.

Since 1973, 96 people on death row were found to be wrongfully convicted and released. Last June, a Columbia Law School study found that seven of 10 of the thousands of cases examined had serious, reversible error, many due to "egregiously incompetent defense counsel" and prosecutorial misconduct.

For some, these case histories, described by capital trial expert Stephen Bright, and related statistics are fodder for the ongoing debate about death penalty reform. Proponents of reform say the death penalty is administered unfairly. Whether or not you live or die is more contingent on income, skin color and where you are tried than on the crime itself.

Opponents of reform say the judiciary process has enough internal checks to prevent convicting the innocent. At the heart of the debate are questions about the integrity of the criminal justice system in the United States and its ability, to assure every American the right to a fair capital trial.

Last June, lawmakers heard from both sides of the issue during a Senate Judiciary committee hearing on the Innocence Protection Act. The bi-partisan bill, co-sponsored by Patrick Leahy, D-Vt., and Gordon Smith, R-Ore., would afford convicted offenders greater access to DNA testing and would help states improve the quality of legal representation in capital cases by establishing national standards.

Title II of the Innocence Protection Act, considered the bill's most controversial feature, would establish a National Commission on Capital Representation. The commission, comprised of prosecutors, defense attorneys and judges, would develop standards for providing defense counsel to indigents facing a death sentence. The bill includes a grant program to help states implement these standards and "otherwise improve the quality of representation in capital cases." States failing to do so would be denied federal funds for their prisons.

Endorsers of the Innocence Protection Act include supporters of the death penalty. Among those testifying on behalf of the bill was Beth Wilkinson, lead prosecutor in the Oklahoma City bombing case. Co-sponsor Sen. Gordon Smith said he "believes that the death penalty is a useful tool for deterring crime." However, he said, the penalty must have the confidence of the people if it is to work. "Providing competent counsel to poor defendants will help maintain the integrity of our justice system and make the administration of capital punishment more effective," he said.

The bill, endorsed by the United States Catholic Conference, has 25 supporters in the Senate and more than 214 in the House, most of whom are Democrats.

Capital representation at the federal level is typically considered quite good, according to law professor Larry Marshall of Northwestern University. For the attorney faced with the daunting task of defending a capital client, funds and training are available. Millions were spent on the defense of Timothy McVeigh, for example, and Robert Nigh, McVeigh's attorney, received ample legal assistance from the Federal Death Penalty Resource Counsel, an organization comprised of topnotch capital defenders.

Capital representation at the state level, however, is far more haphazard. Some states provide training for their capital trial attorneys; in others, resources are absurdly scant. "Many," says Bright, "lack the key elements of an effective indigent defense system: a structure, independence from the judiciary and the prosecution and adequate resources."

Bright believes that it is "not unreasonable for Congress to require the states as a condition of receiving millions of federal dollars to implement an adequate indigent defense system to protect the innocent at least in capital cases." --Claire Schaeffer-Duffy

http://findarticles.com/p/articles/mi_m1141/is_42_37/ai_79339788/print                                   12/25/2007

Related Web sites

Equal Justice Initiative
www.eji.org

National Legal Aid and Defender
Association
www.nlada.org

Southern Center for Human Rights
www.schr.org

Claire Schaeffer-Duffy is a freelance writer living in Worcester, Mass.

COPYRIGHT 2001 National Catholic Reporter
COPYRIGHT 2001 Gale Group

# EXHIBIT 9

LONG EXHIBIT 1, p. 141

# *Mitigation Partners*

## ATTORNEY – CLIENT PRIVILEGED

MEMORANDUM

To:   Mick Michelson

From:  Toni Knox

Date:  October 26, 2007

Re:   Steven Long, Report #001

---

Interview with Steven Long – 10/25/07
Polunsky Unit – Livingston, Texas

---

Circumstances of Interview:  There were numerous attorneys visiting clients and both of the attorney booths were in use with each attorney planning to see several clients.  There was one side of the visiting area where only attorneys were seeing their clients.  The choice was either wait for several hours or not see Steven, so I decided to use one of the visitation booths with the other attorneys.

Interview:  Steven was surprised to see me as I had been unable to communicate with him because of the short notice that I was coming.  He had received a letter from you with information about me being appointed and with my resume so he knew who I was.

I explained that I was his mitigation specialist and would be reviewing the information that had been previously presented for mitigation in the punishment phase of the trial.  I encouraged him to be honest with me so I could make an accurate assessment of him, his family and other contributing factors.  He stated he would be willing only if he felt I was not going to lie about him like Dr. Goodness.  Steven was very upset at some of the things Dr. Goodness said on the stand.  He was angry that she didn't present some information and presented other information that was not true.  Steven was most angry about Dr. Goodness saying that he had been masturbating in front of her in the jail.  Steven was shocked when she stated that, as she had not said anything to him at the time of the "alleged masturbation".  Steven stated that it was extremely cold in the area where he was talking with Dr. Goodness.  He said he had his hands in his pockets because he was cold.  Steven is very restless and moves about constantly.

I asked Steven if he had spent a great deal of time with Dr. Goodness talking about his family and other things.  Steven stated he didn't think he had spent more than an hour with Dr. Goodness talking about his family and he had spent much more time with me today than with Dr. Goodness throughout the trial.

LONG EXHIBIT 1, p. 142

Steven Long
October 26, 2007

I asked Steven if Dr. Goodness had done psychological testing on him and Steven initially said no and then stated yes she had given him a lot of papers to fill out, but they were not like a test. Steven stated the papers were information asking about his family and other things and it had taken him about four days to complete them, particularly with a fourth grade education. Steven didn't understand why Dr. Goodness only wanted to talk with his family and not him. I explained it was important to talk with the family in addition to him. Steven had seen some other doctors who had done some testing on him. When I asked if it was neuropsychological testing, he thought that sounded familiar. He had to put blocks together and other tasks that he frequently got wrong. He became frustrated during the testing because he didn't think he was getting very many things right. He remembers looking at some ink blots and telling them what it reminded him of. After saying he felt he had done really poorly on the tests, Steven then stated that he thought they had told him he had been really intelligent. Steven says that none of this information was used in the trial.

Steven talked about his difficulty in school. He was unable to pass the fifth grade and went through the fifth grade twice and was still unable to pass. He was told that he was going to be passed into the sixth grade, which made him happy and he went home and told his mother he was going to passed to sixth grade. After he started the sixth grade, a few hours later while in class, he was called out of class to the principal's office. When he went there he was surprised to see his mother there and immediately began to deny that he had done anything. He was informed he was going to be sent to the 7th grade. At the time, he was excited that he was getting caught up and would be in the 7th grade. Looking back, he says it was not a good thing because he was trying to 7th grade work with a 4th grade education. Steven had behavioral problems in school and on several occasions was sent to "alternative schools". Initially, he was sent to the Metro Alternative School on South Ervay. Later he was sent to the Family Guidance Center, which he thought had replaced the Metro Alternative School.

Throughout his life, Steven and his mother have had frequent conflict and Steven reports Judy was extremely violent and abusive to him, but not his sister, Cynthia. As a child, Steven wondered why his mother seemed to hate men and that included him. He never knew anything about the sexual abuse of his mother and aunt by his maternal grandfather. When Judy and the family went to live with his grandfather, he had no idea about the prior sexual abuse. Steven remembers his grandfather was a "stern" man, but does not feel he was ever sexually inappropriate with him. His grandfather was in the remodeling business and would often take Steven with him. Steven does report memories of sleeping with his grandfather in a sleeping bag, but does not remember his grandfather being sexually inappropriate with him. Steven later stated I probably didn't need to worry "because he liked girls".

I encouraged Steven to tell me about any of the times he felt someone was sexually inappropriate with him as a child and then we would discuss any later incidences of sexual assault as an adult.

   ☐   When Steven was living on Overlook Street, there was a family that lived in the neighborhood. Steven was friends with brothers, Chris and a younger brother; in a family (he can't remember the last name of the family). Chris had an older

LONG EXHIBIT 1, p. 143          Page 2 of 7

Steven Long
October 26, 2007

sister Carla Pass (her current name) and they had a cousin, Dana, who was
frequently over at their home.  Steven states that Dana was often sexually
inappropriate with him, as she would show him her breasts and vagina.  She
would also fondle Steven's penis.  Dana was 23 to 25 at the time and Steven
believes he was about 11 or 12.  Dana was a "truck stop whore".  Steven reports
his contact with Dana was over about a three month period of time.  Steven liked
to look at her breasts, but was upset when she would fondle him and then tell him
he was not a man.  There was no sexual intercourse between Dana and Steven, but
he performed oral sex on Dana.

☐  The next incidence of sexual abuse occurred with one of his sister's friends,
Rhonda Cole.  Steven was 11 or 12 at the time and she would frequently show
him her breasts.

☐  Steven says his first instance of sexual intercourse was with one of his sister's
friend's, Charmane.  Charmane became sexual with Steven and wanted to have
intercourse.  She was angry at Steven because he didn't know how to do it.  While
they were having intercourse, his penis kept coming out because he was pulling
out too far.  Charmane was extremely critical of him because he was so inept.

☐  Steven had a friend named Jason (possibly Baker) who had an older sister, Kim
Baker.  Steven was twelve at the time and Kim was nineteen.  Steven has a vivid
memory of accompanying Jason and his mother to pick up Kim in Ft. Worth from
her father.  Her father was a pilot of a small plane (probably crop duster).  They
picked up Kim at the airport and her father took Steven and Jason for a quick ride
on the airplane.  It was very exciting for Steven and he remembers it well.  He
was unable to remember his exact age, but states that it was two days after he had
been arrested as a juvenile for stealing a spiked dog collar in Mesquite.  After
picking up Kim, Steven spent the night with the family.  Kim later engaged
Steven inappropriate sexual behavior.  Kim asked Steven to put his fingers in her
and then he later gave her oral sex.

Steven did not report any other incidences of sexual abuse as a child, but was raped when he was
first sent to prison by several men in a gang situation.  This incident happened in the Wallace
Unit and Steven faked having an asthma attack to get out of the situation.  Steven later made
superficial cuts on his wrists to get transferred to another area where he would feel safer.  Steven
was extremely fearful of what would happen to him in prison.  He did asked to be moved and
later put in a grievance regarding the rape, but he was fearful it would only cause worse
repercussions.  Steven stated that he later allowed the sexual advances and did not fight it
because he knew it was going to happen and he didn't want to get beat up and/or killed.  Steven
states that he later found he enjoyed this type of sexual behavior, but only when it was
consensual and not a "rape".

Steven frequently described himself as being "gay" in prison, but not when he was out of prison.
Steven and I discussed the difference between being a homosexual and having sex with both
males and females.  I indicated to Steven that it would appear that he had sexual desire for both
males and females and could probably be more accurately describes as bi-sexual, rather than

Steven Long
October 26, 2007

occasionally gay. Steven states he is frequently abusive to the female in heterosexual relationships and attempts to be very dominant. Steven doesn't feel he does well in that role. He is much more comfortable being the "girl" in a homosexual relationship.

We spent some time discussing "pretty boy" and I informed Steven that I did not believe he had multiple personalities. We discussed the inner turmoil that was inside Steve with these different sexual preferences. We also discussed how difficult it is at times when we have done something bad or that goes against or inner beliefs to accept that behavior. I explained to Steven that at times to be able to resolve that conflict within ourselves, it is easier to feel that there is some other "bad" part of us that has done things. Steven was very tearful during this conversation and agreed with me. I explained to Steven that what he was calling "multiple personalities" was really a part of his personality that he had difficulty accepting and it felt like a "foreign person" and helped to relieve the conflict within himself about his actions that did not go along with his inner believes and values. I informed Steven I would not be focusing on Pretty Boy as it was all Steven and I was going to try and understand what had contributed to Steven's mental illness. I informed Steven that I was not saying that he did not have a "mental illness" and he has had prior psychiatric diagnosis. Steven told me he really appreciated me trying to explain things to him. He said that is one thing he had appreciated about Dr. Goodness' testimony is she had provided some information about his mental state with some insight into himself. Steven said he had been very angry at Dr. Goodness, but had found God in prison and wasn't angry with her any longer.

Steven talked about his biological father, Steve Ramon, and how he had come to learn about him. Steven had been told by his mother when he was growing up that Ronnie Long was not his father. Judy told Steven she had about a six month relationship with a Hispanic man, but the relationship had ended. Judy did not portray Steven's father in a positive light and he felt that his father had not wanted to have anything to do with him. Later when Steven was in prison, he was talking with another prisoner who indicated to Steve that he looked like someone else he knew and asked Steve about his father. Steven eventually began to correspond with his father and his father told him about what had happened at his birth. Steve stated that he had wanted to take Steven and have his family raise him, but Judy would not allow it. Steven continued to have written correspondence with his father over a few years, but then became angry at him. Steve started writing Judy and telling her that she was "babying" Steven and needed to let him become a man by stopping her visits and putting money on his books. Steven was angry and stopped contacting him.

During his trial, Steven was called out to visit with Dr. Goodness and his attorneys one day. When he came out, there was an older man in the holding area next door. When Steven sat down to talk with Dr. Goodness, Steven was getting angry because the old man kept looking at him. Dr. Goodness then told him the man was his father. Steven was upset because he had to see his father for the first time under these circumstances and had not been prepared. Steven was angry at Dr. Goodness because after that she said "Long, how did you feel about seeing your father?" Steven's father was scheduled to testify, but later told Steven he felt it would harm him rather than help him and refused to testify. Steve Ramon was fearful that the DA would ask him

Steven Long
October 26, 2007

questions about prison and the ability to be hurt and hurt others. Steve told Steven that he felt it would hurt him with the jury for him to talk about the violence in prison. After the trial, Steven was allowed to visit with his father for about thirty minutes.

Steven also ran across his brother while he was in prison. He had gone to get a haircut and the barber was busy and another man was giving him a haircut. This man was talking about being from Austin and Steven felt he looked familiar in some way. Later the Barber said "Ramon, hand me the clippers". When Steven heard this, he asked the man to meet him later. Later he told the man "Steve Ramon, Jr." that he was his brother. His brother did not initially believe him but he later showed him letters from his father. Steve Ramon, Jr. is out of prison, married and living in Austin as far as Steven knows.

Steven is very bitter toward his brother-in-law Phillip Blankinship. Steven is angry that he got his sister pregnant at such a young age. Steven says Phil exposed him to pornography and drugs. Steven remembers staying with Phil and his family in a hotel and they are all smoking and using drugs, including Phil's children. Steven was appalled that Phil was playing pornographic movies in front of his family and Steven noticed that Phil's younger boys were very uncomfortable. Even though Steven is mad at Phil for exposing his children to drugs and pornography, he acknowledges that he is "no better" and is ashamed because he was also using drugs with them and exposing them to drugs. Steven acknowledges how wrong it is to expose your children to this type of environment and he bases it on his own experience. Steven still is angry with his mother because she refused to testify about Phil's behavior in court because she didn't want to get the family in trouble and didn't want Cynthia to loose her children. Steven cannot understand how his mother could choose protecting Phil over his life.

Steven was often very critical of his mother, but would state she was his mother and he loved her. We discussed the trauma that his mother had experienced as a child and being raised in Buckner. Steven acknowledges that he know his mother did not have any "parenting skills" and had never had the ability to learn them from her family. Steven knows the same is true for him and knows he was not a good father to his children, although he only spanked them once. Steven showed no insight into his inappropriate behavior when he spanked his children. It was his son's birthday and they were going to celebrate at Cici's Pizza. Steven's mother was driving Steven and his children to Cici's when Steven and his mother got into an argument and he told her to just put him out of the truck. She pulled over and put him out of the truck. His mother and the children went on to have the party at Cici's. Steven walked back and got a ride with someone else to Cici's Pizza. He went into Cici's and demanded that his children leave immediately. His mother tried to calm him down and not ruin the birthday. Steven was furious that the children did not want to leave the party at Cici's and told them he would spank them when they got home. He waited for them at home and spanked them when they got home. Steven blamed the children from not minding him and had no insight into his behavior on his son's birthday, him ruining the party, him being the adult, etc. Steven was remorseful about the spankings because it was like his mother, but had no insight into the "whole picture" of the inappropriateness of the spankings because of his behavior.

Steven Long
October 26, 2007

I mentioned to Steven that I noticed he frequently had trouble staying on topic and was very restless and fidgety. I asked Steven if he had been diagnosed as ADHD as a child and he stated he had taken drugs – Cylert and Ritalin, as a child. He said that had helped some when he had taken them, but he frequently didn't take them. His mother had to go to work at 4:00 and she would wake Steven up at that time to give him the medication. This was really too early to be giving Steven the medication. Steven would often just spit out the medication after she left.

Steven describes his mother as a very "hard worker" and only having a few jobs in her life and she stays at a job for a long period of time. Steven believes that work is a way of his mother escaping from life and the family. She is most happy when she is at work and away from the family and their problems.

Steven talked about his former relationship with Anthony Hogan while in prison. Steven acknowledges that he had sexual relationships with Anthony and eventually enjoyed those relationships. He stated he enjoyed being in the female role and it became a turn on to shave his legs and pluck his eye brows. He felt safe with Anthony because he was a tough guy and protected him. Steven enjoyed that feeling of being protected. Anthony told him at the time of the trial he was only testifying to help him because he was facing the death penalty. Anthony was very angry about circumstances of the crime Steven was accused.

Steven stated to me he was just going to tell the truth, he didn't have anything more to lose. He acknowledged that he may have not been totally truthful during the time of the trial because he was fighting for his life, but that was all over. He stated several times "they just need to kill me".

Steven does not think it is a good idea to have contact with his children. He believes they are in a good situation and contact with him would not be healthy.

Steven denies that he was involved in the prison riot. Steven states that he had helped Major Wheeler at the time as to who had been involved. He says that Wheeler is now a Warden. Steven was aware the riot was going to happen because a prisoner had been injured or killed. When the riot started, he was told to get out of the way because it was known he was "weak" and didn't like to be involved in fighting. He says that he had been identified as one of the inmates involved, but it had not been him.

Steven was seeing MHMR in Dallas on Lancaster road for some period of time and was taking Trazadone, an anti-depressant and Resperidal (anti-psychotic). Steven stated that he seemed to be doing better when he was taking the drugs, but eventually had difficulty getting the medication and the last time he was seen at MHMR, they told him he seemed to be doing fine and "cut him loose". He had been off medication about a year at the time the crime.

Steven spent some time telling me about his relationship with Mindy and marriage. They had gotten a marriage license and they were married by a family member that was ordained, but they did not file the certificate. Steven doesn't know if he is still married to Mindy or not. He was

Steven Long
October 26, 2007

attracted to Mindy because she loved him and wanted to "take" care of him. He helped Mindy
get started in exotic dancing so she could make more money. He has no contact with Mindy at
this time.

I brought a copy of a preliminary genogram with me and we reviewed it. Steven gave me some
contact information for his aunt Dorothy and indicated that she would probably be the only
family member that would be very cooperative. Steven stated his family is "tired" of talking to
people and probably will not be too enthusiastic about talking with me. He doesn't have
addresses for many, but says his Aunt Dorothy should be able to furnish that information. He
also gave me what he believed to be his mother's work number.

Assessment: Steven was somewhat apprehensive in talking with me initially, but later seemed
open. His eye contact was poor initially, but quickly improved and he was frequently tearful
throughout the interview. He has very poor insight and has an outward "blaming" attitude
toward his family, former attorneys, Dr. Goodness, the legal system and everyone else who has
"done him wrong" over the years. Although, there is a great deal of truth in some of the
wrongdoings, he is rarely able to accept his responsibility in the outcome of a situation.
Although he is very remorseful about what happen, he blames other for not seeing "it coming".
He was extremely restless and got up twice to be taken to the restroom and wanting toilet paper
to blow his nose. I frequently had to redirect him back to our topic. It was necessary to "dumb"
down things when I talked with him as he does not have a good vocabulary and often misuses
words and does not pronounce them correctly. It appears that neuropsychological testing was
done on Steven so I will try to track that down. I felt I had a good rapport with Steven and he
said it made him feel good that I called him "Steven".

LONG EXHIBIT 1, p. 148

# EXHIBIT 10

# THE NATURE AND ROLE OF MITIGATING
## EVIDENCE IN CAPITAL CASES

Submitted by

Scharlette Holdman [1]
Center for Capital Assistance

I am honored that the public defender has invited the Center for Capital Assistance to offer a written report on the nature, role, and impact of mitigating factors in capital cases. For the past twenty-five years, I have served as a mitigation specialist and assisted counsel in capital cases in investigating and presenting mitigating evidence in death penalty cases in state and federal jurisdictions in the United States. I have also collaborated closely with colleagues at the NAACP Legal Defense Fund, Inc., the National Association of Criminal Defense Lawyers, the

---

[1] I am the Executive Director of the Center for Capital Assistance, San Francisco, California, a non profit organization dedicated to providing assistance to defense counsel at all stages in capital litigation. The staff of investigators and mitigation specialists at the Center for Capital Assistance are appointed by state and federal courts in the United States to investigate, develop, and present evidence at the penalty phases of capital trials and in post conviction proceedings. I am a frequent faculty member at training seminars sponsored by bar associations and colleges of law. I am the recipient of numerous awards for efforts on behalf of the indigent capital defendants, including honors from the American Judicature Society, the National Association of Criminal Defense Lawyers, the American Civil Liberties Union, and the National Association of Sentencing Advocates.

LONG EXHIBIT 1, p. 150

National Association of Sentencing Advocates, and other professional organizations in presenting education and training programs for defense counsel, mental health professionals, and investigators in the role of mitigation in capital cases.

This report[2] on the nature and role of mitigation in capital cases addresses the following areas of concern:

- The types of issues which constitute mitigation;

- The protocol for investigating and preparing mitigation;

- The qualifications and responsibilities of mitigation specialists; and

- The relevance of mitigating evidence to various stages of criminal proceedings.

### Issues Which Constitute Mitigation

Mitigating factors stem from the diverse frailties of humankind and are presented to the jury and court to provide insight into the offender's behavior. Mitigation is complex and multifaceted. Theories of mitigation are governed by principles of individualized sentencing and allow for great variation in the information presented to and considered by the jury and court. Mitigation evidence is based on respect for the uniqueness of the individual and requires

---

[2]In preparing this report, I have incorporated the training materials authored by my colleagues Lee Norton, Ph.D., a fellow mitigation specialist with expertise in the effects of trauma on human behavior; Russell Stetler, chief investigator at the Capital Defender Office in New York; Denise Young, Mark Olive and John Blume who serve as Habeas Corpus Resource Counsel for the nation; and Deborah Fins, staff attorney with the NAACP Legal Defense Fund, Inc.

LONG EXHIBIT 1, p. 151

thoughtful presentation of the character and record of the offender. It covers all relevant facets of the character and record of the individual in order to minimize the risk that the death penalty will be imposed in spite of factors which call for a less severe penalty. It is based on the constellation of factors that were formative in the offender's development, behavior, and functioning.

Although most mitigation evidence focuses on the offender, it also reflects the nature and circumstances of the offense under the theory that punishment should be proportionate to the offense. Circumstances of the offense often shed light on an otherwise inexplicable act and call for a penalty less severe than death. Facts of the offense may show that others were equally culpable but were not charged with a capital offense or that the victim consented to criminal activity that led to the offense. Relevant evidence may contradict the prosecution's theory of the offense and provide a basis for mitigation.

Mitigation covers an enormous array of issues, but it begins with the individual's family history. Mitigation necessarily focuses on the offender in relation to his family for the simple fact that families shape the child in ways that profoundly affect and sometimes control adult behavior. Family behavior patterns and effects are multi generational and passed from one generation to the next as certainly as genetic factors such as eye color and height are passed along. Healthy development of children depends on family relationships, and unhealthy development reflects family practices and values. The quality of the attachments to parents and other members of the family during childhood is central to how the child will relate to and value other members of society as an adult.

Each mitigating factor contributes to the mosaic of a person's life. Although understanding the family dynamic is the first step, it is not exclusive in its power to explain an

Page 3 of 33

LONG EXHIBIT 1, p. 152

offender's behavior. Family influences must be considered along with psychiatric and neurologic deficits, developmental disabilities, medical diseases, compromised intellectual functioning, and cultural and ethnic influences. The offender's actions surrounding the offense should be viewed against the backdrop of his social history. A thorough, reliable social history assists the jury and court in understanding how the offender's experiences in the world affected his behavior.

No list of specific factors can adequately describe the diverse elements of mitigation, whether or not related to the offense for which the offender is on trial. The possibilities of mitigation are limitless. No one aspect of an individual's character or record is sufficient to constitute mitigation; each aspect must be considered in context of the individual's social and medical history. The following list is not exhaustive; it is offered to describe some of the elements of mitigation that form the whole.

**Family Dynamics.** Security, safety and stability across childhood are essential for children to become competent adult members of society. Children's development is emotionally damaged by chaotic, abusive, and neglectful families. Family mental illness, chronic marital conflict of parents or care givers, domestic violence, emotional abuse and neglect, and sexually traumatic exposure scar children. Disrupted attachments, peer isolation and rejection, extreme poverty, and corruptive community influences further undermine a child's competency and derail normal development.

Emotional, physical, and sexual abuse have enormous impact on development and result in long-term physical, psychological, emotional, and cognitive impairments. Physical abuse by care givers creates constant terror and fearfulness, serious psychiatric disorders, behavior problems, and confusion. Neglect and emotional abuse cause distrust of relationships, distorted

Page 4 of 33

identify, eroded self-esteem, and feelings of powerlessness and futility. Many survivors of chronic abuse and neglect use drugs and alcohol in an effort to quell overwhelming emotions caused by abuse. Children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children exposed to other forms of child maltreatment. The nexus between child abuse and serious adult difficulties is clear. Abused and maltreated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

A family history of mental illness is especially relevant to mitigation. Mental illness such as depression, schizophrenia, and bipolar mood disorder have a strong genetic component and predispose children to developing mental illness. Untreated family mental illness damages a child's development by creating an unpredictable and unsafe atmosphere. Parental mental illness manifests in unstable moods, poor judgment, moral insensitivity, irrational suspicions, and dangerous behavior. It contributes to alcohol and drug abuse, sexual and physical abuse, and neglect. It can create a distorted family atmosphere in which children are exposed to graphic or perverse sexuality as well as direct physical sexual abuse.

**Extreme Poverty.** A family's ability to provide a healthy environment is compromised by extreme poverty. Extreme poverty undermines a family's ability to provide a secure, safe, and stable home. Children in impoverished homes experience life as unpredictable and out of control. Severe poverty is a broad social risk factor that erodes a child's sense of competence and leads to reduced opportunities for achievement. It makes it difficult for a child to incorporate social ideals and values with the reality the child faces daily. Extreme poverty results in increased distrust of authority and increased likelihood of criminal behavior. Extreme poverty

LONG EXHIBIT 1, p. 154

also has medical consequences, such as brain damage, that have psychiatric implications.

**Neurologic deficits.** Neurologic deficits can be caused by mental retardation, inherited physical or psychiatric dysfunction, substance use or abuse, pre- or perinatal trauma, acquired brain injury or psychiatric disorders. Neurologic disease can cause impaired judgment and reasoning, distorted perceptions of reality, loss of contact with reality, memory loss, social ostracism, disrupted academic performance, learning disabilities, and aggressive behavior. Acquired brain damage can also have psychiatric consequences such as confusion, lability, depression, irritability, and paranoia.

Neurologic deficits are suspected when certain hallmark signs and symptoms are present. The most salient of these are a history of affective mental disorders such as depression; an earlier psychiatric finding of significant frontal lobe impairment; indications of exposure to neurotoxins in utero — one of the leading causes of mental retardation — and during development; a known history of physical victimization, especially chronic violence in early childhood; extended use and addiction to drugs and alcohol; and ingestion of organic solvents such as glue and paint. Deficits in the frontal, parietal, temporal, and occipital lobe regions of the brain cause specific functional impairments. These impairments include the ability to perceive, process, and remember information, to make decisions, and to understand the long term consequences of actions. They also affect sensory ability, motor strength and speed, the ability to problem solve, attention deficits, and memory performance.

It is possible to determine the presence and extent of brain damage by administering a comprehensive battery of neuropsychological tests by a competent neuropsychologist. Neurologic deficits may occur in a cluster that allows diagnosis such as autism, learning and

*Page 6 of 33*

developmental disabilities, AIDS dementia, seizure disorders, organic brain damage, fetal alcohol syndrome, and mental retardation.

Psychiatric Illness. [3]    As old as humankind, mental illness can be perplexing and confounding, but there is no doubt that it is real and has real consequences. It exacts enormous personal, social, and economic costs worldwide. Psychiatric disorders affect speech, psychomotor behavior, emotional state, judgment, attention, concentration, intelligence, sensorium, memory, thinking, perception, mood, and insight. Depending on the age of onset, it can derail normal development, cause regression, or freeze maturity. It causes a host of symptoms that isolate and alienate its victim to a world of mental confusion, fear, hallucinations, and delusions. It affects friends, family relations, schooling, and memorable life events. Mental illness filters the environment through a distorted lens. Untreated, it is catastrophic. For people with mental illness, "[i]t is the aimlessness, melancholy, want of confidence, irresolution, misgivings of all sorts, alarm, terror, and moments of outright panic that torment them." [4]

Although psychiatric illness does not necessarily cause violent behavior, it has a direct effect on behavior that is likely to occur around violent offenses. The severity of the illness and the manifestation of its symptoms vary over time, but the disorder is omnipresent and expresses itself in devastatingly cruel ways at critical times. It results in maladaptive responses caused by:

---

[3]Psychiatric illness is defined by The International Statistical Classification of Diseases and Related Health Problems (ICD - 10), developed by the World Health Organization, and the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision (DSM IV TR), published by the American Psychiatric Association.

[4]Sheehan, Susan, Is There No Place on Earth For Me? New York: Vintage Books, 1982, page xiv.

• A low threshold for becoming aroused, anxious and fearful in novel or unexpected

- Excessive anxiety and fearfulness to social stressors such as loss and separation;

- A low threshold for frustration in situations that require sustained attention and effort;

- Disturbances in the regulation of emotions;

- Heightened reaction to imagined or delusional threats of harm from others;

- Disturbed balance in brain systems that serve functions of attentional focus and concentration, behavioral organization, and strategic planning;

- Loss of contact with reality; and

- Inability to recognize the presence or effects of mental illness.

Psychiatric illness refers to mental disorders that constitute a clinically significant manifestation of behavioral, psychological, or biological dysfunction. It is associated with serious distress, disability or a significantly increased risk of suffering death, pain, disability, or an important loss of freedom. Classification of mental disorders is based on strict clinical criteria propounded in the ICD 10 and DSM IV TR (ibid.). The following three psychiatric disorders are offered as examples of the more than 300 mental disorders[5] that are relevant to mitigation:

- Schizophrenia. Schizophrenia has been described as the worst disease affecting

---

[5] See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revised, American Psychiatric Association, 2000.

LONG EXHIBIT 1, p. 158

humankind.  A disease of the brain, it manifests in disturbed thought, perception, emotion, movement and behavior.  Characteristic symptoms of schizophrenia are bizarre behavior; delusions of being controlled, influenced, or persecuted; auditory hallucinations; visual hallucinations; withdrawal; and disorganized thoughts. The cumulative effect of the illness is always severe and usually long-lasting.

- Bipolar Mood Disorder.  Mood disorders cover a broad spectrum of disturbances, but in their most severe forms result in life threatening suffering and dysfunction. Formerly known as manic depressive illness, bipolar mood disorder is a cyclical pattern of sustained depression and elation.  The dysregulation in mood is beyond the control of the individual, can last only a single episode or recur with episodes of varying severity.  During a manic or depressive episode, symptoms can escalate to include  auditory and visual hallucinations, delusions, and paranoia.

- Post Traumatic Stress Disorder (PTSD).  Psychological trauma is described by one of the world's leading psychiatrists as,

> . . . an affliction of the powerless.  At the moment of trauma, the victim is rendered helpless by overwhelming force.  When the force is that of nature, we speak of disasters.  When the force is that of other human beings, we speak of atrocities.  Traumatic events overwhelm the ordinary systems of care that give people a sense of control, connection, and

LONG EXHIBIT 1, p. 159

meaning."[6]

Exposure to extreme trauma can result in the development of extremely disabling symptoms of intense fear, helplessness and horror, persistent re-experiencing the trauma, persistent avoidance of stimuli associated with the trauma, numbing of general responsiveness, and persistent increased arousal. People with PTSD can also experience dissociative episodes (loss of contact with reality). In addition to dramatic psychological effects, PTSD is accompanied by physiological changes that reflect increased arousal, such as increased heart and respiratory rate, rapid eye movements, and perspiration, and alternations in brain function.

Reliable determination of the presence, severity and effect of psychiatric illness must be conducted by appropriately trained individuals such as psychiatrists, neuropsychologists, psychologists, and mental health professionals. Mental health professionals require multiple interviews with the offender in order to observe symptoms over time, an independently documented social and medical history, and appropriate diagnostic tests in order to provide a diagnostic assessment that meets the standard of care in their professional community.

**Medical Conditions with Psychiatric Consequences.** Medical conditions can mimic or masquerade as psychiatric illness. Medical conditions that can masquerade as mental disorders include blood diseases, neurological syndromes, and hormonal disorders. An incomplete list is Cushing's disease, diabetes, hyperthyroidism, hypoglycemia, Wilson's disease, AIDS, hepatitis, influenzas, mononucleosis, syphilis, viral pneumonia, Kleine-Levin syndrome, temporal lobe epilepsy, metal (mercury, thallium, manganese) intoxications, lupus, nutritional disorders

---

[6]Herman, M.D., Judith Lewis. Trauma and Recovery. Harper Collins, 1992, page 33.

Page 10 of 33

LONG EXHIBIT 1, p. 160

(pellagra, pernicious anemia), and central nervous system tumors. These diseases can cause dramatic mood fluctuations, unpredictable behavior, hallucinations, delusions, and delirium. A significant number of people who suffer these illnesses without adequate health care abuse alcohol and drugs. Many of these individuals are self medicating (calming the agitation or other distressing symptoms). Psychiatrists routinely order appropriate and relatively simple laboratory tests to determine the presence of medical conditions that confound psychiatric diagnosis.

Medical treatment can create mental symptoms and disorders, including: neuroleptic-induced Parkinsonism, medication-induced tremor, confusion, tardive dyskinesia, neuroleptic malignant syndrome, disorientation, memory lapses, and apparent dissociative episodes. These symptoms can be caused by medications, electroconvulsive (shock) therapy or intrusive medical procedures.

. **Mental Retardation**. Mental retardation affects every aspect of a person's life. It is a permanent condition that compromises every sphere of a person's day to day functioning. Its essential feature is significantly sub-average general intellectual functioning. It is accompanied by life altering limitations in communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety. Its onset is before age 18, so it robs children and adolescents of the opportunity to accomplish basic milestones in life. Its etiology includes in utero exposure to alcohol, malnourishment, chronic exposure to neurotoxins, head injury, and disease. People with mental retardation are especially vulnerable and are easy prey for designing others.

**Child Maltreatment**. The consequences of child maltreatment and neglect last long into adulthood. Maltreatment does not include reasoned, measured, and controlled or even strict

discipline meted out by a loving and responsible care giver. It covers those physical and psychological acts by caretakers that create an atmosphere of terror for the child. Battering, scarring, burning, starving, sexually assaulting, segregating, and restraining a child is maltreatment. Threatening to maim, harm or kill, humiliating, degrading, and isolating a child are the manners by which abusers maintain coercive control over children and constitute maltreatment. Intentionally depriving a child of basic rights such as food, clothing, shelter, medical care, and education is maltreatment.

Maltreatment deprives a child of important relationships, the raw materials of self esteem, and the socialization necessary to become competent workers, parents, and citizens. Abuse and neglect impair the child cognitively, emotionally, socially, and physiologically. Maltreatment causes children to be helpless, to have no sense of self, to be dominated by negative feelings, to develop self defeating styles of relating to others, and to devote energy to managing danger rather than learning through love and play, to have arrested and stunted development, to develop either-or perspective, to have difficulty concentrating, not to understand the motives of others, to have depressed verbal abilities, to show increased arousal and insecurity, to have impaired problem solving skills, to be emotionally constricted, to live in a heightened state of terror and arousal. Maltreatment can result in post traumatic stress disorder, a serious psychiatric illness with grave consequences.

Maltreatment prevents a child from developing a safe base from which to grow. Maltreatment dysregulates physiological and emotional states, leaving the child disoriented and confused. Maltreatment prevents children from learning how to interpret or express their own emotions and use emotions as guides for appropriate action. It makes children overreact to

Page 12 of 33

LONG EXHIBIT 1, p. 162

internal and external cues. Children who survive a lifetime of abuse at the hands of their caretakers, developed a characteristic set of symptoms in response to chronic fear and terror. They learn how to survive in the secret world of their home lives by becoming hyper vigilant and ever alert to any threat of harm. They live in a constant state of arousal, scanning their environment for threats and attempting to stay safe from harm. They become overwhelmed by intense emotions of fear and despair and seek relief from these emotions by self medicating with drugs, fleeing their home, attempting suicide or entering altered states of consciousness such as dissociation and fugue states.

Not all children who are exposed to chronic trauma have the same responses. Their responses to trauma depend on the source, nature and duration of the trauma, age when the trauma occurs, how much social support is available, how many other problems the child faces, the presence of a wise, caring adult, the presence of mental illness in family, the educational level of caretaker, a supportive educational climate, early and effective intervention, intelligence, and good self esteem. If a child has to content with deeply troubled families and hostile environments with a weakened, impaired mind, maltreatment causes greater injury to the child and, thus, to the adult.

**Good Character**. The presence of strong evidence that a person has good character is mitigation, even if it is not related to the offense and stands in sharp contrast to the person's conduct at the time of the offense. Evidence of no criminal record, good job history, positive behavior in school, stable family life, participation in religious activities, cooperation with law enforcement, good conduct in jail since his arrest, and involvement in community activities are possible mitigation. It is, however, highly unusual when an offender can present a complete

*Page 13 of 33*

Long Exhibit 1, p. 163

penalty phase based on this type of evidence.  More often, good conduct is presented in conjunction with a traumatic event such as brain injury that changed the course of the individual's life.

**Chronological Age.**  Youth carries with it the limitations, inexperience and vulnerabilities associated with immaturity. Adolescence and young adulthood are difficult and challenging times for those with normal, healthy backgrounds and abilities. Adolescence "is a time and condition of life when a person may be most susceptible to influence and psychological damage."[7] For those whose lives have been forged in a crucible of maltreatment and who have underlying mental impairments, they lack the judgment, insight, and skills they need to be competent citizens.

**Community Violence.**  Unsafe communities are marked by violence at the hands of community members, law enforcement, and family.  Children who on a daily basis face the threat of annihilation are severely traumatized.  They develop signs and symptoms that are characteristic of post traumatic stress disorder, including depression and despair, hopelessness, and a sense of foreshortened future.  Their development is thwarted by their preoccupation with safety and defense issues.  They are often forced to choose between banding with other youngsters in an effort to provide safety for each other or facing chronic danger alone.

**Dislocation and Immigration.**  Immigration, whether an effort to escape grinding poverty or war, can have a harsh and crippling impact on a family's life.  Pre migration stressors such as poverty, interment in refugee camps, loss of employment, and constant fear erode a

---

[7] <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982).

Page 14 of 33

family's core relationships. Often times, the family is split into units that must fend for themselves, take care of aging relatives, or remain behind while another unit of the family immigrates. Family members left behind or sent ahead find themselves at sea in a different culture without the support of their families to guide them. The journey of immigration itself may be traumatic and life threatening as an impoverished family is forced to rely on the kindness and good will of strangers. The cumulation of stress brought on by immigration exacerbates other problems in the family and the individual. Post immigration stressors include the loss of familiar support systems such as the church and extended family, isolation from the larger community, anxiety over different cultural expressions, communication difficulties and fear of deportation.

Adjustment in the host country depends on a number of factors, including: attitude of the receiving country; presence of other members of the same ethnic group; presence of marketable skills; knowledge of familiarity with the host culture and its language; whether the immigration was voluntary or compulsory, legal or illegal; personal traits conducive to successful acculturation; presence of pre existing mental disabilities; similarity between the old and the new culture. Immigration can lead to disorientation and disorganization, suspicion and distrust, paranoia, depression, anxiety, and substance abuse.

**Effects of Conditions of Confinement**. Offenses committed during incarceration or after release should be evaluated in light of the offender's experiences during incarceration. Physical assault by guards and other inmates, unsanitary living conditions, and inadequate health and psychiatric care affect mental functioning and create serious psychiatric symptoms. Prolonged isolation and reduced environmental stimuli cause normally functioning people to

Page 15 of 33

LONG EXHIBIT 1, p. 165

deteriorate mentally and to show symptoms of paranoia, anxiety, fear, depression, and psychosis. If a person has pre existing mental disabilities, harsh conditions of imprisonment exacerbate the symptoms.

**Good Conduct while Incarcerated**. An offender's conduct during previous incarcerations and while awaiting trial provides insight into the offender's future dangerousness to other inmates as well as to guards. It can be evidence that an offender is able to conduct himself appropriately and peacefully in a structured environment or where drugs or alcohol are not available. Under certain circumstances it allows the jury and court to consider the effect of appropriate psychiatric medication on the offender's behavior. Good conduct during incarceration also reveals the offender's willingness and ability to follow rules, obey orders, and respect authority as well as the rights of other inmates.

**Remorse.** Offenders often attempt to come to terms with their acts and struggle to find some way to reduce the suffering their actions have caused. They feel and express profound sadness for the loss of life and its impact on others, search for ways to find reconciliation with the family they have offended, and seek spiritual insight into the nature of forgiveness and redemption.

**Future Dangerousness**. Future dangerousness is assessed in context (e.g., an individual who might be dangerousness on the streets might not be dangerous in prison, especially in a maximum security facility). An assessment of future dangerousness is based on security options available to corrections agencies and particular factors in an offender's background.

**Duress at the Time of the Offense.** The unique circumstances in an individual's life must be measured to determine if he was under unusual or substantial duress at the time of the

Page 16 of 33

LONG EXHIBIT 1, p. 166

offense. People who are mentally retarded, have neurologic deficits, or have a history of abuse have different levels of abilities to withstand stress, to think of responsible solutions at critical moments, to take independent action, and to understand the long term consequences of their actions.

**Minor Participation.** An offender's role in the offense may be mitigation if he is not the principal architect or actor. The offender's participation should be reviewed relative to the role of others and against the backdrop of his cognitive limits and foibles.

**Circumstances of Prior Offenses.** Consideration of prior convictions can be especially pernicious unless the circumstances of the prior offense are mitigated by thorough investigation. Prior convictions may be invalid due to tainted judicial processes that resulted in inaccurate or misleading conclusions. Mitigating factors that are developed for the instant offense may be applicable to prior offenses.

**Cultural Background.** Mitigation investigation also identifies cultural factors which influenced the offender's development and family patterns of behavior. Family patterns of behavior reflect culture, government intervention, community services and attitudes, economic status, ethnicity, religion and education. Family patterns of behavior find expression in family values, child rearing practices, and beliefs about the role of families.

The standard of care within the mental health community requires that any mental health assessment must take into account the role of culture on functioning. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM IV), which is internationally recognized as the authority on diagnosing and classifying mental disorders, warns that symptoms and course of a number of disorders are influenced by cultural and ethnic factors. Three specific

Page 17 of 33

LONG EXHIBIT 1, p. 167

types of information are related to cultural considerations in diagnostic assessments:

    a.       Cultural variations in clinical presentations of disorders such as post traumatic stress disorder and depression;

    b.       Culture bound syndromes such as nervios (a wide range of symptoms of emotional distress), lacera (severe psychosis), and gusto (soul loss);

    c.       Systematically evaluating and reporting the impact of an individual's cultural context.

The offender's relationship with his family must be seen in the context of his culture. A mental health expert with expertise in the relevant culture is must assess family dynamics within the family system, family member's relationships with the larger community, and family values that were either maladaptive or positive.

### Protocol for Investigating and Preparing Mitigation

Lee Norton, Ph.D., a mitigation specialist who is an expert in trauma, describes the relationship between an individual's life history and mitigation:

    Mitigation evidence pertains to the offender's life and personal attributes, including the milieu in which he or she was raised and the effects of this environment, his or her abilities and/or contributions to society, and the nature and extent of any limitations and/or impairments from which he may suffer.[8]

---

[8]Norton. Ph.D., Lee. "Capital Cases: Mitigation Investigations," The Champion. May 1992, Page 47.

LONG EXHIBIT 1, p. 168

The information is presented to the jury and court in a coherent, meaningful and empathy provoking manner with care to guarantee the information's reliability and relevancy. The heart of mitigation is a story "that began not at the time of the offense but years, and sometimes generations, earlier."[9]

✓ Mitigation is based on a very thorough investigation of the offender's life, as well as his family history. Only after a leave-no-stone-unturned approach is counsel in a position to marshal effectively a powerful case for life, as well as defuse the government's arguments for death. Counsel requires the assistance of others to complete this task successfully. A mitigation specialist conducts the life history investigation.[10]

Life history investigation has two components: interviews with lay and expert witnesses and document gathering. Multiple interviews are conducted with the offender, family members, peers, and others who have known the offender over time, including: physicians, mental health

---

[9]Norton, Ph.D., Lee. "Capital Cases: Mitigation Investigations," The Champion. May 1992, Page 47.

[10] The results of the life history investigation are relied up by psychiatrists, neurologists, neuropsychologists, psychologists, social workers, and other mental health professionals who conduct a mental assessment of the offender. These professionals require a reliable and independently documented life history about the offender. Although the offender is a valuable source of information, he can not be relied upon to provide the data that constitutes a social history. Mental illness, neurologic deficits, mental retardation or lack of knowledge cause an individual to be an unreliable historian.

Only with a properly gathered and documented history, can mental health professionals determine the presence, severity and effect of mental disorders as well as personal strengths that affected the offender's behavior during the course of his life. Mental health professionals rely on the social history as well as their clinical observations to determine appropriate diagnostic tests to administer, the likelihood of genetic predisposition in the development of mental illness, and possible etiology of impairments.

LONG EXHIBIT 1, p. 169

professionals, law enforcement officials, social service providers, teachers, neighbors, peers, and clergy.  Documents relating to the offender's and his family's education, employment, health, psychiatric history, housing, and criminal conduct are collected.

The time and resources for the investigation vary according to the case and the offender, but it usually requires hundreds of hours of a mitigation specialist's time.  Funding for the services of the mitigation specialist, copying, travel, and telephone are necessary in order for the mitigation investigation to be more than a formality.  In a 1998 report, the Judicial Conference of the United States found that the use of mitigation specialists was economically warranted:

> The work performed by mitigation specialists is work which otherwise would
> have to be done by a lawyer, rather than an investigator or a paralegal.  Because
> the hourly rates approved for mitigation specialists are substantially lower than
> those authorized for attorneys, the appointment of a mitigation specialist or
> penalty phase investigator generally produces a substantial reduction in the overall
> costs of representation.[11]

**Record Collection and Analysis.**  It is crucial that the mitigation investigation be based on methods of data collection that are accepted both in the legal and medical communities.  The data must be competent, reliable and valid evidence.  Collateral evidence obtained from health care providers, mental health workers, foster care givers, law enforcement, governmental

---

[11]Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," May 1998, pages 24 - 25.

LONG EXHIBIT 1, p. 170

agencies, family, neighbors, friends, schools and employers usually exists to support valid claims such as mental diseases, brain damage, physical abuse, or drug addiction.   As part of a competent investigation, this evidence must be collected and analyzed.   It is important to determine the criminal backgrounds of adults and others who are significant figures in the individual's and to gather appropriate records about other family members who have mental disabilities or histories that affected the offender's behavior or functioning.   The records for the offender and other members of his family to be obtained include:

- All school records, including transcripts, health records, standardized testing, attendance, special education testing and/or classes, disciplinary action for every school attended, including adult education and vocational schools;

- Employment records, including applications, attendance, job assignments and performance evaluations, medical and psychological evaluations, relocations, pay records, tax records;

- Family and individual social service records, including welfare, counseling records, referrals, and medical and mental health treatment, records associated with adoption agencies and foster homes, including placement and discharge reports, progress reports, and medical, educational, mental health and intelligence evaluations;

- Medical records, including private physicians, clinics and hospitals;

- Youth agency and juvenile criminal justice records, including defense counsel's files, pre-trial intervention, community service records, juvenile detention records, and all related medical, educational and intelligence evaluations, treatment plans,

Page 21 of 33

LONG EXHIBIT 1, p. 171

field and progress notes, referrals and court files;

- Adult criminal records, including law enforcement, jail and prison records including: psychological, educational and medical evaluations and notes, daily progress notes, disciplinary reports, work assignments, classification reports, participation in all vocational, educational, religious and honor programs, religious reports and visitation logs; all court records; all defense counsel defender and prosecution files;

- Probation and parole records, including pre-sentence investigation and sentencing reports, field notes, family and social history information, conditions of supervision and violations, and conditions of release from supervision;

- Military records, including testing, promotions, disciplinary hearings, exposure to neurotoxins, assignment, discharge, mental health assessments, security clearance, pay rates, disability determinations, and medical treatment.

- Psychological and psychiatric records, including community mental health clinics, private doctors and counselors, hospitals and substance abuse facilities, to include intake evaluations, treatment interventions, medication logs, physician and nurse progress notes, referrals, and discharge reports; and

- Immigration records, including applications for visas, work permits and citizenship.

These records are analyzed carefully to determine theories of mitigation, additional records to obtain and witnesses to interview. The data in records must be triangulated (obtained from more than one source). Information obtained from records inform interviews of the

Page 22 of 33

LONG EXHIBIT 1, p. 172

offender and other witnesses and establishes collateral evidence of theories of mitigation such as physical or sexual abuse. As data are obtained, they are summarized in a manner that allows other mental health experts and counsel to review the material. The most prevalent way of summarizing the data is in a chronology. The chronology is a narrative, by date, of an event, details of the event, and source of the information. It provides an historical account of events that may have significance in the family's life. Genograms are used to supplement the chronology. Genograms are annotated family trees which highlight patterns of impairments and family relationships. They denote victims and perpetrators of sexual and physical abuse, divorces and marriages, births and deaths, and prevalence of mental impairments such as substance abuse, mental illness, and neurologic disease. A genogram is useful in charting the long-term effects of various influences on the offender. Although genograms and chronologies are critical tools of mitigation investigation, they later become evidence for the jury and court to consider.

**Interviewing Witnesses.** Interviews of potential lay witnesses for penalty phase is time intensive. Mitigating interviewing is the core skill of preparing for penalty phase. It is the means through which the story of the defendant's life is elicited and the most important single source of diagnostic data for mental health experts. Mitigation specialists are trained in the framework for the interview, the structure and process of the interview, the context of the interview, and special situations and types of interviews. Information must be obtained in a complete and unbiased fashion and then organized and related to a larger fund of information about the defendant's life history and hypotheses that provide insight into his behavior.

Several factors make the task of mitigation interviewing especially time consuming and

complex. Foremost, it is very likely that serious child abuse, maltreatment, and neglect occurred during the defendant's childhood, but it does not mean that the experience or long term consequence are the same for all capital defendants. Presentation of child abuse must be particularized, investigated, and evaluated on its own merit in each case. The nexus between the abuse and other adverse factors must be investigated and documented. The interplay between poverty, race and ethnic bias, substance-abuse, impaired cognition, brain damage, and trauma outside the home forms a social historical profile.

Investigating allegations of child abuse requires the mitigation specialist to validate the allegations by collecting verifiable evidence and information to prove or disprove that specific acts occurred. The majority of legally admissible information is collected by interviewing witnesses other than the defendant and perpetrators. Witnesses to abuse and perpetrators are extremely reluctant to divulge accurate information about the nature and frequency of abuse within the household. Interviews around issues of abuse are likely to fracture and disrupt family functioning and cause non cooperation with some family members — especially the perpetrators. Shame, embarrassment, and fear initially create barriers to accurate disclosure, and the mitigation specialist must exercise skills aimed at overcoming those barriers. She must build an atmosphere of trust and respect for the witness and provide confidentiality for disclosure. Multiple and lengthy interviews over time are necessary in order to create a protective climate that allows reluctant and fearful witnesses to provide accurate information.

The dynamics of child abuse govern the protocol for interviewing perpetrators of child abuse. Interviewing the perpetrators of child abuse and neglect can provide credible validation that abuse occurred. Perpetrators can be biological parents, step parents, foster parents,

Page 24 of 33

LONG EXHIBIT 1, p. 174

caretakers in juvenile residential programs, neighbors, teachers, clergy, or other relatives. It is important to gather as much background information as possible before interviewing the suspected perpetrators, including criminal history, social history, medical history, driving record, credit history, hobbies, likes, dislikes, personal history, and evidence or previous reports of domestic violence in current and prior residences. The mitigation specialist's goal is to build rapport with the perpetrator and to encourage openness. The suspected perpetrator must be allowed as much time as necessary to be comfortable talking about his life and his perceptions of the defendant. Perpetrators often admit specific acts of abuse only after multiple visits.

### Qualifications and Responsibilities of Mitigation Specialists

Mitigation specialists are individuals whose training and experience are well suited to identifying, analyzing and incorporating relevant mitigating evidence into the theory of the case. They can be social scientists with training and experience in the forensic application of social science theory or investigators with special knowledge and experience in human sciences.

There are two categories of mitigation specialists. One category is the mitigation specialist who testifies and presents her findings to the court in addition to conducting the entire social history investigation. The other category of mitigation specialist does not testify or present findings to the court but conducts the entire social history investigation, including interviewing the offender, all family members and other collateral witnesses and gathering all documents. The non testifying mitigation specialist assists defense counsel in making decisions about what additional experts are needed and who should present which data to the court.

Mitigation specialists examine the offender's complete life history, including:

• Pre perinatal development;

- Early childhood and adolescent development including physical, mental, emotional, social, and spiritual spheres;

- Medical history;

- Incidents of neglect and abuse;

- Symptoms of social impairment (self medication);

- Quality of caretakers, homes, and schools;

- Consistency and quality of social support;

- Presence and effect of corrupting influences;

- Offender strengths and efforts to overcome impairments; and

- Offender's response to care, structure, medication, and incarceration.

The Judicial Conference of the United States defined the duties of mitigation specialists in 1998:

> They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary materials for them to review. Although most often they assist counsel in assembling and interpreting the information needed in the penalty phase of a capital case, in some cases mitigation specialists are also called to testify about their findings. . . .Without exception, [] lawyers [] stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase.[12]

---

[12]Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," May 1998, p. 24.

Page 26 of 33

Mitigation specialists work with defense counsel as a member of the defense team, fully protected by attorney offender privilege. Mitigation specialists work with counsel to develop a coherent theory of the case, determine the relevance of mitigation evidence and determine how it may be presented in the context of the entire case. They develop trusting relationships with untrusting, confused, mentally ill offenders to elicit the most comprehensive, accurate information possible. They assist offenders in overcoming barriers of shame and fear so that they can tolerate their life histories being investigated and presented. They work with polarized enmeshed, self defeating family systems to gain their families' cooperation and trust and gather information about generational patterns of mental illness and behaviors.

Mitigation specialists assist mental health experts and counsel in assessing the genetic vulnerability of family members and determining family patterns of behavior. They generate demonstrative evidence such as genograms, chronologies, time lines, frequency charts, and affidavits.

Defense counsel need the assistance of mitigation specialists in capital cases because counsel do not have training or experience in researching the offender's life through trans generational records; in determining the significance of information contained in life records; in recognizing signs and symptoms of mental illness, mental retardation, and neurologic deficits; and in overcoming barriers to disclosure in abuse victims. Defense counsel are not familiar with the literature on signs and symptoms of child neglect and abuse, the implications of child abuse and neglect for development, the etiology of chronic substance abuse and its effects on judgment and behavior. As a rule, counsel are not experts in identifying traumatic stress disorders and its impact on development and its role in the offense; how previous incarcerations influenced mental

Page 27 of 33

LONG EXHIBIT 1, p. 177

health; the presence and severity of community violence and its effect on behavior and development; and the relationship of culture to individual behavior.

### Relevance of Mitigating Evidence to Various Stages of Criminal Proceedings

The primary obligation of counsel in a death-eligible case is to take seriously the possibility that the case will be tried as a capital murder. The American Bar Association in its commentary to ABA Standard 4-1.2, urges defense counsel to "endeavor, within the bounds of law and ethic, to leave no stone unturned in the investigation and defense of a capital case." Counsel must begin immediately to prepare the case as though a penalty trial is anticipated. Investigation into innocence and mitigation must proceed from day one. Timely investigation may literally save a life. Mitigation must not be relegated to second stage consideration or viewed as a last ditch effort, to be prepared only after a finding of guilt has been made.

A defense attorney must begin preparing for the punishment phase of a death penalty trial at the same time she starts working on the guilt phase. Many elements of the mitigation investigation are relevant to and will be introduced at the pre trial and guilt/innocence phase of the trial. The strategy for mitigation can not be contrary to the strategy for guilt/innocence and should be a coherent extension of the theme for the guilt/innocence phase. This requires the defense attorney to have the assistance of a mitigation specialist during the early pre trial preparation of the case.

The offender's social history, which is the bulwark of mitigation, is relevant at all stages of legal proceedings. The social history is the necessary first step in any reliable determination of the offender's mental state at the time of the offense, the reliability and voluntariness of any statements or admissions made to law enforcement or others, competency to aid and assist

Page 28 of 33

counsel and to understand the nature of the proceedings, competency to waive any rights that are afforded him, and, of course, presence of mitigation. Evidence of an offender's mental state is presented through the testimony of lay (family, friends, neighbors, and employers) and expert witnesses (psychiatrists and mental health professionals) and the introduction of documentary evidence (school, medical, and employment records). The testimony is presented at pretrial hearings, during the guilt phase, and during the penalty phase of the trial.

**Culpability and Lesser Included Offenses.** Even if mental impairments do not rise to the level required for a defense against the charges, such as insanity, they may reduce culpability that is worthy of consideration in determining guilt. Mental deficits may reduce the offender's ability to premeditate, plan, intend to do harm, or conform his actions to that expected by the community. Mental impairments may effect the perceptions of the offender at the time of the offense to cause him to believe that his life is in danger. Paranoid delusions and hallucinations may act in concert to make the offender sincerely believe the victim was a real threat to him or to his loved ones.

**Family Homicides.** An accurate social history is essential in determining mitigating factors that have a direct bearing on homicides within the family. Abusive parents and care givers are often able to escape detection by community agencies by engaging in a pattern of well recognized behaviors that limited their exposure. They may successfully derail attempts to intervene by the community. Abusers can isolate children and spouses from friends, neighborhood relationships, and outside contacts. Victims of domestic abuse frequently fear the consequences of informing on the abuser, are deeply ashamed they are abused, perceived their abuser as all powerful, and believe it is hopeless to expect an end to the abuse. When the abuse

Page 29 of 33

LONG EXHIBIT 1, p. 179

culminates in the death of the abuser, in depth investigation into the lives of the offender and the victim are mandated.  Any records concerning suspected abuse are especially important because most domestic abuse goes unreported, and a report of a single incident can have profound implications for understanding family dynamics even if it provides limited facts.

**Settlement**.  Aggressive and meticulous investigation can also be vital in persuading the prosecution not to seek death or to charge a lesser offense.  Russell Stetler, director of investigations, Capital Defender Officer for the State of New York, explains:

> Extraordinary defense effort in the initial weeks of a capital case may also demonstrate to prosecutors how complex and time-consuming the case will be if it continues as a death penalty proceedings.  Solid, early defense work may cast doubt on the reliability of the prosecution's theory of the case, or educate the district attorney about reasons why a jury would be reluctant to impose death.

Plea negotiations with the prosecution are on going in capital litigation.  As new information is developed about mitigation, it may be presented to the prosecution as grounds not to seek death.  Mental retardation, severe mental illness, successful adjustment to the structure of prison, and brain damage are powerful arguments in persuading prosecutors that negotiated settlement is a better course than the expense and time of a trial.

**Reliability of Statements.**  Mitigation evidence is especially relevant to the voluntariness, accuracy and reliability of in custody statements by the arrested person to law enforcement.  Pre existing mental deficits are compounded by the stress associated with the arrest for capital crimes.  Arrestees may experience terror, helplessness, isolation, sleep deprivation, fatigue, hunger, sensory deprivation, physical pain, and threats following their arrest. Their ability to withstand extreme adversity and to resist pressure by law enforcement is compromised and may constitute grounds for challenging admissibility of evidence obtained by coercion or

Page 30 of 33

LONG EXHIBIT 1, p. 180

evidence that is unreliable due to the mental impairments of the defendant. A growing number of cases shows that innocent people confess to serious offenses, including homicides, they did not commit. False confessions are the result of police techniques in interrogation coupled with the accused's ability to withstand the techniques. Fear of authority figures, compromised intellectual functioning, or mental illness make a person more vulnerable to confessing falsely. Pre trial litigation can result in the exclusion of unreliable confessions. Presentation at trial of the factors that contributed to the false confession can result in exoneration or reduction in the sentence.

**Competency to Stand Trial.** Competency to aid and assist counsel is a complex and on going determination. It takes into account language and communication barriers, educational deficits, and any physical, emotional, or mental disabilities which may affect the offender's ability to understand case developments and assist counsel. Competency varies over time as many mental illnesses are cyclic and depend on environmental factors such as stress, diet, sleep, conditions of confinement, and appropriate medication. Competency is an organic process that is monitored throughout all stages of the proceedings.

**Jury Selection.** Jury selection should guarantee that the jury will not be biased against theories of mental health and mitigation advanced by the defense. Defense counsel should introduce theories of mitigation during voir dire to expose biases of potential jurors. The relationship of poverty, mental illness and child abuse to maladaptive behavior is controversial. Potential jurors may have deeply held beliefs that are not supported by facts that would prevent them from fairly considering the effect of mental health issues on behavior. A thorough voir dire on mental health issues and mitigation themes helps assure the fairness of the proceedings.

**Jurors Consider Mitigation**

Page 31 of 33

Mitigation plays a powerful role in protecting charged and convicted offenders from being sentenced to death. Numerous studies document the importance juries give to presentation of mitigating evidence. Jurors report that proximate culpability such as compromised intellectual functioning or youthfulness is significantly mitigating, as are other circumstances over which the defendant has no control and that diminish his individual responsibility at the time of the offense.

One study found that half the jurors reported they would be less likely to vote for death if the homicide was committed under the influence of extreme mental or emotional disturbance.[13] A majority of jurors was less likely to vote for death if the defendant had a history of mental illness. One third of the jurors assigned mitigating weight to the fact that the defendant had been seriously abused as a child; 15 % attached significant to a background of extreme poverty; and nearly half assigned mitigating weight to the fact the defendant had been in state institutions but had never received any "real help or treatment" for his problems.

### Conclusion

Mitigation offers overarching themes that explain the offender's behavior. It is relevant at all critical stages of criminal proceedings. Mitigation investigation begins at the moment counsel meets the defendant and continues to be developed by a multi disciplinary team whose members are trained to understand human behavior. Mitigation attempts to answer some of the most difficult questions about the nature of the mind, the brain, and the role of individual responsibility in determining behavior. The answers are as varied as the individuals whose lives

---

[13] The Capital Juror Project in South Carolina interviewed jurors who sat in forty-one capital murder cases. The results of the study are reported in "Aggravation and Mitigation in Capital Cases: What Do Jurors Think?" Stephen P. Garvey, Columbia Law Review, October 1998.

Page 32 of 33

LONG EXHIBIT 1, p. 182

depend on them.

Page 33 of 33

LONG EXHIBIT 1, p. 183

# EXHIBIT 11

LONG EXHIBIT 1, p. 184



# WINDHAM SCHOOL DISTRICT

*Schools in the Texas Department of Criminal Justice*

### AFFIDAVIT

STATE OF TEXAS          )
                                )
COUNTY OF WALKER    )

BEFORE ME, the undersigned authority, personally appeared Gail Swik, who, being duly sworn by me, deposed as follows:

"My name is Gail Swik. I am of sound mind, capable of making this affidavit and personally acquainted with the facts herein stated:

"I am the custodian of the records of the Windham School District. Attached hereto are eight (8) pages of records from the Windham School District. These said 8 pages of records are kept by the Windham School District in the regular course of business, and it was the regular course of business of the Windham School District for an employee or representative of the Windham School District, with knowledge of the act, event, condition, or opinion, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original."

_____
Affiant

SWORN TO AND SUBSCRIBED before me on the 21ˢᵗ day of December 2007.

_____
NOTARY PUBLIC, STATE OF TEXAS

KELLY M. HOOT

My Commission Expires:

05|18|10

KELLY M. HOOT
Notary Public, State of Texas
My Commission Expires 05-18-10

P.O. Box 40 • Huntsville, TX 77342-0040 • 936- 291-5340

```
CSWWHD04 WWSWHD4I043   -- Windham School District --      Date:  12-21-2007
Data Inquiry                 Inmate Information System     Time:  08.06.00
JFE4298  2                      Assessment Data
 TDCJ-ID Number: 00999514  Type:  ID   Name: LONG,STEVEN L
          SID: 04536106         Unit: TL   Date of Birth: 08-17-1971
Inquiry mode.                    Social Security Number: 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
Outside TDCJ-ID - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Education Claimed: 05                    HD316 Approved?   Date: MM-DD-CCYY
        Verified: 00                     No Record Found:
  College Claimed:                       First HD316 Sent?  Date: MM-DD-CCYY
        Verified:                        Curnt HD316 Sent?  Date: MM-DD-CCYY

Inside TDCJ-ID - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Ed Claim:                        | GED:    Dt:            Unit:
First LEP:   Dt: MM-DD-CCYY Unit: |First EA Locatr:   Date: MM-DD-CCYY
Curnt LEP:   Dt: MM-DD-CCYY Unit: |Curnt EA Locatr:   Date: MM-DD-CCYY
                                 |
 Further Assessment:  (S)pcl. Ed (T)itle I or (E)SL

 EA Score:  Date    Unt Typ Lvl Frm Comp  ColDeg:          Lang.Survey
   Highest 01-03-2000 DB   T   M   7   5.4  IQ Sc: 097      Year given:
   Recent: 01-03-2000 DB   T   M   7   5.4  IQ Dt: 05-01-1995

 PF1-Help PF3-Exit PF20-Header  (PF5>-Updt
40                                         TDCBI043         004/019
```

LONG EXHIBIT 1, p. 186