

# The Milam Assessment Center

359 E. Hildebrand, Ste 100 San Antonio, TX 78212      (210) 828-3624    Fax: (210) 697-0064
Director: Daneen A. Milam, Ph.D., ABPN
Diplomate, American Board Of Professional Neuropsychology

## DECLARATION

I, Daneen A. Milam, do hereby declare the following to be true and correct, under penalty of perjury:

1. My name is Daneen A. Milam, I am over 21 years of age and competent in all respects to make this declaration. I hold a Ph.D. in Educational Psychology from Texas A & M University. I am a licensed Psychologist and certified as a Health Service Provider in the State of Texas. My license number is 2-2661. I am board certified (a Diplomate) in clinical neuropsychology by the American Board of Professional Neuropsychology. I practice clinical neuropsychology in San Antonio, Texas where I have been the director of an assessment center for more than twenty years. I served on the editorial board of Archives of Clinical Neuropsychology, for five years, the official scholarly journal of the National Academy of Neuropsychology. Much of my present clinical practice is in the area of forensic neuropsychology and I have conducted more than 50 examinations of criminal defendants. I have testified in excess of seventy five (75) times as an expert witness in the state courts of Texas for the Texas Department of Family and Protective Services, Child Protective Services and more than twenty times as an expert witness in state murder trials.

2. I was retained as an expert in neuropsychology and appointed by the court to assist in the representation of Steven Lynn Long. My qualifications to serve as an expert in this field are enumerated in my curriculum vitae appended to this declaration as <u>Exhibit I</u>.

1

PETITIONER'S EXHIBIT 2 3:12cv839

3. My analysis of this case involved
performed a neuropsychological ev
Long. Secondly, I reviewed recor
information to assess what Mr. Lor
known in order to inform the ju
functioning and level of potential at tl

4. I traveled to Polunski Unit, on Nover
examine and evaluate Steven in an ex
alone in the room; three to four gu;
mirror and observed us through a g
allowed to work without handcufl
throughout the evaluation.

5. I first conducted a clinical interview
performed a mental status exam to cl
place and person to ensure that he w
complete the evaluation. I spent ap]
two days conducting formal neurop
with a formal assessment of intellec
skills. Initially, Steven was given por
Neuropsychological Tests which w
Impairment Index plus additional tes
Intelligence Scales (WAIS-III), Wide
4 (WRAT-4), Wechsler Memory
Abbreviated, Comprehensive Tra
Fluency, Purdue Pegboard Test, Ber
Person. In addition, a projective inst
Personality Assessment Inventor
instrument was invalid due to his pr
levels. These tests are all accepted
within the neuropsychological comn
evaluation Steven was making a good
internal measures built into the Ha
item by item review of prior respons
on his measure of intelligence, along
of responses across instruments w
sustained effort.

6. To assess malingering an item by item analysis was undertaken between the measure of intellectual potential given by Dr. Laura Lacritz on August 1, 2006 and the identical instrument given by this examiner on November 28th, 2007 (Wechsler Adult Intelligence Scale, Third Edition). Mr. Long's answers were remarkably similar and even more importantly, his mistakes remained basically the same across math and block design subtests. It would be very difficult for a high functioning individual to maintain set with a sixteen month lag time between test and retest. There is simply no possibility that a low functioning individual could maintain set with no knowledge that a retest was going to be undertaken. In addition, this examiner did not have access to Dr. Lacritz's test scores until months after the evaluation was given.

| Test One 8-1-06 | Test Two 11-28-07 |
|---|---|
| VIQ = 66 | VIQ = 63 |
| PIQ = 64 | PIQ = 70 |
| FSIQ = 62* | FSIQ = 63* |

\* This level of functioning exceeds less than 1% of all men Mr. Long's age taking this evaluation.

7. The current neuropsychological evaluation contained a wide variety of instruments with a total of 56 subtests to measure brain impairment, one of which was the 13 subtest measure of potential (WAIS-III). The fact that the responses on this measure (and scores) are so similar across time is a powerful indicator that Mr. Long is clearly mentally retarded. His performance across time remained substantially the same, although there was a small improvement in his current evaluation that could be attributed to the practice effect. For example, Mr. Long achieved a score of 76 errors on the Category Test when taking Dr. Lacritz's evaluation and achieved a score of 49 errors on his current evaluation. The cut off score for brain impairment on this measure was 50. Therefore, although his profile of responses were consistent with brain impairment and his improved score was quite likely the result of the practice effect, Mr. Long's score on this measure

3

was not included in the Impairment Index. Across all measures, Mr. Long's responses on his current evaluation were conservatively interpreted. It would not be possible for a man with a measure of potential in the mentally retarded range to remember such a similar response pattern on so many of the subtests given more than a year before. For this reason, his performance on his current evaluation, which is both similar and improved, is a true reflection of his ability and he was most likely not malingering on his measure of potential at the time of his prior intellectual testing. While he may have exaggerated his memory deficits in his original evaluation his test results were suggestive of both brain damage and mental retardation and should have been presented to the jury. Comparing current to prior testing, Mr. Long performed better on most current measures of brain integrity (November 2007) indicating either less of a commitment to performance on his original assessment or the impact of the practice effect on test performance. However, in spite of improved performance, Mr. Long received an impairment index of three of seven indicators, scoring in the moderate range of brain impairment. In addition, he scored in the impaired range on many of the instruments that were not used to compute the Impairment Index, (WMS-III, FAS, Comprehensive Trails, Aphasia Screener, and measures of reading, spelling and math). To not inform the jury that Mr. Long had been evaluated and was brain impaired as well as scoring in the mentally retarded range represents a grossly inadequate defense. (See Exhibit II for a list of all instruments administered.)

8. In order to assess what trial counsel should have known about and discussed at the mitigation phase of his trial, I have also reviewed portions of the testimony from the trial in the *United States v. Steven Lynn Long*. Specifically, I reviewed the testimony of Wanda Holder, Kenneth Edwards, Dorothy Hutson, Cindy Blankinship, Judy Long, Dr. Kelly Renee Goodness, and closing arguments of Ms. Hallman, Mr. Harrison, and Mr. Beach. I have reviewed Steven's school records, a Neuropsychological Report by Dr. Laura Lacritz, and the Psychosocial History of Steven Long prepared by Ms. Toni Knox.

9. There are multiple overlapping indicators in this background information that would have led a neuropsychologist or similar expert, with this information, to suspect that Steven may suffer from organic brain damage, mental retardation, and/or Post Traumatic Stress Disorder. While a neuropsychological evaluation was undertaken by Dr. Lacritz, vital information was withheld from her that would have allowed her to interpret her data in terms of environmental stressors and a documented history of underachievement. Firstly, a review of his family history indicates that his mother Judy was tested at Buckner's Children's Home and her stated FSIQ was 59. Current research indicates that 80% to 85% of Intellectual Potential is passed from parent to child genetically. Secondly, his mother, father, sister, and cousin have all been diagnosed with a wide variety of mental health diagnoses and have a documented history of mood symptoms that have led to impairment in social, occupational or other important areas of functioning. Given the fact that Judy scored in the mentally retarded range, and there is a strong genetic predisposition to mental health issues, that should have been a signal to anyone evaluating his records that this was an issue requiring further investigation. Dr. Lacritz performed the evaluation but was not given the records that would have alerted her to the possibility of an exaggerated arousal response rather than malingering. Even without records, Dr. Lacritz noted that Mr. Long had "extremely low intellectual abilities and impairment across neurocognitive domains." The person who reported the findings to the jury minimized the impact of Steven's poor performance stating he had "some level of brain pathology" but did not raise the issue of mental retardation. In addition, there were a number of factors that may have indicated mental retardation and brain damage which are described in the following paragraphs.

10. Mr. Long stated he was hit by a car as a child. In addition, he was hit in the head by a pull down bar while in prison. A table snapped and the bar came down with great force. He still has a scar from this incident. Furthermore, Mr. Long reports he was in several bar fights. Once he was hit with a beer bottle and was unconscious. There was no effort at all made to link these undocumented examples of brain damage with his constant

public masturbation. This was described as "evil" by the defense attorney and the expert witness for the defense stated from the stand that the masturbation was "not the direct cause (of brain damage) although there has been some pathology noted." "I'm not saying this individual has a hole in his brain or anything like that." Dr. Lacritz had noted in her report while she did not believe that his performance was based upon a history of closed head injuries she did note "(Mr. Long) has mild generalized neurocognitive deficits which are probably long standing and have been compounded by the effects of polysubstance abuse and psychiatric difficulties" and noted he was functioning in the mentally retarded range. These results were not given to the jury by Dr. Goodness and Dr. Lacritz was not asked to testify.

11. Mr. Long's school records indicate he repeated the first grade twice, repeated the fourth and fifth grade, was "placed" in the sixth grade and finally "placed" in the seventh grade. He did not achieve any passing scores beyond the fourth grade. A review of his standardized scores on prior achievement tests indicated consistent learning problems and his current achievement and potential scores are in the bottom 10% of all men his age being evaluated. Comparing across all academic records that were provided, his family moved often and it appears that Mr. Long attended six schools in seven years. Although special education meeting notes have long since been destroyed, I would infer from these test scores and documented academic performance that he must have been placed in Special Education Classes. A review of report cards across time indicated he was functioning at a very low level. At Montford Psychiatric Unit Mr. Long was given a series of personality tests written at the fourth grade level. He produced an invalid test primarily due to a reading comprehension level lower than the fourth grade. Montford noted that his test results were invalid and could not be used for placement. These results were replicated once more when he was given a measure of personality during his current evaluation.

12. While in prison Mr. Long wanted to enter a vocational training program that was only open to individuals with a GED. Mr.

6

Long stated he hired an inmate to "help" him with the group administered measure of potential and paid for this with cigarettes. He received a score of 97 but a careful review of prison records indicate he never passed his GED test. Although requested, records of this IQ score were not available. No other measure, in any setting, was found with a score remotely close to the score of 97. Since mental retardation is such a critical factor in capital death cases, an effort to find the inmate should have been undertaken at the time of his original trial. There is no record that such a search occurred. That window of opportunity is now passed. Due to the passage of time, both security personnel and inmate population that might have been able to document this event have long since disappeared.

13. Steven Ramon (Steven Long's father) stated that Mr. Long's mother used alcohol and smoked cigarettes while pregnant with Steven. Steven, in turn, was using alcohol and drugs from an early age. This is a key point as alcohol intensifies brain states in an individual with brain damage. Comparing across his life span, most bad acts occurred while he was drinking. His mother gave him a 12 pack of beer for his 13th birthday. Therefore, two events were occurring simultaneously. Alcohol was being consumed on a daily basis while his brain was forming and his drinking intensified feelings of rage, anger, fear and depression. At no time was the jury informed of the interaction of alcohol and brain damage, nor of the impact of alcohol on brain development.

14. Across time, Mr. Long has experienced headaches dating from the time a bar fell on his head and he has a scar on his head to document this event. These headaches were documented in his prison records. Therefore, a critical precipitating event which might have documented his lack of brain integrity was never brought to the attention of the jury.

15. By eleven Mr. Long was exhibiting severe behavioral problems. Interviews with family members indicate that at the same time he continued to sleep in the bed with his mother until the age of 17. At John B. Hood Middle School Mr. Long was suspended for "paranoid delusions." By now his sister was pregnant and

7

moving away while his mother worked long hours. Mr. Long was totally unsupervised during this period. His mother, in an attempt to discipline him, began to hit him with her fists, and his sister beat him up. Mr. Long was given a diagnosis of Attention Deficit Disorder with Hyperactivity. He was referred to Children's Hospital and placed on Cylert. Due to the constant moves, his poor behavior was documented but it appears no intervention measures were undertaken.

16. With the lack of attention, low academic functioning, and the drug culture that permeated his life, Mr. Long continued in a downward spiral. He was caught sniffing glue on the school bus, and he reports he was repeatedly sexually abused by older girls. His mother and sister were using crack cocaine, and all individuals interviewed agreed that Mr. Long was completely on his own. With a low level of intellectual functioning, no supervision, a drug culture, and few problem solving skills, he was unable to develop the vocational and social skills so needed by the child who is intellectually challenged.

17. There is no record of serious intervention until the age of twelve when he was referred to Parkland Hospital for suicidal ideation. It appears he was given a diagnosis and medication but there is no evidence of treatment. He was diagnosed with Major Depression with Psychotic Features. At another time he was diagnosed with Schizophrenia. Over time he was given Prozac, Cogentin, Zyprexa, and Trazadone. At no time was a complete physical and psychological workup documented. At no time was there a record of anyone looking at his pattern of disorders and suggesting that Mr. Long's behavior problems, emotional problems, and physical problems could be connected.

18. At 15 and 16, most family members describe Mr. Long as having behavior problems and no close friends. This is consistent with a child with an attachment disorder. He began to identify with a group of young boys who took on the trappings of a gang affiliation. This gang affiliation provided Mr. Long with identity, support and acceptance that was not forthcoming at home. Clearly, from a review of the data, Mr. Long was a follower and was easily influenced by this set of

new friends. His drug usage increased and he spent more and more time under the influence. Since he was working with an impaired brain, the drugs enhanced the impact of his brain damage and his overall behavior declined even further. All of the signs generally associated with brain damage were present but were interpreted at that time (and at his trial) as further proof that he was unworthy and bad. He could not sleep at night, and was often irritable and angry. These are hallmark symptoms of a mood disorder. Had he been given a mood stabilizing drug rather than an antidepressant he might have had a better outcome. Mr. Long was never properly evaluated and diagnosed and the medication interventions he received may have been ineffective. An attempt was made to evaluate him on a psychiatric unit in prison but this consisted of a mental status exam and an invalid PAI.

19. Had Mr. Long been evaluated prior to his capital murder trail by a psychiatric professional who had been provided with the full information above, the testimony and the outcome may have been very different. I believe any reasonably competent mental health professional would have evaluated Steven for both an attachment disorder and Post Traumatic Stress Disorder. The jury needed to know he had never received treatment. He had simply been labeled and moved through the system. His labels, given to him from the stand by the expert speaking for him at mitigation were: drug addict, depressed, somewhat psychotic, attention deficit disorder, schizophrenic, and antisocial personality disorder.

20. Research from the National Center for PTSD indicates that the primary symptoms of PTSD are an impairment in a person's ability to function in social situations, occupation instability, sleep irregularities, feelings of detachment, and estrangement from others. The traumatic event most often associated with PTSD for men is rape, childhood neglect, and childhood physical abuse. The most vulnerable of men are those that also have a genetically caused deficit, lack of social support and concurrent stressful life events. Psychophysiological alterations associated with PTSD include hyperarousal of the sympathetic nervous system,

9

increased sensitivity of the startle reflex and sleep abnormalities. Of particular note, 88% of men with PTSD will meet the criteria for another psychiatric disorder. 51.9% will experience episodes of major depression and 43% will be drug dependent. Most men with PTSD have profound and pervasive problems in their daily lives. With a history of sexual abuse, followed by documented rape when Steven entered prison, it is hard to imagine how this issue was not evaluated as a central cause of Steven's bad acts. It is much more plausible then to agree with the District Attorney that Steven was manipulating, deceiving and twisting things for his own purpose, and being desensitized to aggression. Reason dictates that this level of cognitive control requires a much higher level of functioning than could be produced by a man who consistently scores in the mentally retarded range.

21. A predominant feature of brain injury is the lack of inhibition. Individuals who have experienced brain damage quite commonly lose the ability to inhibit emotional outbursts and regulate behavior. A brain damaged individual may have significant cognitive impairment and appear to be relatively normal on casual observation. At the same time the individual may begin to exhibit overt compulsive actions that result in inappropriate behaviors. These behaviors can be classified as a wide variety of socially maladaptive behaviors undertaken when stressed to avoid thoughts, feelings, or conversations about traumatic and traumatizing events. Had consideration been given to the diagnosis of head injury, it might have been an alternate explanation for Mr. Long's compulsive public masturbation. Even as a possibility it would have been more appropriate for the jury than to define his masturbating as one more instance of Antisocial Personality Disorder.

22. The records I have reviewed established that Mr. Long had often displayed symptoms strongly suggestive of organic brain damage, mental retardation, and PTSD for many years and trial counsel should have known that it was imperative for the Neuropsychologist to be allowed to testify about the results of her evaluation. If she had concerns as to the validity of the results of her assessment, serial testing would have had a high probability of alleviating these concerns. In point of fact, serial testing

10

undertaken during the current evaluation has established significant consistency across measures of potential and patterns of brain integrity. At best, serial testing would have ascertained whether Mr. Long had or had not malingered his battery of instruments. At worst, it would have identified which instruments were malingered and which instruments presented a valid representation of Mr. Long's abilities. Just because he may have malingered a simplistic memory test does not also mean he is not mentally retarded or brain damaged. Of particular concern is the "all or nothing at all" thinking. Masturbating is a symptom of an impaired brain and is not a symptom often seen in Antisocial Personality Disorder. This was a clinically unsound opinion. Masturbation is linked with impulsivity and reduction in the ability to inhibit behavioral impulses. Had his masturbation been compared with his performance on his test data, it might have been seen as an example of his impairment rather than a source of revulsion.

23. On three of the seven measures used to obtain an impairment index, Mr. Long clearly scored in the impaired, or moderate range. When his performance, across measures, was compared he presented with a clear pattern of organic brain impairment. He exhibits, across most instruments, an inability to control or inhibit impulsive responses along with disturbances of muscular control which are highly suggestive of deficits in the central nervous system, called constructional dyspraxia. He exhibited verbal attention deficits, impulsivity, organizational deficits and the partial loss of ability to perform coordinated acts. The results tended to indicate frontal and temporal lobe dysfunction that is exhibited in poor planning and organizational skills which have a significant impact on a person's ability to benefit from feedback and alter behavior.

24. Mental Retardation requires three criteria.

(1) Significantly sub average intellectual functioning: An IQ of approximately 70 or below on an individually administered IQ test. This criteria has been met twice. Both Dr. Lacritz and current testing found scores in the mentally retarded range on measures of potential.

11

(2) Concurrent deficits or impairments in present adaptive living: Steven has never been able to live independently, never been able to manage his finances, or support his family. He worked one year with his mother in a strictly supervised setting where he was taken back and forth to work by his mother, and was eventually fired for poor job performance. Both of his ex wives noted that Mr. Long was a "high maintenance" man, unable to contribute to the household or participate in day to day chores.

(3) The onset is before the age of 18: Steven has failed first grade twice, repeated fourth and fifth and was in Special Education for most of his time in school. Records from Windham School District noted that Steven was functioning at a very low level.

25. Comparing across the records reviewed, Steven exhibited a clear pattern of distractibility, and impulsive behavior. He made at least two suicidal gestures before the age of 17. He had been diagnosed with Attention Deficit Disorder, Major Depression and Schizophrenia and had been referred for mental health problems outside and inside the prison system. Comparing across all records, Steven exhibited a state of cognitive disarray indicating his lack of organizational skills were not purposeful or neglectful on his part. His efforts at symptom enhancement were an attempt to get mental health professionals and prison personnel to take his concerns seriously. He presented with a clear pattern of poor problem solving, immaturity, depression and a poor regulation of thoughts, feelings, and abilities. He consistently displayed distractibility and impulsive behavior, to the extent that he endangered his own and other's physical safety. Due to his poor level of processing, lack of brain integrity and mood disturbance, he has a reduced ability to perceive the consequences of his actions and a neurological difference was seen as oppositional behavior. Although this information was available at the time of his trial, this information was not presented to the jury.

26. Post Traumatic Stress Disorder is a medical problem that is not

the result of lack of will power. It is a biological and chemical malfunction. The effects of Steven's mental problems were no doubt aggravated by the chaotic, traumatic home environment in which he spent his formative years. Mentally retarded children require intensive limit setting and a stable environment. Since his mother was also mentally retarded, she could not provide the structure he needed. She had found a structured, clearly defined job and could function well in that setting but could not reach beyond her own needs to meet Steven's needs. This was most clearly exhibited when she gave him a 12 pack of beer for his 13th birthday. It appears extremely unlikely that any adult in Steven's home could provide the structure and stability so much needed at that time. This problem was particularly exacerbated by his Mother's mental disorder. Due to her own traumatic childhood of sexual abuse, abandonment, and mental illness, she did not have the skills needed. Steven was taught that his mere existence was a problem. Mindy, Steven's wife, stated that Judy would say things like "I wish you had never been born" or "go lie in the street and get run over."

27. Due to his distractibility Steven was often diagnosed with Attention Deficit Disorder. He was placed in Special Education classes but moved so often an individual education plan was not implemented. Steven noted that he spent much of his time in behavioral type facilities rather than a resource room that focused on his learning disabilities. Therefore, due to his chaotic life style he received a diagnosis but very little treatment. His education effectively stopped at the fourth grade. He was raised by an older sister until the age of 12 and then spent his time on the streets, in a gang, and using drugs. There was no role model available to him beyond gang members. He was mentally limited, emotionally disturbed, traumatized, and had brain damage that was significantly enhanced by alcohol. He did not choose to be mentally retarded. He did not choose an abusive family or choose to be raised in a family where drug use was the normal state of affairs. He certainly did not choose to be raped in prison. Clearly, the neuropsychological evaluation indicates that Steven is incapable of assessing and responding to a rapidly changing situation. His poor ability to think and plan makes him particularly unsuited to control events as they occur.

28. A review of the trial transcript indicates that the mitigation factors

13

presented to the jury at the mitigation stage of the trial on behalf of Mr. Long were as follows:

* Steven was subjected to emotional and physical abuse as a child, and was deprived of parental guidance and protection.

* He has "less horsepower" available to him to control his impulses and that is why he masturbates in public. However, there is no brain injury or brain problem.

* Every member of Steven's family had been touched by sexual abuse, either by a history of sexual abuse, sexual acting out, or just general criminality. There was a pervasive chronic history of familial substance and sexual abuse.

* "This would be a significant factor in what they do and and how they interact with the world."

* His mother was unable to bond with her child and, as a result, Mr. Long was unable to bond and empathize with others. He is desensitized to aggression. He is exhibiting a disorder often called Antisocial Personality Disorder.

* The expert witness noted that Mr. Long had an attachment disorder because he had not developed a social conscience. "He does well in a contained environment where rules and regulations are enforced by authority figures."

It is my opinion that the foregoing list of mitigating factors do not accurately capture the neuropsychological impairments and the impact that mental retardation has had on Mr. Long's behavior.

29. Additionally, the jury did not have available for further review and consideration the fact that the rapes in prison most probably changed his diagnosis to Post Traumatic Stress Disorder. With limited intellectual potential and a serious mental disorder, along with the impact of alcohol on an impaired brain, he was not able to control or inhibit impulsive acting out behaviors.

14

30. Without being able to exam the impact of the data available to the defense, the jury would not be able to make a fair and balanced assessment of his personal moral culpability.

I, Daneen Milam, declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of April, 2008.

_____   4-30-08
Daneen A. Milam, Ph.D., ABPN       Date

Further affiant sayeth not.