PETITIONER'S
EXHIBIT
7

3:12cv839

## GUIDELINE 10.7 – INVESTIGATION

A.   Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

    1.   The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

    2.   The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

B.   1.   Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.

    2.   Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.

*History of Guideline*

    This Guideline is based on portions of Guideline 11.4.1 of the original edition. Changes in this Guideline clarify that counsel should conduct thorough and independent investigations relating to both guilt and penalty issues regardless of overwhelming evidence of guilt, client statements concerning the facts of the alleged crime, or client statements that counsel should refrain from collecting or presenting evidence bearing upon guilt or penalty.

    Subsection B (1) is new and describes the obligation of counsel at every stage to examine the defense provided to the client at all prior phases of the case. Subsection B (2) is also new and describes counsel's ongoing obligation to ensure that the official record of proceedings is complete.

*Related Standards*

    ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-4.1 ("Duty to Investigate"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

    NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 4.1 (1997) ("Investigation").

*Commentary*

At every stage of the proceedings, counsel has a duty to investigate the case thoroughly.[193] This duty is intensified (as are many duties) by the unique nature of the death penalty, has been emphasized by recent statutory changes,[194] and is broadened by the bifurcation of capital trials.[195] This Guideline outlines the scope of the investigation required in a capital case, but is not intended to be exhaustive.

<u>Guilt/Innocence</u>

As noted *supra* in the text accompanying notes 47-49, between 1973 and 2002 some 100 people were freed from death row in the United States on the grounds of innocence.[196] Unfortunately, inadequate investigation by defense attorneys -- as well as faulty eyewitness identification, coerced confessions, prosecutorial misconduct, false jailhouse informant testimony,[197] flawed or false forensic evidence,[198] and the special vulnerability of juvenile suspects – have contributed to wrongful

---

[193]     *See* ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-4.1, 4-6.1, *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993); NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 4.1 (1997) ("Investigation").

[194]     *See* 28 U.S.C. § 2254(e)(2), which, as amended by the AEDPA, precludes certain claims from federal habeas corpus review if the petitioner "has failed to develop the factual basis" of them "in State court proceedings." *See also* Williams v. Taylor, 529 U.S. 420 (2000) (construing this section).

[195]     *See generally* Lyon, *supra* note 2; Vick, *supra* note 3.   Numerous courts have found counsel to be ineffective when they have failed to conduct an adequate investigation for sentencing.  *See, e.g.* Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of defendant's "nightmarish childhood," borderline mental retardation, and good conduct in prison); Brownlee v. Haley, 306 F.3d 1043, 1070 (11th Circuit 2002) (counsel ineffective for failing to "investigate, obtain, or present *any* mitigating evidence to the jury, let alone the powerful mitigating evidence of Brownlee's borderline mental retardation, psychiatric disorders, and history of drug and alcohol abuse"); *infra* note 203.

[196]     *See* DEATH PENALTY INFORMATION CENTER: *Innocence and the Death Penalty, available at* http://www.deathpenaltyinfor.org/innoc.html (last visited November 5, 2002) (stating that there are 102 people that have been wrongly convicted of capital crimes).

[197]     *See generally* Dodd v. State, 993 P.2d 778 (Okla. Crim. App. 2000) (canvassing special unreliability of such testimony and restricting its use); *supra* note 48.

[198]     Recent years have seen a series of scandals involving the prosecution's use, knowingly or unknowingly, of scientifically unsupportable or simply fabricated forensic evidence by governmental agents. *See, e.g.*, U.S. DEPT. JUSTICE, OFF. INSP. GEN., *The FBI Laboratory: An Investigation into*

convictions in both capital and noncapital cases.[199]  In capital cases, the mental vulnerabilities of a large portion of the client population compound the possibilities for error.[200]  This underscores the importance of defense counsel's duty to take seriously the possibility of the client's innocence,[201] to scrutinize carefully the quality of the state's case, and to investigate and re-investigate all possible defenses.[202]

In this regard, the elements of an appropriate investigation include the following:

1.  <u>Charging Documents</u>:

Copies of all charging documents in the case should be obtained and examined in the context of the applicable law to identify:

a.  the elements of the charged offense(s), including the element(s) alleged to make the death penalty applicable;

---

*Laboratory Practices and Alleged Misconduct in Explosives Related and Other Cases* (1997) (Eighteen-months investigation into charges by whistleblower Frederic Whitehurst that FBI Laboratory mishandled "some of the most significant prosecutions in the recent history of the Department of Justice" finds "significant instances of testimonial errors, substandard analytical work, and deficient practices"); Paul C. Gianelli, *The Abuse of Scientific Evidence in Criminal Cases: The Need for Independent Crime Laboratories,* 4 Va. J. Soc. Pol'y & L. 439, 442-69 (1997) (summarizing numerous cases); *supra* note 49.

[199]  *See* Barry Scheck et al., Actual Innocence: When Justice Goes Wrong and How to Make It Right (Signet 2001 ed.).

[200]  *See generally* Atkins v. Virginia, 122 S. Ct. 2242, 2251-52 (2002) ("Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes."); *see also* Jurek v. Estelle, 623 F.2d 929 (5th Cir. 1980) (same), *cert. denied,* 450 U.S. 1001 (1981).

[201]  As this Guideline emphasizes, that is so even where circumstances appear overwhelmingly indicative of guilt.  A recent study that includes both capital and non-capital DNA exonerations has found that in 23 percent of the cases the client had confessed notwithstanding his innocence.  *See* Scheck et al., *supra* note 199, at 92.  *See also* Dan Morain, *Blind Justice; John Cherry's Killing Left Many Victims; Was the Accused One of Them?* L.A. Times, July 16, 1989, View, at 6 (noting that Jerry Bigelow confessed many times, including to the newspapers and television stations and was eventually found to be innocent).

[202]  *See* Steven M. Pincus, *"It's Good to be Free": An Essay About the Exoneration of Albert Burrell,* 28 Wm. Mitchell L. Rev. 27, 33 (2001).

b. the defenses, ordinary and affirmative, that may be available to the substantive charge and to the applicability of the death penalty;

c. any issues, constitutional or otherwise, (such as statutes of limitations or double jeopardy) that can be raised to attack the charging documents; and

d. defense counsel's right to obtain information in the possession of the government, and the applicability and validity of any obligation that might arise to provide reciprocal discovery.

2. <u>Potential Witnesses</u>:

a. Barring exceptional circumstances, counsel should seek out and interview potential witnesses, including, but not limited to:

(1) eyewitnesses or other witnesses having purported knowledge of events surrounding the alleged offense itself;

(2) potential alibi witness

(3) witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), the degree of culpability for the offense, including:

(a) members of the client's immediate and extended family
(b) neighbors, friends and acquaintances who knew the client or his family
(c) former teachers, clergy, employers, co-workers, social service providers, and doctors
(d) correctional, probation or parole officers

(4) members of the victim's family.

b. Counsel should conduct interviews of potential witnesses in the presence of a third person so that there is someone to call as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews. Counsel should investigate all sources of possible impeachment of defense and prosecution witnesses.

3. <u>The Police and Prosecution</u>:

Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports, autopsy

80

reports, photos, video or audio tape recordings, and crime scene and crime lab reports. Where necessary, counsel should pursue such efforts through formal and informal discovery.

4.   Physical Evidence:

Counsel should make a prompt request to the police or investigative agency for any physical evidence or expert reports relevant to the offense or sentencing. With the assistance of appropriate experts, counsel should then aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence.

5.   The Scene:

Counsel should view the scene of the alleged offense as soon as possible. This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (e.g., weather, time of day, and lighting conditions).

Penalty

Counsel's duty to investigate and present mitigating evidence is now well established.[203] The duty to investigate exists regardless of the expressed desires of a client.[204] Nor may counsel "sit

---

[203]   See, e.g., Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of defendant's "nightmarish childhood," borderline mental retardation, and good conduct in prison); Caro v. Woodford, 280 F.3d 1247, 1255 (9th Cir. 2002) (counsel ineffective for failing to investigate and present evidence of client's brain damage due to prolonged pesticide exposure and repeated head injuries, and failing to present expert testimony explaining "the effects of the severe physical, emotional, and psychological abuse to which Caro was subjected as a child"), cert. denied, 122 S. Ct. 2645 (2002); Coleman v. Mitchell, 268 F.3d 417, 449-51 (6th Cir. 2001) (though counsel's duty to investigate mitigating evidence is well established, counsel failed to investigate and present evidence that defendant had been abandoned as an infant in a garbage can by his mentally ill mother, was raised in a brothel run by his grandmother where he was exposed to group sex, bestiality and pedophilia, and suffered from probable brain damage and borderline personality disorder), cert. denied, 122 S. Ct. 1639 (2002); Jermyn v. Horn, 266 F.3d 257, 307-08 (3d Cir. 2001) (counsel ineffective for failing to investigate and present evidence of defendant's abusive childhood and "psychiatric testimony explaining how Jermyn's development was thwarted by the torture and psychological abuse he suffered as a child"); supra note 195.

[204]   See Blanco v. Singletary, 943 F.2d 1477, 1501-03 (11th Cir. 1991) (counsel ineffective for "latch[ing] onto" client's assertions he did not want to call penalty phase witnesses and failing to conduct an investigation sufficient to allow their client to make an informed decision to waive mitigation), cert. denied, 525 U.S. 837 (1989); see also Karis v. Calderon, 283 F.3d 1117, 1136-41 (9th Cir. 2002), petition for cert. filed (U.S. Sept. 13, 2002) (No. 02-434).

81

idly by, thinking that investigation would be futile."[205] Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.[206]

Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant,"[207] "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."[208] In the case of the client, this begins with the moment of conception.[209] Counsel needs to explore:

---

[205]   Voyles v. Watkins, 489 F. Supp. 901, 910 (N.D. Miss. 1980); *accord* Austin v. Bell, 126 F.3d 843, 849 (6th Cir. 1997) (counsel's failure to investigate and present mitigating evidence at the penalty phase of the trial, on grounds that he "did not think that it would do any good," constituted ineffective assistance), *cert. denied*, 523 U.S. 1079 (1998).

[206]   *See, e.g.*, Silva v. Woodford, 279 F.3d 825, 838-39 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 342 (2002); Coleman v. Mitchell, 268 F.3d 417, 447 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 1639 (2002); Battenfield v. Gibson, 236 F.3d 1215, 1229 (10th Cir. 2001) ("In addition to hampering [defense counsel's] ability to make strategic decisions, [defense counsel's] failure to investigate [defendant's background] clearly affected his ability to competently advise [defendant] regarding the meaning of mitigation evidence and the availability of possible mitigation strategies."); United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."); Knighton v. Maggio, 740 F.2d 1344, 1350 (5th Cir. 1984) (petitioner entitled to relief if record shows that "counsel could not make a valid strategic choice because he had made no investigation"), *cert. denied*, 469 U.S. 924 (1984).

[207]   Brown v. State, 526 So. 2d 903, 908 (Fla. 1988) (citing Hitchcock v. Dugger, 481 U.S. 393 (1987)). *See* Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978).

[208]   Russell Stetler, *Mitigation Evidence in Death Penalty Cases,* THE CHAMPION, Jan./Feb. 1999, at 35; *see also*, ABA Criminal Justice Section, Report to the House of Delegates (Feb. 1990), *reprinted in Toward a More Just and Effective System of Review in State Death Penalty Cases Toward a More Just and Effective System of Review, supra* note 84, at 63.

[209]   Norton, *supra* note 180, at 2 (mitigation investigation must encompass client's "whole life"); EQUAL JUSTICE INITIATIVE OF ALA., ALABAMA CAPITAL DEFENSE TRIAL MANUAL ch. 12 (3d ed. 1997) [hereinafter ALABAMA CAPITAL DEFENSE TRIAL MANUAL]; Lyon, *supra* note 2, at 703 (observing that "mitigation begins with the onset of the [defendant's] life" because "[m]any [defendants'] problems start with things like fetal alcohol syndrome, head trauma at birth, or their mother's drug addiction during pregnancy"); Vick, *supra* note 3, at 363.

(1)     Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2)     Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3)     Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4)     Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5)     Employment and training history (including skills and performance, and barriers to employability);

(6)     Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (*e.g.*, by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.[210]

Accordingly, immediately upon counsel's entry into the case appropriate member(s) of the defense team should meet with the client to:

1.      discuss the alleged offense or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;

2.      explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any

---

[210]     *See supra* text accompanying notes 11-26.

83

aggravating factors under the applicable death penalty statute and any mitigating factors; and

3.    obtain necessary releases for securing confidential records relating to any of the relevant histories.

Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. Topics like childhood sexual abuse should therefore not be broached in an initial interview. Obtaining such information typically requires overcoming considerable barriers, such as shame, denial and repression, as well as other mental or emotional impairments from which the client may suffer. As noted *supra* in the text accompanying note 101, a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others.[211] Records -- from courts, government agencies, the military, employers, etc. -- can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness,[212] and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children.[213] A multi-generational investigation frequently discloses significant patterns of family dysfunction and may

---

[211]    Goodpaster, *supra* note 2, at 321; Lyon, *supra* note 2, at 703-04; Vick, *supra* note 3, at 366-67.

[212]    *See* Williams v. Taylor, 529 U.S. 362, 395 (2000) (counsel ineffective where they "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.") (footnote omitted);  Jermyn v. Horn, 266 F.3d 257, 307 (3d Cir. 2001) (counsel ineffective for failing to obtain school records that disclosed childhood abuse); *see also* ALABAMA CAPITAL DEFENSE TRIAL MANUAL, *supra* note 209; TEXAS DEATH PENALTY MITIGATION MANUAL, *supra* note 103, ch. 3; Norton, *supra* note 180, at 32-38.

[213]    In order to verify or corroborate witness testimony about circumstances and events in the defendant's life, defense counsel must "assemble the documentary record of the defendant's life, collecting school, work, and prison records "which might serve as sources of relevant facts. Vick, *supra* note 3, at 367; *see also* Lyon, *supra* note 2, at 705-06.

help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.[214] The collection of corroborating information from multiple sources – a time- consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.[215]

Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information pertaining to the client, his or her siblings and parents, and other family members, including but not limited to:

a.  school records
b.  social service and welfare records
c.  juvenile dependency or family court records
d.  medical records
e.  military records
f.  employment records
g.  criminal and correctional records
h.  family birth, marriage, and death records
i.  alcohol and drug abuse assessment or treatment records
j.  INS records

If the client was incarcerated, institutionalized or placed outside of the home, as either a juvenile or an adult, the defense team should investigate the possible effect of the facility's conditions on the client's contemporaneous and later conduct.[216]  The investigation should also explore the adequacy of institutional responses to childhood trauma, mental illness or disability to determine whether the client's problems were ever accurately identified or properly addressed.[217]

The circumstances of a particular case will often require specialized research and expert consultation.  For example, if a client grew up in a migrant farm worker community, counsel should investigate what pesticides the client may have been exposed to and their possible effect on a child's developing brain.[218]  If a client is a relatively recent immigrant, counsel must learn about the client's

---

[214]    Norton, *supra* note 180, at 3 (counsel should "investigate at least three generations" of the client's family).

[215]    *See id.* (advocating "triangulation" of data).

[216]    *See* Terry Kupers, Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It (1999).

[217]    *See* Craig Haney, *Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death*, 49 Stan. L. Rev. 1447, 1467 (1997) (noting damaging effects of "social conditions and experiences" often inflicted on institutionalized juvenile offenders).

[218]    *See* Caro v. Woodford, 280 F.3d 1247 (9th Cir. 2002), *cert. denied*, 122 S.Ct. 2645 (2002) (described *supra* note 203).

85

culture, about the circumstances of his upbringing in his country of origin, and about the difficulties the client's immigrant community faces in this country.[219]

<u>Miscellaneous Concerns</u>

Counsel should maintain copies of media reports about the case for various purposes, including to support a motion for change of venue, if appropriate, to assist in *voir dire* of the jury regarding the effects of pretrial publicity, to monitor the public statements of potential witnesses, and to facilitate the work of counsel who might be involved in later stages of the case.

Counsel must also investigate prior convictions, adjudications, or unadjudicated offenses that could be used as aggravating circumstances or otherwise come into evidence. If a prior conviction is legally flawed, counsel should seek to have it set aside.[220] Counsel may also find extenuating circumstances that can be offered to lessen the weight of a conviction, adjudication, or unadjudicated offense.[221]

Additional investigation may be required to provide evidentiary support for other legal issues in the case, such as challenging racial discrimination in the imposition of the death penalty or in the composition of juries.[222] Whether within the criminal case or outside it, counsel has a duty to pursue appropriate remedies if the investigation reveals that such conditions exist.[223]

---

[219]   *See* Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992) (positive testimony from defendant's family, combined with expert testimony about difficulty of adolescent immigrants from Hong Kong assimilating to North America would have humanized client and could have resulted in a life sentence for defendant convicted of 13 murders).

[220]   *See* Johnson v. Mississippi, 486 U.S. 578, 586 (1988); *supra* note 6.

[221]   *See supra* text accompanying notes 19-22.

[222]   *See, e.g.,* Sara Rimer, *In Dallas, Dismissal of Black Jurors Leads to Appeal by Death Row Inmate,* N.Y. TIMES, Feb. 13, 2002, at A24 (discussing memoranda and training manuals from prosecutor's office documenting policy of racial discrimination in jury selection); Stephen B. Bright, *Challenging Racial Discrimination in Capital Cases,* THE CHAMPION, Jan./Feb. 1997, at 22.

[223]   *See supra* Guideline 10.10.2; text accompanying note 7.

As discussed *infra* in the text accompanying notes 247-59, counsel should consider making overtures to members of the victim's family – possibly through an intermediary, such as a clergy person, defense-victim liaison, or representative of an organization such as Murder Victim's Families for Reconciliation – to discern their feelings about the death penalty and/or the possibility of a plea.[224]

---

[224]    *See* Russell Stetler, *Working with the Victim's Survivors in Death Penalty Cases*, THE CHAMPION, June 1999, at 42;  *see also* Michael Janofsky, *Parents of Gay Obtain Mercy for His Killer*, N.Y. TIMES, Nov. 5, 1999, at A1 (stating that the prosecutor decided to drop the death penalty in the Matthew Shepard case because the parents of the victim requested him to do so).